**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH HUGHES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | **1:06-cv-595-SRW** |
| | ) | |
| **DALE MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Dale Medical Center (hereafter, "DMC"), Defendant in the above-styled action, and submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment.  As grounds for summary judgment, Defendant shows as follows:

### Introduction

This is a termination and retaliation case brought under the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), and various state law causes of action.  In essence, Plaintiff claims that she was terminated from her job in a rural medical clinic because she took five weeks of leave to have a benign tumor removed, after which she fully recovered.  For this, she blames the clinic's doctor, who at the time had terminal pancreatic cancer and was himself taking time off for extensive chemotherapy.

The undisputed evidence shows that Plaintiff was afforded all of the leave she requested and never had a disability, real or perceived, under the ADA.  Although plead in her Complaint, she never asserted age discrimination in her EEOC Charge.

The undisputed evidence further shows that Plaintiff's position was eliminated because the bulk of her duties were outsourced and DMC believed that Plaintiff did not want to perform the alternate duties that had been assigned to her. DMC began taking steps to outsource these duties before learning of Plaintiff's benign tumor, and Plaintiff was kept on staff until the duties were actually taken over by the outside contractor.

Plaintiff also complains about the doctor's wife, a non-employee who sometimes visited the clinic to care for her husband. DMC cannot be liable for such claims as Plaintiff admits that she never complained about any alleged misconduct and DMC was never aware of it.

## STATEMENT OF UNDISPUTED FACTS[1]

### Plaintiff's employment background

1.    Plaintiff worked at a healthcare clinic in Ariton, Alabama (hereafter referenced as "the Ariton clinic"). Complaint ¶ 12.

2.    In August 1998, DMC purchased the Ariton clinic from Plaintiff's former employer, Dr. Zumstein. Hughes 11:21 – 12:6, 103:12 – 104:8 and DX 2 thereto.

3.    At the time DMC purchased the Ariton clinic, it hired Plaintiff as an employee. Dunn 28:18 – 29:23 and PX 5 thereto.

4.    DMC issued Plaintiff a copy of its employee handbook on May 19, 2004. Hughes 104:12 – 106:7 and DX 3 - 4 thereto.

---

[1]    Defendant presents the facts in the light most favorable to Plaintiff as required for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Defendant adopts this version of the facts only for purposes of summary judgment. The cited testimony, exhibits and affidavits have been filed as exhibits in Defendant's Evidentiary Submission. Depositions are referenced herein by the deponent's name and a page: line reference (e.g. Hughes 4:1). Affidavits are referenced by the affiant's name and a paragraph reference (e.g. Dunn Aff., ¶ 1). Defendant's deposition exhibits are referenced as DX [exhibit number], and Plaintiff's deposition exhibits are referenced as PX [exhibit number].

5.     The handbook contains a policy prohibiting unlawful discrimination or harassing, taunting, demeaning, or abusive behavior by employees or visitors. DX 4 at p. D00163 - D00164.  The policy further requires employees to report any concern relating to harassment – including the conduct of non-employees -- to the company.  DX 4 at p. D00163 - D00164.  The handbook also contained DMC's policy regarding leave pursuant to the Family and Medical Leave Act.  *Id.* at p. D00193 – D00194.  Pursuant to the policy, an employee's FMLA leave runs concurrently with paid vacation and sick leave.  *Id.*; Dunn 84:4 – 84:14.

6.     All employees are trained on the policies in the handbook at their time of hire and receive refresher courses annually.  Dunn 20:1-20:17.

### Dr. Ennis begins working at the Ariton clinic

7.     Around early 2004, Dr. John Ennis became the resident physician at the Ariton clinic and became Plaintiff's direct supervisor.  Dunn Aff. ¶ 5; Hughes 24:9 – 24:14.

8.     In early 2004, Dr. Ennis took a period of leave to undergo treatment for terminal pancreatic cancer.  Hughes 36:6 – 37:13; Dunn 119:20 – 121:11; Dunn Aff. ¶ 6.  After Dr. Ennis returned to work, his wife, Pat Ennis, began spending more time in the clinic to assist him with personal issues, such as medication.  Hughes 37:14 – 40:3; Johnson 135:21 – 138:19; Dunn 173:11 – 173:19.

9.     When Dr. Ennis began having extensive chemotherapy sometime after January 2005, Mrs. Ennis was sometimes present at the clinic all day.  Hughes 38:7 – 40:3.

10.    Mrs. Ennis was not employed by DMC at any time during the period of Plaintiff's employment.  Dunn Aff. ¶ 7; Hughes 123:4 – 123:6.  Plaintiff did not complain to anyone at DMC about Mrs. Ennis' presence in the clinic.  Hughes 50:23 – 51:3.  DMC was not aware of Mrs. Ennis' presence in the clinic, other than ordinary, occasional visits to her dying husband.  Dunn 173:10 – 173:19; Dunn Aff. ¶ 7; Johnson 135:10 – 138:19.

11.    Dr. Ennis died from cancer in August 2005, after the end of Plaintiff's employment.  Dunn 123:17-123:19.

### *Outsourcing the Billing/Coding functions*

12.    Before DMC took over the Ariton clinic, Plaintiff's principal responsibility was to run the billing and coding system.  Hughes 15:9 – 15:16.  That responsibility involved entering medical charges into the computer and sending bills for those charges to patients and their insurance companies.  Hughes 17:19 – 18:2, 20:20 – 21:7.

13.    Plaintiff became Office Manager in 1998 when DMC took over the Ariton clinic.  Hughes 15:19 – 16:19.  The billing and coding function remained her principal responsibility.  Hughes 15:9 – 15:16; Dunn 26:6 – 26:8; 61:19 – 62:13; Dunn Aff. ¶ 8.

14.    At the time Plaintiff performed the billing and coding functions for the Ariton clinic, that clinic was the only rural general healthcare clinic operated by DMC which performed its own billing and coding function.  Johnson 33:10 – 34:23, 100:8 – 100:19; Dunn Aff. ¶ 9.  The billing functions for all of DMC's other rural general healthcare clinics were always performed by an outside contractor.  *Id.*

15.    Assistant Administrator Sheila Dunn verbally reprimanded Plaintiff on at least two occasions concerning excessive unauthorized overtime.  Hughes 112:9 – 112:14; Dunn 58:14 – 60:5, 68:10-72:20, 74:1-74:4.

16.    Around June 2004, Plaintiff wrote off medical charges without authorization and without informing anyone at DMC.  Hughes 31:6 – 35:2, 87:21 – 89:8; Dunn 224:11 – 230:22; Johnson 89:6 – 90:20.   Both Dr. Ennis and Sheila Dunn reprimanded her for her unauthorized conduct.  *Id.*; Dunn 67:15 – 68:9.

17.    Around July 2004, Dr. Ennis discussed with Assistant Administrator Sheila Dunn that Plaintiff's job performance needed to improve in several areas.  Dunn 110:10 – 112:7 and PX 10 thereto; Dunn Aff. ¶ 10.  On Plaintiff's July 2004 job evaluation, Dr. Ennis indicated that Plaintiff's job performance needed to improve in several areas, including billing.  Hughes 106:11 – 106:22 and DX 5 thereto.

18.    Around August 2004, Plaintiff ordered 10 times more flu vaccine for the clinic than she was instructed to order.  Hughes 27:1 – 28:23, 108:4 – 108:12 and DX 6 thereto; Dunn 162:6 - 164:16.  The vaccine cost $25,000 and was non-returnable.  *Id.* DMC considered this error to be very serious and potentially financially crippling for a small rural clinic.  Dunn Aff. ¶ 12.  Both Dr. Ennis and Sheila Dunn reprimanded Plaintiff for making this error.  Hughes 27:1 – 30:21; Dunn 67:17 – 67:23.

19.    Because of the problems with Plaintiff's job performance and because of DMC's desire to bring the billing system at the Ariton clinic into conformity with the third-party systems used at its other rural general healthcare clinics, DMC decided in August or early September 2004 to outsource the billing and coding functions for the Ariton clinic to an outside contractor.   Dunn 13:6-14:22, 142:16-143:15; Dunn Aff. ¶ 13; Johnson 87:13 – 88:3.   The same month, DMC began searching for an outside contractor to perform this function and began negotiating with outside contractors, with the goal of implementing a new system by October 1, 2004, which was the beginning of

DMC's new fiscal year.  Dunn Aff. ¶ 13.  DMC was not able to complete negotiations by October 1, 2004, but did complete the negotiations sometime in early 2005 with United ProBill.  *Id.*

### Plaintiff is Diagnosed with a Benign Tumor

20.     Beginning in 2003, Plaintiff began having problems with episodes of vertigo and falling.  Hughes 40:18 – 42:15.  These episodes became progressively more frequent until November 2004, by which time she was having such episodes about once every two weeks.  *Id.*  She also had some problems with her memory.  Hughes 42:16 – 44:1.

21.     These problems did not impact her job nor interfere with her daily activities until mid-November 2004, when she told Dr. Ennis that something was wrong with her and that she needed to step down as office manager.  Hughes 24:15 – 25:11, 42:16 – 44:1.  DMC did not know that Plaintiff claimed to have any medical problem prior to this time.  Dunn Aff. ¶ 14.

22.     In mid-November 2004, Plaintiff was diagnosed with a benign brain tumor. Hughes 40:13 – 40:17, 55:7 – 55:20.  She informed Dr. Ennis that she needed surgery to remove the benign tumor, which was scheduled for January 3, 2005, and also informed him of the anticipated recovery period.  Complaint ¶15; Hughes 52:22 – 55:6. At that time, DMC understood and expected that Plaintiff would return to work after her recovery from the surgery.  Hughes 113:11 – 113:14; Dunn Aff. ¶ 15.

23.     Plaintiff took paid leave to have and recover from the surgery from January 3, 2005, through February 3, 2005.  Dunn 74:9-78:18 and PX 11 thereto at p. D00012 – D00015.

24.     On February 7, 2005, Plaintiff's doctor released her to return to work half days.  Hughes 108:22 – 109:11, 110:1 – 110:6 and DX 7 thereto.

25.     The first week of her return, Plaintiff resumed the office manager duties. Hughes 59:10 - 62:16.

26.     Plaintiff worked half days from February 7, 2005, through February 18, 2005.  Dunn 78:18 – 80:22 and PX 11 thereto at p. D00015 – D00016.

27.     On February 21, 2005, Plaintiff's doctor released her to return to work full time, with no restrictions.  Hughes 109:15 – 110:12 and DX 8 thereto.  Plaintiff did return to work full-time that day.   Dunn 78:18 – 80:22 and PX 11 thereto at p. D00015 – D00016.

28.     Plaintiff made a full recovery from the benign tumor.  Hughes 66:11 – 67:8.  Following her surgery, she no longer had problems with her memory, vertigo, or falling.  *Id.*  Upon her return to work, she was able to perform her job.  Hughes 74:22 – 75:1.

29.     DMC understood that Plaintiff had made a full recovery.  Dunn 141:22-142:9; Johnson 147:13 – 149:1.

**Plaintiff Takes Additional Sick Leave**

30.     On the morning of April 11, 2005, Plaintiff suffered a panic attack on her way to work.   Hughes 75:5 – 77:21, 110:21 – 111:3.   Plaintiff had not previously suffered from panic attacks.  Hughes 75:5 – 76:15.

31.     Plaintiff called the doctor's office.  Hughes 77:22 – 78:5.  The doctor could not see her until 1:00 pm, so the nurse told her to go home and take a pill.  *Id.* at 78:2 – 78:13.

32.    Plaintiff did not contact anyone at work to notify them of the reason for her absence until after she saw the doctor at her afternoon appointment that day.  Hughes 78:14 – 78:17.

33.    After leaving the doctor's office that afternoon, she called and left a message for Dr. Ennis but did not speak with him.  Hughes 76:21 – 77:16.  The nurse faxed a medical excuse to Sheila Dunn.  *Id.* at 76:18 – 76:20.

34.    Because of the panic attack, Plaintiff took leave from April 11, 2005, through April 15, 2005.  Hughes 75:5 – 76:15; Dunn 102:5 – 102:22 and PX 11 thereto at p. D00019 – D00020.  Plaintiff did not attempt to communicate with anyone from DMC during that week.  Hughes 78:18 – 79:7.

35.    Plaintiff was granted all the leave she requested, both for the tumor and the panic attack.  Hughes 73:17 – 74:21, 121:22 – 123:3.  She was on leave for less than 12 weeks.  Dunn 90:4 – 90:11.

36.    Plaintiff was paid for all of her time off in accordance with DMC policy.  Hughes 75:2 – 75:4; Dunn 90:4 – 90:11, 102:1 – 102:13.

**DMC eliminated Plaintiff's position**

37.    United ProBill took over the billing functions in April 2005 after Plaintiff returned from sick leave.  Hughes 79:23 – 80:12, 81:6 – 81:8, 111:23 – 112:4.

38.    Previously, sometime shortly after Plaintiff returned from surgery, Dr. Ennis had asked Plaintiff to work on collecting overdue patient accounts.  Hughes 81:21 – 82:13; Dunn Aff. ¶ 17.  This conversation occurred well prior to Plaintiff's leave in April 2005.  Hughes 82:18 - 84:17.  Dr. Ennis and Ariton employee Lisa Brookes, who

witnessed the conversation, informed Sheila Dunn of this conversation.  Dunn Aff. ¶ 17; Hughes 82:7 – 82:12.

39.    Dr. Ennis and Lisa Brookes further informed Sheila Dunn that Plaintiff stated she could not collect the old accounts because those people were Plaintiff's friends.  Dunn Aff. ¶ 17.

40.    By April 2005, Plaintiff had taken no steps to collect these accounts other than ordering envelopes.  Hughes 82:18 - 84:17.

41.    Because the billing and coding functions – the bulk of Plaintiff's job – were taken over by United ProBill after Plaintiff returned from her second period of sick leave in April 2005, because Plaintiff failed to perform the alternate duties which had been assigned to her, and because Dr. Ennis and Sheila Dunn understood that Plaintiff did not intend to perform those duties, on April 20, 2005, Dr. Ennis recommended the elimination of Plaintiff's position.  Dunn 113:16 – 114:4; Dunn Aff. ¶ 18; Johnson 60:11 – 61:4.  Sheila Dunn approved this recommendation for the same reasons, based both on the information she learned from Dr. Ennis and on the information she learned independently from Lisa Brookes.  Dunn Aff. ¶ 18.  Vernon Johnson, the hospital CEO, subsequently approved the decision as well.   Johnson 53:4 – 53:15, 55:22 – 56:4, 143:19 – 144:4.

42.    On April 20, 2005, Sheila Dunn met with Plaintiff and informed her that her position had been eliminated.  Hughes 92:5 – 95:10, 152:11 – 152:15.

43.    Sheila Dunn determined at that time that Plaintiff was ineligible for re-hire, because of the performance problems that Plaintiff had in the year prior to her termination.  Dunn Aff. ¶ 21; Dunn 158:17 – 160:13 and PX 18 thereto.

44.    At the time of her termination, Plaintiff was paid for the hours of vacation and sick time that she had accrued and was also paid two weeks' severance pay. Hughes 97:18 – 97:20; Dunn 105:14-105:23 and PX 12 thereto at p. D00142.

45.    There were no open positions for which Plaintiff was qualified at that time. *Id.*; Dunn Aff. ¶ 22.

46.    Plaintiff appealed her termination to CEO Vernon Johnson, who denied the appeal.  Hughes 98:8 – 101:11; Johnson 6:14 – 6:21.  At that time, Plaintiff reported for the first time that Mrs. Ennis had used the F word and complained of having to "walk on egg shells" around Dr. Ennis.  *Id.*; Hughes 99:4 – 102:16; Johnson 132:15 – 134:14, 141:22 – 142:4.

47.    Following her termination, Plaintiff's job duties other than the billing and coding were absorbed by existing employees at the clinic, except that beginning in or about May 2005, Pat Ennis was brought in on an as-needed basis to help file and clean up.  Dunn 21:12 – 22:11, 25:19 – 26:5, 42:9 – 43:11, 148:16 – 150:12.

48.    No one was ever hired to fill the office manager position nor any similar position at the Ariton clinic.  Dunn Aff. ¶ 23.

49.    Although Plaintiff subsequently applied for re-hire, she was not considered for these jobs because she had been determined ineligible.  Dunn Aff. ¶ 24.

50.    After Dr. Ennis' death, DMC sold the Ariton clinic.  Johnson 39:23 – 40:23.

***Plaintiff's claims of harassment***

51.    At the time Dr. Ennis learned that Plaintiff ordered ten times too much flu vaccine, he allegedly told Plaintiff she was worthless and stupid, but Plaintiff did not report this comment to anyone.  Hughes 27:1 – 30:17.

52.     Plaintiff claims Dr. Ennis also told her she was incompetent and worthless when he learned that she wrote off accounts without authorization, but Plaintiff did not report this comment to anyone.  Hughes 31:6 – 35:6.

53.     Beginning about the time Dr. Ennis was getting sicker and Mrs. Ennis began spending more time in the clinic, Plaintiff claims that Pat Ennis would stand in her office and tell her what to do.  Hughes 44:13 – 45:5, 50:14 – 50:19.  Mrs. Ennis allegedly talked about "stupid things," like asking Plaintiff about her sex life and telling sexual jokes.  46:19 - 48:22, 51:4 – 51:23.  On one occasion, Mrs. Ennis allegedly referred to Plaintiff and another woman in the office as "fucking morons."  Hughes 45:6 – 46:18.  Plaintiff did not complain to anyone at DMC about this conduct.  48:22 – 50:3, 49:1 – 49:8, 50:4 – 50:13, 52:1 – 52:6.

54.     After Plaintiff returned to work following her surgery, Dr. Ennis allegedly asked Plaintiff, "When's your hair gonna grow back?  It's just sticking up there."  Hughes 62:20 – 63:7.  Plaintiff did not report that comment to anyone at DMC.  *Id.* at 64:18 – 64:20.

55.     Plaintiff further complains that Dr. Ennis instructed her to put the money [data] into the computer as fast as she could.  *Id.* at 65:20 – 66:1.  Plaintiff did not report that comment to anyone at DMC.  *Id.* at 67:9 – 67:19.

56.     Plaintiff claims that after her brain surgery, Pat Ennis stated that Pat and Sheila Dunn figured out why they didn't like Plaintiff – her hair and her baggy pants.  Hughes 157:20 – 159:1.  Plaintiff admits that Sheila Dunn never made that comment to her.  *Id.* at 161:23 – 162:7.  Plaintiff never reported that comment to anyone at DMC.  *Id.* at 162:14 – 162:17.

57.    After Plaintiff's surgery, she claims that Mrs. Ennis struck her on the head and said, "Oh, I thought it'd be well by now."  Hughes 67:23 – 70:21.  Plaintiff did not report this incident to anyone at DMC.  *Id.* at 70:20 – 70:22.  Plaintiff had never seen nor heard of Mrs. Ennis hitting anyone previously.  *Id.* at 71:6 – 71:8.

58.    Plaintiff is not aware of anyone ever complaining to DMC about Dr. Ennis or Mrs. Ennis.  Hughes 71:12 – 71:21; Dunn 43:12 – 43:23.

### Plaintiff's EEOC charge

59.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 17, 2005.  Hughes 120:7 – 120:19 and DX 10 thereto.

### Plaintiff's alleged disability

60.    Plaintiff claims that she was disabled solely because of her benign tumor. Hughes 85:11 – 85:17.  She has no other disability.  Hughes 85:18 - 85:20.

61.    Plaintiff never needed any workplace accommodation for her benign tumor, other than leave for her surgery.  Hughes 114:1 – 114:15.

62.    No one ever said or did anything to indicate they thought Plaintiff's benign tumor was interfering with her normal daily activities or preventing her from doing her job.  Hughes 89:13-89:23.  Plaintiff never told any of her supervisors that she believed any problems with her performance were related to her benign tumor, and none of them attributed it to such.  Hughes 116:6 – 116 12; Dunn 256:4 – 256:8.

63.    Sheila Dunn never made any negative comments to Plaintiff concerning her surgery or the fact that she took leave.  Hughes 73:11 – 73:16.

64.    Plaintiff never complained to anyone at DMC that she was being discriminated against due to her brain tumor nor because of her age.  Hughes 85:6 – 85:20, 87:11 – 87:16.

65.    Both Dr. Ennis and Sheila Dunn are older than Plaintiff.  Dunn Aff. ¶¶ 2, 5; Hughes 128:14 – 128:16.

66.    During her employment with DMC, no one said or did anything to indicate that Plaintiff was discriminated against because of her age.  Hughes 87:17 – 87:20, 116:13 – 117:22.

67.    Plaintiff concedes DMC's actions were motivated by her performance problems.  Hughes 117:23 – 120:3.

## ARGUMENT

### 1.    Plaintiff Cannot Establish a Prima Facie Case of Age Discrimination.

In Count One of the Complaint, Plaintiff claims that DMC discriminated on the basis of age in terminating her employment.   As Plaintiff never asserted age discrimination in her EEOC Charge, her claim is barred for failure to meet administrative prerequisites.  In any event, Plaintiff cannot establish the elements of a prima facie case of age discrimination using either a reduction-in-force analysis or otherwise.

### a.    Plaintiff Failed to Meet Statutory Prerequisites.

Before suit may be brought under the ADEA, an employee must file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory or harassing conduct.  *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1220 (11th Cir. 2001).  A plaintiff's judicial complaint is limited by the scope of the EEOC investigation to what "can reasonably be expected to grow out of the charge of discrimination."  *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (per curiam).

The narrative section of Plaintiff's Charge does not allege any of the basic elements of an age discrimination claim.  Specifically, it does not even allege:

(1)     Plaintiff's age or date of birth,

(2)     That Plaintiff was discriminated against on the basis of age,

(3)     Any suggestion that younger people were treated better than Plaintiff,

(4)     Any claim that Plaintiff was replaced by a younger person, or

(5)     Any reference whatsoever to the Age Discrimination in Employment Act.

(Hughes 120:7 – 120:19 and DX 10 thereto.)   Instead, the narrative description of Plaintiff's claim solely discussed her medical condition and leave taken pursuant to the FMLA.   Since Plaintiff never asserted a claim of age discrimination, such claim is untimely and due to be dismissed.

Although Plaintiff checked the box for age discrimination in her Charge, numerous courts have found that the act of checking a box on the EEOC Charge of Discrimination form, without providing any supporting allegations, fails to satisfy the claimant's duty to exhaust administrative prerequisites.   "As far as the checking of the box relating to [a certain type of] discrimination, this is not sufficient to constitute an actual claim of discrimination on th[at] basis."  *Bailey v. Frederick Goldman, Inc.*, 2003 WL 22227958 at *2 (S.D.N.Y.).   *See also McKinney v. Eastman Kodak Co.*, 975 F. Supp. 462, 465-66 (W.D.N.Y. 1997) (where plaintiff checked the boxes for sex discrimination, age discrimination and retaliation, but where her statement of facts said nothing about sex discrimination, the plaintiff was precluded from bringing a lawsuit claiming sex discrimination); *McCutchen v. Sunoco, Inc.*, 2002 WL 1896586 at *3 (E.D. Pa.) (holding "where the EEOC charge is bereft of any allusion to allegations of racial

discrimination, merely checking off the box of 'race' on the EEOC charge is insufficient to exhaust it as a claim"); *Mohan v. American Tel. and Tel. Co.*, 1999 WL 495113 at *10-11 (N.D. Ill.) (holding the administrative exhaustion requirements for a race discrimination suit were not met by the mere presence of a checkmark on the plaintiff's EEOC charge).

As a matter of policy, allowing a complainant to preserve every possible claim of discrimination merely by checking every box on the EEOC charge would further obfuscate the EEOC's investigative duties, obliterating the "reasonably related" rule. *McKinney*, 975 F. Supp. 462, 466. Charging parties (or at least those with diligent counsel) would began routinely checking every box on the form, replacing the meaningful foundation for investigation, mediation, and conciliation with boilerplate, vague, and all-inclusive allegations. *Id.*

Accordingly, Plaintiff's claim of age discrimination should be dismissed for failure to satisfy administrative requisites.

**b.      Plaintiff Cannot Establish A Prima Facie Case Using Reduction-In-Force Analysis.**

A variant of the *McDonnell Douglas* test, adopted by the Eleventh Circuit in reduction-in-force ("RIF") cases, applies to Plaintiff's claim. In a RIF case under the ADEA where the plaintiff has presented no direct evidence of discrimination, the plaintiff may only establish a prima facie case by demonstrating "(1) that she was in a protected age group and was adversely affected by an employment decision, (2) that she was qualified for her current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision." *Jameson v.*

*Arrow Co.*, 75 F.3d 1528, 1531-1532 (11th Cir. 1996); *see also Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990). Plaintiff cannot establish the third element of her claim, because age was not a factor in terminating Plaintiff's employment.

> To satisfy the third element of a prima facie case, Plaintiff must present:

>> some evidence that an employer has not treated age neutrally, but has instead discriminated based upon it. Specifically, the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a Plaintiff because of her age, or (2) that defendant regarded age as a negative factor in such consideration.

*Williams v. General Motors Corp.*, 656 F.2d 120, 129-30 (5th Cir. Unit B 1981); *see also Daniels v. Westinghouse Elec. Corp.*, 772 F. Supp. 1278, 1282 (N.D. Ga. 1990) (holding that mere age difference is insufficient to satisfy third requirement of an ADEA prima facie case).

Plaintiff cannot present any such evidence, because Plaintiff's age was not a factor in her discharge and Plaintiff concedes there is no evidence of age discrimination. (Dunn Aff. ¶19; Hughes 87:17 – 87:20, 116:13 – 120:3.) Rather, Plaintiff's position was eliminated as part of a reduction in force ("RIF") resulting from DMC's decision to outsource the billing and coding functions and because of Plaintiff's failure to perform other duties as assigned. (Dunn 113:16 – 114:4; Dunn Aff. ¶ 18; Johnson 60:11 – 61:4.) Moreover, Dr. Ennis and Sheila Dunn had no reason to regard age as a negative factor, as both are older than Plaintiff. (Dunn Aff. ¶¶ 2, 5; Hughes 128:14 – 128:16.) *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (holding decision-makers are unlikely to discriminate against employees in the same protected class).

### c.   Plaintiff Cannot Establish a Prima Facie Case of Discriminatory Discharge Under Non-RIF Principles

Had there been no job elimination, Plaintiff would be required to establish the ordinary *McDonnell Douglas* elements of a prima facie case.  Plaintiff would not be any more successful using this analysis than under the RIF analysis. In a non-RIF case, the ADEA requires that Plaintiff first prove that she was: (1) a person over the age of forty; (2) that she was subject to an adverse employment action; (3) that a substantially younger person filled the position from which she was discharged; and (4) that she was qualified to do the job.  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310 (1996); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998). Plaintiff cannot demonstrate the third element.

Plaintiff cannot establish that she was replaced by or otherwise lost a position to a younger individual, as no one ever replaced her.  *Chapman v. AI Transport,* 229 F.3d 1012, 1024-1025 (11th Cir. 2000).  A plaintiff may not satisfy this prong by showing only that she was terminated and a younger person was hired to do her job.  *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1315-1316 (11th Cir. 1998).  Rather, she is required to demonstrate that the new replacement had similar skills and was hired to perform the same tasks.  *Id.*  Here, it is undisputed that the bulk of Plaintiff's functions were outsourced to an outside billing company, her remaining duties were absorbed by existing employees, and no one replaced her at the Ariton clinic.  (Dunn 21:12 – 22:11, 25:19 – 26:5, 42:9 – 43:11, 113:16 – 114:4,  148:16 – 150:12; Dunn Aff. ¶¶ 18, 23; Johnson 60:11 – 61:4.)

Accordingly, Plaintiff was not "replaced" by a younger worker.  *See, e.g., Brownlow v. Edgecomb Metals Co.*, 867 F.2d 960, 965 (6th Cir. 1989) (holding that

when a plaintiff's position was eliminated and his duties were divided between existing employees and a new, lesser position, the plaintiff was not replaced with a younger worker; cited with approval in *Earley* at 1083). Accordingly, DMC is entitled to summary judgment on the basis that Plaintiff was not replaced with a younger worker.

**2.    Plaintiff Cannot Establish a Prima Facie Case of Disability Discrimination.**

Count Two of Plaintiff's Complaint claims that Defendant terminated Plaintiff's employment because of her alleged disability. A prima facie case of disability discrimination is established only by demonstrating that Plaintiff: (1) has a disability; (2) is qualified, with or without reasonable accommodations; and (3) was unlawfully discriminated against because of her disability. *Rossbach v. City of Miami*, 371 F.3d 1354, 1356-57 (11th Cir. 2004) (citing 42 U.S.C. § 12112(a)); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); 42 U.S.C. § 12132. Plaintiff's claim fails because she cannot establish the first or third elements of her prima facie case.

**a.    Plaintiff's Temporary Condition Was Not A Disability.**

As a threshold matter, Plaintiff must establish that she has a disability. *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). The ADA defines "disability" to include:

> (A)    a physical or mental impairment that substantially limits one of more of the major life activities of such individual;
>
> (B)    a record of such an impairment;[2] or
>
> (C)    being regarded as having such an impairment.

42 U.S.C. § 12102(2). Plaintiff cannot establish that she is disabled under any prong of the definition.

---

[2]    Plaintiff's Complaint does not allege a disability under the "record of such an

i.    **Plaintiff Cannot Show That She Has a Physical or Mental Impairment That Substantially Limits One or More of Her Major Life Activities.**

The mere presence of an impairment is not, by itself, sufficient to constitute a "disability" under the ADA.  *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1327 (11th Cir. 1998).   Rather, a disability exists only where the impairment substantially limits one or more major life activities.  *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999).  To be substantially limiting, the impairment must prevent or severely restrict the individual's activities, and the impairment's impact must be permanent or long-term.  *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184, 198 (2002).

Here, Plaintiff's condition cannot be considered a disability, as the period of her impairment was neither permanent nor long-term.  None of her problems affected her daily activities until mid-November 2004, at the earliest.  (Hughes 24:15 – 25:11; 40:18 – 44:1.)  She had surgery on January 3, 2005, made a full recovery, and returned to work full time without any restrictions in February 2005.  (Dunn 74:9-80:22 and PX 11 thereto at p. D00012 – D00016; Hughes 109:15 – 110:12 and DX 8 thereto.)  Periods of several months when a patient is severely limited in his activities while recuperating from surgery or other medical treatment are not long enough to constitute disabilities. *See, e.g., Rector v. Sylvania*, 285 F.Supp.2d 349, 354-356 (S.D.N.Y. 2003) (no substantial limitation where plaintiff was out several months due to shoulder surgery); *Madjlessi v. Macy's West, Inc.*, 993 F. Supp. 736, 741 (N.D. Cal. 1997) (holding temporary period of incapacity due to plaintiff's undergoing chemotherapy treatment was not sufficient to constitute a disability).

impairment" prong.  (Complaint, Count Two).

### ii. Plaintiff Cannot Show That She Was "Regarded As" Having a Physical or Mental Impairment That Substantially Limits One or More of Her Major Life Activities.

The "regarded as" prong of the ADA's disability definition is intended to provide a remedy for discrimination based on misperceptions about the abilities of impaired persons. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999). These misperceptions may take the form of an employer's mistaken belief that (1) the plaintiff has a physical impairment that substantially limits one or more major life activities, or (2) that an actual, nonlimiting impairment substantially limits one or more of the plaintiff's major life activities. *Id.*

Importantly, regardless of which option Plaintiff pursues, Plaintiff must establish that Defendant regarded Plaintiff as "substantially limited" in a major life activity, i.e., an activity central to most people's daily lives. *Toyota*, 534 U.S. at 199-200; *Hilburn v. Murata Electronics N.A., Inc.*, 181 F.3d 1220, 1229-1230 (11th Cir. 1999). Mere evidence of an impairment is not sufficient to establish disability under the ADA. *See, e.g., Toyota,* 534 U.S. at 198 ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'") (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)).

Here, there is no evidence to suggest that DMC regarded Plaintiff as having an impairment that substantially limited a major life activity, as there is no evidence DMC understood the impact of her impairment would be permanent or long-term. There is no evidence DMC was aware that Plaintiff claimed to have any medical problem prior to

mid-November 2004. (Hughes 24:15 – 25:11, 40:18 – 44:1; Dunn Aff. ¶ 14.) When Plaintiff reported her diagnosis to DMC at that time, she was aware that her brain tumor was benign. (Hughes 40:13 – 40:17, 55:7 – 55:20.) She reported the anticipated recovery period. (Complaint ¶ 15; Hughes 52:22 – 55:6.) At that time, DMC understood and expected that Plaintiff would return to work after her recovery from the surgery. (Hughes 113:11 – 113:14; Dunn Aff. ¶ 15.) When she returned to work, DMC understood that Plaintiff's surgery was successful and that she was able to do the job. (Dunn Aff. ¶ 16, Dunn 141:22-142:9; Johnson 147:13 – 149:1.) Plaintiff concedes that no one ever said or did anything to indicate they thought Plaintiff's brain tumor was interfering with her normal daily activities or preventing her from doing her job. (Hughes 89:13-89:23.)

Thus, there is no showing that DMC misperceived Plaintiff's impairment as being substantially limiting on a permanent or long-term basis. Where the employer does not consider the plaintiff's condition to be long term or permanent, the plaintiff is not entitled to the protection of the ADA. *See Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1290 (10th Cir. 2000) (plaintiff employee was temporarily out of work due to migraine headaches, dizziness, and blurred vision, but there was no evidence the employer considered her condition to be permanent or long-term).

Because there is no evidence that Plaintiff was either disabled or regarded by Defendant as disabled, she cannot establish the first element of her prima facie case.

### b. Plaintiff Cannot Establish That She Was Unlawfully Discriminated Against Because Of Her Disability

The additional failure in Plaintiff's ADA prima facie case overlaps with Defendant's subsequent responsibility in Plaintiff's ADA, ADEA, and retaliation claims to

articulate a legitimate, non-discriminatory reason for her termination. *See, e.g., Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) ("Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action."). Accordingly, the facts related to both the third element of her prima facie case and the Defendant's non-discriminatory reason will be discussed in this section.

To prove the third element of her prima facie case, Plaintiff must present facts which would permit a reasonable inference of discrimination. *See Cotton v. Hospital Housekeeping Systems, Ltd.,* 2005 WL 2654354, *5 n.4 (M.D. Ala.). Since Plaintiff complains of discriminatory termination, she must present evidence sufficient to permit an inference that "[s]he was terminated *because of* [her] disability." *Id.* at *5 (emphasis in original).

However, there is no evidence that plaintiff's alleged disability bore any relation to the decision to terminate her employment. It is undisputed that the decision to outsource Plaintiff's billing and coding duties to the third party contractor was made, and the negotiations were set in motion, long before DMC even learned that Plaintiff claimed to have any medical problem. (Dunn 13:6-14:22, 142:16-143:15; Dunn Aff. ¶¶ 13, 14; Johnson 87:13 – 88:3; Hughes 24:15 – 25:11, 42:16 – 44:1.) DMC never attributed Plaintiff's performance problems to her alleged disability. (Hughes 89:13-89:23, 116:6 – 116 12; Dunn 256:4 – 256:8.) The decision to outsource the billing was made because of Plaintiff's performance problems and due to the desire to bring the system at the Ariton clinic into conformity with the systems used at DMC's other rural healthcare clinics. (Dunn 13:6-14:22, 142:16-143:15; Dunn Aff. ¶ 13; Johnson 87:13 – 88:3.) In

April 2005, DMC determined that Plaintiff's position was no longer needed because the bulk of her job duties had been outsourced to a third party contractor and because Plaintiff failed and refused to collect overdue accounts as requested by Dr. Ennis. (Dunn 113:16 – 114:4; Dunn Aff. ¶ 18; Johnson 60:11 – 61:4.)  The recommendation was made by Dr. Ennis, who himself had terminal cancer and was therefore presumptively unlikely to discriminate on the basis of actual or perceived disability. (Dunn 113:16 – 114:4, 119:20 – 121:11; Dunn Aff. ¶¶ 6, 18; Johnson 60:11 – 61:4; Hughes 36:6 – 37:13.)  *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (holding decision-makers are unlikely to discriminate against employees in the same protected class).  Thus, the decision to eliminate Plaintiff's position was purely a business decision and unrelated to Plaintiff's alleged disability, age, or leave taken.  (Dunn Aff. ¶ 19.)

3.    **Plaintiff Cannot Establish Any Denial of FMLA Leave.**

Count Three of Plaintiff's Complaint alleges that Defendant failed to give Plaintiff the 12 weeks of leave to which she was entitled under the FMLA.  This claim fails, as Plaintiff admittedly received all the leave which she requested and was on leave for less than 12 weeks.  (Hughes 73:17 – 74:21, 121:22 – 123:3; Dunn 90:4 – 90:11.)

4.    **Plaintiff Cannot Establish a Prima Facie Case of Retaliation.**

Count Four of Plaintiff's Complaint alleges that her employment was terminated in retaliation for her pursuit of her rights under the ADA, ADEA, or FMLA.  To state a prima facie case of retaliation under any of these statutes, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity

and the adverse action. *Daugherty v. Mikart, Inc.*, 205 Fed.Appx. 826, 827 (11th Cir. 2006). The same *McDonnell Douglas* burden-shifting paradigm applies. *Id*.

With regard to Plaintiff's ADA and ADEA retaliation claims, Plaintiff cannot satisfy the first prong, as she did not engage in protected activity. A plaintiff states a claim of retaliation under the ADA or ADEA only where the plaintiff is discriminated against because she engaged in conduct opposing any practice made unlawful by those statutes. *See* 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a). Here, Plaintiff concedes that she never made any complaint of discrimination until after her termination. (Hughes 85:6 – 85:20, 87:11 – 87:16.)

With regard to her FMLA claim, Plaintiff cannot satisfy the third prong of this test, as there is no causal relation between Plaintiff's leave and her subsequent termination. As discussed above, DMC has clearly articulated that Plaintiff was terminated because her position was eliminated. *(See, supra*, § 2(b).)* Thus, DMC has articulated a legitimate, non-retaliatory reason for her termination. Defendants need only articulate a legitimate reason for their decisions; they need not persuade the Court that it actually relied upon the articulated reasons. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 257-258 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

## 5.  **Plaintiff Cannot Establish Pretext**

Once Defendant has produced a legitimate non-discriminatory reason, "[t]he presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action." *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or

intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1471 (11th Cir. 1991) (quoting *Carter v. Miami*, 870 F.2d 578, 585 (11th Cir. 1989)).    Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Silvera v. Orange Cty. Sch. Bd.,* 244 F.3d 1253, 1258 (11th Cir. 2001) (internal citation omitted).

Moreover, Plaintiff must not only show that Defendant's articulated reason is false, but also that its true reason for terminating Plaintiff was discriminatory. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).  At all times, "[t]he ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited . . . conduct remains on the plaintiff." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

The reasonableness of DMC's actions are <u>not</u> a consideration.  The Eleventh Circuit has made it clear that courts

> must be careful not to allow . . . plaintiffs simply to litigate whether they are, in fact, good employees.  The factual issue to be resolved is not the wisdom or accuracy [of the employer's action].   We are not interested in whether the conclusion is a correct one, but whether it is an honest one. Like all Title VII cases where pretext is an issue, the question the factfinder must answer is whether [the employer's] proffered reasons were a coverup for a . . . discriminatory decision.

*Rojas v. State of Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (internal citations omitted) ("We are not in the business of adjudging whether employment decisions are prudent or fair.   Instead, our sole concern is whether unlawful discriminatory animus

motivates a challenged employment decision.")    In fact, an employer may fire an employee based upon a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. *Abel v. Dubberly*, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000).

In this case, Plaintiff cannot show that DMC's articulated legitimate, non-discriminatory and non-retaliatory reason for terminating her employment was pretextual.    The bulk of plaintiff's job consisted of performing the billing and coding functions.  (Hughes 15:9 – 15:16; Dunn Aff.  18; Dunn 26:6 – 26:8, 61:19 – 62:13.)  It is undisputed that DMC began planning to outsource the billing and coding functions before she ever reported having any alleged medical problem or requested any leave. (Dunn 13:6-14:22, 142:16-143:15; Dunn Aff. ¶¶ 13, 14; Johnson 87:13 – 88:3; Hughes 24:15 – 25:11, 40:18 – 44:1.)  Once the billing and coding functions were outsourced, Plaintiff admits that Dr. Ennis asked her to perform alternate duties, specifically collecting overdue bills.  (Hughes 81:21 – 84:17; Dunn Aff. ¶ 17.)  Dr. Ennis and witness Lisa Brookes reported to Sheila Dunn that Plaintiff stated she could not do that because those patients were her friends.   (Dunn Aff. ¶ 17.)   Plaintiff never took any action to collect the accounts other than to order some envelopes.  (Hughes 82:18 - 84:17.)

Although Plaintiff protests that she never unequivocally refused to collect the overdue accounts, that claim is irrelevant.   The question is whether Sheila Dunn honestly believed that Plaintiff refused to collect the accounts, at the time Ms. Dunn acted to approve the termination decision.  *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (holding a federal court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how

medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the [antidiscrimination laws do] not interfere. Rather [the Court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.") (citations omitted); *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (holding employers are entitled to rely on their good-faith beliefs in making employment decisions, and pretext is not demonstrated by showing simply that the employer was mistaken).

It is undisputed that, prior to approving the decision to terminate Plaintiff's employment, Sheila Dunn was told both by Dr. Ennis and Lisa Brookes that Plaintiff stated she would not collect the accounts because those patients were her friends. (Dunn Aff. ¶ 17.)  Plaintiff cannot overcome the fact that Sheila Dunn believed in good faith that Plaintiff did refuse to collect the accounts, and accordingly discrimination was not Dunn's motive in approving the termination decision.  *See, e.g., Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004) (holding supervisor's good-faith belief in reason for discharge precluded finding of pretext).

It should further be noted that Dr. Ennis had no motive to consider Plaintiff's age, disability, or medical leave, because before Plaintiff's claims arose, Dr. Ennis himself had been diagnosed with cancer and took a leave of absence for treatment.  He and Sheila Dunn were also over 40 years of age.  Decision-makers are presumptively unlikely to discriminate against employees of the same protected class.  *See Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1153 (N.D. Ga. 1997) (noting that an employee's burden or proving discriminatory is "extremely difficult when the decision makers are in the same protected class as the employee complaining about an adverse

employment decision"); *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (holding decision-makers are unlikely to discriminate against employees in the same protected class).

Moreover, Plaintiff herself admits that she believes DMC's actions in terminating her employment were motivated by her performance problems.  (Hughes 117:23 – 120:3.)

**6.    Plaintiff Failed to State A Claim for Intentional Infliction of Emotional Distress.**

Count Five of the Complaint claims that Defendant's employees intentionally inflicted emotional distress upon Plaintiff and that Defendant ratified such conduct.  This claim is due to be dismissed because the plaintiff has not alleged, and cannot allege, any outrageous conduct.   She has alleged only plain-vanilla claims of employment discrimination and retaliation.  Such conduct is not sufficiently egregious to state a claim for Intentional Infliction of Emotional Distress.  Further, as discussed below, there is no basis to hold Defendant liable, as it did not ratify the alleged conduct of its employees.

**a.    The Alleged Conduct Is Insufficiently Egregious To State A Claim.**

The tort of outrage is a very limited cause of action available only in the most egregious circumstances.  *Thomas v. BSE Industrial Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).   It requires proof that: (1) the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from its conduct; (2) the defendant's conduct was extreme and outrageous; and (3) the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it.  *Jackson v. Alabama Power Co.*, 630 So. 2d

439, 440 (Ala. 1993); *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).

With respect to the second element, the plaintiff must allege sufficient facts to show that the defendant's conduct is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Inmon*, 394 So. 2d at 365. There can be no recovery for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* at 364-365.

The Alabama Supreme Court has explicitly recognized that every case in which it found a jury question about an outrage claim has fallen into only three categories: 1) cases involving wrongful conduct in the context of family burials, 2) cases where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured to settle an insurance claim, and 3) cases involving egregious sexual harassment. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).

This case does not fit within any of these three categories. The plaintiff's allegations amount only to nothing more than ordinary claims of employment discrimination and retaliation. Conduct of the type alleged here cannot be characterized as "atrocious and utterly intolerable in civilized society." *Inmon*, 394 So. 2d at 365.

A claim of employment discrimination, harassment, or retaliation *vel non* is insufficient as a matter of law to state a claim of outrage. *See, e.g., Whaley v. Sony Magnetic Products, Inc. of America*, 894 F. Supp. 1517 (M.D. Ala. 1995) (claim of age discrimination in failure to promote case held insufficient, as plaintiff failed to plead

egregious facts); *Jackson v. Colonial Baking Co.*, 507 So. 2d 1310, 1312 (Ala. 1987) (no jury question presented by evidence that plaintiff's employer intentionally mistreated him, after learning of his chronic respiratory disability, by giving him dusty work and retaliating against him for his refusal to do it); *Inmon*, 394 So. 2d at 365 (no jury question presented by evidence that plaintiff was harassed, investigated without cause, humiliated, accused of improper dealings, treated uncustomarily, and terminated without justification by his employer); *Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1423 (M.D. Ala. 1996) (holding allegations of mean-spirited or mocking comments by plaintiff's managers do not state a claim for outrage).

Indeed, the plaintiff's allegations pale by comparison to innumerable cases in which the Alabama Supreme Court held that much more egregious conduct was not sufficient to support a claim of outrage, as a matter of law. *Id. See also, e.g., Surrency v. Harbison*, 489 So. 2d 1097, 1105-1106 (Ala. 1986) (holding there was not even a scintilla of evidence to support a claim of outrage where there was evidence that plaintiff's co-employee turned on a machine while plaintiff was inside it, management had offered $15,000.00 to anyone who would "take care of" plaintiff, and co-employees shoved plaintiff, cursed at him, and falsely accused him of making homosexual advances); *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986) (no jury question presented by evidence that plaintiff's employment was terminated because she had refused owner's sexual advances).

Given the more egregious and atrocious conduct held insufficient in the cases cited above, it is clear that Plaintiff's run-of-the-mill allegations of employment discrimination and retaliation are not sufficient to support a claim of outrage.

### b.     Defendant Did Not Ratify Any Allegedly Tortious Conduct.

Further, Plaintiff failed to show any basis to hold DMC liable for the alleged infliction of emotional distress. For DMC to be liable, Plaintiff must show that it (1) had actual knowledge of the tortious conduct, (2) knew or should have known that such conduct constituted a continuing tort, and (3) failed to take adequate steps to remedy the situation. *Potts v. BE &K Construction Co.*, 604 So. 2d 398, 400 (Ala. 1992). Plaintiff cannot satisfy any of these elements.

Plaintiff concedes that she never reported any of the allegedly inappropriate conduct by Dr. Ennis or Mrs. Ennis, and there is no evidence that DMC was otherwise aware of it. (Hughes 71:12 – 71:21; Dunn 43:12 – 43:23.) Thus, Plaintiff cannot establish that DMC had actual knowledge of the alleged conduct. Further, as noted above, none of the conduct alleged by Plaintiff constitutes the tort of intentional infliction of emotional distress, so DMC by definition could not have known of any continuing tort.[3]

### 7.     Plaintiff Failed to Prove a Prima Facie Case of Negligent Hiring, Training, Supervision, or Retention

Count Six of Plaintiff's Complaint claims that Defendant negligently hired, trained, supervised, or retained Dr. Ennis, Pat Ennis, Vernon Johnson, or Sheila Dunn by failing to protect Plaintiff from harassment or by failing to communicate and administer its policies on harassment.

---

[3]     Although Counts Seven and Eight allege claims of assault and battery, these claims are made solely against Pat Ennis and not against Dale Medical Center. (Complaint, ¶¶ 81, 85.)

Plaintiff's claims are due to be dismissed because Plaintiff does not allege (and cannot prove) that this Defendant owed any duty recognized under Alabama law to prevent harassment.

In order to state a negligence claim, a plaintiff must establish: (1) that the defendant owes the plaintiff a duty, (2) that the defendant breached that duty, and (3) that the breach proximately caused the plaintiff to be injured. *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala.1994). "The absence of any one of these [elements] renders a complaint bad or the evidence insufficient." *Calvert Fire Ins. Co. v. Green*, 180 So. 2d 269, 273 (Ala. 1965). The existence of a duty is a question of law to be decided by the court. *Rose v. Miller & Co.*, 432 So. 2d 1237, 1238 (Ala. 1983).

Although federal anti-discrimination law imposes a duty on employers not to harass employees because of certain protected characteristics, Alabama common law does not. In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort. *Stevenson v. Precision Standard, Inc.,* 762 So. 2d 820, 824 (Ala.1999) (citing *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala.1993)). As Alabama does not recognize a common-law tort for harassment in employment, Plaintiff cannot maintain an action for negligent supervision, training, and/or retention based upon such conduct. *See Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) ("As Alabama does not recognize a common-law tort for sex discrimination in employment, the Court finds that Plaintiff cannot maintain an action for negligent supervision, training, and/or retention based

upon conduct that is employment discrimination, but does not support a common-law tort.")

Even if Plaintiff could establish a duty, she cannot establish any breach of such. DMC had no prior notice of any harassing conduct, and Plaintiff never complained of any alleged harassment.  (Hughes 71:12 – 71:21; Dunn 43:12 – 43:23.)

Because Plaintiff does not allege (nor can she prove) any duty owed to her under Alabama law, much less a breach of any such duty, Plaintiff's negligence claims are due to be dismissed.

## **CONCLUSION**

For all the foregoing reasons, DMC is entitled to summary judgment as a matter of law on all claims.

Respectfully Submitted,


s/Jennifer L. Howard_____
Jennifer L. Howard  ASB-9511-O68J
Albert L. Vreeland, II  ASB-0066-V78A


LEHR MIDDLEBROOKS & VREELAND, P.C.
P.O. Box 11945
Birmingham, Alabama  35202-1945
Phone:  (205) 326-3002
Fax:  (205) 326-3008
E-mail: jhoward@lehrmiddlebrooks.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Alicia K. Haynes, Esq.
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, AL 35226


s/Jennifer L. Howard
OF COUNSEL

177062