# EXHIBIT B

# FREEDOM COURT REPORTING

Page 1

1     IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3        SOUTHERN DIVISION

4

5  CASE NUMBER: 1:06-CV-595

6  DEBORAH HUGHES,

7      Plaintiff,

8      vs.

9  DALE COUNTY MEDICAL CENTER,

10    Defendant.

11

12    S T I P U L A T I O N

13     IT IS STIPULATED AND AGREED by and

14 between the parties through their respective

15 counsel, that the deposition of Deborah

16 Hughes may be taken before Sara Mahler, CSR,

17 at the Hampton Inn Boardroom, at 103 Troy

18 Plaza Loop, Troy, Alabama 36081, on the 2nd

19 day of May, 2007.

20

21

22    DEPOSITION OF DEBORAH HUGHES

23

Page 2

1     IT IS FURTHER STIPULATED AND

2 AGREED that the signature to and the reading

3 of the deposition by the witness is not

4 waived, the deposition to have the same

5 force and effect as if full compliance had

6 been had with all laws and rules of Court

7 relating to the taking of depositions.

8     IT IS FURTHER STIPULATED AND

9 AGREED that it shall not be necessary for

10 any objections to be made by counsel to any

11 questions except as to form or leading

12 questions, and that counsel for the parties

13 may make objections and assign grounds at

14 the time of the trial, or at the time said

15 deposition is offered in evidence, or prior

16 thereto.

17     IT IS FURTHER STIPULATED AND

18 AGREED that the notice of filing of the

19 deposition by the Commissioner is waived.

20

21    * * * * * * * * * * * * *

22

23

Page 3

1    * * * * * * * * * * * * *

2       I N D E X

3      EXAMINATION

4        PAGE

5 By Mr. Vreeland .................... 6

6 By Ms. Haynes .................... 152

7  EXAMINATION CONTINUED

8        PAGE

9 By Mr. Vreeland .................. 161

10   DEFENDANT'S EXHIBITS

11        PAGE

12 Ex. 1 - Request for documents ..... 102

13 Ex. 2 - Ms. Hughes' job

14    application ............. 103

15 Ex. 3 - Employee handbook receipt

16    signature ............... 104

17 Ex. 4 - Copy of employee handbook . 105

18 Ex. 5 - One of Ms. Hughes'

19    performance evaluations . 106

20 Ex. 6 - Invoice for flu vaccines . 108

21 Ex. 7 - Return-to-work slip from

22    original leave .......... 108

23 Ex. 8 - Return-to-work slip from

Page 4

1    half time to full ....... 109

2 Ex. 9 - Dr. Sy's note for

3    one-week's leave ........ 110

4 Ex. 10 - Charge of discrimination . 120

5    * * * * * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**367 VALLEY AVENUE**

**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 9

1  you're on today?
2      A.    No, sir.
3      Q.    What do you take the Topamax
4  for?
5      A.    Seizure and migraine.
6      Q.    How long have you been taking
7  that?
8      A.    I can't recall how long.
9      Q.    Okay.
10         MS. HAYNES:  Just give him
11  your best estimate of time.
12      A.    Three years.
13      Q.    All right.  What do you take
14  the Synthroid for?
15      A.    Hypothyroidism, about two
16  years.
17      Q.    And the depression medication
18  you don't recall the name of, how long have
19  you been taking that?
20      A.    About ten years.
21      Q.    Is that when you were first
22  diagnosed with depression?
23      A.    Uh-huh.

Page 10

1         MS. HAYNES:  You have to
2  answer yes or no.
3      A.    Yes.  I'm sorry.
4      Q.    You're doing fine.  It just
5  makes it easier for our court reporter.
6  Who first diagnosed you with
7  depression?
8      A.    Dr. Zumstein, Z-U-M-S-T-E-I-N.
9      Q.    And who is currently writing
10  the prescription for that medication?
11      A.    Luna Sy.
12      Q.    You may need to spell that for
13  her, too.
14      A.    L-U-N-A S-Y.
15      Q.    Who's prescribed the Topamax
16  for you?
17      A.    Luna Sy.
18      Q.    And the Synthroid?
19      A.    Luna Sy.
20      Q.    Would any of those three
21  medications interfere with your ability to
22  remember or give truthful testimony today?
23      A.    The Topamax.

Page 11

1      Q.    What does that do?  Does that
2  interfere with your memory?
3      A.    It can.
4      Q.    Has it in the past, interfered
5  with your's?
6      A.    Not so far, no, sir.
7      Q.    Okay.  Is there anything else
8  today that would interfere with your ability
9  to remember and give truthful testimony?
10      A.    No, sir.
11      Q.    When did you last attend
12  school?
13      A.    1976.
14      Q.    What school was that?
15      A.    Wallace College.
16      Q.    Did you get a degree from
17  Wallace?
18      A.    No.
19      Q.    What were you studying there?
20      A.    Just general studies.
21      Q.    When did you first go to work
22  for the Arrington Clinic?
23      A.    1974.

Page 12

1         MS. HAYNES:  I'm sorry, '74 is
2  what you said?
3         THE WITNESS:  Yes, 1974.
4      Q.    Who was operating the clinic
5  at that time?
6      A.    Dr. Zumstein.
7      Q.    What was your position when
8  Dr. Zumstein was operating the clinic?
9      A.    I'm sorry?
10      Q.    What was your job position?
11      A.    Receptionist.
12      Q.    Did that change?
13      A.    Yes, sir.
14      Q.    What was your next position?
15      A.    Lab.
16      Q.    What did you do in the lab?
17      A.    Urines.
18      Q.    You did urine tests?
19      A.    Yes.
20      Q.    What was your next position?
21      A.    Work up patients.
22      Q.    What did you do to work up
23  patients?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1    A.    Get the temperatures, blood
2   pressures, weighed them, got them back to
3   the rooms.
4        Q.    What was your next position?
5        A.    I learned EKGs, chest X-rays,
6   to give shots, draw blood.
7        Q.    You conducted EKGs on
8   patients?
9        A.    Yes, sir.
10       Q.    You took X-rays?
11       A.    Yes, sir.
12       Q.    And you administered shots?
13       A.    Yes.
14       Q.    And you drew blood?
15       A.    Yes.
16       Q.    What was your next position?
17       A.    I was out having my son and
18  came back and learned -- started the
19  computer system.
20       Q.    When were you out to have your
21  son?
22       A.    1980.
23       Q.    What sort of computer system

Page 14

1   was that?
2        A.    I don't recall the computer
3   system.
4        Q.    What was it's purpose?
5        A.    Billing and coding.
6        Q.    Explain what you mean by
7   coding.
8        A.    CPT/ICD-9.
9        Q.    What do you code for?
10       A.    Procedures and diagnosis.
11       Q.    Is that part of the process
12  you use to get insurance to pay for things?
13       A.    To pay, yes.
14       Q.    Were you responsible for
15  implementing that computer system?
16       A.    Yes.
17       Q.    What was your next position
18  with Dr. Zumstein?
19       A.    That was it.
20       Q.    These various duties you
21  described for me, did you do them in
22  addition to -- are these cumulative, you
23  added them to your other duties?

Page 15

1        A.    I'm sorry?
2        Q.    Well, when you implemented the
3   computer system, did you continue to do
4   EKGs, chest x-rays, shots, and draw blood?
5        A.    When it was needed.
6        Q.    Were there other people there
7   that did that at that time?
8        A.    Yes.
9        Q.    Okay.  So in 1980, was your
10  principal responsibility running the billing
11  and coding system?
12       A.    Yes, sir.
13       Q.    And did that stay the same
14  through the time Dale Medical Center took
15  over the clinic?
16       A.    Yes.
17       Q.    When was that?
18       A.    I don't recall.
19       Q.    Were there any changes in your
20  job duties at the time Dale Medical Center
21  took over the clinic?
22       A.    I became an office manager.
23       Q.    And what were your duties as

Page 16

1   office manager?
2        A.    To keep the place going, order
3   supplies, direct employees in their job
4   duties.
5        Q.    Anything else you did to keep
6   the place going, other than order supplies
7   and direct employees?
8        A.    I really was never trained to
9   be an office manager.
10       Q.    Okay.  Well, I'm asking what
11  you did, though, what you actually did every
12  day.
13       A.    Billing; coding; ordered
14  supplies; made sure everyone had all their
15  shots up to date; their T B tests up to
16  date; took complaints, if there was any,
17  from patients.
18       Q.    Anything else?
19       A.    No, sir.
20       Q.    Was Dr. Zumstein still the
21  physician there when Dale Medical Center
22  took over?
23       A.    No, sir.

4  (Pages 13 to 16)

Page 17

1    Q.    Who was the doctor?
2    A.    Dr. Blough, B-L-O-U-G-H.
3    Q.    Were you using the same
4    computer system for billing and coding when
5    Dale Medical Center took over as the one you
6    implemented in 1980?
7    A.    At first, yes.
8    Q.    But I think that changed at
9    some time?
10   A.    Yes, sir.
11   Q.    When did that change?
12   A.    I don't recall the date.
13   Q.    And what did it change to?
14   A.    I don't recall what it changed
15   to.
16   Q.    Do you recall any differences
17   in the two systems?
18   A.    I don't recall.
19   Q.    Your responsibilities for
20   billing, I take it then, part of that was
21   billing insurance companies?
22   A.    Yes, sir.
23   Q.    Did you also bill individual

Page 18

1    patients?
2    A.    Yes, sir.
3    Q.    Were you responsible for
4    collecting their copays?
5    A.    No, sir.
6    Q.    Who was responsible for that?
7    A.    Lisa.
8    Q.    What's Lisa's last name?
9    A.    Williams.
10   Q.    What was her job?
11   A.    Sorry, back up.  I'm sorry.
12   At the time when Dr. Blough took over, it
13   was Sharon Peters.  I'm sorry.
14   Q.    What was Ms. Peters job at the
15   time?
16   A.    Receptionist.
17   Q.    Okay.  I take it Lisa Williams
18   became the receptionist after Ms. Peters?
19   A.    Yes, sir.
20   Q.    What would they do with the
21   money after they collected it?
22   A.    They'd leave it on the charts.
23   Q.    What would happen to the money

Page 19

1    from there?
2    A.    I would key it in, and run a
3    report at the end of the day.
4    Q.    So, the receptionist would put
5    the money with the patient charts?
6    A.    Yes, sir.
7    Q.    And then at the end of the
8    day, you took the patient charts and typed
9    the copay, or the payment, into the system?
10   A.    I would go get the chart as
11   the patient would leave, when I had a
12   chance; and I would go get the charts and
13   key them in as I had time to get the charts
14   and key them in, and put the money in, and
15   do them as I had time to do them.
16   Q.    So, it happened all day long,
17   is what you're saying?
18   A.    Yes, sir.
19   Q.    And once you keyed it into the
20   system, what happened to the money from
21   there?
22   A.    I just put it in an envelope.
23   Q.    So, what happened to the

Page 20

1    envelope?
2    A.    It was put in the deposit.
3    Q.    Deposit for the bank?
4    A.    Yes, sir.
5    Q.    Who was responsible for
6    depositing it in the bank?
7    A.    I was.
8    Q.    Did you do that daily?
9    A.    Daily.
10   Q.    And in the system, are the
11   billing and the coding something that
12   happens at the same time when you put it in
13   there?
14   A.    I'm sorry, say that again.
15   Q.    Are those two separate
16   functions, or is that something that is
17   related when you do it all at the same time,
18   when you put it in the computer?
19   A.    Repeat the question.
20   Q.    With regard to the billing and
21   coding, my question is, is that something
22   that you do at the same time when you're
23   keying it into the computer?

**FREEDOM COURT REPORTING**

Page 21

1    A.    The billing and the coding?
2    Q.    Uh-huh.
3    A.    Yes, sir.
4    Q.    The coding determines what the
5 cost is?
6    A.    Yes, sir. It's already keyed
7 into the computer.
8    Q.    All right. At the time
9 Dr. Blough became the physician at the
10 clinic, you told me the receptionist — the
11 original receptionist was Sharon Peters, and
12 she was later replaced by Lisa Williams.
13 Who were the other employees?
14    A.    Dusty Reilly, Felicia Reilly,
15 Sandy Sessoms, Mary Skinner, and myself.
16    Q.    What was Dusty Reilly's
17 position?
18    A.    He worked in the back.
19    Q.    What did he do?
20    A.    He gave shots, worked up
21 patients, EKGs, chest X-rays.
22    Q.    What was Felicia Reilly's
23 position?

Page 22

1    A.    She did the same.
2    Q.    What was Sandy Sessoms'
3 position?
4    A.    She did the same.
5    Q.    What was Mary Skinner's
6 position?
7    A.    Transcriptionist.
8    Q.    How long was Dr. Blough at the
9 clinic?
10    A.    To the best of my ability that
11 I can remember, four years.
12    Q.    Did you ever have any problems
13 with Dr. Blough while he was there?
14    MS. HAYNES: Object to the
15 form. What do you mean by problems?
16    MR. VREELAND: You can object.
17    MS. HAYNES: Do you know what
18 he means by problems?
19    A.    He could have a temper.
20    Q.    Any other problems?
21    A.    No, sir.
22    Q.    Did he single anybody out with
23 his temper?

Page 23

1    A.    No, sir.
2    Q.    He had a temper with all
3 the — toward all the employees when it
4 happened?
5    MS. HAYNES: Object to the
6 form.
7    A.    Yes, sir.
8    Q.    Did you ever complain about
9 Dr. Blough's temper to anybody at the
10 Medical Center?
11    A.    Not during his practice.
12    Q.    Did you complain afterwards?
13    A.    Yes, sir.
14    Q.    Who'd you complain to?
15    A.    Sheila.
16    Q.    Sheila Dunn?
17    A.    Yes, sir.
18    Q.    What did you tell Ms. Dunn
19 about Dr. Blough's temper?
20    A.    I just told her that he could
21 have a very volatile temper, and she told me
22 that I should have come to her and told her.
23    Q.    Did she say anything else to

Page 24

1 you when you told her about Dr. Blough's
2 temper?
3    A.    She said that she had fired
4 many a doctor before, and she could fire
5 him -- she could have fired him.
6    Q.    Did she tell you anything
7 else?
8    A.    No, sir.
9    Q.    After Dr. Blough, who was the
10 physician at the Arrington Clinic?
11    A.    Dr. Ennis, E-N-N-I-S, Sean.
12    Q.    Did your job responsibilities
13 change when Dr. Ennis became the physician?
14    A.    No.
15    Q.    Did they stay the same the
16 entire time Dr. Ennis was there as the
17 doctor and you were working there?
18    A.    No.
19    Q.    They did change?
20    A.    Yes.
21    Q.    When did they change?
22    A.    When I became sick.
23    Q.    And when was that?

6 (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

---

Page 25

1    A.    In November of '04. I stepped
2  down as office manager because I told him I
3  could not take the pressure anymore; that
4  something was wrong with me, and that I
5  could not handle the pressure, and that I
6  felt that I had to step down as office
7  manager.
8    Q.    At the time you stepped down
9  as office manager, had you been diagnosed
10  yet?
11    A.    No.
12    Q.    Who were the other employees
13  that worked at the Arrington Clinic with you
14  while Dr. Ennis was the doctor?
15    A.    Lisa Williams, Cheryl Petrie.
16  I'm sorry, wait a minute. Karen Williams,
17  Lisa Brookes, I'm sorry, Lisa Brookes, not
18  Lisa Williams, Lisa Brookes.
19    Q.    Anybody else?
20    A.    No, sir.
21    Q.    Okay. So, it's Karen
22  Williams, what was her position?
23    A.    She was the -- She wasn't a

---

Page 26

1  nurse; she was a medical assistant.
2    Q.    Does that mean she did the
3  jobs you described earlier, as working up
4  patients, giving shots?
5    A.    Yes, sir.
6    Q.    Performing EKGs?
7    A.    Yes, sir.
8    Q.    What was Cheryl Petrie's
9  position?
10    A.    Lab tech.
11    Q.    I take it, that means she did
12  the urine tests, and things like that?
13    A.    Yes, sir.
14    Q.    What was Lisa Brookes?
15    A.    She was the receptionist.
16    Q.    Prior to the time you stepped
17  down in November '04 as office manager, had
18  you had any problems with Dr. Ennis?
19        MS. HAYNES: Object to the
20  form.
21    A.    Yes, sir.
22    Q.    What problems have you had up
23  to that point?

---

Page 27

1    A.    I had ordered three thousand
2  vials of vaccine, which was way too many.
3    Q.    Is that flu vaccine?
4    A.    Yes, sir.
5    Q.    What happened when you ordered
6  too many vials of the vaccine?
7    A.    I was reprimanded by him,
8  verbally.
9    Q.    I'm sorry?
10    A.    Verbally.
11    Q.    What did he say to you?
12    A.    He asked me, did I not have
13  any sense to order three thousand vials of
14  vaccine.
15    Q.    What else did he say to you?
16    A.    That's all.
17    Q.    Did he ever bring it up again?
18    A.    When the vials came in, I
19  realized my mistake, and I looked at him and
20  I said: I really did, didn't I? And he
21  just smiled at me.
22    Q.    Did he ever say anything else
23  about it?

---

Page 28

1    A.    He brought it up,
2  occasionally.
3    Q.    What would he say when he
4  brought it up, occasionally?
5    A.    He said: The hospital looks
6  really bad on you because of this.
7    Q.    Do you know how many vials of
8  vaccine the clinic needed?
9    A.    Three hundred shots. So, that
10  would have been, I assume, thirty vials.
11    Q.    Did anyone else speak to you
12  about the vaccine order?
13    A.    Sheila Dunn.
14    Q.    When did she talk to you about
15  it?
16    A.    She called me on the phone,
17  and asked me if I realized what I had done.
18    Q.    What did you say to her?
19    A.    No, I didn't.
20    Q.    Did Ms. Dunn say anything
21  else?
22    A.    I don't recall exactly what
23  she said.

---

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    Q.    Do you recall generally what
2  she said?
3    A.    That was a very big mistake,
4  very costly mistake.
5    Q.    Do you know how Ms. Dunn found
6  out about the mistake?
7    A.    She got the invoice.
8    Q.    Had you realized your mistake
9  before that?
10    A.    No, sir.
11    Q.    Did she say anything else to
12  you about it, the vaccine order?
13    A.    It was brought up again
14  numerous times the day that she called me in
15  to let me go.
16    Q.    Prior to her calling you down
17  to let you go, had she brought it up again?
18    A.    Not that I recall.
19    Q.    Just so I'm clear, she called
20  you up when she got the invoice?
21    A.    Uh-huh.
22    Q.    And then she brought it up
23  again when you were fired?

Page 30

1    A.    Yes, sir.
2    Q.    She didn't bring it up in
3  between?
4    A.    Not that I recall.
5    Q.    Okay. When Dr. Ennis talked
6  to you about it, was he angry?
7    A.    Yes, sir.
8    Q.    Did he say anything
9  inappropriate to you?
10    A.    He told me that I was
11  worthless; I was stupid.
12    Q.    Anything else?
13    A.    Not that I recall.
14    Q.    Did you tell anybody else at
15  Dale Medical Center that Dr. Ennis had
16  called you worthless and stupid?
17    A.    No, sir.
18    Q.    When Ms. Dunn called you up
19  and asked you about the invoice, did she say
20  anything inappropriate to you?
21    A.    No, sir.
22    Q.    Prior to the time you stepped
23  down as office manager in November 2004, did

Page 31

1  you have any other problems with Dr. Ennis,
2  other than this incident with the flu
3  vaccine?
4    A.    Yes, sir.
5    Q.    What else?
6    A.    I wrote off ten to twelve Blue
7  Cross/Blue Shield accounts that equaled nine
8  hundred seventy dollars because
9  Dr. Zumstein's Blue Cross/Blue Shield
10  provider number was discontinued.
11    Q.    What did Dr. Ennis say to you
12  about that?
13    A.    He told me that I was
14  incompetent again; that I was worthless;
15  that if I didn't have my little meager job
16  in that office in there, that I wouldn't
17  have a job; that they could let me go at any
18  time, and that when they did, that I would
19  be qualified for nothing in this office and
20  I'd have nothing.
21    Q.    Did Dr. Ennis say anything
22  else to you when he talked to you about
23  these twelve accounts?

Page 32

1      MS. HAYNES: Object to the
2  form.
3    Q.    Ten to twelve accounts?
4    A.    That he wanted to see them,
5  and I went and got them; and that I had no
6  right to do that; and that I had better get
7  them paid back.
8    Q.    Did he say anything else to
9  you about these ten to twelve accounts?
10    A.    No, sir.
11    Q.    Was anyone else present when
12  he said this to you?
13    A.    No, sir. Not in the room.
14    Q.    Okay. Where were you?
15    A.    In his office.
16    Q.    Was there anybody else within
17  hearing distance?
18    A.    Pat.
19    Q.    Pat who?
20    A.    Ennis.
21    Q.    And where was she?
22    A.    I don't know.
23    Q.    What did you do about the

8 (Pages 29 to 32)

## FREEDOM COURT REPORTING



Page 33

1  accounts after Dr. Ennis spoke to you about
2  it?
3      A.    Blue Cross/Blue Shield called
4  me and told me his number had been
5  reinstated, to refile the claims. So, I
6  refiled the claims, and I got the claims
7  paid.
8      Q.    Did you talk to anybody, other
9  than Dr. Ennis, about these ten to twelve
10  accounts?
11      A.    Sheila Dunn.
12      Q.    When did you speak with
13  Ms. Dunn about it?
14      A.    She called me and told me that
15  I had no right to write-off those accounts
16  without talking to somebody first. I also
17  talked to, I don't recall her name, at
18  MedNet, and told her initially that
19  something was wrong; that the accounts
20  weren't going through; that they were being
21  unpaid due to discontinuation of the
22  provider number. And Sheila told me that
23  things could be fixed, all I had to do was

Page 34

1  ask.
2      Q.    Was anything else said between
3  you and Ms. Dunn in that conversation?
4      A.    Yes.
5      Q.    What was that?
6      A.    I told her that I thought Jan
7  Hamm might have discontinued the number; I
8  did not know. She said I should not accuse
9  people of things I did not know; that Jan
10  did not -- probably didn't do it because Jan
11  was handling Dr. Zumstein's accounts.
12      Q.    Who is Jan Hamm?
13      A.    I do not know her position.
14      Q.    Did she work at the Medical
15  Center?
16      A.    Yes, sir.
17      Q.    Did you ever talk to Ms. Hamm
18  about the write-offs?
19      A.    No, sir.
20      Q.    Other than the conversation
21  with Dr. Ennis and the conversation with
22  Ms. Dunn, did you speak to anybody else
23  about this?

Page 35

1      A.    The girl at MedNet, and that's
2  it.
3      Q.    Did you report to anybody at
4  Dale Medical Center that Dr. Ennis had
5  called you incompetent and worthless?
6      A.    No, sir.
7      Q.    Prior to stepping down as
8  office manager, did you have any other
9  problems with Dr. Ennis?
10      A.    No, sir.
11      Q.    Prior to stepping down as
12  office manager, did Dr. Ennis ever speak to
13  you inappropriately, other than the two
14  times you've already told me about?
15      A.    He just told me to get in my
16  office, and do my job, and don't come out
17  unless spoken to.
18      Q.    When did he tell you that?
19      A.    After the conversation about
20  the accounts written off.
21      Q.    Had you written off accounts
22  before?
23      A.    No, sir.

Page 36

1      Q.    Is there any other time, prior
2  to stepping down as office manager in
3  November of 2004, that you believe Dr. Ennis
4  spoke to you inappropriately?
5      A.    No, sir.
6      Q.    At some point during this time
7  frame, Dr. Ennis was diagnosed with cancer?
8      A.    Yes, sir.
9      Q.    Do you know when that was?
10      A.    No, sir.
11      Q.    Was he out of the clinic for
12  sometime?
13      A.    Yes.
14      Q.    Okay. Do you remember how
15  long?
16      A.    No, sir.
17      Q.    Was it before these incidents
18  with the accounts?
19      A.    I'm sorry, say that again.
20          MS. HAYNES: Object to the
21  form.
22      Q.    Was Dr. Ennis on leave from
23  the clinic before the incident about writing

9 (Pages 33 to 36)

**FREEDOM COURT REPORTING**

Page 37

1  off the accounts?
2      A.    He had come back.
3      Q.    He had come back from his
4  leave when this happened?
5          Let me see if this helps.
6  Were you using Dr. Zumstein's billing number
7  because he was filling in for Dr. Ennis
8  while he was on leave?
9      A.    Yes.
10     Q.    Okay. So, therefore, Dr. Ennis
11 would have been on leave before the problem
12 arose with the billing?
13     A.    Yes.
14     Q.    When Dr. Ennis returned from
15 leave, did Pat Ennis start spending more
16 time in the office?
17     A.    Yes.
18     Q.    Prior to his leave, how often
19 was she in the office?
20     A.    She would come in, leave his
21 medication, his lunch, and ask me to make
22 sure that he took his medication.  She would
23 probably stay about an hour or two a day.

Page 38

1      Q.    After his leave, how often was
2  she in the clinic?
3      A.    At the start, about the same
4  time.
5      Q.    I take it that changed?
6      A.    Yes, it did.
7      Q.    How frequently -- After it
8  changed, how frequently was she there?
9      A.    All day.
10     Q.    When did it change?
11     A.    When he was taking extensive
12 chemotherapy.
13     Q.    I guess, she was driving him
14 to work?
15     A.    Yes, sir.
16     Q.    That's a bad question.  Was
17 she driving him to work?
18     A.    Yes, sir.
19     Q.    When was this that he was
20 taking extensive chemotherapy?
21     A.    Yes.
22     Q.    When?
23     A.    I'm sorry, I don't recall.

Page 39

1      Q.    You're speaking a little
2  softly, so I had a hard time hearing you.
3          You did not know, or don't
4  recall when he was taking extensive
5  chemotherapy?
6      A.    No, I do not recall.
7      Q.    Okay.  Was it before you
8  stepped down as office manager?
9          MS. HAYNES:  We're talking
10 about his chemotherapy now?
11         MR. VREELAND:  Yes.
12     A.    Say that again, now.
13     Q.    Okay. You said that Pat Ennis
14 started spending all day in the clinic when
15 Dr. Ennis started taking extensive
16 chemotherapy?
17     A.    Uh-huh.
18     Q.    Can you say yes?
19     A.    Yes.  I'm sorry.
20     Q.    My question to you is, was
21 that before you stepped down as office
22 manager in November 2004?
23     A.    It was after.

Page 40

1      Q.    Do you recall how long after?
2      A.    It was after my surgery in
3  January of 2005.
4      Q.    When you stepped down as
5  office manager in November of 2004, who took
6  over those job duties?
7      A.    Dr. Ennis.
8      Q.    When you told him that
9  something was wrong and that you couldn't
10 take the stress of being an office manager,
11 how did he respond?
12     A.    He said he understood.
13     Q.    How long after that, before
14 you were diagnosed -- until you were
15 diagnosed with the brain tumor?
16     A.    It was the middle part of
17 November.
18     Q.    What problems were you having
19 in November of 2004, physical problems?
20     A.    I was falling, coordination
21 problems.
22     Q.    Anything else?
23     A.    (Witness shakes head in a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 41

1 negative response.)
2    Q.    When did you start having
3 those problems?
4    A.    Those started about two years
5 prior to finding out.
6    Q.    Did they get progressively
7 worse over time?
8    A.    Yes, sir.
9    Q.    Did they become more frequent
10 over time?
11    A.    Yes, sir.
12    Q.    Can you explain for me what
13 you mean by coordination problems?
14    A.    I would have types of vertigo.
15    Q.    When this first started, how
16 frequently would you have problems either
17 falling or with vertigo?
18    A.    I might have it once a month,
19 and then maybe three to four months later
20 have it again.
21    Q.    I guess we're talking December
22 of 2004 when you were diagnosed, how
23 frequently was it happening?

Page 42

1    A.    I fell in November and
2 cracked -- fractured three ribs.
3    Q.    How frequently would you have
4 those spells, though?  Was it once a month?
5    A.    I never knew when it was going
6 to happen.
7    Q.    In terms -- In hindsight, was
8 it once a week, once a month?
9    A.    About every two weeks they
10 would happen.
11    Q.    And how long would the spells
12 last?
13    A.    It would just hit me.
14    Q.    So, it was quick?
15    A.    Instantaneous, yes.
16    Q.    Prior to November of 2004,
17 when you stepped down as office manager, had
18 you had problems doing the job?
19    A.    I had memory problems.
20    Q.    Describe for me what you had
21 problems with.
22    A.    Codes that I had used for over
23 twenty years, I had to start looking up.

Page 43

1    Q.    When did that start?
2    A.    As best I can remember, in
3 June.
4    Q.    Of 2004?
5    A.    Yes, sir.
6    Q.    Did your problems impact your
7 job in any other way?
8    A.    When Dr. Ennis told me to
9 order three hundred vials, I could not
10 comprehend what he meant by three hundred.
11    Q.    Did memory problems impact
12 your job in any other way?
13    A.    No, sir.
14    Q.    Did the falling and the
15 coordination problems impact your job in any
16 way?
17    A.    No, sir.
18    Q.    Did they prevent you from
19 doing any daily activities?
20    A.    No, sir.
21    Q.    Did the memory problems
22 prevent you from doing any of your daily
23 activities?

Page 44

1    A.    No, sir -- May I make a
2 correction, please.
3    Q.    Sure.
4    A.    When I said three hundred
5 vials, he just said order three hundred.  He
6 did not say vials.  He just said order three
7 hundred.
8    Q.    That was Dr. Ennis'
9 instruction to you?
10    A.    Yes.  He said order three
11 hundred.  He did not say three hundred
12 vials.
13    Q.    From the time you stepped down
14 as office manager in November of 2004, until
15 the time you were diagnosed in mid December,
16 did you have any problems with Pat Ennis?
17    A.    Yes.
18    Q.    What problems did you have
19 with Mrs. Ennis?
20    A.    She was constantly standing in
21 my office.
22    Q.    What did she do while she was
23 in your office?

11 (Pages 41 to 44)

**FREEDOM COURT REPORTING**

Page 45

1    A.    Constantly harassing me.
2    Q.    What did she do to harass you?
3    A.    Just tell me things I needed
4    to do. I gotta do this; I gotta do that.
5    Keeping me from doing my job.
6    Q.    Anything else she was doing to
7    harass you?
8    A.    Calling us F'ing morons.
9    Q.    You said calling us, was she
10   calling other people F'ing morons?
11   A.    Yes, she was.
12   Q.    Who else was she calling F'ing
13   morons?
14   A.    Cheryl Petrie.
15   Q.    Anybody else?
16   A.    Cheryl and I were the only two
17   workers that heard her say it. She was
18   sitting in my office at the time she said
19   it.
20   Q.    I take it, Mrs. Ennis did not
21   use the word F'ing?
22   A.    Yes, she did.
23   Q.    Did she literally say F'ing,

Page 46

1    or did she use the F word?
2    A.    Yeah, she used the word. I'm
3    paraphrasing. I'm not going to say the
4    word.
5    Q.    Was she using the word
6    fucking?
7    A.    Yes, she was.
8    Q.    How many times did she use
9    that word?
10   A.    Often.
11   Q.    How many times did she call
12   you and Ms. Petrie F'ing morons?
13   MS. HAYNES: I have an
14   objection that I want placed on the Record.
15   A.    It was once.
16   Q.    Did she call you an F'ing
17   moron more than once?
18   A.    No.
19   Q.    All right. Did Ms. Ennis do
20   anything else to harass you?
21   A.    Specify when.
22   Q.    Right now we're talking about
23   after you stepped down as office manager,

Page 47

1    and before you were diagnosed in mid
2    December.
3    A.    The day I was diagnosed, she
4    hugged me and said: Debbie, I'm so sorry
5    I've been so mean to you.
6    Q.    You didn't consider that
7    harassment?
8    A.    No. It was just a case in
9    point.
10   Q.    Prior to your diagnosis,
11   though, did she do anything else to harass
12   you?
13   A.    Just stay in my office all the
14   time, bringing up sexual talks, and asking
15   me about my sex life and stuff like that.
16   Just stupid things.
17   Q.    Is there anything else she did
18   to harass you during that time period?
19   A.    Not that I can recall.
20   Q.    When you say she was telling
21   you what to do, give me an example of what
22   she'd tell you to do.
23   A.    That I needed to get the

Page 48

1    accounts in; that I needed to tell someone
2    to do something; that I need an employee to
3    do something. You know, you need to get
4    so-and-so to do this, and so-and-so to do
5    that.
6    Q.    When you say she was keeping
7    you from doing your job, you mean by sitting
8    in your office talking to you?
9    A.    Yes, sir.
10   Q.    When she asked you about your
11   sex life, or talking about sex, was anybody
12   else present?
13   A.    No, sir.
14   Q.    When she did that, what would
15   she say? What would she ask you?
16   A.    She just asked me how my sex
17   life was. She said: I bet it's good. I
18   don't get any.
19   Q.    Did she say anything else?
20   A.    No, sir.
21   Q.    If at any point you need to
22   take a break, just tell me.
23   MS. HAYNES: I do.

12 (Pages 45 to 48)

## FREEDOM COURT REPORTING

Page 49

1      (Recess taken.)
2      Q.    (By Mr. Vreeland) How
3  frequently did Ms. Ennis ask you sexual
4  questions about your sex life?
5      A.    Daily.
6      Q.    Did you complain to anybody at
7  Dale Medical Center about that?
8      A.    No, sir.
9      Q.    When you stepped down as
10  office manager in November of 2004, did you
11  tell Dr. Ennis what physical problems you
12  were having?
13      A.    Yes, sir.
14      Q.    Had you talked to him about
15  them before that?
16      A.    No, sir.
17      Q.    What did Dr. Ennis say to you
18  when you informed him of your diagnosis?
19      A.    He had no comment.
20      Q.    And you told me Mrs. Ennis
21  apologized to you on that day?
22      A.    Yes, sir.
23      Q.    Did you complain to anybody at

Page 50

1  Dale Medical Center about Ms. Ennis being in
2  your office and telling you what to do?
3      A.    No, sir.
4      Q.    Did you complain about her
5  using the F word?
6      A.    I got onto her for using it
7  where the patients could hear it.
8      Q.    You reprimanded her for that?
9      A.    Yes.  Yes, I did.
10      Q.    Did you report that, the fact
11  that she was using the F word at the office,
12  to anybody at Dale Medical Center?
13      A.    No, sir.
14      Q.    All right.  The issue of her
15  staying in your office and harassing you,
16  did that start around the time she was in
17  the office every day, all day, when
18  Dr. Ennis started his chemotherapy?
19      A.    Yes, sir.
20      Q.    And you don't recall when that
21  was?
22      A.    No, sir.
23      Q.    Did you complain to anybody at

Page 51

1  Dale Medical Center about her constant
2  presence in the office?
3      A.    No, sir.
4      Q.    Have you told me all the ways
5  she harassed you up through the time of your
6  diagnosis?
7      A.    Just sexual in nature, sexual
8  jokes, just things that I needed to do, just
9  like I told you.
10      Q.    Okay.  She told you sexual
11  jokes?
12      A.    Yes, sir.
13      Q.    How frequently would she tell
14  you sexual jokes?
15      A.    Every day.
16      Q.    Were there other people
17  present when she'd tell these jokes?
18      A.    Sometimes.
19      Q.    Who else was present when
20  she'd tell these jokes?
21      A.    Lisa.
22      Q.    What's Lisa's last name?
23      A.    Brookes.

Page 52

1      Q.    Anyone else?
2      A.    I don't recall.
3      Q.    Did you tell anybody at Dale
4  Medical Center that she was telling these
5  sexual jokes?
6      A.    No, sir.
7      Q.    Did you tell her you didn't
8  like the sexual jokes?
9      A.    At the time, I really didn't
10  know what to say to her.
11      Q.    So, I take it, therefore, you
12  didn't tell her —
13      A.    I didn't tell her, no.
14      Q.    — that you didn't want to
15  hear the sexual jokes?
16      A.    I just sat there and looked at
17  her.
18      Q.    Did she do anything else to
19  harass you up through the time of your
20  diagnosis?
21      A.    Not that I recall.
22      Q.    At the time you told Dr. Ennis
23  and Mrs. Ennis about the diagnosis, did you

13 (Pages 49 to 52)

**FREEDOM COURT REPORTING**

Page 53

1 know that you were going to have to be off
2 for surgery?
3     A.    Yes, sir.
4     Q.    Did you tell them that as
5 well?
6     A.    Yes, sir.
7     Q.    How did Dr. Ennis respond?
8     A.    He asked me why I could not
9 wait and have my surgery when the other
10 girls had their surgery.  Lisa Brookes was
11 having a gastric bypass, and Karen Williams
12 was having elective hysterectomy, and he was
13 taking a trip to Mexico.  And I told him
14 that I couldn't; that it was very important
15 that I have my brain tumors taken out.
16     Q.    How did he respond?
17     A.    He just said:  Whatever.
18     Q.    Did he say whatever?
19     A.    He said:  It would be a lot
20 better for me if you would do that.  You're
21 just making it inconvenient for me.
22     Q.    Did he say anything else?
23     A.    (Witness shakes head in a

Page 54

1 negative response.)
2         MS. HAYNES:  You have to
3 answer out loud.
4     A.    No, sir.
5     Q.    Was anyone else present when
6 he said this?
7     A.    I don't recall.  No, sir.  I
8 do recall, no, sir.
9     Q.    Did you already have a date
10 for your surgery set at that point?
11     A.    Yes, sir.
12     Q.    Was it January 5th?
13     A.    3rd.
14     Q.    Did Mrs. Ennis say anything to
15 you about having to be off for surgery?
16     A.    No.
17     Q.    Did you have any conversations
18 with Sheila Dunn about being off for your
19 surgery?
20     A.    I just informed her -- I went
21 to her and talked to her and told her that I
22 did have a brain tumor, and that I would
23 have to be off.  I told her when my surgery

Page 55

1 was going to be.
2     Q.    How did she respond?
3     A.    She said that she was glad
4 that they finally figured out what was wrong
5 with me, and that she wished the best for
6 me.
7     Q.    What was your actual
8 diagnosis?
9     A.    It was hemangionoma.
10     Q.    For those of us not in the
11 medical field, is that a benign tumor?
12     A.    It's a benign tumor.  There
13 was two of them, yes.
14     Q.    How long were you off for your
15 surgery?
16     A.    Five weeks, if I recall
17 precisely -- if I recall correctly.
18     Q.    Did they know at the time they
19 diagnosed you that your tumors were benign?
20     A.    Yes, sir.
21     Q.    That's got to be a relief?
22     A.    Sir?
23     Q.    Nothing.  I was just saying

Page 56

1 that it would have to be a relief to know in
2 advance.
3     A.    Yes, sir.
4     Q.    While you were off on leave
5 for your surgery, did you have contact with
6 anybody in the clinic?
7     A.    Pat called me daily.
8     Q.    And what did she talk about?
9     A.    Said that I would have to take
10 the office manager job back, because they
11 wouldn't be able to pay me for doing what
12 little job I did in the coding and billing
13 if I didn't.
14     Q.    Okay.  Did she talk about that
15 every day?
16     A.    Every time she called me.
17     Q.    And she called you daily?
18     A.    Almost daily.  I should take
19 that back.  She called me about every --
20 about three times a week.
21     Q.    Did she talk about anything
22 else when she'd call you?
23     A.    She asked me how I was.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 61

1    A.    Sorry.
2    Q.    Pat Ennis comes in and asks
3    you if you would take the office manager
4    back?
5    A.    Yes.
6    Q.    And you respond, if Dr. Ennis
7    wants me to?
8    A.    Yes, sir.
9    Q.    And then she goes and tells
10   Dr. Ennis that you would?
11   A.    Yes, sir.
12   Q.    Then you go talk to Dr. Ennis?
13   A.    Yes, sir.
14   Q.    Tell me what was said when you
15   were talking to Dr. Ennis.
16   A.    I said: If you want me to
17   take it back, I'll take it back. And I
18   said: But there's a few things I want to
19   change. And he said: Go for it.
20   Q.    Did you tell him what you
21   wanted to change?
22   A.    I told him I wanted to change
23   Lisa not pulling charts for the day; and for

Page 62

1    Cheryl to help -- for Karen to help Lisa --
2    I mean, Karen to help Cheryl draw blood,
3    because she couldn't handle the load by
4    herself. And he said: Go for it.
5    Q.    Anything else you told him you
6    wanted to change?
7    A.    No, sir.
8    Q.    Did Mrs. Ennis seem happy you
9    were going to take the job?
10   A.    Yes, sir.
11   Q.    And this is while you were on
12   half days?
13   A.    Yes, sir.
14   Q.    Did you go back to being
15   office manager while you were on half days?
16   A.    Yes, sir.
17   Q.    When you returned on half
18   days, did Mrs. Ennis, Pat Ennis, harass you?
19   A.    No, sir.
20   Q.    Did Dr. Ennis harass you in
21   any way while you were on half days?
22   A.    He just made a comment about
23   my hair.

Page 63

1    Q.    What did Dr. Ennis say about
2    your hair?
3    A.    He said: When's your hair
4    gonna grow back? It's just sticking up
5    there.
6    Q.    Did he say anything else?
7    A.    No, sir.
8    MS. HAYNES: Are we talking
9    about half days, while she's at half days?
10   MR. VREELAND: Correct.
11   MS. HAYNES: Okay.
12   MR. VREELAND. No. And I'm
13   talking -- Actually, I'm asking about that
14   particular conversation.
15   MS. HAYNES: Okay.
16   Q.    How did you respond?
17   A.    I said: It's growing back as
18   fast as it can.
19   Q.    Where were you when he said
20   this?
21   A.    Sitting in my office.
22   Q.    Was anybody else present?
23   A.    Pat.

Page 64

1    Q.    Did she say anything?
2    A.    No.
3    MS. HAYNES: Object to the
4    form. It's unclear if she — You're asking
5    did she say anything. If you're referring
6    to the comment about her hair, or if she
7    said anything else about her condition.
8    Q.    I'm just asking you about that
9    conversation with you and Dr. Ennis, in
10   which he said -- asked a question about your
11   hair, and you said Pat Ennis was there.
12   My question is, during that
13   conversation, did Pat Ennis say anything?
14   A.    No, sir.
15   Q.    Did she react in any way when
16   Dr. Ennis asked you that?
17   A.    She smiled.
18   Q.    Did you report that comment to
19   anyone at Dale Medical Center?
20   A.    No.
21   Q.    While you were on half days,
22   did Dr. Ennis do anything else that you
23   considered to be harassing?

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1    A.    No, sir.
2    Q.    Did anyone else at Dale
3  Medical Center harass you while you were on
4  half days?
5    A.    No, sir.
6    Q.    And after about four weeks you
7  came back full time?
8    A.    Yes, sir.
9    Q.    And when you came back full
10 time, were you doing the office manager job?
11   A.    Yes, sir.
12   Q.    When you originally came back
13 on half days, did Pat Ennis tell you she was
14 glad you were coming back?
15   A.    Yes, sir.
16   Q.    After you returned or came
17 back full time, did Pat Ennis do anything to
18 harass you?
19   A.    No, sir.
20   Q.    Did Dr. Ennis do anything to
21 harass you during that time?
22   A.    He just made the comment that
23 he wanted the money put in, put in as fast

Page 66

1  as I could.  And when I put in over twenty
2  thousand dollars worth back in the computer
3  that had piled up, I went to show him.  And
4  I said:  How does this look?  And he said:
5  It looks good, but it's not good enough.  He
6  said:  The five weeks you were out, was the
7  worst five weeks of my life.  I said:
8  Dr. Ennis, I tried to get well as fast as I
9  could.  And he said:  Well, you didn't do it
10 fast enough.
11   Q.    After your surgery, did you
12 continue to have the falling problems?
13   A.    No, sir.
14   Q.    Did you continue to have any
15 coordination problems?
16   A.    No, sir.
17   Q.    Did you have any vertigo?
18   A.    Yes, sir.
19   Q.    That continued?
20   A.    I had one episode.
21   Q.    When did that happen?
22   A.    Earlier in 200 -- Late 2006.
23   Q.    Did you continue to have

Page 67

1  memory problems?
2    A.    No, sir.
3    Q.    So, with the exception of the
4  vertigo, you haven't had any of the problems
5  you had before, after you had your surgery?
6    A.    No, sir.
7    Q.    Successful?
8    A.    Yes, sir.
9    Q.    Was anybody else present in
10 this conversation with you and Dr. Ennis
11 when you showed him the twenty thousand
12 dollars you had put into the system?
13   A.    No, sir.
14   Q.    Did you tell anybody else
15 about it?
16   A.    I told my husband.
17   Q.    All right.  Did you tell
18 anybody at Dale Medical Center about it?
19   A.    No, sir.
20   Q.    Did Dr. Ennis do anything else
21 that you considered to be harassment after
22 you came back full time?
23   A.    No, sir.  May I correct myself

Page 68

1  in one place?
2    Q.    Yes.
3    A.    Pat did harass me one more
4  time.
5    Q.    What did Pat do?
6    A.    We were eating lunch, Cheryl
7  Petrie and I, and she struck me against the
8  head on my surgery side.
9    Q.    Where were you having lunch?
10   A.    In the lunchroom at the
11 office.
12   Q.    You were eating with Cheryl
13 Petrie?
14   A.    Yes, sir.
15   Q.    When did this happen?
16   A.    The day after my surgery --
17 Well, the day after I came back from my
18 surgery to work.
19   Q.    All right.  So, on your second
20 day back from leave?
21   A.    Uh-huh.
22   MS. HAYNES:  Say yes.
23   Q.    Is that yes?

17 (Pages 65 to 68)

**FREEDOM COURT REPORTING**

Page 69

1     A.    Yes, sir.
2     Q.    Did she say anything when she
3  struck you?
4     A.    She said: Oh, I thought it'd
5  be well by now.
6     Q.    And describe for me how she
7  hit you.
8     A.    She just walked in the
9  lunchroom, sat down, and just struck me.
10    Q.    She was sitting at the table
11 with you?
12    A.    Yes, sir.
13    Q.    And she hit you open handed?
14    A.    Yes, sir.
15    Q.    Did she say anything before
16 she struck you?
17    A.    No, sir.
18    Q.    Did she draw back before she
19 hit you?
20    A.    She just kind of halfway drew
21 back and hit me (indicating).
22    Q.    Did she say anything, other
23 than, oh, I thought it'd be well by now?

Page 70

1     A.    She just got up and walked
2  out.
3     Q.    Did she appear to be angry
4  when she did this?
5     A.    No.
6     Q.    Did she appear to be joking
7  when she did this?
8     A.    I'm not sure.
9     Q.    Did Cheryl Petrie say anything
10 when this happened?
11    A.    She said: Debbie, are you
12 okay?
13    Q.    How'd you respond?
14    A.    I said: It really hurt. I
15 had tears in my eyes.
16    Q.    Did the two of you talk about
17 it any further?
18    A.    No. I got up and went to my
19 office.
20    Q.    Did you report this to
21 anybody?
22    A.    No.
23    Q.    Did you ever talk to Pat Ennis

Page 71

1  about it?
2     A.    No.
3     Q.    Did she ever say anything to
4  you about it?
5     A.    No.
6     Q.    Had you ever seen or heard of
7  Pat Ennis hitting any other employee?
8     A.    No.
9     Q.    Did she catch you off guard
10 when she did it?
11    A.    Yes.
12    Q.    Do you know if any of the
13 other employees at the Arrington Clinic had
14 complained about Pat Ennis to Dale Medical
15 Center?
16    A.    I don't know.
17    Q.    Do you know if any other
18 employees at the Arrington Clinic had
19 complained about Dr. Ennis to Dale Medical
20 Center?
21    A.    I don't know.
22    Q.    Had any of the other employees
23 in the clinic complained to you about Pat

Page 72

1  Ennis?
2     A.    Yes.
3     Q.    Who had complained to you?
4     A.    Cheryl Petrie.
5     Q.    Anyone else?
6     A.    No, sir.
7     Q.    What did Cheryl Petrie
8  complain to you about Pat Ennis?
9     A.    Just telling her how to do her
10 job, and what to do on patients, and her
11 telling her to do one thing and then
12 Dr. Ennis telling her to do another.
13    Q.    Anything else Cheryl Petrie
14 complained about Pat Ennis?
15    A.    No, sir.
16    Q.    What did you tell Cheryl
17 Petrie?
18    A.    I told her to listen to what
19 Dr. Ennis told her to do.
20    Q.    Did you offer any other
21 advice?
22    A.    No, sir.
23    Q.    Did you report Ms. Petrie's

18  (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 73

1  complaint to anybody at Dale Medical Center?
2      A.  No, sir.
3      Q.  Other than what you've already
4  told me about, did Dr. Ennis say anything
5  negative to you about your surgery?
6      A.  No, sir.
7      Q.  Did Pat Ennis say anything
8  negative to you about your surgery, other
9  than what you've already told me about?
10     A.  No, sir.
11     Q.  Did Sheila Dunn ever say
12  anything negative to you about your surgery?
13     A.  No, sir.
14     Q.  Did she ever say anything
15  negative to you about taking leave?
16     A.  No, sir.
17     Q.  Were you granted all the time
18  off that you requested for your surgery?
19     A.  I was kind of pressured by
20  Sheila -- excuse me, by Pat to come back to
21  work; that things were getting behind, and
22  that I needed to get back to get things up
23  to date.

Page 74

1      Q.  How did Pat pressure you to
2  come back to work?
3      A.  She just said:  Things are
4  getting behind, you know.  You really need
5  to get back to work.  Aren't you better now?
6      Q.  Had your doctor released you
7  to return to work when you came back?
8      A.  I called and asked if I could
9  come back to work, and he said half days
10  only.
11     Q.  So, you had been released to
12  come back half days?
13     A.  And not to drive.  My husband
14  had to drive me.
15     Q.  Did anybody, other than Pat
16  Ennis, pressure you to come back to work?
17     A.  No, sir.
18     Q.  Did you tell anybody you
19  wanted to take more time off than you
20  actually did?
21     A.  No, sir.
22     Q.  Were you able to perform your
23  job when you came back?

Page 75

1      A.  Yes, sir.
2      Q.  Were you paid for all your
3  leave time?
4      A.  Yes, sir.
5      Q.  After you came back full time,
6  you then took an additional week off?
7      A.  Yes, sir.
8      Q.  What was the reason for the
9  additional week?
10     A.  I had started having panic
11  attacks.
12     Q.  Did your doctor diagnose what
13  was causing those panic attacks?
14     A.  She said she felt like I went
15  back to work too soon.
16     Q.  Luna Sy?
17     A.  Yes, sir.
18     Q.  Did Dr. Sy prescribe anything
19  for your panic attacks?
20     A.  She just upped my medication.
21     Q.  She upped what you were
22  already taking?
23     A.  Yes, sir.

Page 76

1      Q.  Do you recall what that was?
2      A.  I was taking Lexapro at the
3  time.
4      Q.  How long had you been taking
5  the Lexapro?
6      A.  A year or more.
7      Q.  Had you had panic attacks
8  before?
9      A.  No, sir.
10     Q.  What were you taking the
11  Lexapro for?
12     A.  Depression.
13     Q.  So, in the spring of '05, is
14  the first time you had panic attacks?
15     A.  Yes, sir.
16     Q.  Who did you tell that you were
17  going to need more time off?
18     A.  I had Jackie, Dr. Sy's nurse,
19  fax an excuse to Dr. Ennis and to Sheila
20  Dunn.
21     Q.  Did you contact either of
22  them?
23     A.  No, sir -- Oh, yes, sir,

19 (Pages 73 to 76)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 77

1  excuse me. When I left Dr. Luna Sy's
2  office, I called our office and talked to
3  Lisa Brookes. She said Dr. Ennis had just
4  gotten in, and wanted to talk to me. I told
5  her I was on my way home, and that for him
6  to give me a call; that Dr. Sy had given me
7  a shot, and she told me to go straight home.
8  And she said she would relay the message to
9  him, but he never called.
10      Q.    Did she tell you what
11  Dr. Ennis wanted to speak with you about?
12      A.    No, sir.
13      Q.    And you never spoke with him
14  about whatever it was?
15      A.    No, sir. He never called me.
16  Never said anything.
17      Q.    Were you having a panic attack
18  when you went to Dr. Sy's office?
19      A.    Yes, sir.
20      Q.    Where were you when it hit?
21      A.    I was driving to work.
22      Q.    So, you just diverted yourself
23  from going to work, to going to the doctor's

Page 78

1  office?
2      A.    Well, I called and they
3  couldn't get me in until one o'clock.
4      Q.    What did you do in the
5  meantime?
6      A.    She told me to go home, and
7  take one of my pills, and lay down.
8      Q.    And that's the doctor's office
9  that told you that?
10      A.    Jackie told me that, yes, sir.
11      Q.    And Jackie's with Dr. Sy's
12  office?
13      A.    She's a nurse, yes.
14      Q.    Did you call anybody at the
15  Medical Center before you called Lisa
16  Brookes after your appointment?
17      A.    No, sir.
18      Q.    How long did Dr. Sy take you
19  off of work?
20      A.    A week.
21      Q.    During that week, did you have
22  any communications with anybody at the
23  Medical Center?

Page 79

1      A.    No, sir.
2      Q.    Did you have communications
3  with Dr. Ennis?
4      A.    No, sir.
5      Q.    So, did you return to work the
6  next week?
7      A.    Yes, sir.
8      Q.    Did Dr. Ennis say anything to
9  you when you returned to work about being
10  off the previous week?
11      A.    No, sir.
12      Q.    Did he tell you what he had
13  wanted to talk to you about?
14      A.    No, sir.
15      Q.    Did you have any conversations
16  with Sheila Dunn about being off for the
17  previous week?
18      A.    I'm sorry?
19      Q.    Did you have any conversations
20  with Sheila Dunn about being off for the
21  previous week?
22      A.    No, sir.
23      Q.    Prior to this, had they

Page 80

1  implemented a new billing system at the
2  clinic?
3      A.    Yes, sir. They were in the
4  process.
5      Q.    They were in the process at
6  the time you were coming back from leave?
7      MS. HAYNES: Object to the
8  form.
9      A.    When I came back from that
10  last leave, yes.
11      Q.    The one-week?
12      A.    Yes, sir.
13      Q.    Were you still responsible for
14  billing at this point?
15      A.    If I recall, I was for coding.
16      Q.    Were you receiving training on
17  the new system?
18      A.    Brief.
19      Q.    Did anybody tell you why they
20  were implementing a new system?
21      A.    Because they wanted to get rid
22  of the old one.
23      Q.    Do you know what the new

20  (Pages 77 to 80)

**FREEDOM COURT REPORTING**

Page 81

1 system was named?
2     A.    I don't recall.
3     Q.    It was a new company handling
4 the billing?
5     A.    Yes.  Pro Billing.
6     Q.    Were they, in essence,
7 outsourcing the billing at the clinic?
8     A.    Yes, sir.
9     Q.    Did anybody tell you why they
10 were outsourcing the billing?
11     A.    Because they said I wasn't
12 doing my job.
13     Q.    Who told you that?
14     A.    The best I recall, Dr. Ennis.
15     Q.    Did he explain what he meant
16 by that?
17     A.    He said because I refused to
18 do the collections, which I did not say.
19     Q.    What does he mean by
20 collections?
21     A.    He asked me -- We had a
22 conversation.  He said:  We're going to have
23 to collect these old accounts.  And I said:

Page 82

1 I've been working here a long time, these
2 people are my friends.  It's going to be
3 really hard, but you got to do what you got
4 to do.  And I went to the back and ordered
5 five hundred self-addressed, stamped
6 envelopes.
7     Q.    Who else was present when you
8 had this conversation with Dr. Ennis about
9 collecting the old accounts?
10     A.    Lisa was in the room.  Lisa
11 Brookes was in the room.
12     Q.    Anyone else?
13     A.    No, sir.
14     Q.    Were there a substantial
15 number of old accounts that were in
16 receivables?
17     A.    Yes, sir.
18     Q.    When was this conversation
19 where he told you that we were going to have
20 to collect old accounts?
21     A.    I don't recall.
22     Q.    Was it before you — the
23 week's leave?

Page 83

1     A.    Yes, sir.  Way before.
2     Q.    Okay.  Was it since you'd come
3 back from surgery?
4     A.    Yes, sir.
5     Q.    Other than ordering the
6 self-addressed envelopes, did you do
7 anything else to prepare to collect the old
8 accounts?
9     A.    I never got a chance.
10     Q.    Why?  What do you mean by
11 that?
12     A.    I was let go.
13     Q.    Therefore, ordering the
14 envelopes was the only thing you'd done at
15 that point?
16     A.    Yes, sir.
17     Q.    And you said Dr. Ennis told
18 you that they were outsourcing the billing,
19 because you'd refused to do the collections?
20     A.    That's what he said, yes, sir.
21     Q.    How'd you respond?
22     A.    I told him that I was never
23 given the chance to do them; that I had

Page 84

1 already ordered the envelopes; that I was
2 going to send out dunning letters.  And
3 after the dunning letters, I was going to
4 start calling people.  And he said:  A
5 little bit too late.
6     Q.    Did he say anything else?
7     A.    No, sir.
8     Q.    This was after you returned
9 from the one-week's leave?
10     A.    It's before.
11     Q.    Was anybody else present when
12 Dr. Ennis told you this?
13     A.    No, sir.
14     Q.    Did you talk to anybody else
15 at the Medical Center about collecting the
16 old accounts, other than to Dr. Ennis?
17     A.    No, sir.
18         MS. HAYNES:  Do you need a
19 break?
20         THE WITNESS:  Uh-huh.  Please.
21         (Recess taken.)
22     Q.    (By Mr. Vreeland) Ms. Hughes,
23 when you returned from your leave, the

21 (Pages 81 to 84)

**FREEDOM COURT REPORTING**

Page 85

1   initial five-week leave right after your
2   surgery, do you know if Dr. Ennis was
3   terminal at that point, his cancer was
4   terminal?
5       A.   I felt like it was, yes.
6       Q.   Did you ever complain to
7   anybody at Dale Medical Center that you
8   thought you were being discriminated against
9   because of your brain tumor?
10      A.   No, sir.
11      Q.   Let me just be sure. You have
12  a disability discrimination claim in this
13  case?
14      A.   Yes, sir.
15      Q.   And I'm presuming your
16  disability was your brain tumor?
17      A.   Yes, sir.
18      Q.   Okay. Do you have any other
19  disability?
20      A.   No, sir.
21      Q.   Did you complain to anybody at
22  Dale Medical Center that you were being
23  discriminated against because of your age?

Page 86

1       A.   Can I go back?
2       Q.   Yes.
3       A.   Okay. I went to Sheila Dunn,
4   and we had a conversation. I told her
5   that -- concerning the flu shots, we did
6   have a conversation. I told her that when I
7   was not telling the truth about something, I
8   honestly was not lying. I just -- Something
9   was wrong with me, and I didn't know if it
10  was medication or something else. And she
11  said: Well, let's pray it's medication and
12  not something worse. And I said: Well,
13  we're trying to look into that. And I just
14  wanted her to know that I was honestly not
15  trying to tell lies, or do anything to harm,
16  you know, Arrington Medical Clinic or Dale
17  Medical Center.
18      Q.   And this was when y'all were
19  discussing the flu shots?
20      A.   Yes, sir.
21      Q.   Had anyone accused of you
22  lying?
23      A.   In a roundabout way, yes.

Page 87

1       Q.   Who?
2       A.   Dr. Ennis and Sheila.
3       Q.   And how did they do it in this
4   roundabout way?
5       A.   She said: If you're going to
6   saying something, if you're not going to own
7   up to it, then -- you need to own up to what
8   you're saying. If you're going to do
9   something, you need to own up to it. You
10  need to own up to your mistakes.
11      Q.   Okay. Going back to my
12  earlier question, did you ever complain to
13  anybody at Dale Medical Center that you
14  thought you were being discriminated against
15  because of your age?
16      A.   No, sir.
17      Q.   Did anybody at Dale Medical
18  Center ever make any comments about your
19  age?
20      A.   No, sir.
21      Q.   When Blue Cross denied the ten
22  to twelve claims for Dr. Zumstein's number,
23  did you raise that with anybody?

Page 88

1       A.   I talked with the girl at
2   MedNet. I think I answered that question to
3   the best of my ability earlier.
4       Q.   Okay. Let me ask it a
5   different way then.
6       A.   Yes, sir.
7       Q.   After the claims had been
8   denied, who with Dale first raised the
9   issue? Was it you, was it Ms. Dunn, was it
10  somebody in billing, was it Dr. Ennis?
11      A.   I raised the question first.
12      Q.   Okay. And who did you raise
13  that with?
14      A.   The girl at MedNet.
15      Q.   All right. And she's the one
16  that told you it happened because
17  Dr. Zumstein's number had been -- had
18  expired?
19      A.   She called Sheila Dunn, and
20  that's how she found out that it was
21  discontinued.
22      Q.   Did you do anything to try to
23  fix the billing situation before you wrote

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

### FREEDOM COURT REPORTING

Page 89

1  the accounts off?
2      A.    I filed them twice, and they
3  both came back denied due to billing
4  provider number.
5      Q.    Having expired?
6      A.    Expired, yes.
7      Q.    Did you do anything else?
8      A.    No, sir.
9      Q.    When you returned from your
10 one-week leave, what were your job functions
11 at that point?
12     A.    The same as they had been.
13     Q.    Did anybody at Dale Medical
14 Center say or do anything that made you
15 think they thought your brain tumor was
16 preventing you from doing your job?
17     A.    No, sir.
18     Q.    Did anybody at Dale Medical
19 Center say or do anything that led you to
20 believe that your brain tumor was
21 interfering with your normal daily
22 activities?
23     A.    No, sir.

Page 90

1      Q.    Why didn't you complain to
2  Sheila Dunn about the way you'd been treated
3  by Dr. Ennis?
4      A.    Because I felt like if I had,
5  the retaliation from Pat would have been
6  worse, and I would have probably been fired.
7      Q.    Why didn't you complain to
8  Sheila Dunn about Pat Ennis?
9      A.    The same reason.
10     Q.    What led you to believe you'd
11 be fired?
12     A.    I just felt like the doctor is
13 the main character, and you just don't say
14 anything.
15     Q.    Had Ms. Dunn done or said
16 anything to led you to believe that?
17     A.    No, sir.
18     Q.    And the billing system that
19 they were implementing after you came back
20 from the one-week leave, is that a system
21 that would send out initial bills to
22 patients?
23     A.    When I came -- Are you talking

Page 91

1  about when I came back?
2      Q.    From your one-week leave.
3      A.    They had put the system up
4  front, first, and Lisa was -- Brookes was
5  learning the scheduling part of it.  I still
6  had the old system in the back.  I was
7  putting in money still on the old accounts,
8  so I really never got a chance to know what
9  was really going to be implicated into that
10 system.
11     Q.    Okay.  You were never trained
12 on the new system?
13     A.    I had a little bit of
14 training.  Pat said:  Come up front and
15 learn some of this, Debbie, because you're
16 going to probably be doing some scheduling.
17 When Lisa's out, you will probably be up
18 front.  I helped out in every area of the
19 office when someone was out.
20     Q.    So, the training you received
21 on that new system was only on the
22 scheduling part of it?
23     A.    Yes, sir.

Page 92

1      Q.    And you never learned what the
2  billing, coding part of the system was going
3  to do?
4      A.    No, sir.
5      Q.    How long after you returned
6  from that one-week leave before you were
7  told you were being terminated?
8      A.    I came back on Monday, and on
9  Wednesday Sheila Dunn called me at ten
10 o'clock in the morning and told me she
11 needed to speak with me.
12     Q.    Did Dr. Ennis say anything to
13 you that you considered to be harassing in
14 the interim?
15     A.    No, sir.
16     Q.    Did Pat Ennis say anything to
17 you, you considered to be harassing in the
18 interim?
19     A.    No, sir.
20     Q.    What happened when you went to
21 meet with Sheila Dunn?
22     A.    That Monday morning when I
23 came back, Pat stopped me at my office door

23 (Pages 89 to 92)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  and said: Debbie, John would have given you
2  a week off if you had just asked him.
3      Q.    How'd you respond?
4      A.    I didn't say anything.
5      Q.    I think you told me previously
6  Dr. Ennis hadn't said anything to you?
7      A.    No, sir. Dr. Ennis didn't say
8  anything to me.
9      Q.    What happened when you met
10 with Sheila Dunn?
11     A.    She just told me that they
12 were getting a new billing system, to Pro
13 Billing to do the job. And that because I
14 did not call Dr. Ennis, that they were going
15 to have to let me go, and that they were
16 downsizing, and my job would be no longer
17 needed.
18     Q.    So, she told you they were
19 getting a new billing system to do the job?
20     A.    Yes, sir.
21     Q.    And that because you did not
22 call Dr. Ennis?
23     A.    They were going to have to let

Page 94

1  me go.
2      Q.    They would let you go, and
3  they were downsizing?
4      A.    Yes, sir.
5      Q.    Did she say anything else to
6  you?
7      A.    She said that I was a great
8  employee, and that she would give me a
9  letter of recommendation. And I asked her
10 if I could draw my unemployment, and she
11 said yes. And I asked her if any jobs came
12 open, would she call me. And she said:
13 You'll be the first one I'll call.
14     Q.    Did she say anything else to
15 you?
16     A.    She asked me for my key, and
17 didn't want me to go back by the office, and
18 told me she would get my stuff. I told her
19 after thirty-one years, I said: Sheila, I
20 have quite a bit of stuff to get. And she
21 says: Just give me a name of some stuff,
22 and I'll get the girls to get it up. And I
23 told her: I cannot remember, after

Page 95

1  thirty-one years, all the stuff I have. I
2  said: Most of the pictures of my son, and a
3  plaque that I had from my best friend.
4      Q.    Did either of you say anything
5  else?
6      A.    Good-bye.
7      Q.    Do you remember anything else
8  said in that conversation?
9      A.    To the best of my knowledge,
10 that's all I can remember.
11     Q.    Was anybody else present
12 during this meeting?
13     A.    No, sir.
14     Q.    Where did this occur?
15     A.    In her office.
16     Q.    Sheila Dunn's office?
17     A.    Yes, sir.
18     Q.    Did you speak to Ms. Dunn
19 after that?
20     A.    Yes, sir.
21     Q.    When?
22     A.    That next day, I asked her if
23 I could please come get my own stuff; that

Page 96

1  there was just too many things in there that
2  were mine. And I asked her if on a Friday
3  when they work half a day, if she could pick
4  a day that I could come get it. And she
5  said: Well, right now they're learning --
6  they're being trained on Pro Billing, that
7  I'd have to call you back. And she called
8  back at my mother's house later on that day
9  and gave me a date. And I can't recall the
10 date, but I did go back and get my stuff.
11     Q.    That conversation was just
12 about getting your stuff out of the office?
13     A.    Getting my stuff out of the
14 office, yes.
15     Q.    Okay. And you did, at some
16 point, go to the office and get all your
17 stuff?
18     A.    Yes, sir. She and Mr. Jones,
19 I can't remember his first name, came, and
20 opened the doors for me and let me come and
21 get my stuff.
22     Q.    Did you have any other
23 conversations with Ms. Dunn?

24 (Pages 93 to 96)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 97

1      A.    I think there was one more
2  about the unemployment office called me and
3  told me that I would be getting two weeks
4  vacation and two weeks severance pay, but I
5  cannot recall that whole conversation.
6      Q.    Was that in person, or on the
7  phone?
8      A.    On the phone.
9      Q.    Is that a conversation with
10 Ms. Dunn?
11     A.    With Ms. Dunn.
12     Q.    You were talking about what
13 the unemployment folks had said to you?
14     A.    Yes, sir.
15     Q.    And do you recall what she
16 said?
17     A.    She said that was correct.
18     Q.    Were you paid two weeks
19 vacation and two weeks severance?
20     A.    Yes, I was.
21     Q.    Okay.  Did you have any other
22 conversations with Ms. Dunn?
23     A.    No.  I did ask her if there

Page 98

1  was an appeal process on that date, I'm
2  sorry, on that last conversation.  And she
3  said, yes, there was.  And I would have to
4  go through Vernon to get that.
5      Q.    That was the phone call about
6  the unemployment?
7      A.    Yes, sir.
8      Q.    And so, you asked about an
9  appeal's process, and she told you that you
10 would have to contact Vernon Johnson?
11     A.    I would have to go through
12 Vernon Johnson, yes.
13     Q.    And do you recall anything
14 else said during that conversation?
15     A.    Not that I recall.  That's the
16 only thing I can remember.
17     Q.    Okay.  Did you contact
18 Mr. Johnson about an appeal?
19     A.    Yes, I did.
20     Q.    Did you go see him, or call
21 him on the phone?
22     A.    I set up an appointment with
23 Phyllis Sexton.

Page 99

1      Q.    Was anybody else present when
2  y'all met?
3      A.    No, sir.
4      Q.    What happened when you met
5  with Mr. Johnson?
6      A.    He just complained about the
7  flu shots, writing off of accounts.  He told
8  me that I could have hurt the hospital very
9  bad with that flu shot invoice, the amount.
10 And I told him, I said:  Well, by the grace
11 of God, it really went very well for you,
12 didn't it?  And he said:  Well, you're just
13 picking at straws.  And he asked me, he
14 said:  If I gave you your job back today,
15 would you take it?  And I said:  No.  Not
16 unless you could change things with
17 Sheila -- excuse me, with Pat and Dr. Ennis.
18     Q.    Was Sheila in that?
19     A.    No.  I didn't mean to say her
20 name, I'm sorry.
21     Q.    So, you said you'd take it
22 back if he could change things?
23     A.    Change things with Dr. Ennis

Page 100

1  and Pat.  With her saying the F word all the
2  time, and having to walk on egg shells
3  around him.
4      Q.    What else was said in this
5  meeting with Vernon Johnson?
6      A.    I asked him why couldn't he
7  have given me another job in the office.  He
8  said I wasn't qualified for any other job in
9  the office.  I told him I was.  I could --
10 Lisa's job.  And he said:  I'm not going to
11 fire somebody, one person, to give you
12 another job just because of seniority.  I
13 don't do things like that.  That's all that
14 was said.
15     Q.    You told Vernon Johnson that
16 Pat Ennis was using the F word in the
17 office?
18     A.    Yes, I did.
19     Q.    All right.  Did you tell him
20 anything else she was doing in the office?
21     A.    No, sir.
22     Q.    Did you explain to him what
23 you meant about having to walk on egg shells

25 (Pages 97 to 100)

**FREEDOM COURT REPORTING**

Page 101

1  around Dr. Ennis?
2      A.    No, sir.
3      Q.    What did you mean by that,
4  that you had to walk on egg shells around
5  Dr. Ennis?
6      A.    His moods.  There was one
7  other thing said.  He asked me, he said:
8  What do you want to do, get a harassment
9  case against me?  I replied nothing.
10     Q.    You didn't reply at all?
11     A.    No, sir.
12     Q.    When you talk about Dr. Ennis'
13 moods, describe for me what you mean.
14     A.    He could be pretty -- one
15 minute be really nice, and the next minute
16 be really, you know, moody.  I had
17 complaints from patients about that.
18     Q.    Was he this way all along, or
19 was it something that changed over time?
20     A.    It changed over time.
21     Q.    Was it worse near the end of
22 your employment?
23     A.    No, sir.

Page 102

1      Q.    When did it develop that it
2  was changing over time?
3      A.    I think the sicker he got, the
4  worse he got.
5      Q.    He was moodier later in his
6  illness?
7      A.    Yes, sir.
8      Q.    After your meeting, appeal's
9  meeting with Vernon Johnson, did you speak
10 with him again?
11     A.    No, sir.
12     Q.    How did that meeting end?
13     A.    I just said it was going
14 nowhere, and I told him good-bye.
15     Q.    And you didn't speak with
16 Sheila Dunn after that?
17     A.    No, sir.
18           (Defendant's Exhibit 1 was
19           marked for identification
20           purposes.)
21     Q.    I have marked for
22 identification purposes, Defendant's Exhibit
23 1 to your deposition.  I'll ask if you've

Page 103

1  seen that before?
2      A.    Yes, sir.
3      Q.    Do you recognize -- Have you
4  provided your attorney with all the
5  documents you have in your possession or
6  control that are called for by Defendant's
7  Exhibit 1?
8      A.    Yes, sir.
9           (Defendant's Exhibit 2 was
10          marked for identification
11          purposes.)
12    •Q.    Let me show you what I've
13 marked for purposes of identification as
14 Defendant's Exhibit 2.  Do you recognize
15 that?
16     A.    Yes, sir.
17     Q.    As your job application to
18 Dale Medical Center?
19     A.    Yes, sir.
20     Q.    If you would look at the last
21 page, is that your signature at the bottom?
22     A.    Yes, sir.
23     Q.    It appears to be dated August

Page 104

1  6th, 1998?
2      A.    Yes, sir.
3      Q.    Because that's when you became
4  a Dale Medical Center employee?
5      A.    Yes, sir.
6      Q.    That's when they took over the
7  clinic from Dr. Zumstein?
8      A.    I would assume so, yes, sir.
9           (Defendant's Exhibit 3 was
10          marked for identification
11          purposes.)
12     Q.    Let me show what I've marked
13 for purposes of identification, Defendant's
14 Exhibit 3.  Do you recognize that document?
15     A.    Yes, sir.
16     Q.    Is that an acknowledgement you
17 signed for your employee handbook?
18     A.    Yes, sir.
19     Q.    And you signed it on May 19th,
20 2004?
21     A.    Yes.
22     Q.    Did you actually receive an
23 employee handbook when you signed that?

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1    A.    Yes, sir.
2          MR. VREELAND:  I'll give you
3  any of these that you want.
4          MS. HAYNES:  Well, I'd like
5  copies of all of them, yeah.
6          MR. VREELAND:  All right.
7          (Defendant's Exhibit 4 was
8          marked for identification
9          purposes.)
10    Q.    Let me show you what I've
11  marked for purposes of identification,
12  Defendant's Exhibit 4 of your deposition.
13  Do you recognize that document?
14    A.    Yes, sir.
15    Q.    Is that a copy of the handbook
16  you received in 2004?
17    A.    Yes, sir.
18    Q.    Referenced in Exhibit 3?
19    A.    Yes, sir.
20          MR. VREELAND:  I gave you one
21  of those, didn't I?
22          MS. HAYNES:  Yes.
23          MR. VREELAND:  Did I give you

Page 106

1  one of the acknowledgements?
2          MS. HAYNES:  (Attorney shakes
3  head in a negative response.)
4    Q.    Did you have your own copy of
5  Defendant's Exhibit 4 while you were
6  employed?
7    A.    Yes, sir.
8          (Defendant's Exhibit 5 was
9          marked for identification
10          purposes.)
11    Q.    Let me show you what I've
12  marked for purposes of identification,
13  Defendant's Exhibit 5 to your deposition.
14  Do you recognize that document?
15    A.    Yes, sir.
16    Q.    Is that one of your
17  performance evaluations while you were
18  employed?
19    A.    Yes, sir, it is.
20    Q.    It was administered in July of
21  2004?
22    A.    Yes, sir.
23    Q.    And is Dr. Ennis the one who

Page 107

1  administered it to you?
2    A.    That's his signature.
3    Q.    Did he discuss the evaluation
4  with you?
5    A.    Yes, sir.  He told me that I
6  gave the other girls a complete perfect
7  score, and that I had no right to.  And he
8  said from now on, that he would do all of
9  their evaluations.
10    Q.    Did he say anything about your
11  performance when he gave you Defendant's
12  Exhibit 5?
13    A.    He said:  You see, you don't
14  have a perfect score.
15    Q.    Did he tell you why you didn't
16  have a perfect score?
17    A.    No, sir.
18    Q.    Did you ask him?
19    A.    No, sir.
20    Q.    Did y'all talk about any
21  performance issues at the time he gave you
22  Defendant's Exhibit 5?
23    A.    No.

Page 108

1          (Defendant's Exhibit 6 was
2          marked for identification
3          purposes.)
4    Q.    Let me show you what I've
5  marked for purposes of identification,
6  Defendant's Exhibit 6.  Do you recognize
7  that document?
8    A.    Yes, I do.
9    Q.    Is this the invoice for flu
10  vaccines that you were talking about
11  earlier?
12    A.    Yes, it is.
13    Q.    And did you actually receive
14  this from the supplier?  Are you the one
15  that this went to?
16    A.    No, it went to the hospital, I
17  think -- Hold on.  I can't recall.  I can't
18  recall.
19          (Defendant's Exhibit 7 was
20          marked for identification
21          purposes.)
22    Q.    Let me show you what I've
23  marked for purposes of identification,

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1 Defendant's Exhibit 7 to your deposition.
2 Do you recognize that?
3     A.    Yes, sir.
4     Q.    Is that the return-to-work
5 slip for your -- from your original leave?
6     A.    Yes, sir.  When I came back
7 from my brain tumor.
8     Q.    Well, when I say original
9 leave, we're talking about the five-week
10 leave?
11     A.    Yes, sir.
12         (Defendant's Exhibit 8 was
13             marked for identification
14             purposes.)
15     Q.    Okay.  And then, let me show
16 you what I've marked for purposes of
17 identification, Defendant's Exhibit 8.  Do
18 you recognize that?
19     A.    Yes, sir.
20     Q.    Is that your return-to-work
21 slip for going from half time back to full
22 time?
23     A.    Yes, sir.

Page 110

1     Q.    Let me ask you, going back to
2 Number 7, when does that say you're going to
3 return to work?
4     A.    2/7/05.
5     Q.    Does that sound right to you?
6     A.    Yes, sir.
7     Q.    And then in Defendant's
8 Exhibit 8, when does that switch you from
9 half time to full time?
10     A.    2/21/05.
11     Q.    Does that sound about right?
12     A.    Yes, sir.
13         (Defendant's Exhibit 9 was
14             marked for identification
15             purposes.)
16     Q.    Okay.  Let me show you what's
17 been marked for purposes of identification
18 as Defendant's Exhibit 9.  Do you recognize
19 that?
20     A.    Yes, sir.
21     Q.    And is that Dr. Sy's note
22 taking you off work for the week?
23     A.    Yes, sir.  From 4/11 to 4/18.

Page 111

1     Q.    And do those dates sound about
2 right to you?
3     A.    Yes, sir.
4     Q.    Okay.
5         MR. VREELAND:  We're going to
6 go off the Record for a minute.
7         (Off-the-Record discussion
8             was held.)
9     Q.    (By Mr. Vreeland)  Did anyone
10 at the Medical Center talk to you about
11 giving out -- you giving out medicine to
12 friends?
13     A.    No, sir.
14     Q.    Did anybody — Did the Medical
15 Center talk to you about giving out medicine
16 to Dr. Zumstein when he was no longer there?
17     A.    No, sir.
18     Q.    Did you complain to anybody
19 that you didn't like the new billing system,
20 the one they were implementing the last week
21 or two?
22     A.    No, sir.
23     Q.    Was anyone else at the

Page 112

1 Arrington Clinic responsible for billing,
2 other than you, once you came back from your
3 leave?
4     A.    No, sir.
5     Q.    During the time Dr. Ennis was
6 getting moody, did he do that toward
7 everybody?
8     A.    Yes, sir.
9     Q.    Did anybody ever, at the
10 Medical Center, ever talk to you about
11 working too much overtime?
12     A.    Yes, sir.
13     Q.    Who did that?
14     A.    Sheila Dunn.
15     Q.    What'd she say to you?
16     A.    When Dr. Zumstein -- When
17 Dr. Ennis was out, and I had no help, and I
18 had to do my job and the job in the back to
19 help Dr. Zumstein.
20     Q.    Who had been doing the job in
21 back?
22     A.    I can't recall her name.
23     Q.    Do you know what happened to

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1  that person?
2      A.    I can't recall.
3      Q.    When you told Dr. Ennis about
4  your diagnosis, that you had the brain
5  tumors, did you also tell him what your
6  prognosis was?
7      A.    He didn't ask.
8      Q.    Did you tell him?
9      A.    No, sir.  At the time, I
10  didn't know.
11      Q.    Did he expect that you'd be
12  coming back to work after some period of
13  recovery?
14      A.    Yes, sir.
15      Q.    You testified earlier about
16  Dr. Zumstein asking if you could delay the
17  surgery.  Did you delay the surgery?
18      A.    Dr. Ennis, you mean?
19      Q.    I'm sorry.  Correct.
20      A.    No, I did not.
21      Q.    Did he ever say anything to
22  you about that again?
23      A.    No, sir.

Page 114

1      Q.    Other than your need for the
2  time off for recovery, and the reduced
3  schedule for some period of time, did you
4  need any accommodation because of your brain
5  tumor to do your job?
6      A.    Other than my husband driving
7  me to work?
8      Q.    Other than that?
9      A.    No, sir.
10      Q.    How long did your husband have
11  to drive you to work?
12      A.    The half-a-days.
13      Q.    Once you went back to full
14  time, you were able to drive yourself?
15      A.    Yes, sir.
16      Q.    You've testified some about
17  Pat Ennis cursing in the clinic.  Did she do
18  that before you were diagnosed with the
19  brain tumor?
20      A.    Yes, sir.
21      Q.    So, she did that consistently
22  throughout?
23      A.    Very consistently.

Page 115

1      Q.    Other than Dr. -- what you've
2  told me about Dr. Ennis and Pat Ennis doing,
3  did anybody else harass you?
4      A.    No, sir.
5      Q.    And have you told me about all
6  the things they did to harass you?
7      A.    Yes, sir, I think so.
8      Q.    You believe that you were
9  terminated because of your brain tumor?
10      A.    I think it had something to do
11  with it.  Because of the mistakes I made was
12  due to the brain tumor.  I would not have
13  made those mistakes if I had not had the
14  brain tumor.
15      Q.    You're talking about the flu
16  vaccine, and the writing off of the bills?
17      A.    Yes, sir.
18      Q.    Okay.  You're talking about
19  any of the mistakes you made because of the
20  brain tumor?
21      A.    Yes, sir.
22      Q.    Which?
23      A.    I would not have made those

Page 116

1  mistakes if I had been in my right mind.
2      Q.    Okay.  Were there any other
3  mistakes that you think were caused by the
4  brain tumor?
5      A.    No.
6      Q.    While you were employed at
7  Dale Medical Center, did you tell anybody
8  that you thought those mistakes were because
9  of your brain tumor?
10      A.    Cheryl Petrie.
11      Q.    Anybody else?
12      A.    No, sir.
13      Q.    Do you believe that you were
14  terminated because of your age?
15      A.    Yes.
16      Q.    What leads you to believe
17  that?
18      A.    Excuse me?
19      Q.    What leads to you believe you
20  were terminated because of your age?
21      A.    Due to my health conditions
22  and my age, I felt like it was fixing to
23  start costing them a lot of costly health

29  (Pages 113 to 116)

**FREEDOM COURT REPORTING**

Page 117

1  problems and making their insurance go up.
2      Q.    What leads you to believe
3  that?  Or what led you to believe that?
4      A.    Just health premiums go up
5  when a lot of -- you have to use insurance a
6  lot.
7      Q.    Did anybody at Dale Medical
8  Center say or do anything to cause you to
9  believe that?
10     A.    No, no.
11     Q.    That was an assumption on your
12  part?
13     A.    On my part.
14     Q.    Okay.  Is there anything else
15  that led you to believe that you were
16  terminated because of your age?
17     A.    No, sir.
18     Q.    And other than your
19  termination, do you believe they
20  discriminated against you because of your
21  age in any other way?
22     A.    No.
23     Q.    Do you believe you've been

Page 118

1  retaliated against by Dale Medical Center?
2      A.    Explain.
3      Q.    You have a retaliation claim
4  in this case.  They got mad at you for
5  something and did something bad to you.  My
6  question is, do you believe -- first of all,
7  do you believe that?
8      A.    Yes, sir.
9      Q.    Okay.  And second, what is it
10  that you believe you did that made them mad
11  to do something bad to you?
12     A.    The flu shots, the writing off
13  the accounts.
14     Q.    Anything else?
15     A.    No, sir.
16     Q.    When we talked about them
17  doing something bad to you, are you talking
18  about your termination?
19     A.    Yes, sir.
20     Q.    Is there any other way you
21  believe you were retaliated against?
22     A.    When I came back from my
23  surgery, Dr. Ennis and Pat both told me the

Page 119

1  slate was clean; that the hospital
2  understood that the things I did was due to
3  my brain tumor.
4      Q.    When did they tell you that?
5      A.    When I came back the week --
6  the week I came back after my surgery, after
7  my time off -- the five weeks I was off.
8      Q.    Were they together when they
9  said this?
10     A.    No.  They told me at different
11  times.
12     Q.    When they said the things you
13  had done -- they knew the things you had
14  done were due to your brain surgery, did
15  they say what they were referring to?
16     A.    Brain tumor, the brain tumor.
17     Q.    I'm sorry.  Did they say what
18  they were referring to?
19     A.    They were referring to the flu
20  shots and the writing off of the accounts.
21     Q.    Did they say that's what they
22  were referring to?
23     A.    Yes.

Page 120

1      Q.    Okay.  Is there anything else
2  they did that you believe was retaliation?
3      A.    No, sir.
4          (Defendant's Exhibit 10
5          was marked for
6          identification purposes.)
7      Q.    Let me show you what I've
8  marked for purposes of identification as
9  Defendant's Exhibit 10 in your deposition.
10  Do you recognize that as the charge of
11  discrimination filed against Dale Medical
12  Center?
13     A.    Yes, sir.
14     Q.    Other than this charge have,
15  you ever filed any EEOC charge before?
16     A.    No, sir.
17     Q.    Is this the only charge you
18  filed against Dale Medical Center?
19     A.    Yes, sir.
20     Q.    Was the affidavit that follows
21  the first page attached to the charge when
22  you signed it?
23     A.    Uh-huh.  Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 121

1    Q.    In here in paragraph eleven,
2  your referring to extended illness benefit
3  policy.  Do you believe that was revised
4  because you were out?
5    A.    Yes.
6    Q.    What leads to you believe
7  that?
8    A.    Because at the time it
9  happened.
10   Q.    Because of the timing of the
11  change?
12   A.    Yes, sir.
13   Q.    Okay.  Anything else that
14  leads to you to believe it was because of you
15  that they revised the policy?
16   A.    I don't think it was just
17  because of me, alone, but it did make me
18  feel like I might be centered out, you know,
19  pointed out, that, you know, I was one of
20  the ones that was taking a lot of leave at
21  the time.
22   Q.    Were you afforded all the
23  leave you were due under the policy?

Page 122

1    A.    Not under -- No.
2    MS. HAYNES:  Object to the
3  form.  Go ahead.
4    Q.    No, you were not?
5    A.    No.
6    Q.    Okay.  What leave were you
7  denied?
8    A.    FEMA.
9    Q.    FMLA?
10   A.    FMLA.
11   Q.    Okay.  And at what point did
12  you want to take leave that you were denied?
13   A.    I was never asked about FMLA.
14  No one mentioned that to me.  I took my
15  vacation and sick days that I had
16  accumulated.
17   Q.    Were you allowed to take all
18  the leave with your vacation and sick leave
19  that you needed to?
20   A.    In response of what I said
21  about Pat, no, because she kept pressuring
22  me to come back.
23   Q.    Did anybody with the hospital

Page 123

1  tell you you could not take additional
2  leave?
3    A.    No.
4    Q.    And Pat was not employed by
5  the hospital; correct?
6    A.    I do not know.
7    Q.    Do you know who was hired to
8  do your job?
9    A.    During?
10   Q.    Say in paragraph fourteen:
11  Another woman has been hired to do my job.
12   A.    When Dr. Quintana came, it was
13  June.  I do not know her last name.
14   Q.    Do you know how old June is?
15   A.    No.
16   Q.    And that was after Dr. Ennis
17  died?
18   A.    Yes.
19   Q.    Do you know of anybody else
20  with Dale Medical Center that you believe
21  has been discriminated against because of a
22  disability?
23   A.    No, sir.

Page 124

1    Q.    Do you know of anybody else
2  with Dale Medical Center who you believe has
3  been discriminated against because of their
4  age?
5    A.    No, sir.
6    Q.    Do you know of anybody else
7  with Dale Medical Center who's been denied
8  their FMLA leave?
9    A.    No, sir.
10   Q.    Are you married?
11   A.    Yes, sir.
12   Q.    What's your husband's name?
13   A.    Randy.
14   Q.    Is Randy employed?
15   A.    He's self-employed and works
16  with Stockyard.
17   Q.    What's he self-employed as?
18   A.    A farmer.
19   Q.    Any marriages other than to
20  Randy?
21   A.    No, sir.
22   Q.    How long have y'all been
23  married?

31  (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1    A.    Twenty-eight years.
2    **Q.    Any adult children?**
3    A.    One son.
4    **Q.    What's your son's name?**
5    A.    Josh.
6    **Q.    Where does Josh live?**
7    A.    Dothan.
8    **Q.    Is Josh employed?**
9    A.    He works at Fort Rucker at
10   West Star.  He's a government contractor.
11   **Q.    What does he do for them?**
12   A.    I'm not really sure.  It's
13   private.  It's a government contract.  I'm
14   not allowed to know.  Security.
15   **Q.    What's he do?  Is he an**
16   **engineer?**
17   A.    He's a computer --
18   **Q.    Okay.  A computer guy.**
19   A.    Uh-huh.
20   **Q.    Okay.  Since your employment**
21   **ended, have you spoken with any of the other**
22   **employees at the clinic who were employed at**
23   **the clinic?**

Page 126

1    A.    I spoke with Cheryl.
2    **Q.    Is that Cheryl Petrie?**
3    A.    Cheryl Petrie.  I saw her
4    standing outside the office at Arrington
5    when she was still working there.  I stopped
6    to see how she was doing.
7    **Q.    Did y'all talk about the**
8    **termination of your employment at all?**
9    A.    No.  I told her that I had a
10   lawsuit against Dale Medical Center.
11   **Q.    Did she comment one way or the**
12   **other?**
13   A.    No.
14   **Q.    Other than Ms. Petrie, have**
15   **you spoken with anybody else from the**
16   **Medical Center since your employment was**
17   **terminated?**
18   A.    I called Lisa Brooks and asked
19   her to write a letter -- do a letter,
20   stating that when I had stepped down, due to
21   my illness, of office manager, that two
22   weeks prior to that, Dr. Ennis said I wasn't
23   an office manager anyway, and not to be

Page 127

1    listening to me at all, to listen to him
2    only.  But she never did it.
3    **Q.    You said prior to you asking**
4    **Dr. Ennis to step down, he said you weren't**
5    **an office manager anyway?**
6    A.    He told them on a Friday when
7    I wasn't there.  He told them that I wasn't
8    an office manager anyway.
9    **Q.    Do you know if he supposedly**
10   **said this before or after you had stepped**
11   **down?**
12   A.    It was before.
13   **Q.    All right.  Is Lisa the one**
14   **who told you that?**
15   A.    Her and Cheryl.
16   **Q.    Did they tell you anything**
17   **else that he said during that?**
18   A.    No, sir.
19   **Q.    Have you spoken with any other**
20   **Dale Medical Center employees since your**
21   **termination?**
22   A.    No, sir.
23   **Q.    Okay.  Have you ever been**

Page 128

1    **party to another lawsuit?**
2    A.    No, sir.
3    **Q.    Have you ever filed for**
4    **bankruptcy?**
5    A.    No, sir.
6    **Q.    Have you ever had your**
7    **deposition taken before?**
8    A.    No, sir.
9    MS. HAYNES:  May I have a
10   break?
11   MR. VREELAND:  Yeah.  Yeah.
12   Now's a good time.
13   (Recess taken.)
14   **Q.    (By Mr. Vreeland) What's your**
15   **date of birth?**
16   A.    9/8/56.
17   **Q.    Have you told me about all of**
18   **the conduct you're complaining about in this**
19   **lawsuit?**
20   A.    All the conduct complaint?
21   **Q.    Have you told me about all of**
22   **the conduct that you're complaining about in**
23   **this lawsuit?**

32  (Pages 125 to 128)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 149

1 medication for my fibromyalgia. I think
2 that's all. Everything else I pretty much
3 will -- if I can't afford them, my mom helps
4 me buy it. But now I have Blue Cross,
5 so . . .
6    Q.    So, the ones you dropped were
7 the osteoporosis and the pain medication?
8    A.    Uh-huh.
9         MS. HAYNES: You have to
10 answer out yes or no.
11    A.    Yes, sir.
12    Q.    And you have not restarted
13 those?
14    A.    I haven't been for a mammogram
15 or for a bone density. All my records are
16 at Dale Medical Center.
17    Q.    Have you not gone because you
18 don't have insurance, or have you not gone
19 because your records are at Dale Medical
20 Center?
21    A.    My records are at Dale Medical
22 Center.
23    Q.    You can request those.

Page 150

1    A.    Yes, sir, I know. I plan to.
2    Q.    Now, you said that it's the
3 guy whose name you can't spell Meghani?
4    A.    Meghani.
5    Q.    He asked you to come back?
6    A.    He called me at home and asked
7 if I'd be willing to come to work.
8    Q.    Where?
9    A.    At Arrington.
10    Q.    Is he -- or was he at
11 Arrington?
12    A.    He's the owner.
13    Q.    When did he ask you that?
14    A.    I don't recall the exact date.
15 But he wanted to pay me nine dollars an hour
16 and me pay eight hundred and twenty-two
17 dollars of insurance out of my pocket.
18    Q.    Do you recall, roughly, when
19 it was?
20         MS. HAYNES: What it was?
21         MR. VREELAND: When it was?
22    A.    I'd say the first of last
23 year.

Page 151

1    Q.    So, early '06?
2    A.    Yes, sir.
3    Q.    You said you gained weight.
4 When did you put on weight?
5    A.    I put on a lot of weight right
6 after the termination. I got up to nearly
7 two hundred pounds.
8    Q.    What's the weight gain?
9    A.    Subtraction. I weigh one
10 hundred forty-three now.
11    Q.    So, it's fifty-seven, roughly.
12 Have you lost that weight?
13    A.    Yes, sir.
14    Q.    Okay. Obviously, you've lost
15 that weight.
16         Are you roughly at the weight
17 you were prior to your termination?
18    A.    Yes, sir.
19    Q.    How long did it take you to
20 lose that weight?
21    A.    My son got married in May 20th
22 of last year, and I was that big. So, it
23 took me from May until now, to lose that

Page 152

1 weight.
2    Q.    Have you been injured in any
3 other way?
4    A.    No, sir.
5         MR. VREELAND: That's all I've
6 got.
7         MS. HAYNES: I have a few
8 questions.
9         EXAMINATION
10 BY MS. HAYNES:
11    Q.    Ms. Hughes, you state you were
12 told you were being downsized?
13    A.    Yes, ma'am.
14    Q.    Who told you that?
15    A.    Sheila Dunn.
16    Q.    And at the time you were told
17 you were being downsized, how many people
18 were in that office where you worked?
19    A.    There was me, Lisa Brookes,
20 Karen Williams, and Cheryl Petrie.
21    Q.    Were you the most senior
22 individual?
23    A.    Yes, yes.

38  (Pages 149 to 152)

## FREEDOM COURT REPORTING

Page 157

1  Dr. Ennis contacting her?
2      A.    Yes.
3      Q.    About your medical condition?
4      A.    Yes.
5      Q.    When was that that you had
6  this conversation with Dr. Sy?
7      A.    I went to her one day for some
8  reason, I was sick for some reason, and she
9  mentioned to me that Dr. Ennis and Sheila
10 Dunn had stopped her at the hospital at
11 different occasions, and asked them -- they
12 asked her what was really wrong with me.
13 And she told them that she could not tell
14 them, and they knew that, due to the HIPPA
15 law.
16     Q.    Was this after or before you
17 were terminated?
18     A.    This was after I was
19 terminated.
20     Q.    In Defendant's Exhibit 10, you
21 make mention in paragraph nine that Ms. Dunn
22 and Pat Ennis made a comment about your
23 appearance after your brain surgery?

Page 158

1      A.    Uh-huh.
2      Q.    And you wrote in your
3  affidavit to the EEOC: We know why we don't
4  like you, your hair and your baggy pants.
5  Who made that comment, Ms. Dunn or
6  Ms. Ennis?
7      A.    Ms. Ennis.
8      Q.    Was Ms. Dunn present?
9      A.    No. She said they had talked
10 on the telephone.
11     Q.    Who said that?
12     A.    Pat. Ms. Ennis.
13     Q.    She said that she had talked
14 to?
15     A.    Sheila Dunn.
16     Q.    Pat Ennis said that she and
17 Sheila Dunn had talked on the telephone, and
18 then she repeated this?
19     A.    She said: We decided why we
20 didn't like you.
21     Q.    Were Ms. Ennis and Ms. Dunn
22 friends?
23     A.    They talked on the telephone.

Page 159

1      Q.    How do you know that?
2      A.    Ms. Ennis told me.
3      Q.    In paragraph thirty-two of
4  your complaint, do you have your complaint?
5  He didn't offer that.
6          In paragraph thirty-two of
7  your complaint, did Ms. Dunn ever accuse you
8  that you had not sent her a doctor's excuse,
9  that she had no notice of you being out?
10         MR. VREELAND: Object to the
11 form.
12     A.    No. She admitted to receiving
13 my doctor's excuse, but she just didn't
14 agree with it.
15     Q.    Is that what she said, I don't
16 agree with it?
17     A.    She didn't agree with it.
18     Q.    Did she tell you what she did
19 not agree with?
20     A.    No.
21     Q.    You testified earlier that you
22 were paid for your time off, and that was
23 because you took your accrued vacation and

Page 160

1  sick leave?
2      A.    Yes, ma'am.
3      Q.    Do you know how many days of
4  sick leave you had accrued at the time you
5  had your surgery?
6      A.    I can't recall.
7      Q.    Do you know how many days a
8  year you're entitled to, or were entitled
9  to, at that time?
10     A.    You get so many days for so
11 many hours you work, for every forty hours
12 you work, or it's worked somehow like that.
13     Q.    Did anyone ever explain to any
14 time you would be entitled to under the
15 Family Medical Leave Act?
16     A.    No.
17     Q.    Was it ever mentioned?
18     A.    No.
19         MS. HAYNES: I think that's
20 all I have.
21         MR. VREELAND: I have a couple
22 more.
23         MS. HAYNES: Well, one more

40 (Pages 157 to 160)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| | Page 161 |
|---|---|

1  question.
2      Q.    (By Ms. Haynes) Do you know
3  whether or not Pat Ennis ever received a
4  paycheck from Dale County Medical Center?
5      A.    No, ma'am.
6      Q.    You don't know one way or the
7  other?
8      A.    No, ma'am.
9          EXAMINATION CONTINUED
10 BY MR. VREELAND:
11     Q.    Did I understand you correctly
12 just now that Ms. Dunn never denied
13 receiving your medical excuse that last
14 leave?
15     A.    No.  She received it.
16     Q.    Okay.  Did she tell you that
17 you hadn't reported off properly?
18     A.    She just said that I should
19 have called.
20     Q.    And that you should have
21 called Dr. Ennis or her?
22     A.    Yes, sir.
23     Q.    Okay.  Did you ever hear

| | Page 162 |
|---|---|

1  Sheila Dunn say anything about not liking
2  you because of your hair or your baggy
3  pants?
4      A.    No.
5      Q.    That's just what Ms. Ennis
6  said to you?
7      A.    Yes, sir.
8      Q.    Was anybody else there when
9  Ms. Ennis told you this?
10     A.    No, sir.
11     Q.    Did you ever ask Ms. Dunn
12 about that comment?
13     A.    No, sir.
14     Q.    Did you ever complain to
15 anybody at Dale Medical Center about that
16 comment?
17     A.    No, sir.
18     Q.    Okay.  You said that the first
19 application you filled out after you were
20 terminated at Dale Medical Center, your
21 mother went inside and got the application
22 for you?
23     A.    Yes, sir.  They're sitting in

| | Page 163 |
|---|---|

1  a little folder thing right outside the door
2  of human resources.
3      Q.    And you stayed outside?
4      A.    Yes, sir.
5      Q.    Is that because you couldn't
6  stand to go in the Medical Center?
7      A.    Huh-uh.
8      Q.    You need to say yes or no.
9      A.    Yes, sir.  No, sir.  I
10 couldn't go in.
11     Q.    Okay.  And then the other
12 applications, you filled out at home and
13 then mailed in?
14     A.    Yes, sir.
15     Q.    Is that also because you
16 couldn't stand the idea of going in the
17 Medical Center?
18     A.    Yes, sir.
19     Q.    If you couldn't stand to go in
20 to get the applications, how would you work
21 there?
22     A.    I felt like if they hired me,
23 could I show them that I could do it.  I

| | Page 164 |
|---|---|

1  felt like maybe they didn't have bad
2  feelings toward me.  And if they didn't,
3  maybe it would be okay.
4      Q.    Have you walked back in the
5  Medical Center since?
6      A.    No, sir.
7          MR. VREELAND:  That's all I've
8  got.
9          MS. HAYNES:  I have nothing
10 further.
11 (The deposition was concluded at 3:15 p.m.,
12 May 2nd, 2007.)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

```
 1        REPORTER'S CERTIFICATE
 2   STATE OF ALABAMA,
 3   ELMORE COUNTY,
 4        I, Sara Mahler, Certified Shorthand
 5   Reporter and Commissioner for the State of
 6   Alabama at Large, do hereby certify that the
 7   above and foregoing proceeding was taken
 8   down by me by stenographic means, and that
 9   the content herein was produced in
10   transcript form by computer aid under my
11   supervision, and that the foregoing
12   represents, to the best of my ability, a
13   true and correct transcript of the
14   proceedings occurring on said date and at
15   said time.
16        I further certify that I am neither
17   of kin nor of counsel to the parties to the
18   action; nor in any manner interested in the
19   result of said case.
20
21
22   _____
     Sara Mahler, CSR,
     for the State of
23   Alabama at Large.
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660