# EXHIBIT C

1    IN THE UNITED STATES DISTRICT COURT

2       MIDDLE DISTRICT OF ALABAMA

3          SOUTHERN DIVISION

4

5   DEBORAH HUGHES,

6   Plaintiff,

7   vs.

8   DALE COUNTY MEDICAL CENTER,

9   Defendant.

10

11   Case Number:  1:06-CV-00595-SRW

12

13

14      DEPOSITION:  SHEILA R. DUNN

15

16

17      S T I P U L A T I O N S

18

19       IT IS STIPULATED AND AGREED by

20   and between the parties through their

21   respective counsel that the deposition

22   of SHEILA R. DUNN  may be taken on May

23   3, 2007, before Amy Walls Lenoir,

1

1   Commissioner and Notary Public, at the

2   Hampton Inn, 103 Troy Plaza Loop, Troy,

3   Alabama.

4

5       IT IS FURTHER STIPULATED AND

6   AGREED that it shall not be necessary

7   for any objections to be made by

8   counsel to any questions except as to

9   form or leading questions, and that

10   counsel for the parties may make

11   objections and assign grounds at the

12   time of trial or at the time said

13   deposition is offered in evidence or

14   prior thereto.

15

16

17

18

19

20

21

22

23

2

---

APPEARANCES

Appearing for the Plaintiff:

    HAYNES & HAYNES, P.C.

    Alicia K. Haynes

    1600 Woodmere Drive

    Birmingham, Alabama 35226

Appearing for the Defendant:

    LEHR, MIDDLEBROOKS

      & VREELAND, P.C.

    Albert Vreeland

    P.O. Box 11945

    Birmingham, Alabama 35202-1945

Court Reporter:  Amy Walls Lenoir

Also Present:  Vernon Johnson,

          Deborah Hughes

3

---

I N D E X

Examination by Ms. Haynes............5

Plaintiff's Exhibit 5...............28
Plaintiff's Exhibit 6...............30
Plaintiff's Exhibit 7...............52
Plaintiff's Exhibit 8...............53
Plaintiff's Exhibit 9...............55
Plaintiff's Exhibit 10............110
Plaintiff's Exhibit 11..............74
Plaintiff's Exhibit 12..............74
Plaintiff's Exhibit 13..............88
Plaintiff's Exhibit 14..............88
Plaintiff's Exhibit 15..............89
Plaintiff's Exhibit 16..............91
Plaintiff's Exhibit 17............136
Plaintiff's Exhibit 18............150
Plaintiff's Exhibit 19............157
Plaintiff's Exhibit 20............166
Plaintiff's Exhibit 21............170
Plaintiff's Exhibit 22............191
Plaintiff's Exhibit 23............193
Plaintiff's Exhibit 24............210
Plaintiff's Exhibit 25............212
Plaintiff's Exhibit 26............213
Plaintiff's Exhibit 27............214
Plaintiff's Exhibit 28............216
Plaintiff's Exhibit 29............224
Plaintiff's Exhibit 30............224
Plaintiff's Exhibit 31............251

4

1  and the director of hospice.

2    Q.  Who is your contact at MedNet?

3    A.  It depends on why I am calling

4  them, but generally Donna Peters

5  because she is the director.

6    Q.  Do you know when you first

7  contracted with United ProBilling for

8  the Ariton Clinic?

9    A.  I believe it was April of

10  2005.

11    Q.  What makes you think it's that

12  day?

13    A.  Because it came around about

14  the same time that Ms. Hughes' position

15  was eliminated.

16    Q.  Had you contacted them prior

17  to Ms. Hughes being eliminated?

18    A.  Yes.  Discussions were already

19  underway to talk with them about the

20  billing at Ariton.  And they bill for

21  another one of our practices.

22    Q.  When did United ProBilling

23  start billing for the Ariton Clinic?

13

1    A.  I believe it was April 1st,

2  2005.  But without reviewing the

3  contract, I can't say for sure.

4    Q.  Who handled that contract on

5  behalf of United ProBilling?

6    A.  Shane Kenny.

7    Q.  Was there a period of time

8  that the Ariton -- am I saying it

9  right?

10    A.  Ariton.

11    Q.  The Ariton Clinic was still

12  coding and ProBilling was billing?

13    A.  No.  That was part of the

14  contract that they would also -- you

15  know, sometimes physicians code also.

16  Sometimes a physician will code.  But

17  they did what we call posting the

18  accounts so that you don't have to have

19  someone in the doctor's office doing

20  that.  You just submit the paperwork to

21  them and they do all the computer and

22  data entry.

23    Q.  What paperwork was being

14

1  submitted to United ProBilling?

2    A.  I believe it's called a face

3  sheet or -- Different offices call it

4  different things.  An encounter form.

5  A UB -- I don't know the numbers

6  because I have never actually worked in

7  a doctor's office.  But it is a form

8  that the doctor uses when they are

9  seeing the patients that they mark what

10  they did, what level of visit.  Then

11  there is a code that is attached to

12  that.

13    Q.  How was United ProBilling

14  receiving these forms or face sheets?

15    A.  We had a courier that went up

16  to Ariton every day and would pick the

17  sheets up and bring them back to

18  ProBill in Ozark.

19    Q.  Was Dale County Medical Center

20  the only client of ProBill?

21    A.  No.  I don't think so.

22    Q.  Is it affiliated in any way

23  with the hospital?

15

1    A.  No.

2    Q.  Does it have the same board of

3  directors?

4    A.  No.

5    Q.  Do you have individuals who

6  report to you?

7    A.  Yes.

8    Q.  Has that changed in the last

9  five years?

10    A.  Have the people changed?

11    Q.  Yes, ma'am.

12    A.  Yes.

13    Q.  Have the positions changed

14  that report to you?

15    A.  Yes.  There has been an

16  additional department that reports to

17  me in the last five years.

18    Q.  When was that department added

19  on?

20    A.  When?

21    Q.  Yes, ma'am.

22    A.  Sometime in 2005.  I'm not

23  quite sure when.  The latter part of

16

**Page 17**

1  the year.

2    Q.  Tell me the positions, not

3  names of individuals, but positions or

4  departments that report to you

5  currently.

6    A.  Okay.  The StatMed.

7    Q.  That's the urgent care?

8    A.  That's the urgent care.

9  Correct.  Do you want me to name the

10  practices -- And the physician

11  practices that we own.

12    Q.  Who are those?

13    A.  Dr. Lam, Dr. Duerr.

14    Q.  Is that D-o-e-r?

15    A.  D-u-e-r-r.  I can't even think

16  of the name of the doctors.  I'm sorry.

17  I'm sure the others will come to me.  I

18  will write them down as I think of them

19  and tell you.  Then the senior RX

20  program.

21    Q.  Anyone else?  Any other

22  departments?

23    A.  No.

**Page 18**

1    Q.  Is there an indigent program?

2    A.  That's the senior RX program

3  that I mentioned to you.  It is not an

4  indigent program as such.  It deals

5  strictly with prescription medications

6  for seniors.  Dr. Parwaiz or Dale

7  Pediatric Clinic is another one.

8    Q.  Is Dr. Crawford's office going

9  to report to you?

10    A.  Yes.

11    Q.  How about the surgical center?

12    A.  No.

13    Q.  Home health?

14    A.  No.

15    Q.  Hospice?

16    A.  No.

17    Q.  You heard Mr. Johnson's

18  testimony about the facilities that are

19  no longer owned by Dale Medical

20  Center -- Ariton office, Dr. Luna Sy's

21  office, the neurology office, Dr. Robin

22  Cromer-Tyler's office, and the

23  urologist's office by Dr. Brad Bower.

**Page 19**

1  Did you have any reporting structure

2  with those offices?

3    A.  With all of them.

4    Q.  What were your job duties with

5  regards to those five offices?

6    A.  I just -- We kept them

7  staffed.  And it was different.  It

8  could be different in each office

9  because each physician had their own

10  level of preference as to how much

11  involvement they wanted in the daily

12  running of their office.  Some of them

13  didn't call me until the place was

14  falling apart and others wanted me to

15  make at least a weekly visit and talk

16  with the staff.  It depended on the

17  physician as to how much involvement I

18  had.

19    Q.  Did you provide training to

20  the employees at those offices?

21    A.  No.  I did not.

22    Q.  In your -- Is it 23 years?

23    A.  Yes.

**Page 20**

1    Q.  Did you ever provide any

2  training to the employees at Ariton on

3  human resources?

4    A.  You mean policy training or --

5    Q.  Sexual harassment?

6  Discrimination training?  Retaliation?

7    A.  We have what we call new

8  employee orientation.  All the

9  employees went through that.  One

10  segment of that training is on the

11  policies, sexual harassment and that

12  sort of thing.  Then annually they had

13  to come in for what we call annual

14  update.  Again they were trained

15  annually on those policies.  Not

16  necessarily by me, but either me or

17  someone in my office.

18    Q.  Who else trains other than

19  you?

20    A.  Hilda Houston, Donna Reid.

21    Q.  Anyone else?

22    A.  No.

23    Q.  Is Hilda the mother of Jason

1  Houston?

2  **A.  Yes.**

3  **Q.**  Did Hilda or Jason ever

4  complain to you about Mrs. Ennis?

5  **A.  No.**

6  **Q.**  Did you ever train Mrs. Ennis

7  on any personnel policies or

8  procedures?

9  **A.  She received the same training**

10 **that any other employee that starts**

11 **does.**

12 **Q.**  When did you train Mrs. Ennis?

13 **A.  I believe she started in May.**

14 **So it probably was in May of '05.  Yes.**

15 **May of '05.**

16 **Q.**  What position was she hired?

17 **A.  Just as a clerk.**

18 **Q.**  Where?

19 **A.  At Ariton.**

20 **Q.**  How long was she employed?

21 **A.  Until August of '05 when**

22 **Dr. Ennis died.**

23 **Q.**  As a clerk, what was

21

1  Mrs. Ennis' duties?

2  **A.  She was just supposed to clean**

3  **up, help file, do anything that was not**

4  **getting done.  But I believe from the**

5  **time that we actually employed her**

6  **until the time that she was**

7  **terminated -- her employment was**

8  **terminated.  That was at the very end**

9  **for Dr. Ennis.  I don't know that she**

10 **probably received more than one or two**

11 **paychecks.**

12 **Q.**  Did you have an opening at

13 Ariton?

14 **A.  Let's see.  At that time let**

15 **me see who we had.  I don't know**

16 **without going back to look because I**

17 **can't really recall who all was working**

18 **in the clinic at that time.**

19 **Q.**  Did you have any recollection

20 who was working in the clinic May 2005?

21 **A.  Well, I know that Debbie was**

22 **because she had been there for so long.**

23 **And I know that Sheryl Petrey was**

22

1  because she had been there for so long.

2  But I don't have total recollection of

3  when Karen and Lisa went to work there.

4  **Q.**  I'm sorry.  I thought you told

5  me Mrs. Ennis started May 2005.

6  **A.  That's right.  Well, I guess**

7  **Debbie wasn't there.  Well, then I**

8  **remember that Sheryl was there.  But,**

9  **you know, since I have already made one**

10 **error there, I would hate to go and say**

11 **something else and make another.  She**

12 **did not do the billing.**

13 **Q.**  Who?

14 **A.  Mrs. Ennis.**

15 **Q.**  What was her rate of pay?

16 **A.  I don't recall her rate of**

17 **pay.**

18 **Q.**  Was Lisa -- is it Brown --

19 **A.  Brooks.**

20 **Q.**  -- Lisa Brooks still employed?

21 **A.  No.**

22 **Q.**  Where was she?

23 **A.  Where was she?  Was she still**

23

1  employed then?  I don't -- She may have

2  still been at the clinic at that time.

3  But I'm guessing right now as far as

4  dates go.

5  **Q.**  Karen Williams, was she still

6  employed with the Ariton Clinic in May

7  2005?

8  **A.  There again, it would just be**

9  **a guess.  I believe that she was.  She**

10 **was a medical assistant.**

11 **Q.**  Do you know who was the

12 receptionist?

13 **A.  If Lisa was still there, it**

14 **would have been Lisa.**

15 **Q.**  Do you know what Karen's

16 duties were?

17 **A.  She was the clinical person.**

18 **She was the one that assisted the**

19 **physician in the back with patients.**

20 **Q.**  How long had she been employed

21 at the Ariton Clinic?

22 **A.  I don't know.  I don't recall**

23 **dates.**

24

1  Q.  Less than a year?
2  A.  Probably.
3  Q.  Ms. Petrey was over the lab?
4  A.  Yes.
5  Q.  Did she have any other job
6  duties?
7  A.  I think she occasionally
8  assisted bringing patients back to the
9  back.
10  Q.  Okay.  So we think we had
11  Ms. Brooks as the receptionist greeting
12  patients; is that correct?
13  A.  Correct.
14  Q.  And we had Ms. Petrey in the
15  lab and bringing patients back.  And we
16  had Ms. Williams as a clinical
17  assistant assisting the doctor?
18  A.  Correct.
19  Q.  So what did Mrs. Ennis do in
20  May of 2005?
21  A.  She was just hired to catch up
22  on the filing, actually filing papers
23  in charts.  Those sorts of duties.

25

1  Just clerk.
2  Q.  Who was doing those duties
3  before?
4  A.  I guess they all pitched in
5  and did that.  Debbie did some of it.
6  Q.  What were Ms. Hughes' duties
7  before her position was eliminated?
8  A.  Primarily coding and billing.
9  Q.  What else?
10  A.  Debbie was capable of doing
11  any of the clerical work.  I don't
12  really know what she did on a daily
13  basis.  She made the bank deposits,
14  scheduled patients.
15  Q.  What else?
16  A.  That's --
17  Q.  Were you her direct
18  supervisor, Ms. Hughes' supervisor?
19  A.  It was one of those situations
20  where the physician and I were both
21  considered people that she could go to.
22  Q.  Have you ever seen an
23  organizational chart at Dale Medical

26

1  Center that Ms. Hughes reported
2  directly to you?
3  A.  The physician practices are
4  listed under me on the organizational
5  chart.
6  Q.  Have you seen an
7  organizational chart that had
8  Ms. Hughes' name on it?
9  A.  No.
10  Q.  Her position?
11  A.  No.
12  Q.  Have you seen an
13  organizational chart that has Dr. Ennis
14  on it?
15  A.  No.
16  Q.  Just has physician practice?
17  A.  Well, yes.  In their case it
18  would have been Ariton Medical Clinic.
19  Q.  Did you ever tell Ms. Hughes
20  you were her direct report?
21  A.  Yes.
22  Q.  When?
23  A.  When we first assumed that

27

1  clinic after Dr. Zumstein retired.
2  Q.  When was that?
3  A.  I don't recall even the year.
4  It may be -- Maybe 1999, 1998.
5  Q.  Did you ever conduct any
6  performance evaluations of Ms. Hughes?
7  A.  Yes, I did.
8  Q.  How many?
9  A.  I do not recall Dr. Blough
10  doing hers.  He was the first physician
11  there.  I can't tell you a number
12  because Dr. Ennis wanted to do the
13  evaluations on his staff.  I don't know
14  how many I did.
15  (Plaintiff's Exhibit 5 was
16  marked for identification.
17  A copy is attached.)
18  Q.  Plaintiff's Exhibit 5, have
19  you ever seen this document?
20  A.  Yes.
21  Q.  It is dated August 6, 1998; is
22  that correct?
23  A.  Yes.

28

1    Q.  Is that your writing under
2  Personnel Use Only?
3    A.  It is.
4    Q.  Do you know why the hire date
5  is 8/1/98 and this application is
6  completed on 8/6/98?
7    A.  I would imagine it was just a
8  matter of the paperwork catching up
9  with what was going on up at the clinic
10  because when Dr. Zumstein retired and
11  he approached administration about us
12  trying to -- well, actually, before he
13  retired he had already approached us to
14  ask us to recruit a physician for that
15  office. And at that time we were in
16  the process of recruiting a physician,
17  found a physician. I do not recall how
18  much of a gap there was in between
19  Dr. Zumstein retiring and Dr. Blough
20  assuming that practice. But we kept
21  all of the staff in place. I am sure
22  it was just a timing matter that we got
23  her down there to do the paperwork.

29

1    A.  It begins with the second page
2  there.
3    Q.  Of Plaintiff's 6, Bates
4  No. D00084; is that correct?
5    A.  That is correct. And then --
6    Q.  I'm sorry. Was this title
7  consistent, office manager, patient
8  account, and insurance clerk
9  Ms. Hughes' title until she was
10  eliminated?
11    A.  I don't recall if we changed
12  the title, but we would have done --
13  Actually, the lead person in all the
14  doctors' offices I call office
15  coordinators. At some point the job
16  description may have been changed to
17  office coordinator because that is what
18  we call -- there is only one office
19  that has an office manager.
20    Q.  How many offices have
21  coordinators?
22    A.  Every office has a
23  coordinator.

31

1    Q.  Was Ms. Hughes already the
2  office manager under Dr. Zumstein?
3    A.  I believe that -- Yes. She
4  worked for him. I don't know if he
5  called her. I guess he did.
6    Q.  Under -- Well, about middle of
7  the page it talks about a job
8  description for the position for which
9  she is applying. Have you seen a job
10  description for the office manager
11  position?
12    A.  The job descriptions and
13  evaluation form are one in the same.
14    Q.  I'm sorry. Say that again.
15    A.  The job description and the
16  evaluation form are one in the same
17  form.
18        (Plaintiff's Exhibit 6 was
19         marked for identification.
20         A copy is attached.)
21    Q.  Let me show you Plaintiff's
22  Exhibit 6. Can you tell me what you
23  are referring to?

30

1    Q.  Is it one in the same? An
2  officer manager the same as office
3  coordinator?
4    A.  No.
5    Q.  What is the difference?
6    A.  An office manager has more
7  responsibility. Generally there are
8  more employees in that area. Other
9  than Ariton had four at the time, I
10  believe -- I don't know. I think when
11  we assumed that practice, there was
12  maybe five or six people in that
13  office, which was more than we had in
14  any of our practices. But we just
15  assumed all of Dr. Zumstein's
16  employees. Generally in an office
17  practice just starting up there will
18  only be two employees. At some point
19  you may add a third. But it is after
20  that third when you get -- well, like
21  StatMed. They have probably twelve,
22  thirteen employees. So that's why we
23  have an office manager there.

32

1    Q.    Did Mrs. Ennis hold the title
2    of office coordinator?
3        A.    No.
4        Q.    Did she hold the title of
5    office manager?
6        A.    No.
7        Q.    Do you know what the pay is
8    for an office coordinator?
9        A.    I believe the starting salary
10    is eight dollars an hour.
11        Q.    Is that what Ms. Stelly is
12    making?
13        A.    I'm not sure if it is or not
14    since she transferred.  But I believe
15    it probably is.
16        Q.    Do you know Audra Ammons' rate
17    of pay?
18        A.    No, I don't.
19        Q.    Do you know how long she has
20    been the office manager?
21        A.    Approximately three years.
22        Q.    Who did she replace?
23        A.    Amy Maund.

41

1    Q.    Spell that last name, please.
2        A.    M-a-u-n-d.
3        Q.    Was Ms. Maund terminated?
4        A.    She moved to Florida.
5        Q.    Was Ms. Maund's position
6    available when you eliminated
7    Ms. Hughes?
8        A.    I do not believe so.
9        Q.    When you hired Pat Ennis in
10    May 2005, was she a full-time employee?
11        A.    No.
12        Q.    How many hours a week was she
13    working?
14        A.    Very few.  I don't recall.  We
15    hired her as a PRN employee, which
16    means, you know, work as needed.  And I
17    do not recall her number of hours.
18        Q.    You would have pay records on
19    that, though, wouldn't you?
20        A.    Yes, ma'am.
21        Q.    Did she complete an
22    application?
23        A.    Yes, she did.

42

1    Q.    And has a personnel file?
2        A.    Yes, she does.
3        Q.    How is it you know that?
4        A.    Because everybody that's
5    employed has to complete an application
6    and has a personnel file.
7        Q.    Is that her first time to be
8    employed?
9        A.    With us?
10        Q.    Yes, ma'am.
11        A.    Yes.
12        Q.    Had you ever received
13    complaints from any employee, vendor,
14    or patient about Mrs. Ennis?
15        A.    Not that I recall.
16        Q.    Have you ever had to talk with
17    her about her conduct in the workplace?
18        A.    No.
19        Q.    Did Ms. Hughes ever complain
20    to you about Mrs. Ennis?
21        A.    No, she didn't.
22        Q.    I'm sorry?
23        A.    No, she did not.

43

1    Q.    Did Mrs. Ennis ever complain
2    to you about Ms. Hughes?
3        A.    No.
4        Q.    Have you ever had meetings or
5    phone conversations with Mrs. Ennis
6    about Ms. Hughes?
7        A.    The only meeting I had where
8    Ms. Hughes was discussed that Pat was
9    present was at a dinner that Dr. Ennis
10    and I had to discuss changing the
11    duties in the clinic.
12        Q.    When was that?
13        A.    I believe it took place latter
14    part of March, first of April of 2005.
15        Q.    Who initiated that meeting?
16        A.    Dr. Ennis.
17        Q.    How did he initiate that?
18        A.    He called and wanted us to
19    meet.  That was at the time I believe
20    the decision had already been made to
21    outsource the billing.  He wanted to
22    come up with a job description for
23    Ms. Hughes.

44

1 evaluation also.

2     Q.  Did you review it with

3 Ms. Hughes?

4     A.  No, I did not.

5     Q.  In the 2000 and 2001

6 evaluations were those deemed

7 satisfactory evaluations?

8     A.  Yes.

9         (Plaintiff's Exhibit 8 was

10        marked for identification.

11        A copy is attached.)

12     Q.  Plaintiff's Exhibit 8.  Is

13 this the 2002 evaluation?

14     A.  Dr. Blough did this one also.

15     Q.  Did you review this evaluation

16 with Ms. Hughes or Dr. Blough?

17     A.  No.

18     Q.  Do you recognize the writing

19 on the second page?  Did she have

20 additional duties added to her in 2002?

21         MR. VREELAND:  Object to the

22 form.

23     Q.  Do you know?

53

1 the patient charges.  She would have

2 posted -- That is my understanding.  I

3 was not that involved with the billing

4 aspect of it at that time.

5     Q.  Was she coding?

6     A.  She probably coded some too.

7     Q.  Okay.  On the page four,

8 D00073 of Plaintiff's 8, can you tell

9 me No. 11 what that reads?

10     A.  It looks like to me maintained

11 BCLS training, which is basic cardiac

12 life support training.

13     Q.  Was she training or had

14 received that training?

15     A.  I do not know.

16        (Plaintiff's Exhibit 9 was

17        marked for identification.

18        A copy is attached.)

19     Q.  Plaintiff's 9, did you

20 complete this evaluation?

21     A.  I did.

22     Q.  That is your handwriting?

23     A.  It is.

55

1     A.  What this tells me is this is

2 the year that we discontinued the

3 billing service with MedNet for Ariton

4 and implemented the Medisys system that

5 Dr. Blough had bought.

6     Q.  So prior to September '01, was

7 the clinic using MedNet?

8     A.  That is correct.

9     Q.  MedNet is like United

10 ProBilling?

11     A.  Yes.  It is an outside billing

12 service.

13     Q.  Do you know what Ms. Hughes

14 was doing as office manager when MedNet

15 was doing the billing for the Ariton

16 Clinic?

17     A.  Initially when MedNet was put

18 at Ariton I do not believe that they

19 were entering any of the data into the

20 computer system.  So basically Debbie

21 would have been doing the same thing.

22 She would have entered the patient

23 demographics, she would have entered

54

1     Q.  That is your signature on the

2 last page?

3     A.  Yes, it is.

4     Q.  Why is it you evaluated

5 Ms. Hughes in 2003?

6     A.  I am assuming we might have

7 been in between physicians.  I don't

8 know that.  Because Dr. Blough left.

9 I'm not sure if there was a little gap

10 or if Dr. Ennis had just gotten there

11 and wasn't comfortable with doing the

12 evaluation at that point.  But I would

13 have guessed it would be one of those

14 two or three.

15     Q.  What was the basis of your

16 evaluation on pages three and four

17 under the performance standards?

18     A.  I guess probably with whatever

19 contact that I had with Debbie during

20 that period of time.

21     Q.  Were those your only personal

22 observations or is this self

23 evaluation?

56

1    A.   It is not either.  I can't say
2  it is personal because I didn't spend
3  that much time up in the clinic.  But
4  even though I wasn't there a lot,
5  Debbie and I had conversations about
6  the work.  I am assuming there was
7  nothing standing out one way or the
8  other at the time.
9    Q.   Did you have a physician at
10  the Ariton Clinic?
11    A.   I don't know.  I don't know
12  when Dr. Ennis started.  I don't know
13  if there was one there or not.  But we
14  never closed the clinic.  We always
15  maintained the clinic open so the
16  employees would not lose the jobs.  But
17  I can't say if Dr. Ennis was there or
18  not.
19    Q.   Well, if you were between
20  physicians, what would the office staff
21  do?
22    A.   Not a lot.  You know, catchup
23  work.  They did at sometimes swap

57

1  taking days off.  But we just wanted to
2  maintain a presence in the clinic just
3  to let people know because people could
4  come in and see Debbie or the front
5  office person and they could say, well,
6  the new doctor will be here.  These
7  were our reasons behind it.
8    Q.   Did you ever have a contract
9  doctor there?
10    A.   We did.  But it was during
11  Dr. Ennis's illness, some of the
12  periods of time that he was out that we
13  had a contract.
14    Q.   Did Dr. Zumstein ever come
15  back?
16    A.   He did.  But that was,
17  again -- Let me think a minute.
18  Dr. Zumstein worked there on two
19  different occasions.  One of them could
20  have been when we were between
21  Dr. Blough and Dr. Ennis, but I do not
22  know without looking it up.  Then he
23  did work after Dr. Ennis came and he

58

1  was out for an extended period of time.
2  So it is possible Dr. Zumstein was
3  there at this time.
4    Q.   Do you know why you did not
5  sign on the first page as her manager?
6    A.   No, I do not.
7    Q.   You stated that you and
8  Ms. Hughes talked a lot during this
9  time, 2003 time period?
10    A.   I believe we talked quite a
11  bit during the whole time she was
12  employed up there.  I won't say daily.
13  Certainly it wasn't daily.
14    Q.   2003 did you have any issues
15  with her job performance?
16    A.   No.
17    Q.   Ever have to discipline her or
18  counsel her?
19    A.   During 2003?
20    Q.   Or prior.
21    A.   I did have to talk with her
22  several times when Dr. Zumstein was
23  there, but I can't give you a time

59

1  frame because I don't know when he was
2  there.  That had to do with the amount
3  of overtime.  But I don't know if it
4  was the first time he was there or the
5  second time he was there.
6    Q.   Okay.
7    (Recess was taken, commencing at
8  2:09 p.m., concluding at 2:19 p.m.)
9    Q.   (MS. HAYNES) Looking back at
10  the 2003 evaluation you completed,
11  Ms. Dunn, on Ms. Hughes, looking back
12  at that, on page three and four, which
13  is Bates Nos. D0062 and 63, were those
14  the 22 separate responsibilities that
15  Ms. Hughes was responsible for?
16    A.   Yes.
17    Q.   Which of those duties did she
18  lose when you were going to transfer
19  coding and billing to United
20  ProBilling?
21    A.   The things that changed was
22  when she was actually -- told Dr. Ennis
23  that she no longer wanted to be the

60

1 office manager. She would not -- I
2 think at that point Dr. Ennis had taken
3 over the responsibility of the other
4 employees, doing their evaluation and
5 monitoring their work. She would not
6 have had to do the assures that all
7 office staff follows established
8 policies and procedures because that is
9 a supervisory. She wouldn't have had
10 to do No. 4 on 00062. She wouldn't
11 have had to do No. 5, No. 9, 10. Then
12 on the next page.
13     Q.  Just so we are clear on the
14 first page, she would not have been
15 responsible for 4, 5, 9, and 10. But
16 you are identifying those as when she
17 stepped down as office manager?
18     A.  Yes.
19     Q.  My question was when you
20 turned coding and billing over to
21 United ProBilling, which duties would
22 she have not been responsible for?
23     A.  Well, the ones that I just --

61

1 Well, actually, her whole job
2 description would have changed because
3 it would have not involved hardly any
4 of these. Let's see. Those two things
5 kind of go hand in hand, not being
6 office manager. One or the other. And
7 turning the billing over to ProBill.
8 The discussion that I had with
9 Dr. Ennis, the only thing that she was
10 going to do was collect on the old AR
11 was the only specific duty that we
12 discussed.
13     Q.  All right. Let's divide it
14 up. You sat through her deposition
15 yesterday?
16     A.  Yes, ma'am.
17     Q.  Is that correct?
18     A.  Yes.
19     Q.  And you heard her testify that
20 in November 2004 she asked to step down
21 because of health problems?
22     A.  Right.
23     Q.  Did she tell you that she

62

1 wanted to step down because of health
2 issues or did you learn that from
3 someone else?
4     A.  I believe I learned that from
5 Dr. Ennis. I don't recall Debbie
6 telling me that. I'm not saying she
7 didn't, but I don't recall it.
8     Q.  Did you have any discussions
9 in November or December 2004 with
10 Ms. Hughes where she shared with you
11 that she was having health issues?
12     A.  I did. I had a conversation
13 with her in December when she dropped
14 by my office.
15     Q.  What did she share?
16     A.  She just came by my office.
17 She was there at the hospital for some
18 outpatient testing. She told me that
19 she had some health issues and that she
20 was about to go through some testing.
21 She brought up the flu vaccine issue,
22 she brought up the writing off the
23 accounts issue with me at that time.

63

1 If I'm not mistaken -- It was just a
2 very general conversation. She
3 apologized for the errors that she had
4 made. At that time I talked with
5 Debbie. I told her. I said I just
6 wish that you would have come to me. I
7 believe I even asked her have I ever
8 refused to work with her on anything.
9 I would rather that someone come to me
10 with a mistake that had been made so
11 that we could correct it. She made the
12 comment that she didn't feel like she
13 could ever come to me because she
14 didn't think I liked her. I told her
15 that my personal feelings for anybody
16 had nothing to do with my professional
17 relationship with them in the work
18 environment and that I would work with
19 her on anything that I could. But she
20 had to come to me. She had to tell me
21 what was going on.
22     I wished her well, talked
23 about hoping that it was just a

64

1 medication thing that was making her
2 behaving the way that she did. That
3 was basically the content of the
4 conversation. I told her to keep me
5 informed on her health. That was it.
6 Q. She didn't mention she had
7 stepped down as office manager?
8 A. You know, I don't recall that.
9 Q. Did she relate to you that she
10 thought her errors in writing off the
11 accounts and the overage on the flu
12 vaccine were related to the issues she
13 was sharing with you, the health
14 issues?
15 A. I don't recall if she
16 mentioned that or not because at that
17 time she didn't even have a diagnosis.
18 It was just health issues. I don't
19 think that she had been tested and
20 discovered that she had the benign
21 brain tumor.
22 Q. Did she come back later when
23 she was diagnosed with the brain

65

1 tumors?
2 A. I don't recall how I learned
3 that. I don't recall her coming back
4 to my office again.
5 Q. She did tell you when she came
6 to your office that she did not feel
7 comfortable coming to you?
8 A. Yes.
9 Q. Do you know why she came that
10 day?
11 A. No. I don't. She was in the
12 hospital. I don't know what made her
13 come by. Debbie and I had always
14 gotten along fairly good. There were
15 some issues, but I never felt like it
16 was anything that we could not discuss.
17 I don't think she had a really warm and
18 fuzzy feeling about me. It's very
19 difficult for an employee to transition
20 from working for a private physician in
21 a rural setting for a long period of
22 time and then to become a member of a
23 large organization and the rules

66

1 changing. And I just don't think that
2 she was ever comfortable working with
3 me in that aspect. She was just used
4 to just going to the doctor and saying,
5 hey, I need to do this, I need to do
6 that. That changed.
7 And I think -- I think it
8 happens every time we do this. All of
9 them look at me like I have made the
10 change. So I'm always the person that
11 they are always afraid to come to if
12 there is something that happens outside
13 our policies or outside the way that we
14 want the office run.
15 Q. What issues had you and
16 Ms. Hughes had in the past?
17 A. Well, we had the thing about
18 the vaccine and we had the thing about
19 the writing off the accounts. And we
20 had several conversations. I don't
21 recall having that many about the
22 vaccine. I recall having the one the
23 day that I got the invoice. We had

67

1 several conversations about the writing
2 off of the accounts. That basically
3 had to do with so much of that could
4 have been prevented if Debbie had
5 called me rather than trying to go
6 around me and calling MedNet and trying
7 to find out a way to fix it. I am not
8 saying I could have fixed it. But we
9 could have worked together on it.
10 I had some issues with her
11 about overtime when Dr. Zumstein was
12 working there. Their patient load was
13 not very heavy. And when I noticed
14 that Debbie was coming at four o'clock
15 in the morning to start her workday and
16 working until four or five that
17 afternoon, I called her and talked to
18 her about the overtime and about
19 keeping expenses down. And she told me
20 that she had to come in early to get
21 ready for her day. Generally
22 Dr. Zumstein's first appointment was
23 not until eight o'clock. The more

68

1 times we talked about it and the longer
2 we talked about it, she made the
3 comment that Dr. Zumstein kept calling
4 her to come assist him, which is what I
5 think he did when he owned the
6 practice. So I went up and I had a
7 conversation with Dr. Zumstein. I
8 don't remember who was working in the
9 back at that time. I don't know if it
10 was Sandy Sessoms or -- there was
11 another LPN there at one time. I don't
12 recall her name. But I talked to
13 Dr. Zumstein and I told him that I had
14 to get the hours down and that Debbie
15 felt like that she couldn't get her
16 work done because he called her a lot
17 of times. I just asked him please let
18 whoever the back person was, let them
19 assist you in the rooms and don't call
20 Debbie so she can take care of the
21 billing and the coding and what have
22 you. And he said he would.
23     I only had one other --

69

1 Overtime got okay. There wasn't any
2 overtime for a long time. Then it
3 started creeping back up again. I
4 called Debbie. You know, it was the
5 same thing. She said she just couldn't
6 get the amount of work done. But there
7 were four employees in that clinic. I
8 don't have four employees in any clinic
9 except that urgent walk-in clinic. And
10 I expressed that to Debbie. I just
11 didn't understand why the work could
12 not be completed in an eight-hour day.
13 Because they didn't even see patients
14 on Friday or maybe Friday morning. So
15 that would leave Friday afternoon for
16 catchup. She said she understood. I
17 told her if it happens again, I will
18 take your key and change the security
19 code so that the only time you get in
20 the building is when I come let you in.
21 After that we had no more problems with
22 overtime or anything.
23     But I worked with Debbie when

70

1 we first took that clinic over. In
2 between Dr. Blough and Dr. Ennis,
3 Debbie and I worked together quite a
4 bit. We were trying to upgrade that
5 office because that's a very, very old
6 building. There were things there that
7 those employees didn't have. We fixed
8 up their break room a little bit.
9 Seems like we got a bigger refrigerator
10 or something. Painted. All that time
11 I tried to establish a rapport with
12 Debbie because that clinic was, like,
13 12 or 13 miles away from the hospital.
14 It is difficult to make a lot of trips
15 up there when you have got everything
16 else going on around you. But that's
17 basically it.
18     Q.   The overtime issue, when was
19 that that you talked with her about it?
20 What year?
21     A.   I don't know.  It was when
22 Dr. Zumstein was there.  One of the
23 periods of time he was there.  I don't

71

1 know the year.
2     Q.   We have looked at the
3 evaluations and we had Dr. Blough and
4 Dr. Ennis.  So would it have been
5 before 2000?
6     A.   Uh-uh.  No.  Because
7 Dr. Zumstein worked there.  He may have
8 worked there from the time Dr. Blough
9 left -- which I don't know when that
10 was -- and when Dr. Ennis came -- which
11 I don't know when that was.  We may
12 have had him in there that period of
13 time to keep that clinic going.  Then
14 he worked one other time after
15 Dr. Ennis got there and was going to be
16 out for an extended period of time.
17 Dr. Zumstein came back and worked
18 again.  So it was during one of the
19 periods of time that Dr. Zumstein
20 worked in that clinic.
21     Q.   Do you know who else was
22 working other than Ms. Hughes and
23 Dr. Zumstein in the clinic?

72

1    **A.    I know that Sheryl Petrey was**
2    **working.  I know there was a**
3    **receptionist.  I don't know who it was**
4    **at that time.  And I know that there**
5    **was either an MA or an LPN in the back.**
6    **But I don't know who that person was at**
7    **that time.**
8        Q.    Do you recall allowing
9    Dr. Zumstein to hire another
10   individual, Ms. Sessoms, Sandy Sessoms?
11       **A.    I do.**
12       Q.    Did you hire Ms. Sessoms or
13   allow him to hire Ms. Sessoms because
14   the work was there?
15       **A.    We did allow him to do it.  I**
16   **do not remember if it was during that**
17   **period of time that the other LPN left.**
18   **Debbie had an LPN that worked back**
19   **there that I don't think she let her go**
20   **but she had to talk with her on several**
21   **occasions about her employment.  So I**
22   **don't know if it was when that LPN was**
23   **gone or not.  Sandy worked part-time.**

73

1        Q.    Did you put anything in
2    Ms. Hughes' file about talking with her
3    about the overtime?
4        **A.    No.  It was all verbal.**
5            (Plaintiff's Exhibits 11 and
6            12 were marked for
7            identification.  Copies are
8            attached.)
9        Q.    Let me show you what has been
10   produced by your lawyers as Plaintiff's
11   Exhibit 11 and Plaintiff's Exhibit 12.
12   If you could, tell me what 11 and 12
13   are.
14       **A.    These are copies of her time**
15   **and attendance report.  This one looks**
16   **like November of '04 through April of**
17   **'05.**
18       Q.    Okay.  And what is the reason
19   you pulled this document or what is the
20   significance?
21       **A.    Part of this time is when she**
22   **was out on leave.  I don't know.**
23   **Somebody had to have requested it.**

74

1        Q.    Can you tell me when it
2    appears she went out on leave?
3        **A.    She worked in November.  It**
4    **appears that she started using her sick**
5    **leave January the 3rd of '05.  She used**
6    **it in the next pay period.**
7        Q.    How can you tell that is sick
8    leave?  It is on Document No. D0012 of
9    Plaintiff's 11.
10       **A.    If you will go down there to**
11   **January the 3rd.**
12       Q.    Yes, ma'am.  That is a Monday.
13       **A.    It has got PCD:S.  That S**
14   **stands for sick leave.  The H right**
15   **above it is holiday.**
16       Q.    Above that on 12/30 can you
17   tell what that is?
18       **A.    She clocked in at 7:55 and**
19   **clocked out at 12:36.  She worked a**
20   **total of four and a half hours.**
21       Q.    Okay.  Are there certain days
22   of the week they work half days in that
23   office?

75

1        **A.    Typically it was Friday.  I**
2    **don't know why she only worked a half**
3    **day that day.  Maybe it was because it**
4    **was -- I don't know what day New Year's**
5    **fell on that year.  So I don't know.**
6        Q.    Okay.  The office is not open
7    on Saturdays and Sundays?
8        **A.    Correct.**
9        Q.    Looking at the next document,
10   No. D0013, continuing with 1/6 through
11   1/19, that's all sick leave?
12       **A.    Yes, ma'am.**
13       Q.    Do you know why you would
14   leave out the Friday?
15       **A.    I don't know why she only took**
16   **64 hours a pay period.  That's not**
17   **uncommon with someone that is going to**
18   **be out for an extended period of time**
19   **so that their sick leave lasts longer.**
20   **But generally it is by employee**
21   **request, it is not ours.**
22       Q.    Do you have any leave
23   documentation that you received from

76

1 her?

2    A.    I don't know if I did or not.

3    Q.    Would you agree with me in
4 looking at those two weeks or maybe it
5 is even three weeks she never took a
6 Friday time?

7    A.    Yes, I would.

8    Q.    What are the pay periods?
9 Paid twice a month?

10    A.    Every two weeks.  Biweekly.

11    Q.    On Fridays?

12    A.    No.  Pay period ends on a
13 Wednesday and we are paid the following
14 Thursday.

15    Q.    A week later?

16    A.    Uh-huh.  A week later after
17 the pay period ends.

18    Q.    Okay.  So yesterday was a
19 Wednesday.  That pay period ended if it
20 was the 15th.

21    A.    Yesterday did not end a pay
22 period.  Yesterday ended the first week
23 of the pay period.

77

1    Q.    So employees are being paid
2 today?

3    A.    Yes.

4    Q.    If she had claimed the Friday,
5 would that have put her over into
6 overtime?

7    A.    No.  Sick time doesn't count
8 into overtime anyway.  If she had
9 claimed the Friday, she would have
10 gotten 80 hours a pay period.

11    Q.    All right.  Then moving to
12 D0015.

13    A.    She returned to work working
14 half days.

15    Q.    How can you tell that?

16    A.    Well, she has clock-in and
17 clock-out times on Thursday, February
18 3rd; then Monday, February 7th; and so
19 on down the sheet.  Some days she
20 worked four, some days she worked four
21 and a quarter.  One day she worked
22 three and a half.

23    Q.    In the category at the far

78

1 right can you tell me what non-PROD
2 means?

3    A.    That's when she was using sick
4 leave.  She used 36 hours of sick leave
5 this pay period.

6    Q.    Can you tell me how many hours
7 of sick leave she had accrued?

8    A.    Not from this report.

9    Q.    At the top under her name can
10 you tell me, D0015, what it means
11 00399?  Do you see this?  I am looking
12 right here.  What does that mean?  Is
13 that her employee number?

14    A.    That was her employee number.
15 Uh-huh.

16    Q.    Can you tell me what the next
17 numbers mean where it says 00/40?

18    A.    No.  I cannot.

19    Q.    Do you know what that
20 department code indicates to you?

21    A.    You mean under --

22    Q.    The No. 083 under department.

23    A.    That was the department

79

1 number.  Every department in the
2 hospital is assigned a number.

3    Q.    What does that department
4 indicate to you?

5    A.    Well, it doesn't mean anything
6 to me because I don't actually do the
7 payroll, but it would be the Ariton
8 Medical Clinic.

9    Q.    Looking at the next page,
10 D0016, does this indicate that she came
11 back on Monday, the 21st?

12    A.    The pay period begins on
13 Thursday.  She came back.  This is the
14 beginning of the pay period is 2/17.

15    Q.    Is she still out sick half
16 days?

17    A.    Well, she's got some days that
18 she worked all day.  She came back that
19 Thursday.  She worked a half a day.
20 Friday she worked a half a day.  But
21 Monday, the 21st, with the exception of
22 Friday she worked whole days.

23    Q.    There is no overtime on that

80

page?

A.  No, there is not.

Q.  The next page, does it indicate she worked?

A.  On March 3rd?

Q.  Starting with March 3rd on Document No. D0017.

A.  Yes.  She worked 7.75 hours on Thursday.  She worked 2.75 on Friday.  Then Monday she worked 8.75.  Tuesday, Wednesday, and Thursday she worked 9 hours.

Q.  On that Thursday it has a V. Does that indicate vacation?  You see Thursday, 3/10?

A.  Uh-huh.  Oh.  I was looking at the wrong one.  Yes.  That is vacation time.

Q.  So she would have worked Tuesday.  Does that mean 9 hours she would have worked on Tuesday?

A.  Yes.

Q.  Then we have no time for

81

Wednesday; correct?

A.  8.25.  On the 16th you mean? 3/16?

Q.  No, ma'am.  I am looking at Tuesday, March the 8th.  I don't see anything for March the 9th.

A.  No.  It is not on here.  So that would have been Wednesday.

Q.  Do you know if --

A.  She didn't work, she didn't take vacation or sick time.  So it doesn't show up.

Q.  On Thursday she took vacation; is that correct?

A.  That is correct.

Q.  And then works Monday, Tuesday, and Wednesday?

A.  Uh-huh.  Yes.

Q.  On the next page, D0018, any sick leave there?

A.  No.  There is 12 hours of vacation.

Q.  On this document can you tell

82

me how much vacation time she had accrued?

A.  No.

Q.  Is there another document that you would use to show how much sick time or vacation time an employee has accrued?

A.  Yes.

Q.  What is that document?

A.  A benefits statement.  Well, I don't know what it is called.  There is two -- It is all on one report.  We have a report that shows sick and vacation balances.

Q.  You would have those for each employee?

A.  Yes.

Q.  Do you know how much time she had accrued in sick time and vacation before she would have exhausted that and had to take FMLA?

A.  I don't know --

MR. VREELAND:  Object to the

83

form.

A.  -- what her balances were at the time.

Q.  What is the policy, the FMLA policy?

A.  If you are out due to your own illness once you start your FMLA, we use your sick leave until your sick leave is exhausted.  Then we use your vacation time until that is exhausted.  Then you go into unpaid leave -- unpaid leave then for your 12 weeks.

Q.  Maximum 12 weeks?

A.  Correct.

Q.  Any other leave an employee can take to extend that FMLA?

A.  We have what we call -- I don't know if we still have it.  At one time.  I would have to look at our current handbook.  An extended leave policy where you have exhausted your FMLA but it is not time to come back, but it is not job protected leave.

84

**89**

1    A.    (No response.)

2    Q.    Who?

3    A.    I'm sorry.  What did you ask

4 me?

5    Q.    I said do you know who sent it

6 to you?

7    A.    Debbie sent it to me.

8    Q.    How is it you know that?

9    A.    Well, that is her handwriting

10 where she's written my name.  And she

11 was always sending little smiley faces

12 and hi's and hello's.

13          (Plaintiff's Exhibit 15 was

14            marked for identification.

15            A copy is attached.)

16    Q.    Okay.  Plaintiff's 15, did you

17 receive that documentation?

18    A.    Yes.

19    Q.    How do you know you received

20 that one?

21    A.    Well, just that I have seen

22 it.

23    Q.    Okay.  Did you ever make a

**90**

1 determination when she returned to work

2 full-time how much time she had

3 exhausted?

4    A.    Did I ever -- Are you asking

5 me if I went in and counted to see how

6 many weeks that she was out?

7    Q.    Yes, ma'am.

8    A.    I knew that she was out less

9 than 12.  That was all that was --

10 Actually, I remember thinking that that

11 was not a lot of time that she was out.

12    Q.    At the time you eliminated her

13 position did she still have sick leave

14 time?

15    A.    I don't know.

16    Q.    You would have to look at the

17 benefits statement --

18    A.    I am sure she did because she

19 never went a pay period without being

20 paid hours.  So she was continuously

21 accruing her benefits.  So she would

22 have had time built up again.  I don't

23 know how much, but --

**91**

1          (Plaintiff's Exhibit 16 was

2            marked for identification.

3            A copy is attached.)

4    Q.    Plaintiff's 16, a

5 return-to-work slip on 4/18/05, did you

6 receive that?

7    A.    Yes, I did.

8    Q.    How do you know you received

9 it?

10    A.    Because I have seen it prior

11 to today.

12    Q.    Okay.  Did you ever have a

13 conversation with Dr. Sy about

14 Ms. Hughes?

15    A.    Just in passing.  Just saying,

16 hey, I am glad she's better.  That type

17 thing.  I never asked Dr. Sy anything

18 about her.

19    Q.    After Ms. Hughes was

20 eliminated from the work force at Dale

21 Medical Center, did you approach Dr. Sy

22 and ask her what was really wrong with

23 Ms. Hughes?

**92**

1    A.    I did not.

2    Q.    Do you know why Dr. Sy would

3 make that statement?

4    A.    No, I don't.

5    Q.    Did Dr. Sy tell you what was

6 wrong with Ms. Hughes?

7    A.    No.  Like I said, the only

8 conversations we had were in passing in

9 the cafeteria and what have you.  Any

10 inquiries I made were just general, not

11 trying to find out details.

12    Q.    In Plaintiff's 11 that we went

13 over, the time, is there any time that

14 she worked or any week that she worked

15 overtime?

16    A.    No.

17    Q.    Plaintiff's 12, if you would,

18 look at that and tell me if there is

19 any time that she worked overtime in

20 this document.

21    A.    The first page, 00115, she was

22 paid eighty-nine and a half hours.

23    Q.    Nine and a half hours

1  case?
2     A.  I don't know that to be the
3  case.
4     Q.  But is the policy called the
5  extended illness benefit policy?
6     A.  Right.  It is.
7     Q.  In looking at this, do you
8  know whether or not PTO -- accrued PTO
9  would be paid?
10    A.  Accrued PTO would be paid.
11  And a new policy actually benefitted
12  the employees under PTO time because
13  they accrued the holidays.
14    Q.  Did you have to be out two
15  days before you would get paid under
16  the new extended illness benefit
17  policy?
18    A.  That is correct.
19    Q.  Okay.
20    A.  Unless you had 500 hours of
21  sick leave in your bank, unless you
22  were hospitalized, or unless you were
23  out on a workers' comp injury.

101

1     Q.  If you look at Plaintiff's 16.
2  You with me?
3     A.  No, I'm not with you.  Sorry.
4  Okay.
5     Q.  That doctor's excuse has
6  4/11/05 until 4/18/05.  When I look at
7  her time on Document No. 141 of
8  Plaintiff's 12, 4/11 and 4/12 are
9  missing from her time.
10    A.  Correct.
11    Q.  Is that based on the new
12  policy?
13    A.  That is correct.
14    Q.  Under the old policy she would
15  have been paid those two days?
16    A.  Right.  She could have used
17  PTO time if she had chosen if she had
18  it.
19    Q.  Do you know if she was told
20  she could have used PTO time for those
21  two days?
22    A.  It is in the policy.
23    Q.  When did the policy go into

102

1  effect?
2     A.  This says March 3rd.
3     Q.  Did you provide any training
4  to your employees in --
5     A.  Not except handing the policy
6  out to them.
7     Q.  Can you tell me looking at the
8  Exhibit 4 how an individual employee's
9  time was converted -- if they already
10  had sick leave accrued, how it was
11  converted to PTO?
12    A.  The sick leave wasn't
13  converted to PTO.
14    Q.  What happened to their sick
15  leave?
16    A.  They kept their sick leave
17  balance, whatever it was, when we went
18  to this policy.
19    Q.  So she would still have sick
20  leave as of 3/3/05?
21    A.  If she had not used it all,
22  yes.
23    Q.  So why wouldn't she be paid

103

1  for her sick leave time?
2     A.  Because the policy states that
3  you can't use sick leave the first two
4  days you are out unless you have been
5  hospitalized, it is due to a workers'
6  comp injury, you have been to the
7  emergency room, or you have 500 hours
8  in your bank.  If any of those four
9  things happen, then you can use sick
10  leave your first two days.
11    Q.  You had to have 500 hours of
12  sick leave time?
13    A.  I believe that's correct.
14    Q.  How many years would you have
15  to work to have 500?
16    A.  Well, we get 96 hours a month.
17  So a little over -- 96 hours a year.
18  I'm sorry.  A little over a year --
19  five years.
20    Q.  You would have to have worked
21  five years without taking sick leave?
22    A.  Right.  And this policy is a
23  lot more generous than the hospitals

104

1  that surround us.

2      Q.    At the time this went into

3  effect, 3/3/05, if in fact that is the

4  time it went in, did you have any

5  employees who had more than 500 hours

6  of sick leave time banked?

7      A.    Yes.

8      Q.    How many?

9      A.    I don't know how many.  But it

10  wasn't a great number.  That is one of

11  the purposes for these policies is

12  because people indiscriminately use

13  their sick leave.

14      Q.    Did Ms. Hughes have PTO time

15  to convert when she was terminated?

16      A.    According to this last page on

17  your Exhibit No. 12, she had 51.44

18  hours because that's what we paid her.

19      Q.    Was that PTO or vacation?

20      A.    One in the same.  If this --

21  If this policy had gone into effect

22  already, we called it PTO time.  If it

23  had not, it was vacation.  The

105

1  number -- When we got this new policy

2  and it went into effect, your numbers

3  that were whatever you had in your sick

4  and vacation bank just transferred

5  over.  Nobody lost anything.  But the

6  accrual rate on PTO time increased

7  because we incorporated the vacation

8  days that we gave into the PTO accrual.

9  So accrual went from, like, 3.69 to a

10  higher amount, 6.769.  I'm sorry.

11  5.846.

12      Q.    I'm sorry.  You have lost me

13  now.

14      A.    Okay.  Under the old policy

15  where it was sick and vacation time, an

16  employee with less than ten years would

17  have accrued 3.69 hours per pay period

18  of vacation time.

19      Q.    Every two weeks?

20      A.    Every two weeks.  And when we

21  went to the new policy, the PTO time,

22  we incorporated the 7 holidays that we

23  were getting into the vacation accrual.

106

1  So accrual went from 3.69 to 5.846.

2      Q.    Per pay period?

3      A.    Per pay period.

4      Q.    Which works out on a yearly

5  basis how many hours?

6      A.    15 days, I believe, as opposed

7  to 12 under the old policy.  Wait.  No,

8  it didn't.  I'm sorry.  It went from 12

9  to 19 days because we were getting 7

10  holidays and we didn't take anything

11  away from the employees.  We did the

12  whole 7 days.

13      Q.    Prior to the extended illness

14  benefit, how many vacation days?

15      A.    12.

16      Q.    12 vacation days?

17      A.    A year.

18      Q.    Then how many sick days?

19      A.    12.

20      Q.    Under the old policy?

21      A.    Uh-huh.

22      Q.    And then they had 12 vacation

23  days, 12 sick days, and 7 holidays?

107

1      A.    7 holidays.

2      Q.    So then you converted that to

3  19 days?

4      A.    We converted the vacation and

5  the holidays to 19 days.  Your sick

6  leave accrual still stayed separate.

7      Q.    If you had it banked?

8      A.    Right.

9      Q.    But under the new policy you

10  did not accrue sick days anymore?

11      A.    Uh-huh.

12      Q.    You still did?

13      A.    We still do.  At the same

14  rate.

15      Q.    Where does it talk about sick

16  days in the new extended illness

17  benefit policy?

18      A.    Talk about what?

19      Q.    How they are accrued.

20      A.    On the first page right under

21  procedure, second paragraph.

22      Q.    Did I understand you correct?

23  Even though you have sick time accrued,

108

1  you will not be paid for it for the
2  first two days?
3      A.  Unless you meet the criteria
4  in the next paragraph.
5      Q.  That is surgery or workers'
6  comp?
7      A.  It is hospitalization, an
8  outpatient surgical, or an emergency
9  room visit, workers' comp, or 500 hours
10  in your bank.
11      Q.  Why would an employee have to
12  use their sick time for workers' comp?
13      A.  Well, because workers' comp
14  doesn't kick in until you have been out
15  three days.  A lot of employees opt to
16  use some of their sick leave so that
17  they are paid.
18      Q.  Okay.  Under Plaintiff's 12,
19  the Document No. 142 that we were
20  talking about, we talked about the
21  vacation being 51.44 hours and the 80
22  hours as a severance.  Continuing down,
23  it states other totals and has an S?

109

1      A.  She was also paid 12 hours
2  sick time that she had taken on the
3  14th and 15th of April.
4      Q.  How can you tell that?
5      A.  Look at those two dates and
6  out to the side, four and eight.
7          (Plaintiff's Exhibit 10 was
8          marked for identification.
9          A copy is attached.)
10      Q.  Let's go back and get No. 10
11  in.  Have you seen this document?
12      A.  I have seen it.
13      Q.  Whose writing is that on the
14  top of the page, "Please return by
15  7/22/04"?
16      A.  Donna Reid in my office.
17      Q.  What is her position?
18      A.  She is a personnel assistant,
19  HR assistant.
20      Q.  Do you recognize the signature
21  as manager whose signature that is?
22      A.  John Ennis.
23      Q.  What is the initials out

110

1  beside it?
2      A.  It is D.O.  He was a doctor of
3  osteopath medicine instead of an M.D.
4      Q.  Did you discuss this
5  evaluation with Ms. Hughes?
6      A.  No, I didn't.
7      Q.  Did you discuss it with
8  Dr. Ennis?
9      A.  No.
10      Q.  In 2004, as of July 2004, do
11  you have any knowledge that on page 55
12  and 56 of this exhibit that Ms. Hughes
13  was completing all of these 22
14  responsibilities?
15      A.  Not specifically.  The areas
16  where he did not mark her -- give her a
17  three, those were general areas that he
18  and I discussed where he would like to
19  see improvement.
20      Q.  When did you discuss this with
21  Dr. Ennis?
22      A.  Prior to him discussing the
23  evaluation with Debbie.

111

1      Q.  What was the purpose in
2  discussing this with Dr. Ennis?
3      A.  I believe this might have been
4  the first evaluation that he had done
5  on her and he just called me to go over
6  the areas that he had not given her the
7  three.
8      Q.  Look for me patient insurance
9  information, No. 2.  What did the two
10  of you discuss under Item 2?
11      A.  I will have to be honest with
12  you.  I don't remember any specifics
13  about any of the areas.
14      Q.  Generally do you recall
15  anything about your conversation with
16  Dr. Ennis?
17      A.  I would be guessing if I said
18  anything.  No.
19      Q.  Did you ever discuss with
20  Dr. Ennis that Ms. Hughes had stepped
21  down from office manager after November
22  2004?
23      A.  You know, I don't recall that

112

1  at all.

2      Q.  Did Dr. (sic) Hughes ever tell

3  you that she had taken the position

4  back when she came back from her brain

5  surgery?

6      A.  No.

7      Q.  Did you have that knowledge?

8      A.  I don't even think I had the

9  knowledge that she voluntarily decided

10 to step down.  I may have, but I don't

11 recall it.

12     Q.  Did you ever tell the

13 Industrial Relations that she was not

14 the office manager when you terminated

15 her?

16     A.  I think what came about,

17 whether it was in the telephonic

18 hearing or the -- of course, I don't

19 fill the paperwork out that goes

20 back -- that the reason that she was

21 terminated is because we had outsourced

22 the billing, eliminated the office

23 manager position, and that she had

113

1  failed to take on the responsibilities

2  that were left, which was collecting

3  old patient accounts is all I recall

4  about that.

5      Q.  All right.  What duties --

6  Outsourcing billing would have been

7  eliminated looking at Plaintiff's

8  Exhibit 10, pages 55 and 56.  Which

9  duties were eliminated by outsourcing

10 the coding and billing?

11     A.  The thing that outsourcing the

12 coding and billing would have

13 eliminated would have been No. 6.

14     Q.  Under direct administrative

15 activities?

16     A.  Yes.  That's all on that page.

17 No. 2 under patient insurance

18 information.  Under other duties,

19 No. 1.  That's all on that one.

20     Q.  Going back to Item No. 2 under

21 patient insurance information, who was

22 taking payments and crediting those to

23 patient accounts?  Was ProBilling doing

114

1  that as well?

2      A.  I believe at this point the

3  receptionist up front was taking money

4  if the patient actually came into the

5  facility.  Now, on a bill or an

6  insurance or what have you that ProBill

7  billed, they mailed the statements out

8  to the patient and the patient -- we

9  had a P.O. box that the payments came

10 back into that ProBill got and then

11 posted it to the patient accounts.

12     Q.  Who was making bank deposits?

13     A.  At this time?

14     Q.  Yes, ma'am.

15     A.  I do not know.  I know that --

16 I don't know.

17     Q.  Was it Ms. Hughes'

18 responsibility to make those bank

19 deposits?

20     A.  At one time it was.  I don't

21 know if that was ever removed from her

22 responsibility or not.

23     Q.  Who was doing bank deposits

115

1  after she left?

2      A.  I believe Lisa Brooks was

3  making deposits.

4      Q.  That is the receptionist?

5      A.  Correct.

6      Q.  Other than Items 6 on Document

7  No. 55 of Plaintiff's Exhibit 10, and

8  Item 2 on page 56, the top portion, and

9  Item 1 under other duties, was

10 Ms. Hughes performing all these other

11 duties at the time you terminated her?

12     A.  I do not know if Dr. Ennis had

13 already taken some of those duties away

14 from her or not because those were

15 definitely -- these other duties would

16 definitely be office manager or office

17 coordinator duties.

18     Q.  Now I'm correct, am I not, at

19 this period of time you don't know that

20 she's resigned or taken the job back as

21 office manager; correct?

22     MR. VREELAND:  When you say

23 this period of time, you are talking

116

1  about --

2  **Q.**  At the time you terminate her.

3  **A.  No, I do not know.**

4  **Q.**  Dr. Ennis never shared with

5  you that she stepped down and he

6  offered her the position back when she

7  came back after her tumor surgery?

8  **A.  I do not recall him doing**

9  **that, no.**

10  **Q.**  Am I correct that you had no

11  knowledge about her ever stepping down

12  or taking the job back?

13  **A.  If I had knowledge, it has**

14  **certainly left me now.  I do not right**

15  **now think that I ever knew that.**

16  **Q.**  Am I correct that I read

17  something or heard something that you

18  told the Industrial Relations that she

19  was not office manager at the time you

20  terminated her?

21  **A.  You may have.**

22  **Q.**  Am I correct that I've heard

23  that?  Did you say that?

117

1  **A.  I don't think I have said it**

2  **to you.  I --**

3  **Q.**  No.  But you said it to

4  Industrial Relations?

5  **A.  Back then it was a little**

6  **fresher on my mind than it is now too.**

7  **It is not that I am trying to evade**

8  **your question or anything.  What I**

9  **recall about the office manager thing**

10  **is my meeting with Dr. Ennis and him**

11  **saying that, you know -- I think I do**

12  **recall him saying she no longer wanted**

13  **to be the office manager.  At that**

14  **meeting that we had that night at**

15  **dinner is when the biggest discussion**

16  **about her not being the office manager**

17  **took place and that he was going to, I**

18  **guess, maybe the next day after we had**

19  **dinner that night talk to her about the**

20  **new duties and see if -- although she**

21  **wasn't going to be the office manager,**

22  **that she would accept those duties.**

23  **That's what I recall at this moment.**

118

1  **Q.**  You knew Dr. Ennis was

2  terminal?

3  **A.  I did.**

4  **Q.**  How long had you had that

5  information?

6  **A.  I think probably -- I can't**

7  **give you, like, a month or a date.  It**

8  **was in 2005.  I do believe it was at**

9  **the time that he went out that last**

10  **time that he would not be back because**

11  **that was at the time that we brought in**

12  **a temporary contract physician.  And,**

13  **you know, he never told me, Pat Ennis**

14  **never told me, but it is just something**

15  **you know.  He was losing weight like**

16  **mad, not being able to eat, and just**

17  **looked like a ghost.**

18  **Q.**  In 2005 or 2004?

19  **A.  Five.**

20  **Q.**  In 2004 did you have the

21  knowledge he had pancreatic cancer?

22  **A.  I did.**

23  **Q.**  You had heard that through the

119

1  work grapevine or he told you?

2  **A.  No.  He told me.**

3  **Q.**  Did he tell you that cancer

4  was terminal?

5  **A.  He did.  But when he first**

6  **discovered that he had pancreatic**

7  **cancer and he came and he spoke to**

8  **Vernon and I at the same time to inform**

9  **us of the fact that he had pancreatic**

10  **cancer, he was the one that shared the**

11  **statistics with us and told us that**

12  **there was only a two percent survival**

13  **rate.  But he was convinced he was**

14  **going to be in that two percent.**

15  **Q.**  Did he share with you, as

16  Mr. Johnson testified, that he had six

17  months to live?

18  **A.  That's the normal life**

19  **expectancy of someone who has.  But he**

20  **had several reasons to think that he**

21  **would last longer than that.  One was**

22  **that his was discovered at such an**

23  **early stage, probably because he was a**

120

1  physician and just noticed that he was
2  jaundice and immediately began the
3  process of trying to find out what was
4  wrong with him. And he just had that
5  faith. I think he was a very unique
6  man. He handled that illness with such
7  dignity and fought and did everything
8  that any physician -- he went up to
9  M.D. Anderson. So he felt like -- He
10 really felt like for a long time he was
11 going to be in that two percent.
12     Q. Did you and Mr. Johnson have
13 conversations after he shared -- After
14 Dr. Ennis shared his news about his
15 health situation, did you and
16 Mr. Johnson have conversations what you
17 were going to do with the clinic?
18     A. I don't think it was
19 immediately after that because
20 Dr. Ennis worked for some time after
21 that before he -- I think his first
22 time away from the clinic -- I don't
23 recall when it was -- he had to go to

121

1  up again.
2     Q. Did you and Mr. Johnson ever
3  discuss closing the clinic?
4     A. There were periods of time,
5  yes, when it looked like financially
6  that would have been the best decision.
7     Q. When did the two of you
8  discuss closing the clinic?
9     A. Time frame, I don't know. I
10 think it was after he had been out
11 several times. The clinic was not
12 making money. But I can't tell you
13 when we had those discussions.
14     Q. Would that have been 2004 or
15 2005?
16     A. Probably 2005.
17     Q. He died May 2005; correct?
18 Dr. Ennis?
19     A. No. He died in August.
20     Q. August?
21     A. Uh-huh. My twin grandchildren
22 were born within a day or two of that.
23 That's why I remember it so well.

123

1  UAB for a surgical procedure. He was
2  in the hospital for quite some time. I
3  don't believe that we did anything at
4  that point about bringing another
5  physician in.
6     Q. My question is did you and
7  Mr. Johnson have conversations about
8  what you were going to do with the
9  clinic after -- any time after
10 Dr. Ennis shared his news with you?
11     A. Yes.
12     Q. And what were your
13 discussions?
14     A. Well, about how we were going
15 to hold the clinic together during each
16 period of time that he was out. There
17 again, we didn't want to cut the
18 employees' hours, we didn't want to
19 lose the patient base. So we just
20 decided that when there were periods of
21 time that were going to be very lengthy
22 that we would try to get or -- that is
23 when Dr. Zumstein's name kind of came

122

1     Q. Do you know the last time he
2  worked?
3     A. No. I do not remember the
4  last time he worked. There was a long
5  period of time there at the end.
6     Q. That he did not work?
7     A. That he did not work.
8     Q. Did you and Mr. Johnson
9  discuss that if you closed the clinic,
10 you would have to absorb the employees
11 into the hospital?
12     A. Any time in a similar
13 situation in the past we had always
14 tried to do that or either hoped that
15 if -- if we closed the clinic, yes, we
16 would have had to absorb. But if we
17 could get something like we did from
18 Dr. Magony's group to come in and take
19 it over, we would have always hoped
20 that they would absorb the employees
21 that were already in place there.
22     Q. Why do you make that
23 statement, that if you closed it, you

124

1  that Debbie had had any kind of illness
2  that caused her to be out for a certain
3  period of time.
4      Q.  If Dr. Ennis died and you had
5  to absorb those employees, she was
6  going to become your problem; correct?
7      MR. VREELAND:  Object to the
8  form.
9      A.  I would not say that she was
10  going to become my problem, no.
11     Q.  But she was an employee with a
12  health problem.  And you knew that.
13     A.  I did know that.  Yes.  I knew
14  that.
15     Q.  At the time you terminated
16  her, that was two days after she came
17  back from a leave.
18     A.  Right.
19     Q.  Is that correct?
20     A.  That's correct.
21     Q.  Is that coincidental?
22     A.  It is coincidental.  The
23  conversations that I had with Debbie

141

1  after she came back, she was fully
2  functional.  Everybody that is out -- I
3  understand the seriousness of the
4  problem that she had.  But thank
5  goodness it was benign, she had them
6  removed, she was back, she was
7  functional.
8      Q.  Doing her job?
9      A.  Doing her job.  Well, two days
10  is probably not a long time to
11  determine whether or not she was going
12  to be effective at that.  But yes.
13     Q.  Had any issues at work after
14  she had the brain tumors removed?
15     A.  No.
16     Q.  No one said she wasn't doing
17  her job after she came back from the
18  tumors?
19     A.  No.  Because the time frame of
20  the tumor or the no tumor was not an
21  issue, was not relevant in deciding
22  that we were going to go to an outside
23  billing company.  The fact that at some

142

1  point she was not doing her job very
2  well is when the decision was made to
3  go to an outside billing company.  I
4  believe that Vernon testified earlier
5  this morning we had no checks and
6  balances in that office.  It is kind of
7  like a loose cannon.  You just don't
8  have -- The only thing that we ever got
9  about patient accounts came from Debbie
10  and that system.  She was the only one
11  that could access it.  We don't have
12  those kind of situations in our -- That
13  was an exception to our general way of
14  doing business.  And we just felt like
15  it was time to change that.
16     Q.  In the other offices what is
17  the checks and balances?
18     A.  They never -- Well, first of
19  all, MedNet or ProBill inputs all the
20  data in the system.  They collect all
21  the money that comes in.  Or actually
22  the money comes directly to the
23  hospital.  They just provide us the

143

1  reports where the money -- They key the
2  remits to the patient in the system.
3  Then they send us the reports.  They
4  never touch the money.  That is a check
5  and balance.  They never touch money.
6      Q.  Who is not touching the money?
7      A.  The people in the offices.
8  Because it doesn't come to them.  It
9  comes to us.
10     Q.  Did you think she was taking
11  money?
12     A.  No, I did not.
13     Q.  Have any proof she was taking
14  money?
15     A.  No.  Nobody ever even
16  suspected she was taking anything.
17     Q.  If you asked her for reports,
18  would she generate those reports?
19     A.  Generally, yes.  There at the
20  end when we were dealing with those
21  patient write-offs we had a little bit
22  of trouble with reports.  And those
23  reports -- The monthly reports that

144

1  were generated out of her system went
2  to our CFO.  That is just not something
3  that I dealt with a whole lot.
4      Q.   Is there ever a time that you
5  asked her for a report she didn't give
6  you a report?
7      A.   She gave them to me, but it
8  just took her a long time to get them
9  to me.  I would call and ask for a
10  report.  I would have to call back.
11  That type thing.  She never refused to
12  give me a report.
13      Q.   Did the chief financial
14  officer -- I believe that is
15  Mr. Hull -- did he ever say Ms. Hughes
16  was not providing him timely financial
17  reports?
18      A.   I never heard him say that.
19      Q.   He never complained to you
20  about that?
21      A.   No.
22      Q.   Did he --
23      A.   He wouldn't.  He would have

145

1  are sent to whichever billing company
2  and they input the charges.  Of course,
3  then when the money comes in, the third
4  party biller also posts that money.
5      Q.   Who was doing that at Ariton?
6      A.   Well, we got -- MedNet did it
7  for the first three years that we had
8  Ariton.  Debbie did it for two or
9  three.  Then we got United ProBill was
10  doing it.
11      Q.   Who was doing the patient
12  demographics?
13      A.   When?  At which time?
14      Q.   Okay.  Bad question.  Who did
15  patient demographics and the collecting
16  of the face sheets to send to United
17  ProBilling?
18      A.   Well, Debbie would have if she
19  had been there.  That would have
20  probably still been one of her duties.
21  The person up front can do it.  I don't
22  think that Debbie got that far in the
23  training with United ProBill.  Debbie

147

1  just taken care of it.
2      Q.   Did he ever complain he had
3  issues with Ms. Hughes' job
4  performance?
5      A.   No, he didn't complain to me.
6      Q.   In all the other offices where
7  you have office administrators or
8  office coordinators -- I think they are
9  office coordinators and office
10  managers?
11      A.   Correct.
12      Q.   Do you have third party
13  billing there?
14      A.   Yes.
15      Q.   So why do you need an office
16  coordinator there?
17      A.   Well, someone has to make the
18  appointments, act as the receptionist
19  type thing.  Some of the offices -- I
20  think most of the offices put the new
21  patient demographics in the system.
22  And then at the end of the day they get
23  their charge sheets together and those

146

1  did it when MedNet was doing our
2  billing.  I think she also put in
3  charges.  I don't think that MedNet was
4  doing that at that time.
5      Q.   After Ms. Hughes was
6  terminated who did that job?
7      A.   Put the patient demographics
8  in?
9      Q.   Yes, ma'am.
10      A.   United ProBill.
11      Q.   What was Lisa Brooks doing?
12      A.   She was the receptionist.  She
13  collected copays, made appointments,
14  pulled charts, answered the phone,
15  greeted the patients as they came in.
16      Q.   The duties that Ms. Hughes had
17  performed that were not related to
18  those being taken by United ProBilling,
19  who assumed those?
20      A.   All of the supervisory duties
21  that are in here, Dr. Ennis assumed
22  them.
23      Q.   Okay.  Was he working about

148

1  part-time then, April 2005?

2      **A.  Uh-huh.  About three days a**

3  **week.**

4      **Q.**   Okay.  So when he wasn't

5  there, who was supervising the staff?

6      **A.  Nobody.  They all went in, did**

7  **their jobs.  There was not an actual**

8  **supervisor on site.**

9      **Q.**   The other 19 items on that

10  evaluation, who did those duties?

11      **A.  I'm sure that -- I'm not sure.**

12  **I can give you my opinion.  Debbie --I**

13  **mean, Lisa Brooks probably ordered the**

14  **nonmedical supplies, the back office**

15  **person probably ordered the medical**

16  **supplies.  Some of the other things**

17  **they probably just called me about.**

18      **Q.**   Did Ms. Brooks assume the bulk

19  of Ms. Hughes' responsibilities?

20      **A.  She had no supervisory duties,**

21  **no supervisory -- the financial reports**

22  **had to come from ProBill.  Dr. Ennis**

23  **did his own coding.  Then ProBill would**

                    149

1  do -- check behind him.  The back

2  office person would have worked up.

3  Sheryl would have drawn blood.  I think

4  they probably divided the duties.  We

5  had housekeeping from the main hospital

6  to go up and do the cleaning duties.

7      **Q.**   One person or just the

8  department?

9      **A.  I think they had one person**

10  **that was designated to come up there**

11  **and clean the office once or twice a**

12  **week.  I don't recall the schedule.**

13          MS. HAYNES:  Okay.  You had

14  asked for a break.

15      (Recess was taken, commencing at

16  4:07 p.m., concluding at 4:19 p.m.)

17  (Plaintiff's Exhibit 18 was marked for

18  identification.  A copy is attached.)

19      **Q.**   (MS. HAYNES) Plaintiff's 18,

20  do you recognize this document?

21      **A.  Yes, I do.**

22      **Q.**   Is this your handwriting?

23      **A.  Yes, it is.**

                    150

1      **Q.**   When did you fill this out?

2      **A.  4/20 of '05.**

3      **Q.**   Are you sure about that?

4      **A.  No, I am not sure.  But that's**

5  **what it says.**

6      **Q.**   What time of day was it when

7  you terminated Ms. Hughes?

8      **A.  It was in the morning before**

9  **lunch.**

10      **Q.**   On her time records,

11  Plaintiff's 12, did you pay her for the

12  entire day or did she clock out?

13      **A.  We must have just paid her for**

14  **the entire time because her clock-out**

15  **time is 16:30.**

16      **Q.**   That would be 4:30?

17      **A.  4:30.  Yes, ma'am.**

18      **Q.**   She didn't come over to your

19  office at 4:30 in the afternoon?

20      **A.  No.  I am pretty certain it**

21  **was before lunch.**

22      **Q.**   How is it you recall that it

23  was in the morning?

                    151

1      **A.  Because typically when I know**

2  **I have to do something like that I**

3  **don't like to have to worry about it**

4  **all day.**

5      **Q.**   Get it over with?

6      **A.  Yes, ma'am.**

7      **Q.**   On Plaintiff's 18 is there any

8  reason you did not get her to sign

9  where it says Employee Signature?

10      **A.  More than likely I did not**

11  **fill it out until after she departed my**

12  **office.  I'm saying more than likely.**

13  **I do not feel like I did it before she**

14  **came in.**

15      **Q.**   In the details relating to

16  separation you did not make mention of

17  the flu vaccine, the backtracking on

18  accounts, or not following or

19  implementing an improper procedure

20  during the week; correct?

21      **A.  Correct.**

22      **Q.**   Why did you leave that out?

23      **A.  Because the primary reason for**

                    152

1 termination?

2     A.  I am not going to say it is an

3 untruth.  I believe at any time that

4 Debbie stated what she honestly

5 believed.  I don't think she

6 intentionally lied.  But there was

7 something said.

8     Q.  Made you mad?

9     A.  No.  It didn't make me mad,

10 but it was not a true statement

11 according to my recollection.  Didn't

12 make me mad.  But, you know, in those

13 hearings or in that whole process you

14 unemployment sometimes you don't get

15 but one shot to correct something.  And

16 I guess I felt like the appeal was my

17 only shot.  But I don't remember what

18 it is.  But I will think about it.

19     Q.  How many hearings did you

20 participate?

21     A.  Just one.

22         (Plaintiff's Exhibit 19 was

23           marked for identification.

157

---

1         A copy is attached.)

2     Q.  Plaintiff's 19, do you know

3 what this document is?

4     A.  Okay.

5     Q.  What is this?

6     A.  It is a fax transmission form

7 that Donna Reid sent to -- I think

8 Mr. Archie is with the State

9 Unemployment Office.  Generally when we

10 process an employee, we have them sign

11 that they have been handed a copy of

12 their job description.  I am just

13 assuming from reading this -- Donna

14 acts pretty independently on most of

15 the unemployment stuff -- that that

16 slip was not in Debbie's file.

17     Q.  Going back to Plaintiff's 18,

18 I have got a couple more questions I

19 want to ask you.  You put here or wrote

20 here that she was not eligible for

21 rehire and then listed your reasons;

22 correct?

23     A.  Yes.

158

---

1     Q.  Lack of initiative and

2 inability to perform assigned tasks?

3     A.  Yes.

4     Q.  What was her lack of

5 initiative?

6     A.  Well, I guess because I felt

7 like because the billing and everything

8 had gotten behind and the AR was -- the

9 outstanding AR was so high.  She didn't

10 have many other duties at that point

11 that she had to do.  That was just my

12 choice of words, I guess.

13     Q.  What were you relying on that

14 the AR was high?

15     A.  Financial reports and

16 conversations with Brad Hull.

17     Q.  I thought we had already gone

18 over that Mr. Hull never commented

19 about Ms. Hughes.

20     A.  But the reports that Brad got

21 when I would -- sometimes they would

22 come to me and I sent them up to Brad.

23 But that was the basis for knowing the

159

---

1 AR.  He may not specifically be talking

2 about Ms. Hughes, but we did discuss

3 the outstanding AR in that office.

4     Q.  The AR would be the patient

5 accounts, money that is owing on

6 patient accounts?

7     A.  Yes.

8     Q.  And it is your opinion or at

9 least what you are testifying to as far

10 as her lack of initiative that the AR

11 was considerably more higher than other

12 facilities?

13     A.  Right.

14     Q.  Do you know what it was?

15     A.  Do I know the figure, the

16 number?  No, I do not.  Not anymore.

17     Q.  Who started doing the accounts

18 receivables after she left?

19     A.  United ProBill.

20     Q.  I'm sorry?

21     A.  United ProBill.

22     Q.  Did you already have that in

23 the works, that they were going to do

160

---

1   AR?

2       A.   No.   They were initially just
3   going to do the billing.   But after
4   Debbie left, we brought the old Medisys
5   system down to United ProBill's office
6   for them so they could print reports
7   off and start collecting the old AR.

8       Q.   Who was doing the AR in the
9   other offices?

10      A.   Whoever is doing the billing.
11  You don't have -- Generally you don't
12  have a lot of old AR in a physician
13  practice.   You should not.   Because
14  there is more to just initially billing
15  insurance when a patient comes in.
16  There is all the follow-up.   And either
17  MedNet or ProBill in the other offices
18  does the follow-up so that your AR
19  doesn't get up there.

20      Q.   In the other offices are the
21  office coordinators or office managers
22  working the AR?

23      A.   No.

161

1       Q.   That is left to the third
2   party administrator?

3       A.   Right.   Only offices where
4   they have their own system does the
5   person in the office work the AR.

6       Q.   With regards to Defendant's
7   Exhibit 6, did you have any
8   conversations with Ms. Hughes about the
9   overage of the flu vaccine?

10      A.   Yes.

11      Q.   What were those conversations?

12      A.   I called her the day I
13  received this, which was probably
14  September 2nd because I generally don't
15  keep invoices on my desk.   When I got
16  it, I called because I saw this was 300
17  vials of flu vaccine and $25,000 is a
18  lot of money out of a practice.   So I
19  called her.   The first thing she said
20  when she got on the phone was, oh, you
21  got the invoice.   I just asked her,
22  Debbie, why in the world did you order
23  so much flu vaccine?   Initially she

162

1   told me he told me to, but I am sure we
2   had a few more words.   At that point
3   flu vaccine is not something you can
4   return.   So we just started working on
5   what we were going to do with 300 vials
6   of flu vaccine and it should have been
7   30.   That office was also one of few
8   offices that orders their own flu
9   vaccine.   Generally that is ordered
10  through our pharmacy.   And it would
11  have been caught had she placed the
12  order through the pharmacy.

13      Q.   Do you know what the profit
14  the company ended up making on that?

15      A.   I doubt very seriously we made
16  a profit.   Flu vaccine is not something
17  that our practice generally makes a lot
18  of money on.   The vaccine that we sold
19  in bulk we sold for what we paid.   What
20  I started doing immediately was calling
21  physician practices in Ozark and Dale
22  County to see if everybody had gotten
23  their vaccine.   Now, that didn't -- And

163

1   that information didn't get back to me
2   immediately because this was in
3   September.   Typically offices do not
4   start giving the flu vaccine until
5   October 1 or somewhere around the first
6   of October.   But what I did was I made
7   contact with every physician
8   practice -- family practice in Ozark.
9   There are two nursing homes in Ozark.
10  I called those.   There is a clinic in
11  Midland City that is located in Dale
12  County that I called.   And eventually
13  what vaccine our practices that we
14  owned did not use, then we sold -- we
15  did sell all of it.   There was none
16  that was wasted.   But we sold it at
17  cost.

18      Q.   Was it all gone by October
19  20th, the newspaper clipping?

20      A.   All that we had kept in our
21  possession.   Had we known this was
22  going to happen, that everybody was
23  going to come to StatMed in Ozark to

164

1    Q.  Does the hospital receive any
2  federal funding?
3    A.  No.
4      MR. VREELAND:  Do you mean by
5  virtue of the indigent patient program
6  or at all?
7      MS. HAYNES:  The patient
8  program.
9      MR. VREELAND:  Okay.
10   Q.  (MS. HAYNES) Paragraph 6.
11 Were you aware in 2004, 2005 that
12 Mrs. Ennis was in the office during
13 work hours?
14   A.  I was aware that she drove
15 Dr. Ennis to work and that she picked
16 him up every day.  But I did not know
17 how much time she spent in the office,
18 that she stayed all day or part of a
19 day.
20   Q.  When did you first know she
21 was staying all day and acting as a
22 supervisor?
23      MR. VREELAND:  Object to the
173

1  form.
2    A.  I believe I knew that
3  yesterday when Debbie stated that in
4  her deposition.  I don't believe I knew
5  it prior to then.
6    Q.  Why would you hire her in May
7  2005 if she had no experience --
8    A.  One --
9      MR. VREELAND:  Let her finish.
10   A.  One of the things that she did
11 was she did help or was going to help
12 with this indigent patient program.
13 Those are very lengthy forms.  It is
14 very time-consuming to do it.  Not a
15 lot of doctors' offices do it, but that
16 clinic has always done it.  That was
17 one of the reasons that she was put on
18 part-time.
19   Q.  Did you know if she had any
20 experience?
21   A.  No.  She had no experience.
22   Q.  But you put her in charge of
23 an indigent patient program?
174

1      MR. VREELAND:  Object to the
2  form.
3    A.  I can't say as being put -- it
4  is filling out a form.  It is a
5  difficult form.  It is time-consuming.
6  But it doesn't take a mental giant to
7  do it.  It is just very tedious.
8    Q.  Who was doing it before
9  Mrs. Ennis?
10   A.  I do believe that Debbie did
11 it and some of the other -- Lisa
12 probably did some of them.  They just
13 kind of shared them around.  I don't
14 think it was anything that anybody was
15 just crazy about doing all the time.
16   Q.  Did you know prior to
17 yesterday that Mrs. Ennis was foul-
18 mouthed, abusive, and complained about
19 Ms. Hughes?
20   A.  No, I did not.
21   Q.  Had you ever been in her
22 presence where she was cursing?
23   A.  Have I ever heard her use
175

1  profanity?  Yes.  But not in the
2  office.
3    Q.  Where were you?
4    A.  I think we were at her house.
5  She was extremely angry over how things
6  were going with her husband.  Hurt,
7  angry.  That kind of anger.  And she
8  did use some profanity then.
9    Q.  Why were you at her house?
10   A.  I think I had taken something
11 by for Dr. Ennis to sign.  I don't
12 recall.  I remember spending some time
13 with him and then she and I walked
14 outside and talked.
15   Q.  Did Mrs. Ennis ever complain
16 to you that Ms. Hughes was on a
17 part-time basis back after her brain
18 tumor?
19   A.  No.
20   Q.  When is the first time you
21 knew that Mrs. Ennis had intentionally
22 struck Ms. Hughes on the head after her
23 surgery?
176

1    Q.   Is that correct?
2    A.   That's correct.
3    Q.   Did you have another
4    conversation on May 3rd, 2005, with
5    Mr. Archie?
6         MR. VREELAND:  Object to the
7    form.
8    A.   I don't know.
9    Q.   I am referring to Document
10   No. 36 of Plaintiff's Exhibit 23.
11   A.   I don't recall the
12   conversation, but the content here is
13   all true.
14   Q.   Did you make the statement
15   that Ms. Hughes had worked herself out
16   of a job?  Do you recall making that
17   comment to the Industrial Relations
18   Board?
19   A.   I don't recall making that to
20   the board.
21   Q.   Did you ever make that
22   statement, "You worked yourself out of
23   a job"?

209

1    A.   Yes, ma'am.
2    Q.   That is your signature?
3    A.   Yes, it is.
4    Q.   And Ms. Hughes got her
5    unemployment?
6    A.   Yes.
7    Q.   And you appealed that?
8    A.   I did.
9    Q.   Did you ever have a
10   conversation or recall the conversation
11   when she was terminated that she asked
12   you if she could collect unemployment
13   and you said she could?
14   A.   I asked her -- I remember her
15   asking me that question.  But there is
16   no way I would ever tell anybody they
17   could because that is a determination
18   of the State, not mine.  I told her she
19   could apply for it.
20   Q.   Eliminating her position, you
21   knew she was entitled to it, though;
22   correct?
23        MR. VREELAND:  Object to the

211

1    A.   I did make that statement, but
2    I could not tell you who.  But there is
3    a lot about this document that makes me
4    think I don't believe anything that is
5    on it because it has got claim date
6    4/17/05.  She hadn't even been
7    terminated at that point.  So this
8    document really bothers me.
9    Q.   Did you ever tell Ms. Hughes
10   that United ProSource --
11   A.   ProBill.
12   Q.   -- was going to be doing the
13   coding and billing before you
14   terminated her?
15   A.   I believe that I did.  I don't
16   recall exactly when that took place.
17        (Plaintiff's Exhibit 24 was
18        marked for identification.
19        A copy is attached.)
20   Q.   Plaintiff's 24.  Do you recall
21   this letter?
22   A.   I do.
23   Q.   First page, Document No. 49?

210

1    form.
2    A.   Normally, yes.
3    Q.   That is what you had told her,
4    that her position was eliminated?
5    A.   That's what I had told her
6    when she was terminated, yes, ma'am.
7        (Plaintiff's Exhibit 25 was
8        marked for identification.
9        A copy is attached.)
10   Q.   Plaintiff's 25, is this the
11   policy on extended illness benefits?
12   A.   Yes.
13   Q.   Effective date, March 3rd,
14   2005?
15   A.   Yes, ma'am.
16   Q.   You see where it says Paid
17   Time Off in bold under Procedure?
18   A.   Yes.
19   Q.   "Paid time off must be used
20   for the first two scheduled workdays
21   for any absence, including FMLA and
22   medical leave of absence, except in the
23   following circumstances."  Do you not

212

1 read that to understand that she was
2 entitled to two days paid time off when
3 she is submitting an excuse for medical
4 leave?
5     A.  It could be interpreted that
6 way.  That was not my intent, but yes,
7 I can see how it would be.
8         (Plaintiff's Exhibit 26 was
9           marked for identification.
10          A copy is attached.)
11    Q.  Did you also implement the
12 paid time off policy and procedure on
13 the same date, 3/3/05, Plaintiff's
14 Exhibit 26?
15    A.  Yes.  It was implemented on
16 the same day.
17    Q.  Did you draft this policy?
18    A.  I did.
19    Q.  When did you start the first
20 draft?
21    A.  I probably worked on this for
22 six months prior to actually getting
23 the one that we published.

213

1 incorporate all of these policies in
2 the handbook and for them to match up
3 because that way the employees only
4 have one thing to keep up.  But as long
5 as you have a policy and procedure
6 manual, you have to keep it up.
7     Q.  With regards to the policies I
8 have shown you, 26, 27, and 25, how are
9 the employees advised of the changes?
10    A.  In regards to the harassment
11 policy, it is treated a little bit
12 differently than any of the other
13 policies.  Every employee when they
14 start work at the hospital are given a
15 copy of the current harassment policy
16 and they must sign for it.  I don't
17 recall if we did that with these two
18 policies, the sick and the vacation, if
19 we actually gave each employee a copy
20 and had them sign that they had
21 received it.  The education of the
22 policies could have been done in a
23 different manner.  I'm sorry.  I just

215

1         (Plaintiff's Exhibit 27 was
2           marked for identification.
3          A copy is attached.)
4     Q.  Plaintiff's Exhibit 27, can
5 you tell me what this is?
6     A.  It is our harassment policy.
7     Q.  Does this supersede the policy
8 that's in Plaintiff's Exhibit 2?
9     A.  I don't have 2.  Oh.  Sorry.
10    Q.  I'm sorry.  Did I not ask a
11 question about it?
12    A.  You did ask a question about
13 it.  I don't know if it is just a
14 matter of timing in publishing a new
15 handbook.  I am trying to see.  They
16 could be identical.  So I would have to
17 read both of them to see.
18    Q.  The format lends itself that
19 there are other policies in that same
20 format.  Is that true?
21    A.  There are about a dozen
22 policies in this format.  But what I
23 have tried to do over the years is

214

1 don't recall at this point.  But I do
2 know about the harassment policy.
3         (Plaintiff's Exhibit 28 was
4           marked for identification.
5          A copy is attached.)
6     Q.  Plaintiff's 28, do you
7 recognize this document?
8     A.  Yes, I do.
9     Q.  What is it?
10    A.  We have a folder that we keep
11 all the personnel documents in.  This
12 is just a snapshot of the position and
13 salary history.
14    Q.  Is there writing on the inside
15 cover of this folder?
16    A.  No.  It is a folder like this.
17 On the inside of the folder?  No.
18    Q.  It has ends like this manila
19 folder?
20    A.  Yes.  Yes.
21    Q.  Is there writing on the back?
22    A.  It is just this portion again.
23    Q.  Is any of the writing on

216

1    reference?

2       A.   No.

3       Q.   Do you know why she was

4    terminated from Southern

5    Medical -- Southern Health?

6       A.   **Until yesterday I didn't even**

7    **know she had been employed by Southern**

8    **Health.**

9       Q.   Have you asked relative to any

10   application that she has submitted to

11   Dale Medical Center for a department

12   head to interview her for a job?

13      A.   **No.  No.**

14      Q.   Have you submitted her

15   application to any department head for

16   consideration?

17      A.   **No.**

18      Q.   Are you the decision maker?

19      A.   **No.  The way our process**

20   **normally goes is when a department head**

21   **has a vacancy, we post it in-house and**

22   **let them take in-house applications**

23   **first.  And then after that's over, if**

221

1    **they have not -- if there is no one**

2    **in-house that has applied or anyone**

3    **they want, then they will generally**

4    **contact Donna Reid and tell them that**

5    **they want to see applications for an ER**

6    **admit rep or a switchboard operator.**

7    **And Donna goes through and pulls the**

8    **applications and logs them out to the**

9    **department head.  The department head**

10   **makes their own decisions as to who**

11   **they interview.**

12      Q.   Did Donna Reid make you --

13   Strike that.  Did Donna Reid advise you

14   that Ms. Hughes had submitted

15   applications?

16      A.   **She did.  She gave those**

17   **applications to me.**

18      Q.   What did you do with the

19   applications?

20      A.   **Because I had received her**

21   **complaint from the EEOC, I had made a**

22   **file on Ms. Hughes.  I put them in that**

23   **file.**

222

1       Q.   What is that file?

2       A.   **It is just a manila folder.**

3       Q.   Okay.  So the applications

4    were never put in any file for anyone

5    to consider for her to be considered

6    for employment?

7       A.   **No.**

8       Q.   Did you do that because she

9    had filed a charge of discrimination

10   against Dale Medical Center?

11      A.   **I did that because I had**

12   **marked her separation from employment**

13   **as not being eligible for rehire.**

14      Q.   Why did you even mention then

15   that you knew she had filed a charge of

16   discrimination against the facility as

17   removing her applications and placing

18   them in a file?

19      A.   **Just to let you know that I**

20   **had made a file and that is where I put**

21   **them.  You asked me what I did with**

22   **them.**

23          (Plaintiff's Exhibits 29 and

223

1           30 were marked for

2           identification.  Copies are

3           attached.)

4       Q.   Plaintiff's 30.  I'm sorry.

5    29.  Plaintiff's 29 and Plaintiff's 30.

6    Do you know what these documents

7    represent?

8       A.   **They are e-mail messages from**

9    **Gina May to me.  And from me to Gina**

10   **May.**

11      Q.   Who is Gina May?

12      A.   **She works at MedNet, one of**

13   **the billing companies that we outsource**

14   **with.**

15      Q.   Is she a friend of yours?

16      A.   **A friend?  No.  She is a**

17   **business associate.  I have a long-term**

18   **working relationship with her.**

19      Q.   Look at 29.  Did you start the

20   e-mail trail on June 3rd, 2004, to Gina

21   May?

22      A.   **It looks as if I did.  I don't**

23   **really know what I am talking about**

224

1 here, but yes.

2    Q.   Is there another e-mail that

3 preceded this one from Gina May?

4    A.   (No response.)

5    Q.   It doesn't make sense how it

6 starts; correct?

7    A.   That is correct.  I do believe

8 that it started with a telephone call

9 from Gina May to me.

10    Q.   Telling you what?

11    A.   About the call that Debbie

12 made to her about the accounts that had

13 been written off -- that were being

14 rejected and subsequently written off.

15    Q.   Were the accounts written off

16 as of June 3, 2004, or were the

17 accounts being kicked back?

18    A.   I believe they had been

19 written off at this point.

20    Q.   Why is MedNet involved in June

21 2004 with the Ariton?

22    A.   Because Debbie called Gina May

23 trying to find out what went wrong

225

1 rather than calling me.

2    Q.   MedNet was doing the billing

3 in 2004?

4    A.   No.  MedNet was not doing the

5 billing.  Debbie had established a

6 relationship with MedNet.  Gina May was

7 working there at the time MedNet did

8 the billing for Ariton.  Gina is a very

9 knowledgeable person.  And I am

10 assuming that's why Debbie called her.

11 I consider her a subject matter expert

12 when it comes to billing and provider

13 numbers and that sort of thing.

14    Q.   Tell me about the top part of

15 the e-mail.

16    A.   In order to help us figure out

17 what was going -- why those claims were

18 being rejected, Gina May called

19 Medicare.  This is the information, the

20 Challenges 1, 2, and 3 is the

21 information that she got from Medicare.

22 And the solutions -- I don't know if

23 these are solutions that Gina came up

226

1 with by herself or in conjunction with

2 Medicare.  But what we needed to do to

3 resolve the problem with the rejected

4 claims.

5    Q.   All right.  Under the

6 challenges do any of those challenges

7 have to deal with Ms. Hughes writing

8 off accounts?

9    A.   Only No. 3 stating that the

10 claims that she filed were not HIPAA

11 compliant.  And that's why they were

12 being caught on the front end of the

13 Medicare system.  And that's why

14 Medicare wouldn't really have a record.

15    Q.   Was there also an issue with

16 the provider number?

17    A.   Yes.  There was an issue with

18 a provider number.

19    Q.   Okay.  All right.  Under

20 solutions, "We need to insure that

21 Ariton's billing vendor" -- who is

22 that?

23    A.   Medisys Systems.

227

1    Q.   That is a computer system?

2    A.   It is the computer and the

3 software.

4    Q.   It was not HIPAA compliant?

5    A.   It was HIPAA compliant.  I

6 called Medisys.  I spoke with Debbie

7 and she gave me a phone number and a

8 name of someone to call.

9    Q.   Okay.  Did you update the

10 software?

11    A.   No.  We didn't have to.  Their

12 software was HIPAA compliant.  The

13 problem was they had discontinued

14 Dr. Zumstein's provider number in their

15 system.  So, therefore, when those

16 claims hit, they just popped right

17 back.  I guess Debbie got an electronic

18 message that they were not being paid

19 or that they were -- whatever it said.

20    Q.   Tell me about Solution No. 2.

21    A.   An EOB is explanation of

22 benefit.  Normally if you send -- Say

23 you send a claim to Medicare and it's

228

1  got the wrong date of birth on it or
2  something wrong. Then they -- If they
3  get the claim and start processing it
4  and find an error, then they send a
5  denial EOB. According to whatever the
6  problem was with this provider number,
7  they were not getting -- these claims
8  were not hitting their processing part
9  of the software. I don't know how -- I
10 am not -- That is why I have MedNet and
11 United ProBill. I am not an expert on
12 billing insurance or anything. I don't
13 recall how Debbie was getting notified
14 that these claims were being rejected.
15 But there are always audits that a
16 person can print off and start working
17 the account to see what's wrong. I
18 guess that's what didn't happen until
19 Gina May got involved.
20     Q.  Okay. Did Ms. Hughes call
21 Gina May trying to get help on why
22 these accounts were getting kicked
23 back?

229

1     A.  Yes. Yes, she did.
2     Q.  Is there anything improper
3  about that?
4     A.  Well, we didn't have a
5  business relationship between Ariton
6  and MedNet. We pay for their services.
7  So basically she was calling and asking
8  Gina to provide her something gratis.
9     Q.  Anything wrong with that?
10    A.  Well, it is not the way we
11 generally do business. I mean, why
12 would she -- No. There is nothing
13 illegal. But I think it was -- the
14 intent was to keep anybody else from
15 knowing it.
16    Q.  Why do you say that?
17    A.  Well, because she had already
18 written accounts off. When Gina asked
19 her if she had contacted me, she said,
20 oh, no, like no, I am not calling her.
21    Q.  Gina told you that?
22    A.  Yes.
23    Q.  Did you put that in any of

230

1  your e-mails?
2     A.  Unless it is here. I don't
3  see it here anywhere.
4     Q.  What document are you relying
5  that she had written accounts off prior
6  to June 2004?
7     A.  I am relying on the fact that
8  Debbie told me she wrote the accounts
9  off. Once I spoke with Gina May, then
10 I called Debbie to see if we could work
11 this thing out. At the time I think
12 all of us thought that Medisys was not
13 HIPAA compliant. So that was the first
14 thing we tried to do was just get that
15 corrected. I think that, if I remember
16 correctly, the Medisys people were kind
17 of trying to put Debbie off with doing
18 anything with this. So I finally
19 called them. By the time that
20 happened, Gina May had figured out what
21 was wrong and Debbie had gone back.
22 They had implemented his provider
23 number again. Debbie had gone back in

231

1  and refiled the claims. They were
2  processed then. She made the
3  adjustments where she had written them
4  off. She adjusted them so that they
5  would have that balance again.
6     Q.  Did the write-offs show up on
7  any financial statement?
8     A.  There should be a way in that
9  system to print that off because I know
10 there is on all other systems. We have
11 the computer. We just can't get in it
12 and print the reports because we don't
13 have a business affiliation with
14 Medisys anymore. Debbie would be
15 better to answer that question than me.
16    Q.  Do you have any financial
17 reports that depict that Ms. Hughes had
18 written off accounts prior to June
19 2004?
20    A.  I do not have any, no.
21    Q.  Have you seen any?
22    A.  I do believe that Debbie
23 provided us a list of the accounts she

232

1  response you answered on page 9 that
2  the Plaintiff had received at least
3  five verbal warnings prior to her
4  surgery on January 3, 2005. What are
5  those five verbal warnings she
6  received?
7      A.  **Verbal warnings?**
8      Q.  Yes, ma'am.
9      A.  **Mistake in ordering the flu**
10  **vaccines, writing off the patient**
11  **accounts without authorization, spoke**
12  **to her twice about the overtime, and**
13  **then I guess the other one is**
14  **contributed to Dr. Ennis.**
15      Q.  Where he checked needs
16  improvement I think it was three areas
17  of her performance?
18      A.  Yes.
19      Q.  Is that considered a verbal
20  warning under Dale Medical Center's
21  policy?
22      A.  **It would be considered that an**
23  **area that needs improvement has been**

253

1  discussed.
2      Q.  The performance evaluation is
3  an annual performance appraisal, is it
4  not?
5      A.  **It is.**
6      Q.  Is there a separate form or
7  document that you utilize on verbal
8  warnings to an employee's file?
9      A.  **We have a form that you can**
10  **use when you are doing a verbal warning**
11  **with an employee. Typically I don't**
12  **use it a lot because it makes an**
13  **employee nervous when they see**
14  **something written on a piece of paper**
15  **although you mark it it is verbal. It**
16  **tends to. So I rarely use it unless it**
17  **is a real severe offense.**
18      Q.  Okay. With regard to May or
19  June 2004, you verbally warning
20  Ms. Hughes about writing off accounts
21  without authorization, we have seen
22  today several e-mails between you and
23  Gina May regarding those accounts. But

254

1  did you ever put anything in writing or
2  e-mail to Ms. Hughes about writing off
3  those accounts?
4      A.  **No, I did not.**
5      Q.  And you did not place anything
6  in her personnel file; correct?
7      A.  **Correct.**
8      Q.  Okay. In 2003, is that when
9  you warned Ms. Hughes on two separate
10  occasions regarding excessive overtime?
11      A.  **I don't recall if it was three**
12  **or four.**
13      Q.  Well, it is written here on
14  page nine that it was in 2003. Is that
15  correct?
16      A.  **I don't see 2003. Am I**
17  **overlooking it? Okay. I see. I'm**
18  **sorry. It might have been 2003. I**
19  **don't know.**
20      Q.  Have you gone back and pulled
21  her time records for 2003? We have
22  looked at the time records for 2004.
23      A.  **I don't know if I just made a**

255

1  **mistake in the year here. But I would**
2  **have had something in front of me to**
3  **say 2003 if it is indeed 2003.**
4      Q.  Did you relate the actions of
5  writing off the accounts and not
6  ordering the proper amount of flu
7  vaccine to her brain tumor?
8      A.  **No.**
9      Q.  Prior to 2004, had she,
10  meaning Ms. Hughes, made errors in
11  writing off accounts?
12      A.  **Not to my knowledge.**
13      Q.  Prior to 2004, had she
14  improperly ordered any medication?
15      A.  **Not to my knowledge.**
16      Q.  After you talked with her
17  about excessive overtime, did it stop?
18      A.  **It did for a while the first**
19  **time I talked to her. But then it**
20  **started happening again and there was**
21  **another conversation.**
22      Q.  Okay. After that did it stop?
23      A.  **Yes.**

256

1    Dr. Blough when he was up there.

2        Q.   Did you ever tell Ms. Hughes

3    she had an attitude like Dr. Blough?

4        A.   I don't recall ever saying

5    that.

6        Q.   What was Dr. Blough's attitude

7    in your opinion?

8        A.   He was -- I don't know.  He

9    didn't have a lot of personality in the

10   dealings.  Like I said, my contact with

11   him was minimal.  But I don't remember

12   anything outstanding one way or another

13   about his personality or demeanor.  If

14   he was upset about something, he was

15   very upset.

16       Q.   In June 2004 did Ms. Hughes

17   talk to you about a comment Dr. Ennis

18   had made about getting rid of the old

19   computer system, she would have no job?

20       A.   We discussed a new billing

21   system.

22       Q.   Who is we?

23       A.   Dr. Ennis and I and

261

1    someone would have to code?

2        A.   Like I said, it all sounds

3    logical, but I honestly don't recall

4    the conversation.

5            MS. HAYNES:  I think that is

6    all the questions I have.  Thank you,

7    ma'am.  Sorry we kept you so long.

8            (The proceedings were

9            concluded at 7:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

263

1    Mr. Johnson.  What was the time frame

2    you asked me about, please?

3        Q.   June 2004.

4        A.   I don't at that point recall

5    him saying anything about Ms. Hughes

6    not having a job because you always

7    have to have someone to input data into

8    a computer.

9        Q.   I'm sorry.  My question was

10   did she, Ms. Hughes, talk to you about

11   a comment that Dr. Ennis had made to

12   her, that if they got a new computer

13   system, she was not going to have a

14   job?

15       A.   I don't recall her saying

16   that.  It sounds like a logical thing,

17   but I don't recall her saying it.

18       Q.   You have no recollection of

19   her coming and talking to you about

20   that?

21       A.   No, ma'am.

22       Q.   And you making the comment

23   that she would have a job because

262

1        C E R T I F I C A T E

2    STATE OF ALABAMA  )

3    JEFFERSON COUNTY  )

4        I hereby certify that the above

5    and foregoing proceeding was taken down

6    by me by stenographic means, and that

7    the questions and answers therein were

8    produced in transcript form by computer

9    aide under my supervision, and that the

10   foregoing represents, to the best of my

11   ability, a true and correct transcript

12   of the proceedings occurring on said

13   date at said time.

14       I further certify that I am

15   neither of counsel nor of kin to the

16   parties to the action; nor am I in

17   anywise interested in the result of

18   said cause.

19

20       _____

21       AMY WALLS LENOIR, CSR-530

22       COURT REPORTER

23

264