# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBORAH HUGHES,
Plaintiff,
vs.
DALE COUNTY MEDICAL CENTER,
Defendant.

Case Number: 1:06-CV-00595-SRW

DEPOSITION: VERNON JOHNSON

STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of VERNON JOHNSON may be taken on May 3, 2007, before Amy Walls Lenoir,

Commissioner and Notary Public, at the Hampton Inn, 103 Troy Plaza Loop, Troy, Alabama.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence or prior thereto.

APPEARANCES

Appearing for the Plaintiff:

HAYNES & HAYNES, P.C.
Alicia K. Haynes
1600 Woodmere Drive
Birmingham, Alabama 35226

Appearing for the Defendant:

LEHR, MIDDLEBROOKS
& VREELAND, P.C.
Albert Vreeland
P.O. Box 11945
Birmingham, Alabama 35202-1945

Court Reporter: Amy Walls Lenoir
Also Present: Sheila Dunn,
Deborah Hughes

INDEX

Examination by Ms. Haynes...........5

Plaintiff's Exhibit 1..............73
Plaintiff's Exhibit 2.............101
Plaintiff's Exhibit 3.............155
Plaintiff's Exhibit 4.............160

I, Amy Walls Lenoir, a Court Reporter of the State of Alabama, acting as Commissioner, certify that on this date there came before me at the Hampton Inn, Troy, Alabama, on May 3, 2007, beginning at or about 8:15 a.m., VERNON JOHNSON, witness in the above cause, for oral examination, whereupon, the following proceedings were had:

VERNON JOHNSON,

being first duly sworn, was examined and testified as follows:

EXAMINATION BY MS. HAYNES:

Q. All right, Mr. Johnson. You ready?
**A. I'm ready.**
Q. Would you state your full name for the record, please, sir?
**A. Vernon Lewis Johnson.**

5

Q. What is your address?
**A. 1731 East Roy Parker Road, Ozark, Alabama.**
Q. How long have you lived there in Ozark?
**A. Well, probably three and a half years. About right.**
Q. What is your current position at the hospital?
MR. VREELAND: Just for future, you can't look to her.
**A. I'm so used to it. What is the question again?**
Q. Your current position.
**A. I'm the chief executive officer.**
Q. Of Dale Medical Center?
**A. That's correct.**
Q. How long have you been in that position?
**A. Four and a half years.**
Q. What was your position prior to being CEO of Dale Medical Center?

6

**A. Assistant administrator.**
Q. Reporting to whom?
**A. Bob Bigley.**
Q. Did you replace Mr. Bigley?
**A. I did.**
Q. How long had Mr. Bigley been the administrator or the CEO of Dale?
**A. About five years.**
Q. Why did he leave?
**A. Just relocation.**
Q. Where did he relocate to?
**A. I have no idea.**
Q. What did you hear?
**A. Well, he went to Mississippi, then to Florida. I think he's in Georgia now. He's moved around.**
Q. What did you hear was the reason he left Dale Medical Center?
**A. He was probably asked to resign due to a relationship he had formed.**
Q. Is that a relationship with an employee?

7

**A. That's correct.**
Q. Who would have asked him to leave?
**A. Our board.**
Q. Is that who you report to currently?
**A. That's correct.**
Q. How many individuals are on the board of directors?
**A. There is nine members on the executive board.**
Q. Do you also serve?
**A. No, I do not. As a voting member? Is that what you are asking?**
Q. Yes.
**A. No, I do not.**
Q. Are any of the board of directors employees of Dale Medical Center?
**A. No.**
Q. How long were you the assistant administrator under Mr. Bigley?

8

Q. Who does the billing for hospice?
A. **Gentiva.**
Q. You told me Gentiva.
A. **Uh-huh.**
Q. The stat medical or the urgent care facility, who does the coding and billing?
A. **MedNet.**
Q. Do you have a third party doing the coding and billing for all facilities other than the hospital and the surgical care facility?
A. **That is a true statement.**
Q. How long have you had third party coder and billers for these other facilities?
A. **For as long as I have been in the office.**
Q. Did you also have third party coder and billers for the five offices that you no longer own, Ariton, Dr. Luna Sy's office, the neurology

office, Dr. Robin Cromer-Tyler's office, and urologist's office?
A. **List those again.**
Q. The Ariton, did you have a third party coder?
A. **I did not until the end.**
Q. When? What do you consider the end?
A. **When we -- We made the decision to go to a third party biller toward the end of Ms. Hughes' employment. And out of the other ones that you have listed that you asked me about, yes, we had third party billers for all of them with the exception of Robin Cromer-Tyler.**
Q. Who did the billing there?
A. **It was done in her office by her staff.**
Q. Is there an office manager there?
A. **Not anyone per se had the title of office manager, no.**

Q. How many employees work at the urgent care facility?
A. **I would be guessing again. I would have to -- I don't have the reports in front of me. I know there is probably two in the front office -- I have no idea how many nursing staff. I would guess -- I am guessing. I don't know.**
Q. Less than ten?
A. **It would be around ten.**
Q. And how long have they used MedNet as their third party biller?
A. **Since it was opened.**
Q. Why would you have an office manager there?
A. **Because of the volume that goes through that facility. It handles staffing, supply orders. That is a very busy office.**
Q. What is the office manager duties in any of your facilities?
MR. VREELAND: Object to the

form.
A. **(No response.)**
Q. Can you answer that?
MR. VREELAND: I objected, but you can answer it.
A. **Okay. She is responsible for the day-to-day operations of the clinic. She is responsible for the scheduling of our staff, ordering of supplies, follow-through on our billing.**
Q. Anything else?
A. **It's pretty broad. Just responsible for the day-to-day operations.**
Q. Currently I have that you have Ms. Audra Wood as the office manager for the urgent care facility and you have Linda Cruit as the office manager for home health. Do you have any other office managers that have that title office manager?
A. **Not that I recall.**

Q. Do you consider an office manager a senior manager?
A. **I do not.**
Q. Have you fired any office managers?
A. **Could you clarify what you mean have I fired them?**
Q. Where you were the decision maker.
A. **I have approved it, yes.**
Q. Who have you approved as an office manager to be terminated?
A. **Debbie Hughes.**
Q. Anyone else?
A. **Not that I recall.**
Q. Have you approved --
A. **Could I have a minute?**
MR. VREELAND: Is there a question on the table?
Q. You want to step out?
A. **Yes. I will step out.**
(Off-the-record discussion.)
Q. (MS. HAYNES) Anyone else as an

office manager?
A. **Not that I recall.**
Q. Ms. Hughes is the only office manager you have terminated in four and a half years?
A. **That I recall.**
Q. Have you hired any office managers in four and a half years?
A. **I don't hire them.**
Q. Do you know of any that have been hired?
A. **I do not.**
Q. Do you consider an office manager a senior manager?
A. **I do not.**
Q. Is that considered mid level?
A. **Yes.**
Q. Any other mid level managers you've fired or approved to be fired?
A. **Not that I recall.**
Q. Can you tell me anyone else you have fired in four and a half years other than Ms. Hughes?

A. **Any level?**
Q. Yes, sir.
A. **I have fired dietary workers for stealing money. Those are things that I instantly take care of.**
Q. Are those hourly workers?
A. **Uh-huh.**
Q. Is that yes?
A. **Yes.**
Q. Why would you be involved in firing hourly workers?
A. **They were caught stealing. I have zero tolerance for that.**
Q. Anyone else you fired?
A. **I have fired physicians.**
Q. Anyone else?
A. **I'm sure there are, but I don't recall.**
Q. I'm asking as CEO. In your position as CEO.
A. **That is correct.**
Q. Why did you fire Ms. Hughes?
A. **We deleted her position.**

Q. Who is we?
A. **Myself, Dr. Ennis, and Ms. Dunn as the assistant administrator.**
Q. When did you make the decision to delete her position?
A. **When there was a concern because our billing had backlogged and we were not getting the billing done.**
Q. Was there a time when you determined the need to delete her position?
A. **Are you asking me for a date?**
Q. Yes, sir. Or a month.
A. **I would have to research that. I don't know.**
Q. Any season or --
A. **I don't recall.**
Q. -- month come to mind when you made the decision?
A. **It does not.**
Q. Did you have any meetings about deleting her position?

**A. I have had discussions with Dr. Ennis.**
Q. When was the first time you had a discussion with Dr. Ennis about deleting the position of Debbie Hughes?
**A. I don't recall the date.**
Q. Do you recall a year?
**A. I do not.**
Q. Do you know if it was before or after she was diagnosed with the brain tumor?
**A. It would have been after.**
Q. Do you know if it was before or after she had surgery for that brain tumor that there were discussions about deleting her position?
**A. It would have been after.**
Q. How many discussions did you have with Dr. Ennis about deleting the position of Debbie Hughes?
**A. I would say there was probably two or three.**
Q. Who else was present?



**A. Just Dr. Ennis and myself.**
Q. Did you go to the Ariton Clinic or did he come to you?
**A. He came to me.**
Q. Did you -- Strike that. How did the discussions begin? Did he come to you first or did you go?
**A. He came to me.**
Q. Tell me about the first occasion.
**A. Dr. Ennis was concerned about the performance in his office and that the billing and the office functions of that office were not being performed. He was concerned about Ms. Hughes' continuous presence in the back and not willing to let others operate in the office and had reached a level to where when you try to do too much, you are efficient at none.**
Q. What does that mean, a presence in the back office?
**A. She was basically performing**



**as a bedside clinician where her job function was supposed to be business.**
Q. Was this first occasion during the five weeks she was off to have her brain surgery or after?
**A. I don't have dates in front of me. But I can tell you there were concerns with job performance probably that go back prior to her illness as well that involve the overordering of flu vaccines, it involved writing off insurance accounts without the approval of the administration of the hospital. Then toward the end there were concerns that we were not billing and collecting for the patients that were seen.**
Q. Read back my last question, please.
(Requested portion of record read by the court reporter.)
**A. That he and I talked?**
Q. Yes, sir.
**A. It would have been after.**



Q. After she came back to work?
**A. Yes.**
Q. Was she on half days?
**A. I don't recall. I don't know.**
Q. But she was back at work?
**A. Yes.**
Q. When was the second occasion you had a conversation with Dr. Ennis about deleting the position of Ms. Hughes?
**A. After the decision was made that we were going to outsource the billing, a discussion was held between Dr. Ennis and Ms. Hughes as he shared with me that he had talked with her about staying on to collect old accounts to which she told him she could not do because she knew those people in Ariton too well and she couldn't call them up and collect money from people that she had grown up knowing. So at that point Dr. Ennis shared with me if we are going to**

**outsource the billing and she refuses to collect old accounts, there is really nothing left for her to do in the office.**

Q. Read back my last question.

(Requested portion of record read by the court reporter.)

A. **That was after her surgery.**

Q. Do you know how long the second -- when the second conversation occurred between you and Dr. Ennis from the first conversation?

A. **I do not.**

Q. Weeks? Days?

A. **I don't know.**

Q. Did you have a third conversation with Dr. Ennis?

A. **I don't know. I mean, I see Dr. Ennis weekly. We talked about many things. It wasn't always about Ms. Hughes.**

Q. But the first time he talked to you about Ms. Hughes and deleting

her position was after her surgery?

A. **That is correct.**

Q. Was there a third conversation about deleting her position?

A. **I don't know.**

Q. Had Dr. Ennis spoken to you on any other occasions prior to the one about deleting Ms. Hughes' position about Ms. Hughes?

A. **I am sure we had conversations about asking her health out of a concern level. Had nothing to do with her job performance. But we are a small community hospital. When someone is sick in our organization, we are generally concerned. Dr. Ennis was concerned for Debbie.**

Q. Prior to him approaching you about deleting her position, had you and Dr. Ennis ever met to discuss Ms. Hughes?

A. **No.**

Q. He had never conveyed any

dissatisfaction with her job performance prior to the two of you meeting to delete her position?

A. **Yes.**

Q. That is what I'm asking. When --

A. **He was dissatisfied when we ended up with 3,000 flu vaccines at a huge cost to his office. He was dissatisfied to learn that patient accounts were written off with no one's approval. He was very dissatisfied with it. Sometime after that we discovered that she was ill.**

Q. Okay. Did you meet and discuss Ms. Hughes on those occasions?

A. **You know, what I clarify meeting -- when you are dealing with physicians, a telephone call to me with a concern is a discussion. I don't know that we never had a formal sit-around-the-table meeting about Ms. Hughes, no.**

Q. Did you have a telephone conversation?

A. **Absolutely.**

Q. When was the first time?

A. **When we discovered we had an abundance of flu vaccine for Dale County.**

Q. Who initiated that call?

A. **Dr. Ennis did.**

Q. Did he call you?

A. **Absolutely.**

Q. What did he say?

A. **He was a little upset because his clinic was being charged with thousands of dollars of unnecessary expenses.**

Q. What did he tell you?

A. **I don't recall. He wasn't happy.**

Q. You don't recall anything about the conversation?

A. **No, I do not. Other than he wasn't happy. I speak with a lot of**

**things and we make decisions based on what I am informed.**

Q. You have no independent recollection of what you were informed of?

**A. I was informed that we had patient accounts from Blue Cross Blue Shield that had been written off and cleared out of the system.**

Q. Ms. Dunn told you that?

**A. I don't recall who told me initially. But Ms. Dunn's responsibility was that clinic. So I would expect that came from her.**

Q. Dr. Ennis did not tell you?

**A. Dr. Ennis -- I don't recall that he did. He was aware of it. Now, you are asking me about the first time I heard of it.**

Q. Yes, sir.

**A. Okay.**

Q. How many different conversations did you have with anyone

about Ms. Hughes writing off patient accounts?

**A. I have -- I don't know.**

Q. Was it only the one or could it have been more than one?

**A. Something like that. I am sure there were discussions with my CFO, there were discussions with my controllers. But I don't recall.**

Q. Did you understand what happened to write off those accounts?

**A. Tell me what you mean what happened.**

Q. Did you ever learn that there was an issue with a physician's provider number being cancelled?

**A. No. But that still should have come to an administrative level. Provider numbers get cancelled, but they can also be reapplied for.**

Q. Did you have that knowledge, sir, that that was --

**A. Did I? No.**

Q. Until I just said that --

**A. No.**

Q. -- you had no knowledge?

**A. No.**

Q. Why would a physician provider number be cancelled by Blue Cross Blue Shield?

**A. Are you referring to a specific physician?**

Q. No, sir. I am just asking you as CEO of Dale Medical Center, if you know, why would provider numbers be cancelled?

**A. There is probably a multitude of reasons. Blue Cross Blue Shield credentials physicians just like hospitals do. It could be an issue with documents not being provided to Blue Cross Blue Shield, it could be the physician requested that it be cancelled. I am sure there is a multitude of reasons.**

Q. Did you have a -- I may be

pronouncing this name wrong -- Dr. Zumstein filling in for Dr. Ennis?

**A. He did.**

Q. Was there ever an issue with his provider number being cancelled by Blue Cross Blue Shield?

**A. Not that I recall.**

Q. Is the hospital usually notified that a provider number has been cancelled by Blue Cross Blue Shield?

**A. I would imagine if the provider number is in the physician's name that the physician would be notified and not the hospital.**

Q. If a provider number has been cancelled by Blue Cross Blue Shield for a physician, how does one go about getting it reinstated?

**A. There is an application process.**

Q. Can you transfer those bills to another provider number?

Q. Did you ever discuss the flu vaccine overage with Ms. Hughes?
**A. Those were discussed with Ms. Hughes the day that she came to see me to appeal her termination.**
Q. The writing off of patient accounts and the flu vaccine?
**A. Uh-huh.**
Q. That is a yes?
**A. Yes.**
Q. How did you know she was coming to see you that day?
**A. I don't know if she called before she came or if she just came to the office. I don't recall.**
Q. You have no knowledge if she made an appointment to see you?
**A. I don't recall.**
Q. Did you talk with anyone about Ms. Hughes coming in to see you?
**A. I did not.**
Q. So she just shows up cold --
MR. VREELAND: Object to the

97

form.
Q. -- to your knowledge?
**A. I don't recall.**
Q. Who is Phyllis Sexton?
**A. She is my administrative assistant.**
Q. Does she schedule your appointments?
**A. She does.**
Q. Does she print an itinerary for you each day?
**A. She does not.**
Q. How does she apprise you of meetings and appointments?
**A. I have a Blackberry that is updated where her calendar and mine coincide.**
Q. Is that Outlook?
**A. It is a Blackberry. Yes. I guess it would be Outlook on her computer.**
Q. Does Ms. Sexton maintain your calendar in Outlook for you?

98

**A. She does.**
Q. How long has Ms. Sexton been with you?
**A. She's been with me the entire time I have been the CEO.**
Q. Was she Mr. Bigley's --
**A. She was.**
Q. -- secretary as well?
**A. Yes.**
Q. Tell me about your meeting with Ms. Hughes.
**A. My recollection of the meeting with Ms. Hughes was that she came in the office. The main thing that she wanted me to say to her was I had fired her. I did not say I fired her. We deleted her position. Her position was no longer in the office. So we terminated her because the job duties no longer existed. She was very insistent that I tell her she was fired. I never told her she was fired. She was terminated because the position**

99

**had been omitted or deleted.**
During the course of that conversation I did -- it did come up about the flu vaccine and about the billing issues and about the backlog of the billing in the current practice as to why the decisions were made to terminate her and that position because there was currently no checks and balances from the hospital standpoint in that standalone billing system that was up there. We had no way of knowing what was being done or what was being credited or anything. That was unlike any other office we had. Secondly, the billing had fallen behind. So to put the checks and balances in place we went with the system we used in every other clinic, one of the outsources. I don't recall all the meat of our conversation other than I knew when she left that it wasn't going to be over.
Q. Is there an appeal process for

100

Q. Been trained in the area of sexual harassment?

**A. Yes, I have.**

Q. Anyone ever made complaints about you?

**A. About me?**

Q. Yes.

**A. No.**

Q. Discriminating or harassing them?

**A. No.**

Q. Ever made the comment at one of these awards functions that all these big boobs around here are making me hot?

**A. That I said that? Absolutely not.**

Q. You would deny that?

**A. To my grave.**

Q. Who trained you on sexual harassment?

**A. I have been to in-service education, I have been in graduate and**

**undergraduate school. I have been in management and health care for 25 plus years.**

Q. Have you ever trained on sexual harassment, that you have trained people?

**A. I am sure that I have in some of my leadership development courses, yes.**

Q. If someone made that statement in front of you, what action would you take?

**A. If someone made that statement in front of me, it would be totally unprofessional and unacceptable. And I would take action.**

Q. Have you ever heard it?

**A. I have not.**

Q. Why did you take the card and write something starting with B?

**A. Why?**

Q. Yes.

**A. Because I just found that**

**comment very interesting.**

Q. Why?

**A. Because anyone that knows me knows that I would not do that.**

Q. You don't recall that being made in any awards function?

**A. In an awards function? I do not. And by Vernon Johnson, definitely not.**

Q. Was there a reason you looked down to Ms. Dunn when I made that comment?

**A. Yes, because that is something that I would have never thought could have ever been said about me.**

Q. Do you know why someone would say that?

**A. I certainly do not. That would be a total fabrication.**

Q. Did you ever make a comment about all these women around here are driving me crazy?

**A. Absolutely not.**

Q. How about a comment about PMS in the workplace?

**A. (Witness shakes head.)**

Q. You are shaking your head negative?

**A. Negative. Absolutely.**

Q. Do you know as you sit here today any date that you can recall when Ms. Hughes came to see you in your office, without us going through Ms. Sexton to ascertain that date?

**A. No, I do not.**

Q. You ever had any complaints about Pat Ennis at the Ariton Clinic?

**A. The only complaint I had about Pat Ennis from Ariton Clinic would have been from Debbie Hughes.**

Q. When did Ms. Hughes complain about Pat Ennis?

**A. At the day she came to my office to appeal her termination.**

Q. What did she tell you?

**A. That Mrs. Ennis had cursed**

**her.**

Q. Did she tell you what Mrs. Ennis had said?

**A. She did, but I cannot remember the words. I would be paraphrasing and guessing. But it was inappropriate if she said it.**

Q. It would be inappropriate for Ms. Hughes or inappropriate for Mrs. Ennis?

**A. If what Mrs. Ennis said to Debbie Hughes as relayed to me by her, that would have been inappropriate.**

Q. Did Ms. Hughes tell you the words that Mrs. Ennis had used?

**A. Yes. I believe she did, but I don't recall what they are.**

Q. Did Ms. Hughes have any other complaints about Mrs. Ennis other than being cursed?

**A. Not that I recall.**

Q. Did Ms. Hughes tell you that Mrs. Ennis had referred to her and

another worker as fucking morons?

**A. I don't know if that's the words that she used, but I can tell you that I do recall her using the F word in her relaying the message to me. But I don't remember the context in which it was used.**

Q. Okay. Did you do anything after she told you that?

**A. No, I did not.**

Q. Why not?

**A. A couple of reasons. I'm learning of this after the decision had been made to terminate her. Had I had been approached prior to termination, I would have absolutely dealt with it. Secondly, Mrs. Ennis and Dr. Ennis was on his death bed. And I did not see at this point where it would serve any constructive to approach a dying man and his wife over a complaint that I received post-termination of an unhappy employee. These were some very unusual**

**circumstances.**

Q. Did you talk to Ms. Petrey?

**A. About?**

Q. The comment.

**A. No, I did not.**

Q. Did Ms. Hughes relay to you that Ms. Petrey was present when the comment was made?

**A. I don't recall.**

Q. Did Ms. Hughes convey to you that she had been hit by Mrs. Ennis?

**A. I don't recall her telling me that. I became aware of that after we were served our original papers about this pending litigation.**

Q. Did you talk to Mrs. Ennis about it then?

**A. I did not. And I don't know the time line. I may not have even been in town at that time.**

Q. Was Mrs. Ennis working at the Ariton Clinic?

**A. No.**

Q. What did you understand her presence at the Ariton Clinic was the result of?

**A. She had a husband that was dying of pancreatic cancer of which she was driving to the office and looking after him.**

Q. Was he able to work?

**A. Dr. Ennis was able to come in in between his chemo treatments. He would work a week or two when his health allowed him to. But there were times where -- It was sporadic and got more so toward the end.**

Q. Did you understand Mrs. Ennis was in the office on a day-to-day basis for hours at a time?

**A. I knew that Mrs. Ennis was there. I had no idea how long she was there. I know she was there, number one, because she was concerned for her husband.**

Q. The times that you told me --

we are not holding you to this, but about the half dozen times, more or less, was she there then when you were there?

A. **There were a few times that she was, yes.**

Q. Did she have an office?

A. **No, she did not.**

Q. What was she doing when you were there?

A. **She stood in the hallway and talked to me.**

Q. Do anything else?

A. **Not in my presence.**

Q. Did you understand she was talking to patients?

A. **No.**

Q. Did you ever hear that from anyone?

A. **Do you mean talking to patients as in how are you doing today type thing? I am sure she did. She was a very outgoing person. If you are**

**talking to patients as far as acting as a clinician or bedside, I am not aware of that.**

Q. Were you ever privy to any complaints from any patient about Mrs. Ennis?

A. **I was not.**

Q. Did Mrs. Ennis ever complain to you about Ms. Hughes?

A. **Not that I recall.**

Q. Did Ms. Hughes tell you that Mrs. Ennis was requiring her to send medical excuses from her doctor in Birmingham?

A. **I don't recall.**

Q. Did you understand that Mrs. Ennis was managing employees at the Ariton Clinic?

A. **Not to my knowledge.**

Q. Did you discuss with Ms. Hughes her taking a leave from work on or about April 11th to April 18th, 2005?

A. **Ask me -- What did you just ask?**

Q. Did you and Ms. Hughes discuss her, Ms. Hughes, taking a leave from work on or about April 11th through April 18th, 2005?

A. **Based on what you just asked me and the dates, I don't recall. Is there a reason for the leave?**

Q. I'm asking if you --

A. **I don't recall.**

Q. When Ms. Hughes was in your office appealing her termination, did the two of you discuss her being out of work?

A. **Not that I recall.**

Q. Did you have any conversations with Ms. Dunn about Ms. Hughes being on medical leave?

A. **Not that I recall.**

Q. How did you learn she was having brain surgery?

A. **I am sure from the concern of**

**Dr. Ennis and that staff. Again, we are in a small community. If something is wrong with us, we pretty much share.**

Q. So you just heard word of mouth? No one told you?

A. **Yes. Absolutely.**

Q. When Ms. Hughes told you about Mrs. Ennis, did you make a comment about her suing you for harassment of a nonemployee?

A. **Absolutely not.**

Q. Did you say anything to her when she told you about Mrs. Ennis making remarks to her?

A. **If I said anything to her, it would have been I may have questioned why haven't you come to me prior to this point would be the extent of my comment I would have made to her.**

Q. Do you think you made that comment?

A. **I am pretty sure I did.**

Q. Okay. Why was that important

to you?

A. **Because it is important to me that if I have staff that's being abused or something is going on that's not supposed to go on, I want to know. I don't want you to come in the day after you have lost your job and spill a whole basket full of problems that you haven't shared with me prior to that I can take corrective action.**

Q. How long did you know that Dr. Ennis was dying?

A. **Dr. Ennis came and shared with me -- I don't remember the date -- that he had pancreatic cancer. But his prognosis was six months. Dr. Ennis far exceeded his life expectancy. He was a fighter. I don't have the dates. Dr. Ennis was very open with me from the very beginning once he was diagnosed with pancreatic cancer.**

Q. Did you have any complaints from any employee or patient about

Dr. Ennis in the year preceding his death?

A. **I did not. That community loved Dr. Ennis and was heartbroken.**

Q. Any employee ever convey to you they had problems because he was moody?

A. **Never. No.**

Q. Wasn't moody to you?

A. **I never witnessed that. Dr. Ennis was a very levelheaded compassionate physician. He was a fit for a rural clinic.**

Q. Did he recommend to you that he wanted to terminate Ms. Hughes?

A. **Yes.**

Q. While she's off work for a brain tumor?

A. **No.**

Q. After she came back?

A. **After -- Yes.**

Q. Did you convey to him that she had been there for some 31 years?

A. **He had knowledge of her being there.**

Q. Did he have knowledge that she was the principal breadwinner and insurance provider for her family?

A. **I have no idea.**

MR. VREELAND: Object to the form.

A. **I have no idea.**

Q. Did you know that?

A. **That wasn't a -- Her job was terminated because we deleted the position, because we were unsatisfied with her work performance. That is the only thing I considered.**

Q. Well, was her job deleted or were you terminating her because of unsatisfactory work performance?

A. **Our dissatisfaction with her work performance led to us outsourcing the billing which led to the termination of her position.**

Q. If her position was

eliminated, why did you not find her another place?

A. **I was dissatisfied with her work performance.**

Q. Did you ever convey that to her before you terminated her? I'm asking you.

A. **Did I? No.**

Q. You never conveyed it until she appealed her termination; is that correct?

A. **It is highly unusual for me to get involved with employee affairs at that level. I am not involved in every employee disciplinary action that takes place among the 400 plus employees of Dale Medical Center.**

Q. Can you answer my question?

A. **What was your question?**

Q. Did you ever convey to Ms. Hughes that you were unhappy with her job performance until she appealed her termination?

A. **Personally, no.**

Q. Do you know of anyone that ever conveyed to her they were unhappy with her job performance until she appealed her termination?

A. **Those discussions were held by Dr. Ennis and I am sure Ms. Dunn.**

Q. How do you know that?

A. **Because they have communicated with me.**

Q. You have never reviewed her personnel file, Ms. Hughes'?

A. **Not that I recall.**

Q. You testified earlier that when Ms. Hughes came to see you, she was insistent that she be told she was terminated. Is that correct?

A. **Uh-huh.**

Q. You are shaking your head?

A. **Yes. That is correct.**

Q. Did you tell her she had been terminated?

A. **I told her her position had**

**been deleted. We got into a discussion the reasons why. I never used the word fired, but I did tell her she was terminated because her position was deleted.**

Q. Did you ever tell her she was fired because you were dissatisfied with her job performance?

A. **I don't recall the words that were used. But in our discussion, as I stated earlier, we discussed the flu, we discussed the billing issues, and the reason for our decision to outsource that led to the termination of the position was because we were not satisfied with her performance in those areas.**

Q. As insistent as she was that she wanted to know if she had been fired, were you also as insistent that her position had been eliminated?

A. **For the reasons I stated, yes.**

Q. And you never used the word

terminated to her?

A. **Terminated, yes. She was terminated because her position was deleted.**

Q. Okay. And you never provided any other reason that her position was deleted?

A. **The reasons that I have outlined, the billing issues, the flu vaccine, and the other issues in the office that were going awry. Dr. Ennis did not think she was on task.**

Q. Did you contribute any of that to the fact that she had had a brain tumor?

A. **No. When she returned to work we had no doubt in our minds that she was going to be fully capable of carrying out her job duties. And I believe she had that ability to carry out her job duties. This had absolutely nothing to do with her illness but it had to do with her**

**performance that led to outsourcing and we could not keep her in the office if we were outsourcing her duties.**

Q. The errors you contribute to her, the overage of the flu vaccine and the writing off of the patient accounts, occurred prior to her surgery; correct?

A. **Honestly, I don't have a grasp of these time lines. I would assume that they were. I think it goes back to 2004. I don't recall when her brain surgery was.**

Q. January 2005. January 3.

A. **January what?**

Q. January 3.

A. **3rd of 2005. Okay.**

Q. Did anyone ever make the deduction for you, gee, that's why she's made these mistakes, she had a brain tumor?

A. **No.**

Q. You never made that deduction?

A. **No.**

Q. Did you ever have the knowledge that she had stepped down from her position as office manager back in November 2004?

A. **No.**

Q. Is that the first time you are hearing it, today me telling you?

A. **Yes.**

Q. Did Dr. Ennis ever convey to you that he had a hard time operating his office without Ms. Hughes?

A. **Never.**

Q. Do you know who took over Ms. Hughes' responsibilities when she was out for surgery?

A. **I do not.**

Q. Do you know if it was Pat Ennis?

A. **I do not. And I would have to go back and pull the records, but we may have put her on part-time employment, but I don't recall. I**

**don't recall.**

Q. If you did that, you would have a personnel file on Pat Ennis, would you not?

A. **If she was on our payroll, yes, we would.**

Q. Do you know of any paycheck that Pat Ennis ever received?

A. **No.**

Q. Do you recall any conversations with Dr. Ennis where he asked that she be put on payroll?

A. **I don't recall.**

Q. You told me about the two newspapers you use to advertise for or recruit employees. Are there any others other than those two newspapers?

A. **Depending on --**

Q. Montgomery and Dothan?

A. **Those are the primary markets we advertise in.**

Q. How about the Ozark? Is there a newspaper there?

A. **The Southern Star. But we don't advertise employment in that one to my knowledge.**

Q. You do not use any agency?

A. **For?**

Q. Midlevel management employees?

A. **I have not since I have been in the office.**

Q. Is there an intranet -- intranet web site for outside individuals to access if there is openings?

A. **We do have a page on our web site that does list employment opportunities. It is updated from time to time. Mostly what is posted on there are the licensed positions that are difficult to fill.**

Q. Is there a different site for internal applicants?

A. **No.**

Q. Did you ever approach any of Ms. Hughes' physicians to ask what her

health condition was?

A. **I did not.**

Q. Do you know of that occurring?

A. **Not to my knowledge.**

Q. Have you told me about each and every complaint you had or anyone else that had told you relative to the job performance of Ms. Hughes?

A. **I have told you the ones that I recall.**

Q. Do you know of others?

A. **I don't recall any others.**

Q. Do you know of any other employee at Dale Medical Center in the last five years whose position has been eliminated?

A. **No. I have been very fortunate not to have to do that.**

Q. Is Ms. Hughes the only person in the last five years whose position has been eliminated at Dale Medical Center?

A. **To the best of my**

Q. Yes, sir.

A. **In reference to No. 1, there was no individual that replaced Deborah Hughes. We, of course, have employment policies. I would say in her personnel file would be evaluations and documents on her termination. No. 2, there is a personnel file on Deborah Hughes in our personnel department, as there would be for Ms. Dunn. As for No. 3, there are no notes from my office on my conversations regarding Ms. Hughes.**

Q. Do you have any knowledge of raises or benefits that she was receiving?

A. **I do not. I retract that. All those go across my desk for my signature. But do I recall hers specifically? No, I do not.**

Q. No. 4?

A. **I do not use electronic mail for conversations about employees or anything. There would be none of**

**those. No diaries. It would be highly unlikely that there would be anything dictated on my calendar that would outline meetings with Ms. Dunn or Dr. Ennis concerning these topics. Could possibly be a date that she made an appointment to see me through my secretary. That might possibly be there. If that was a manual system, I don't know if she has that or not. As far as a current resume' on myself, that is available.**

Q. When is the last time your resume' was updated?

A. **When I got this job.**

Q. Four years ago?

A. **Uh-huh.**

Q. Is that a yes?

A. **Yes, ma'am, it is.**

Q. We have talked about No. 6 is available.

A. **No. 6 should be available. A list of employees for the last five**

**years, I am assuming that is in the archives. As far as a list of individuals that I've hired, that would take some research. If you are talking about individuals that the hospital has hired, I don't know if you are wanting me individually who I have personally hired or if you are wanting the whole hospital.**

Q. It was --

A. **Ultimately I sign off on every employee that's hired.**

Q. It was specific to you.

A. **Okay.**

Q. Your decisions. Do you have a list?

A. **I do not. Most of what I hire is the physicians and senior management. I have had no turnover in my senior management in the last four and a half years. I do hire some midlevel managers of departments that report directly to me. Most of those**

**are promoted within the facility.**

MR. VREELAND: The only question is whether you have a list.

A. **I do not have a list. I'm sorry.**

Q. No. 8, do you know of any other policies --

A. **We do have a harassment and discrimination policy, yes.**

Q. Separate and apart from Plaintiff's Exhibit 2?

A. **Yes.**

(Plaintiff's Exhibit 4 was marked for identification. A copy is attached.)

Q. While we are on that subject, do you know what Plaintiff's Exhibit 4 is?

A. **Yes, I do.**

Q. What is it?

A. **It is where we converted our vacation and holiday time to straight PTO time. We changed our sick leave**

**benefits as well and converted it to an extended illness benefit.**

Q. Why was the change made?

A. **There was several reasons there was a change. Reason number one is we have to remain competitive with every hospital in this area. And every hospital in this area had converted to such a pay system.**

Number two, in our old system where we had vacation and I think there was probably eight holidays, we converted all those to PTO so people could take the time off when they wanted it and they weren't mandated they had to take a Christmas day holiday two weeks prior to or four weeks after the holiday because we have some people within our organization that aren't of the Christian belief. We also had people that wanted to take a Good Friday off or they wanted to take Martin Luther Day off or some

other that was not a recognized holiday. This gives our employees the flexibility to take their paid time off when they want it.

Second reason was and both financial reason as well as to curb the abuse of sick time where our goal is to build up and accumulate sick time to where they have a short-term disability program. And every hospital that we compete with for salaries and benefits did not pay people for the first day they called in sick. You had to be out one or two days. We did that to deter people calling in for very minor illnesses. Our policy is very much in line with every hospital that we personally compete with for employees.

Q. Any other policies or procedures regarding discrimination, retaliation other than the harassment?

A. **Not that I --**

Q. -- policy you told me about?

A. **Not that I'm aware of.**

Q. Okay. No. 9. Do you know of any training materials?

A. **I don't know of any.**

Q. Do you know of any training that takes place on discrimination, retaliation, and harassment at Dale Medical Center?

A. **We have done it, yes. I don't know when the time was.**

Q. It has been done in the last five years?

A. **I don't know.**

Q. Have any recollection of that being done in the last five years?

A. **I have recollection of sitting in training seminars. I don't have recollection of the time they were held in which we had -- Our labor attorneys came in and did some training for us. But I don't remember when it was.**

Q. Do you know who did the training? The individual or the law

firm?

A. **I can certainly see him. He is white-headed, curly-headed guy, but I can't remember his name.**

Q. Richard Lehr?

A. **Yes.**

Q. Any other training you have had?

A. **Not that I recall right now.**

Q. Items 10 and 11?

A. **There are none to my knowledge.**

Q. Do you know when you received the charge of discrimination from the EEOC relative to Ms. Hughes?

A. **I do not remember the date, no.**

Q. Did you get a copy of it?

A. **I did read a copy of it.**

Q. Did it come directly to you or did someone else at Dale provide it to you?

A. **I don't recall if it was**

**A. I don't have an indigent clinic.**

Q. Do you recall her being moved, Ms. Brooks?

**A. To an indigent clinic, no, because I don't have one.**

Q. Do you recall her being moved?

**A. I don't recall her being moved. I recognize the name.**

Q. You do recognize the name?

**A. I have heard the name.**

Q. Do you know if she's still an employee with you?

**A. I do not know.**

Q. Karen Williams, do you recognize that name?

**A. No.**

Q. Do you have any recollection of Ms. Williams being moved from the Ariton Clinic to a ward clerk at the hospital?

**A. I have no recollection of it.**

MS. HAYNES: Okay. That's all

I have.

MR. VREELAND: I have no questions.

MS. HAYNES: I do want to reserve the right to redepose him when I get these documents that I requested.

MR. VREELAND: I obviously am not agreeing to that. But I understand you are reserving it for the record.

MS. HAYNES: That's all I have.

(The proceedings were concluded at 11:55 a.m.)

CERTIFICATE

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the questions and answers therein were produced in transcript form by computer aide under my supervision, and that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings occurring on said date at said time.

I further certify that I am neither of counsel nor of kin to the parties to the action; nor am I in anywise interested in the result of said cause.

______________

AMY WALLS LENOIR, CSR-530
COURT REPORTER