1

1      IN THE UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5   DEBORAH HUGHES,

6   Plaintiff,

7   vs.

8   DALE COUNTY MEDICAL CENTER,

9   Defendant.

10

11   Case Number:  1:06-CV-00595-SRW

12

13

14      DEPOSITION:  VERNON JOHNSON

15

16

17      S T I P U L A T I O N S

18

19          IT IS STIPULATED AND AGREED by

20   and between the parties through their

21   respective counsel that the deposition

22   of VERNON JOHNSON may be taken on May

23   3, 2007, before Amy Walls Lenoir,

Page 2

1 Commissioner and Notary Public, at the
2 Hampton Inn, 103 Troy Plaza Loop, Troy,
3 Alabama.
4
5     IT IS FURTHER STIPULATED AND
6 AGREED that it shall not be necessary
7 for any objections to be made by
8 counsel to any questions except as to
9 form or leading questions, and that
10 counsel for the parties may make
11 objections and assign grounds at the
12 time of trial or at the time said
13 deposition is offered in evidence or
14 prior thereto.
15
16
17
18
19
20
21
22
23

Page 3

1         APPEARANCES
2
3 Appearing for the Plaintiff:
4
5     HAYNES & HAYNES, P.C.
6     Alicia K. Haynes
7     1600 Woodmere Drive
8     Birmingham, Alabama 35226
9
10 Appearing for the Defendant:
11
12     LEHR, MIDDLEBROOKS
13       & VREELAND, P.C.
14     Albert Vreeland
15     P.O. Box 11945
16     Birmingham, Alabama 35202-1945
17
18 Court Reporter:  Amy Walls Lenoir
19 Also Present:  Sheila Dunn,
20           Deborah Hughes
21
22
23

Page 4

1         I N D E X
2
3 Examination by Ms. Haynes............5
4
5 Plaintiff's Exhibit 1...............73
6 Plaintiff's Exhibit 2..............101
7 Plaintiff's Exhibit 3..............155
8 Plaintiff's Exhibit 4..............160
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 5

1         I, Amy Walls Lenoir, a Court
2 Reporter of the State of Alabama,
3 acting as Commissioner, certify that on
4 this date there came before me at the
5 Hampton Inn, Troy, Alabama, on May 3,
6 2007, beginning at or about 8:15 a.m.,
7 VERNON JOHNSON, witness in the above
8 cause, for oral examination, whereupon,
9 the following proceedings were had:
10
11
12         VERNON JOHNSON,
13
14 being first duly sworn, was examined
15      and testified as follows:
16
17 EXAMINATION BY MS. HAYNES:
18    Q.  All right, Mr. Johnson.  You
19 ready?
20    A.  I'm ready.
21    Q.  Would you state your full name
22 for the record, please, sir?
23    A.  Vernon Lewis Johnson.

Page 6

1    Q.   What is your address?
2    A.   1731 East Roy Parker Road,
3   Ozark, Alabama.
4    Q.   How long have you lived there
5   in Ozark?
6    A.   Well, probably three and a
7   half years.  About right.
8    Q.   What is your current position
9   at the hospital?
10       MR. VREELAND:  Just for
11   future, you can't look to her.
12    A.   I'm so used to it.  What is
13   the question again?
14    Q.   Your current position.
15    A.   I'm the chief executive
16   officer.
17    Q.   Of Dale Medical Center?
18    A.   That's correct.
19    Q.   How long have you been in that
20   position?
21    A.   Four and a half years.
22    Q.   What was your position prior
23   to being CEO of Dale Medical Center?

Page 7

1    A.   Assistant administrator.
2    Q.   Reporting to whom?
3    A.   Bob Bigley.
4    Q.   Did you replace Mr. Bigley?
5    A.   I did.
6    Q.   How long had Mr. Bigley been
7   the administrator or the CEO of Dale?
8    A.   About five years.
9    Q.   Why did he leave?
10    A.   Just relocation.
11    Q.   Where did he relocate to?
12    A.   I have no idea.
13    Q.   What did you hear?
14    A.   Well, he went to Mississippi,
15   then to Florida.  I think he's in
16   Georgia now.  He's moved around.
17    Q.   What did you hear was the
18   reason he left Dale Medical Center?
19    A.   He was probably asked to
20   resign due to a relationship he had
21   formed.
22    Q.   Is that a relationship with an
23   employee?

Page 8

1    A.   That's correct.
2    Q.   Who would have asked him to
3   leave?
4    A.   Our board.
5    Q.   Is that who you report to
6   currently?
7    A.   That's correct.
8    Q.   How many individuals are on
9   the board of directors?
10    A.   There is nine members on the
11   executive board.
12    Q.   Do you also serve?
13    A.   No, I do not.  As a voting
14   member?  Is that what you are asking?
15    Q.   Yes.
16    A.   No, I do not.
17    Q.   Are any of the board of
18   directors employees of Dale Medical
19   Center?
20    A.   No.
21    Q.   How long were you the
22   assistant administrator under
23   Mr. Bigley?

Page 9

1    A.   Five years.
2    Q.   Prior to assistant
3   administrator, what was your position?
4    A.   I was director of cardio,
5   pulmonary, and neurology services.
6    Q.   There at Dale?
7    A.   That's correct.
8    Q.   How long were you there?
9    A.   I have been at Dale Medical
10   Center for fourteen and a half years.
11    Q.   Did you come to Dale Medical
12   Center as the director of cardio?
13    A.   Yes, I did.  And I don't know
14   if the years I just gave you is
15   correct.  I started at Dale Medical
16   Center in August of 1994.  Whatever
17   that calculates out to be.
18    Q.   Where were you prior to Dale?
19    A.   At Flowers Hospital.
20    Q.   Why did you leave there?
21    A.   I had an opportunity for a
22   promotion with Dale, an opportunity for
23   career growth.

Page 10

1    Q.   What was your last position at
2  Flowers?
3    A.   I was the assistant director
4  of respiratory services.
5    Q.   What is your degree?  Highest
6  degree?
7    A.   My highest degree?  I have a
8  master's in health administration from
9  the University of Alabama in
10  Birmingham.
11    Q.   When did you get that?
12    A.   I completed that in 2001.
13    Q.   Prior to that degree, what was
14  the highest degree you had?
15    A.   I had a bachelor's in business
16  administration from Troy State
17  University in Dothan.
18    Q.   Any others?
19    A.   I have an associate's degree
20  in respiratory therapy from Wallace
21  College in Dothan.
22    Q.   Were you already the
23  administrator -- I'm sorry.  Were you

Page 11

1  already the CEO before you obtained
2  your degree or your master's in health
3  administration?
4    A.   No, I was not.
5    Q.   So you did not become the CEO
6  until after you obtained that degree?
7    A.   That is correct.
8    Q.   Did you live in Birmingham
9  during that time or did you just travel
10  back and forth?
11    A.   I traveled.
12    Q.   What are your current duties?
13    A.   I am responsible for the
14  day-to-day operations of Dale Medical
15  Center.
16    Q.   How many employees do you
17  supervise directly or indirectly?
18    A.   There is probably roughly 400
19  on the payroll.
20    Q.   How many outlying facilities
21  does Dale Medical Center have?
22    A.   Well, we have an outpatient
23  surgery center, StatMed, and I believe

Page 12

1  about three physician clinics right
2  now.
3    Q.   Where are those located?  I'm
4  sorry.
5    A.   We also have a hospice and a
6  home health agency.
7    Q.   Where is the outpatient center
8  located?
9    A.   231 in Ozark.
10    Q.   StatMed you told me.  What
11  does that mean?
12    A.   It is the urgent care walk-in
13  clinic, family practice center.
14    Q.   Where is it located?
15    A.   On Andrews Avenue in Ozark.
16    Q.   And the three different
17  physician clinics, where are those
18  located?
19    A.   One is in the surgery center
20  itself upstairs.  Then we have two on
21  the campus at the hospital.
22    Q.   How do you refer to them?
23    A.   We have Dale Pediatric Clinic,

Page 13

1  which is a new office we have opened.
2  And we have a Dr. Crawford that will be
3  starting next week that we own that we
4  own that practice.  That's Pulmonary
5  Internal Medicine.
6    Q.   Where is it located?
7    A.   It is located on the campus at
8  the hospital.
9    Q.   Then you had a hospice?
10    A.   The hospice is located on
11  James Street I believe is the street
12  that corners there.  But it is on the
13  campus of the hospital.
14    Q.   In Ozark?
15    A.   Yes.
16    Q.   And the home health?
17    A.   Same thing.
18    Q.   Also on the campus?
19    A.   Yes.
20    Q.   Any other clinics or
21  facilities owned by Dale?
22    A.   Not at this time.
23    Q.   Okay.  Prior were there other

Page 14

1 facilities?
2    A.  Yes.
3    Q.  Where were those facilities?
4    A.  We used to own the Ariton
5 Clinic.  We used to own Dr. Luna Sy's
6 clinic.
7    Q.  Is that what you called it,
8 Dr. Luna Sy's?
9    A.  Dr. Luna Sy's office, yes.
10 Internal medicine.  We used to own
11 Dr. Hasan Kersawani's (phonetic)
12 office.  It is the CNC neurology
13 center.  We used to have a surgeon,
14 Dr. Robin Cromer-Tyler.  How far would
15 you like me to go back?
16    Q.  Last five years.
17    A.  Dr. Robin Cromer-Tyler's.
18    Q.  Will you spell that, please?
19    A.  R-o-b-i-n and Cromer,
20 C-r-o-m-e-r, Tyler.  She was a general
21 surgeon.  We had a urologist, Dr. Brad
22 Bower.  We currently also have another
23 office we own now, Dr. Lam, L-a-m, who

Page 15

1 is a family practitioner that is
2 currently owned by us.
3    Q.  Where is that located?
4    A.  It is located behind the
5 hospital on campus.
6    Q.  Okay.
7    A.  I think that pretty much
8 covers the majority of it.  There may
9 be one or two that I missed.  I think
10 that's it.
11    Q.  The clinics you told me you no
12 longer own, Ariton, Dr. Sy, neurology
13 clinic, Dr. Tyler, and Dr. Bower, those
14 facilities?
15    A.  Yes.
16    Q.  Did you sell those?
17       MR. VREELAND:  Object to the
18 form.
19    A.  (No response.)
20    Q.  Why is it you no longer have
21 those facilities?
22    A.  Dr. Bower relocated out of
23 town.  Dr. Luna Sy's practice, she

Page 16

1 assumed her practice.  We sold the
2 practice to her.  Dr. Cromer-Tyler just
3 recently left us, relocated to
4 California to be with her family.  Who
5 else have I got?
6    Q.  Ariton?
7    A.  Ariton Clinic, Dr. Magony's
8 group purchased the clinic from us.
9    Q.  When was that?
10    A.  When?
11    Q.  Yes, sir.
12    A.  I would have to go back and
13 look.
14    Q.  In the last two years or the
15 last year?
16    A.  Yes.  It would be within the
17 last two years, but I don't know the
18 date off the top of my head.
19    Q.  Dale Medical Center still
20 owned the facility when Ms. Hughes was
21 terminated?
22    A.  That is correct.
23    Q.  Is it Dr. Crawford's facility

Page 17

1 or the pediatric clinic that is new?
2    A.  Both of them are new.  The
3 pediatric clinic is opened.  It opened
4 in February.  Dr. Crawford will be
5 arriving in town next week.
6    Q.  What is Dr. Crawford's
7 practice?
8    A.  Pulmonary.
9    Q.  In 2005 do you know how many
10 employees you had on the payroll at
11 Dale Medical Center?
12    A.  Not off the top of my head I
13 don't.
14    Q.  But you do know you have 400
15 currently?
16    A.  That is an estimate.
17    Q.  In 2005 do you know if it was
18 less or more than 400?
19    A.  I would say it was probably
20 the same.  Very close.
21    Q.  Is the hospital growing?
22    A.  Yes, ma'am.
23    Q.  Has it reported profits in the

Page 18

1  last two years?
2    A.  Yes.
3    Q.  Profits growing?
4    A.  Beg your pardon?
5    Q.  Are the profits growing?
6    A.  We had a dip in profits last
7  year due to loss of several
8  specialties, but in the last six months
9  we have brought in five new specialists
10 and the profits are now growing, yes.
11   Q.  How many doctors do you have
12 currently employed?
13   A.  That I currently employ?
14   Q.  Either contract or on salary
15 there at the facilities.
16   A.  Define what you say is
17 contract.  What do you mean by
18 contract?
19   Q.  I would assume you have -- I
20 may be wrong in my assumption that you
21 have some physicians who are contract
22 employees, not employees of the
23 hospital.

Page 19

1    A.  Okay.
2    Q.  Is that true?
3    A.  I am contracting them for the
4  services.
5    Q.  Yes, sir.  I am just trying to
6  figure out how many physicians,
7  practitioners you have currently,
8  whether they are contract or employees.
9    A.  There are independent
10 physicians in that as well.  Are you
11 wanting the total medical staff?  I
12 don't understand what you --
13   Q.  Yes, sir.  That would be fine.
14   A.  The total medical staff with
15 privileges at Dale Medical Center is
16 probably going to roughly be around 35
17 physicians.
18   Q.  Has that been about the same
19 number for the last two years?
20   A.  It's up a little bit now.
21 Understand also when you are talking
22 about physicians, we have those that
23 have courtesy privileges now that come

Page 20

1  in and just do some work.  They don't
2  have a full-time presence there.
3    Q.  Okay.  Let's do it this way.
4  How many physicians are on payroll?
5    A.  Okay.  On payroll I have two
6  in the emergency room, I have two at
7  StatMed.  And I am just going to have
8  to talk it out like this.  That is
9  four.  Then I have got Dr. Lam,
10 Dr. Parwaiz, and Dr. Crawford will be.
11 So currently right now probably got
12 five and a half to six on payroll
13 currently.
14   Q.  The 400 employees you have on
15 payroll other than the five and a half
16 to six physicians, how are they divided
17 up as far as categories of employees?
18   A.  By job description.
19   Q.  How many job descriptions do
20 you have?
21   A.  I would be guessing if I told
22 you that.
23   Q.  In the outlying facilities is

Page 21

1  a physician the manager or do you also
2  have an office manager?
3      MR. VREELAND:  Object to the
4  form.
5    Q.  Do you understand my question?
6    A.  I don't.
7    Q.  For instance, the surgical
8  center that you told me you have, is
9  there an office manager there?
10   A.  I have an OR manager.
11   Q.  Do you also have a physician?
12   A.  Well, let me explain the
13 surgical center to you.  The downstairs
14 is an outpatient surgery department,
15 which is directed by a nurse manager
16 that manages that department for me.
17   Q.  Who is that?
18   A.  Rochelle Fordham.  The
19 upstairs of the surgical center is
20 professional office space.  Those are
21 individual physician offices.
22   Q.  How many are there?
23   A.  How many offices are located

Page 22

1 up there?
2    Q.   How many physicians are
3 located there?
4    A.   Seven.  Six full-time and I
5 have one that comes in two days a week.
6    Q.   Do you have an office manager?
7    A.   I don't own all those.  They
8 are individual offices.
9    Q.   So you do not have an office
10 manager?
11    A.   No.
12    Q.   At the Dale Pediatric office
13 do you have an office manager?
14    A.   No.
15    Q.   Who manages the office?
16    A.   It is under the direction of
17 Dr. Parwaiz and Sheila Dunn, my
18 assistant administrator of professional
19 offices.
20    Q.   Who does the billing at Dale
21 Pediatric?
22    A.   At Dale Pediatric is MedNet
23 out of Dothan.

Page 23

1    Q.   Who does coding?
2    A.   MedNet.
3    Q.   How many employees do you have
4 at Dale Pediatric?
5    A.   Two.
6    Q.   Who are those?
7    A.   I do not know their names.  I
8 have a receptionist at the front.  I'm
9 sorry.  I don't know her name.  I have
10 a nurse in the back that is Jennifer.
11    Q.   Any other employees?
12    A.   No, ma'am.
13    Q.   Dr. Crawford's new office, do
14 you have it staffed?
15    A.   Not at this time.
16    Q.   Are you advertising for
17 positions?
18    A.   Yes, we are.
19    Q.   What positions are you
20 advertising for?
21    A.   A receptionist and a nurse.
22    Q.   Who is going to do the billing
23 and coding?

Page 24

1    A.   United ProBill.
2    Q.   Is there a reason you have two
3 different billing and coding services,
4 MedNet and United ProBill?
5    A.   They both do a great job.
6    Q.   Why not have one?
7    A.   One is a local company.  Then
8 one is a larger company that we use for
9 more specialized services.
10    Q.   Who does the billing and
11 coding for the surgical center?
12    A.   The hospital.
13    Q.   Is there a person?
14    A.   It is a whole department.  It
15 depends on the payer.  Our billing
16 department is divided up by payers.  We
17 have a Blue Cross biller, a Medicaid
18 biller, a Medicare biller.
19    Q.   Three separate individuals
20 doing the billing and coding?
21    A.   There is probably more than
22 that.
23    Q.   Do you know how many?

Page 25

1    A.   I don't off the top of my
2 head.
3    Q.   Who manages that department?
4    A.   They report directly to our
5 hospital controller and CFO.
6    Q.   Who is that?
7    A.   The controller is Rick Wright.
8 The CFO is Brad Hull.
9    Q.   Is that W-r-i-g-h-t?
10    A.   That's correct.
11    Q.   He is the controller?
12    A.   Yes.
13    Q.   And Mr. Hull is the CFO?
14    A.   CFO.
15    Q.   Who makes the hiring decisions
16 for that department?
17    A.   There is a department manager
18 in that department as well, Tina
19 Johnson.
20    Q.   Do you know how many employees
21 Ms. Johnson manages?
22    A.   I would -- Just walking
23 through the office in my mind, I think

Page 26

1  there's about seven.
2     Q.   Have you employed anyone in
3  that department in the last two years?
4     A.   I don't know.
5     Q.   What is that department called
6  that Ms. Johnson manages?
7     A.   Patient accounts.
8     Q.   Anyone over the age of 40 in
9  patient accounts?
10    A.   Yes.
11    Q.   Who?
12    A.   Annette is her first name.
13 There is another lady in there.  Linda
14 I would assume is over 40.  And there
15 may be others that they would be in
16 their 40s.  I don't know.  I have no
17 idea their ages.
18    Q.   The stat or the urgent care
19 facility?
20    A.   Yes.
21    Q.   Who is your office manager
22 there?
23       MR. VREELAND:  Object to the

Page 27

1  form.  Go ahead.
2        MS. HAYNES:  I'm sorry.  What
3  was wrong with the question?
4        MR. VREELAND:  Did you say
5  there was an office manager?
6     A.   There is an office manager in
7  that office.  There is Audra.  She has
8  recently married.  I don't know what
9  her new last name is.  It was Audra
10 Wood.
11    Q.   How long has she been employed
12 with you?
13    A.   I don't know off the top of my
14 head.
15    Q.   Less than two years?
16    A.   I would say more than two
17 years.
18    Q.   Is she under 40?
19    A.   I would say she is, yes.
20    Q.   Do you have an office manager
21 at the outpatient center in Ozark?
22    A.   The surgery center?
23    Q.   No, sir.  You told me an

Page 28

1  outpatient center.
2     A.   I don't recall.  The
3  outpatient center is the surgery
4  center.
5     Q.   Okay.  That would be under the
6  three physician clinics, the surgery
7  center?
8     A.   No, it would not.  The three
9  physician clinics are going to be
10 independent physician practices.
11       MR. VREELAND:  I think you
12 mean physically under.
13    Q.   Well, I asked you what
14 facilities you had.  You told me the
15 outpatient center, the urgent care,
16 three physician --
17    A.   -- offices.
18    Q.   -- offices, hospice, home
19 health, and Dr. Lam.
20    A.   That's correct.  We also have
21 a physical therapy outpatient clinic I
22 didn't tell you while ago.
23    Q.   The outpatient center, that is

Page 29

1  different than the surgical center?
2     A.   It is the same thing.
3     Q.   It is the same thing?
4     A.   That is the same thing.
5     Q.   So you have nurse manager
6  Rochelle Fordham?
7     A.   That's correct.
8     Q.   Managing that?
9     A.   Manages the OR.
10    Q.   Who is doing the outpatient?
11    A.   When you talk about outpatient
12 out there, then what we have got is --
13 the only thing outpatient that is done
14 out there is x-rays.  That's managed by
15 our radiology manager from the
16 hospital.
17    Q.   Okay.  So you do not have an
18 office manager there?
19    A.   No, I do not.
20    Q.   How many employees are
21 employed at the outpatient center?
22    A.   We use the same staff at the
23 hospital and there.  The staff moves.

Page 30

1  In other words, we will start out the
2  beginning of the day doing outpatient
3  surgeries.  Then we move in-house to
4  the hospital.  So it is the same staff
5  that staffs both of them.
6      Q.  Do you have an office manager
7  at your hospice location?
8      A.  I have a -- No, I do not.  I
9  have a director of hospice.
10     Q.  Who is that?
11     A.  She is the nurse.  Kathy
12  Johnson I believe is her name.
13     Q.  Who does the billing for
14  hospice?
15     A.  We have an office biller.  She
16  does the billing through a third party,
17  Gentiva.
18     Q.  Spell that, please, sir.
19     A.  I think it is G-e-n-t-v-i-a, I
20  believe.  That doesn't sound right.
21  G-e-n-t-i-v-a.
22     Q.  Do they also do the coding?
23     A.  That's correct.

Page 31

1      Q.  How many employees do you have
2  that work in the hospice facility?
3      A.  I would be guessing right now
4  because that area has grown so in the
5  last year.
6      Q.  Is it inpatient or outpatient?
7      A.  It is outpatient.
8      Q.  Is that separate and apart
9  from the home health?
10     A.  Yes, it is.
11     Q.  Who manages or -- Strike that.
12  Do you have an office manager at home
13  health?
14     A.  We have a -- Yes.  We do.
15     Q.  Who is that?
16     A.  Linda Cruit.
17     Q.  I'm sorry.  Cruit?
18     A.  Cruit, C-r-u-i-t.
19     Q.  What is her title?
20     A.  Office manager.
21     Q.  How long has she been employed
22  with you?
23     A.  A very, very long time.  I

Page 32

1  don't know.  She was there before I got
2  there.
3      Q.  How many employees work at the
4  home health center?
5      A.  I would be guessing if I told
6  you.  We have a director of home
7  health, Dena Strickland, who is over
8  the entire operation.
9      Q.  Let me ask this.  More than
10  ten or less than ten?
11     A.  It is probably going to be
12  right around ten I would guess.
13     Q.  Do you have an office manager
14  at Dr. Lam's location?
15     A.  No, I do not.
16     Q.  Who manages that office?
17     A.  Sheila Dunn.
18     Q.  Who does the billing and
19  coding for Dr. Lam's office?
20     A.  United ProBill.
21     Q.  Who does the billing and
22  coding for home health?
23     A.  Gentiva.

Page 33

1      Q.  Who does the billing for
2  hospice?
3      A.  Gentiva.
4      Q.  You told me Gentiva.
5      A.  Uh-huh.
6      Q.  The stat medical or the urgent
7  care facility, who does the coding and
8  billing?
9      A.  MedNet.
10     Q.  Do you have a third party
11  doing the coding and billing for all
12  facilities other than the hospital and
13  the surgical care facility?
14     A.  That is a true statement.
15     Q.  How long have you had third
16  party coder and billers for these other
17  facilities?
18     A.  For as long as I have been in
19  the office.
20     Q.  Did you also have third party
21  coder and billers for the five offices
22  that you no longer own, Ariton,
23  Dr. Luna Sy's office, the neurology

Page 34

1  office, Dr. Robin Cromer-Tyler's
2  office, and urologist's office?
3     A.  List those again.
4     Q.  The Ariton, did you have a
5  third party coder?
6     A.  I did not until the end.
7     Q.  When?  What do you consider
8  the end?
9     A.  When we -- We made the
10  decision to go to a third party biller
11  toward the end of Ms. Hughes'
12  employment.  And out of the other ones
13  that you have listed that you asked me
14  about, yes, we had third party billers
15  for all of them with the exception of
16  Robin Cromer-Tyler.
17     Q.  Who did the billing there?
18     A.  It was done in her office by
19  her staff.
20     Q.  Is there an office manager
21  there?
22     A.  Not anyone per se had the
23  title of office manager, no.

Page 35

1     Q.  How many employees work at the
2  urgent care facility?
3     A.  I would be guessing again.  I
4  would have to -- I don't have the
5  reports in front of me.  I know there
6  is probably two in the front office --
7  I have no idea how many nursing staff.
8  I would guess -- I am guessing.  I
9  don't know.
10     Q.  Less than ten?
11     A.  It would be around ten.
12     Q.  And how long have they used
13  MedNet as their third party biller?
14     A.  Since it was opened.
15     Q.  Why would you have an office
16  manager there?
17     A.  Because of the volume that
18  goes through that facility.  It handles
19  staffing, supply orders.  That is a
20  very busy office.
21     Q.  What is the office manager
22  duties in any of your facilities?
23        MR. VREELAND:  Object to the

Page 36

1  form.
2     A.  (No response.)
3     Q.  Can you answer that?
4        MR. VREELAND:  I objected, but
5  you can answer it.
6     A.  Okay.  She is responsible for
7  the day-to-day operations of the
8  clinic.  She is responsible for the
9  scheduling of our staff, ordering of
10  supplies, follow-through on our
11  billing.
12     Q.  Anything else?
13     A.  It's pretty broad.  Just
14  responsible for the day-to-day
15  operations.
16     Q.  Currently I have that you have
17  Ms. Audra Wood as the office manager
18  for the urgent care facility and you
19  have Linda Cruit as the office manager
20  for home health.  Do you have any other
21  office managers that have that title
22  office manager?
23     A.  Not that I recall.

Page 37

1     Q.  Ms. Fordham's title is not
2  office manager?
3     A.  She is director of the OR.
4     Q.  Any other third party billers
5  you use other than Gentiva, MedNet, and
6  United ProBill?
7     A.  No.
8     Q.  Has there ever been a company
9  known as ProBilling that you have used?
10     A.  That is United ProBill.  Same
11  thing.
12     Q.  Any other companies you have
13  used in the last five years as third
14  party billers?
15     A.  Not that I recall.
16     Q.  Do you know where MedNet is
17  located?
18     A.  I do.
19     Q.  Where is that?
20     A.  It is in Dothan.  It is in
21  what used to be the old Porter Square
22  Mall is where their office is.
23     Q.  Where is Gentiva located?

Page 38

1     A.   I don't know their physical
2  address, but I believe it is in
3  Florida.
4     Q.   United ProBill or ProBilling,
5  where are they located?
6     A.   Ozark.
7     Q.   Does the hospital have an
8  interest in United ProBill or MedNet?
9     A.   No.
10    Q.   Do you know who owns United
11 ProBill?
12    A.   I do.
13    Q.   Who?
14    A.   Dr. Connie Chandler.
15    Q.   Anyone else?
16    A.   Not that I'm aware of.
17    Q.   Do you know who owns MedNet?
18    A.   I do.
19    Q.   Who is that?
20    A.   Southeast Alabama Medical
21 Center.
22    Q.   Do you know who are the
23 principals of South Alabama Medical

Page 39

1  Center?
2     A.   It is a health care authority.
3  It would be the Houston County Health
4  Care Authority.
5     Q.   Is there a contract between
6  Dale Medical Center and United ProBill?
7     A.   Yes, there is.
8     Q.   Same with Gentiva and MedNet?
9     A.   Yes.
10    Q.   Is there a difference in the
11 percentage that the three companies
12 keep on collections or is it the same?
13    A.   I would say there was a
14 difference.
15    Q.   Do you know when the contract
16 was entered between United ProBill for
17 the Ariton Clinic?
18    A.   I do not.
19    Q.   Do you have it?
20    A.   Do I have a contract?
21    Q.   Yes, sir.
22    A.   I would have.
23    Q.   I may have asked you this, but

Page 40

1  when did the Dale Medical Center cease
2  having any ownership responsibility
3  with the Ariton Clinic?
4     A.   I don't know the date.
5     Q.   Was there an event that
6  happened that you no longer had the
7  ownership?  Did a physician leave?
8  Physician buy out the clinic?
9     A.   We had a physician die.
10    Q.   Is that Dr. Ennis?
11    A.   Yes.
12    Q.   After Dr. Ennis died, you no
13 longer had the facility?
14    A.   After Dr. Ennis died is when I
15 began discussions with Dr. Magony who
16 had just brought in two new physicians
17 to Ozark that were trying to grow a
18 practice.  He had an interest in that
19 clinic.  So rather than going out and
20 recruiting another physician, we had
21 two capable physicians willing to take
22 that clinic.  So we negotiated with him
23 to take over ownership of that clinic.

Page 41

1     Q.   Who was that?
2     A.   Dr. Magony.  He is a
3  psychiatrist, but he recruited two
4  internists.  The internists that are
5  operating that clinic are Dr. -- please
6  don't ask me to spell them -- Usman
7  Khan.  I think that is U-s-m-a-n.  And
8  Dr. Shazad Khan.
9     Q.   Same last name?
10    A.   Yes.
11    Q.   That is K-a-h-n?
12    A.   K-h-a-n.  There was a period
13 of time that we did have a locum in
14 there until we were able to get it
15 taken care of.
16    Q.   A what?
17    A.   A locum tenens physician, a
18 substitute physician.
19    Q.   Who was that?
20    A.   His name slips my mind.  I may
21 think of it later.
22    Q.   Was he an employee of Dale
23 Medical Center or contract?

Page 42

1  1    A.  It was through a locum tenens
2  2  company.  So I guess you would say a
3  3  contract.
4      (Recess was taken, commencing
5  5  at 8:54 a.m., concluding at 9:03 a.m.)
6  6    Q.  (MS. HAYNES)  Back on the
7  7  record.  All right.  You have thought
8  8  of someone else you need to amend?
9  9    A.  Yes, I do.  The Ariton Medical
10 10  Clinic, after Dr. Ennis's death we did
11 11  hire a physician prior to negotiating
12 12  with Magony.  We hired a Dr. Quintana.
13 13    Q.  Employed by Dale Medical
14 14  Center?
15 15    A.  He was employed by Dale
16 16  Medical Center.
17 17    Q.  Anyone else?
18 18    A.  No.  The locum physician I
19 19  referred to a while ago I believe his
20 20  name was Dean, Dr. Dean.
21 21    Q.  D-e-a-n?
22 22    A.  That's correct.
23 23    Q.  Is he still employed with

Page 43

1  Dale?
2    A.  No.  He never was.
3    Q.  Dr. Quintana?
4    A.  Quintana.  I'm sorry.  I don't
5  recall the spelling of that.
6    Q.  Was Dr. Quintana already
7  working for Dale?
8    A.  No, he was not.  I recruited
9  him from Troy.
10    Q.  Did Dr. Quintana have an
11  office manager?
12    A.  No, he did not.
13    Q.  At the time Dr. Ennis died,
14  who was his staff?
15    A.  I don't recall.
16    Q.  Do you know who Dr. Quintana's
17  staff was?
18    A.  I do not.
19    Q.  Do you know who would know
20  that?
21    A.  We could pull it in personnel.
22    Q.  What would you have to pull?
23    A.  Just employment records.

Page 44

1    Q.  You have it separated as to
2  the facilities?
3    A.  I don't know how they would do
4  it.  We would have to research it.  But
5  no, it is not separated.
6    Q.  If you wanted to find out
7  today who was the staff of Dr. Ennis in
8  April 2005, what would you do?
9    A.  I would call personnel and
10  have them research it is what I would
11  do.
12    Q.  Same if I wanted to know who
13  the staff was of Dr. Quintana?
14    A.  Yes, ma'am.
15    Q.  You would call personnel?
16    A.  Uh-huh.
17    Q.  Have you ever seen a document
18  that lists the employees per facility
19  and their titles?
20    A.  We have the capability of -- I
21  am sure we have the capability of
22  creating an ad hoc report.
23    Q.  Have you ever seen one is my

Page 45

1  question.
2    A.  Have I ever?  I have requested
3  those type reports before, yes.
4    Q.  When you request them, what is
5  your query?
6    A.  Well, I asked yesterday for a
7  report of all registered nurses.
8    Q.  So you can --
9    A.  So it is by job title.  The
10  system can query it by job title.
11    Q.  Can it go back three years?
12    A.  I don't know.  I don't know.
13    Q.  Have you ever seen a document
14  that lists specifically the Ariton
15  employee staff?
16    A.  Have I ever seen one?  No,
17  ma'am.
18    Q.  Have you seen a document that
19  lists all employees employed by Dale
20  Medical Center and list their location
21  and job title?
22    A.  What do you mean by location?
23    Q.  What facility they are working

1  in.
2      A.   No.
3      Q.   Have you seen a list of your
4  employees?
5      A.   Yes.
6      Q.   What kind of list is that?
7      A.   It is a list that lists the
8  name.  I can get it by their employment
9  date.  I can get what their job title
10  is and what department they are in.
11      Q.   Is the department different if
12  they are at the urgent care facility?
13      A.   I honestly don't know how the
14  computer is set up.  I have never
15  queried it to that level.  In other
16  words, if I am talking about an Ariton
17  Medical Clinic, I am talking about
18  three employees.  It is not -- I have
19  never had a need to query a department
20  that small.
21      Q.   Have you seen a list that
22  provides the hire date and date of
23  birth of all employees?

1      A.   I have.
2      Q.   What is that called?
3      A.   It is an ad hoc report that
4  I --
5      Q.   That you request?
6      A.   Yes.  The only reason I
7  requested it, I send birthday cards to
8  the employees.
9      Q.   Do you send
10  anniversary report -- Strike that.  Do
11  you send anniversary cards to those
12  employees who have celebrated an
13  anniversary of their employment with
14  Dale Medical Center?
15      A.   I do not.
16      Q.   Does the hospital recognize
17  seniority in any fashion?
18      A.   What do you mean by recognize
19  it?
20      Q.   Do you have special
21  celebrations?  Pins?
22      A.   Next week we are having an
23  awards banquet where we will recognize

1  years of service.
2      Q.   What is that called?
3      A.   It is our annual employee
4  awards banquet.
5      Q.   Who is invited?  Who do you
6  award?  Which employees?
7      A.   Five, ten, fifteen, twenty,
8  twenty-five, thirty.  We recognize
9  people at the five-year increments.
10      Q.   You have one each year?
11      A.   Yes.  We have since I have
12  been in office.
13      Q.   Something you implemented?
14      A.   No.  It was something that was
15  being done that we have continued.  I
16  don't know when it started.
17      Q.   Do you make hiring and firing
18  decisions?
19      A.   Could you clarify that?
20      Q.   Do you hire employees for Dale
21  Medical Center?
22      A.   Each department manager does
23  their interviewing and make the hiring

1  decisions.  I reserve the right to
2  object to them.
3      Q.   Have you ever tendered an
4  offer of employment to any employee of
5  Dale Medical Center?
6      A.   Have I ever what?
7      Q.   Tendered, provided?
8      A.   Have I --
9      Q.   Sat across the table --
10      A.   And made an offer?  Yes, I
11  have.
12      Q.   To what level of employee?
13      A.   It is usually going to be the
14  senior management level.  But I do not
15  hire for my managers.
16      Q.   Who makes that decision?
17      A.   The manager.
18      Q.   Of each department?
19      A.   That's correct.
20      Q.   How many departments do you
21  have at the hospital?  Let me strike
22  that.  How many departments do you have
23  at Dale Medical Center that you

Page 50

1 recognize?
2    A.  I would be guessing.
3    Q.   Do you have a document that
4 provides that information to you?
5    A.  Uh-huh.
6    Q.  What is it called?
7    A.  It is called departmental
8 operation reports that we review
9 monthly.
10    Q.  What is on a departmental
11 operation report?
12    A.  Revenue, expenses, salaries.
13    Q.  Employees?
14    A.  No.
15    Q.  Anything else on a
16 departmental operation report?
17    A.  No.  It is all going to be
18 financial, procedural.
19    Q.  Is that the only document you
20 have that lists all your departments?
21    A.  Well, I am sure there is
22 others that the finance people use.
23 That is the only one I utilize.

Page 51

1    Q.  Does it list who the manager
2 of each department is?
3    A.  It does not.
4    Q.  Do you know of another report
5 that's generated that lists the manager
6 of each department?
7    A.  I do not.
8    Q.  Do you know who would have
9 that information at Dale Medical
10 Center?
11    A.  Our controller is usually who
12 I call to create ad hoc reports for me.
13    Q.  Who is that?
14    A.  Rick Wright.  But if you are
15 interested in just reports on a level,
16 that would be a personnel report.
17    Q.  Who is over personnel?
18    A.  Sheila Dunn.
19    Q.  In four and a half years that
20 you have been the CEO have you made any
21 hiring decisions?
22    A.  Have I made hiring decisions?
23 Yes, I have.

Page 52

1    Q.  Who have you hired?  Is it
2 over ten?
3    A.  I am sure it is.
4    Q.  Is it over twenty?
5    A.  I do not know.  I will tell
6 you the people that I hire is mostly
7 going to be physicians and senior
8 management is who I hire.
9    Q.  Do you make firing decisions?
10    A.  Yes, I do.
11    Q.  Have you fired anyone in four
12 and a half years?
13    A.  Yes, I have.
14    Q.  Physicians and senior
15 managers?
16    A.  Yes.
17    Q.  Anyone else?
18    A.  Yes.
19    Q.  How many firing decisions have
20 you made in four and a half years?
21    A.  I wouldn't even attempt to
22 guess.  I am not (indecipherable) or
23 anything.  I have no idea.

Page 53

1    Q.  Do you consider an office
2 manager a senior manager?
3    A.  I do not.
4    Q.  Have you fired any office
5 managers?
6    A.  Could you clarify what you
7 mean have I fired them?
8    Q.  Where you were the decision
9 maker.
10    A.  I have approved it, yes.
11    Q.  Who have you approved as an
12 office manager to be terminated?
13    A.  Debbie Hughes.
14    Q.  Anyone else?
15    A.  Not that I recall.
16    Q.  Have you approved --
17    A.  Could I have a minute?
18       MR. VREELAND:  Is there a
19 question on the table?
20    Q.  You want to step out?
21    A.  Yes.  I will step out.
22    (Off-the-record discussion.)
23    Q.  (MS. HAYNES) Anyone else as an

Page 54

1  office manager?
2      A.  Not that I recall.
3      Q.  Ms. Hughes is the only office
4  manager you have terminated in four and
5  a half years?
6      A.  That I recall.
7      Q.  Have you hired any office
8  managers in four and a half years?
9      A.  I don't hire them.
10     Q.  Do you know of any that have
11 been hired?
12     A.  I do not.
13     Q.  Do you consider an office
14 manager a senior manager?
15     A.  I do not.
16     Q.  Is that considered mid level?
17     A.  Yes.
18     Q.  Any other mid level managers
19 you've fired or approved to be fired?
20     A.  Not that I recall.
21     Q.  Can you tell me anyone else
22 you have fired in four and a half years
23 other than Ms. Hughes?

Page 55

1      A.  Any level?
2      Q.  Yes, sir.
3      A.  I have fired dietary workers
4  for stealing money.  Those are things
5  that I instantly take care of.
6      Q.  Are those hourly workers?
7      A.  Uh-huh.
8      Q.  Is that yes?
9      A.  Yes.
10     Q.  Why would you be involved in
11 firing hourly workers?
12     A.  They were caught stealing.  I
13 have zero tolerance for that.
14     Q.  Anyone else you fired?
15     A.  I have fired physicians.
16     Q.  Anyone else?
17     A.  I'm sure there are, but I
18 don't recall.
19     Q.  I'm asking as CEO.  In your
20 position as CEO.
21     A.  That is correct.
22     Q.  Why did you fire Ms. Hughes?
23     A.  We deleted her position.

Page 56

1      Q.  Who is we?
2      A.  Myself, Dr. Ennis, and
3  Ms. Dunn as the assistant
4  administrator.
5      Q.  When did you make the decision
6  to delete her position?
7      A.  When there was a concern
8  because our billing had backlogged and
9  we were not getting the billing done.
10     Q.  Was there a time when you
11 determined the need to delete her
12 position?
13     A.  Are you asking me for a date?
14     Q.  Yes, sir.  Or a month.
15     A.  I would have to research that.
16 I don't know.
17     Q.  Any season or --
18     A.  I don't recall.
19     Q.  -- month come to mind when you
20 made the decision?
21     A.  It does not.
22     Q.  Did you have any meetings
23 about deleting her position?

Page 57

1      A.  I have had discussions with
2  Dr. Ennis.
3      Q.  When was the first time you
4  had a discussion with Dr. Ennis about
5  deleting the position of Debbie Hughes?
6      A.  I don't recall the date.
7      Q.  Do you recall a year?
8      A.  I do not.
9      Q.  Do you know if it was before
10 or after she was diagnosed with the
11 brain tumor?
12     A.  It would have been after.
13     Q.  Do you know if it was before
14 or after she had surgery for that brain
15 tumor that there were discussions about
16 deleting her position?
17     A.  It would have been after.
18     Q.  How many discussions did you
19 have with Dr. Ennis about deleting the
20 position of Debbie Hughes?
21     A.  I would say there was probably
22 two or three.
23     Q.  Who else was present?

Page 58

1    A.   Just Dr. Ennis and myself.
2    Q.   Did you go to the Ariton
3  Clinic or did he come to you?
4    A.   He came to me.
5    Q.   Did you -- Strike that.  How
6  did the discussions begin?  Did he come
7  to you first or did you go?
8    A.   He came to me.
9    Q.   Tell me about the first
10  occasion.
11    A.   Dr. Ennis was concerned about
12  the performance in his office and that
13  the billing and the office functions of
14  that office were not being performed.
15  He was concerned about Ms. Hughes'
16  continuous presence in the back and not
17  willing to let others operate in the
18  office and had reached a level to where
19  when you try to do too much, you are
20  efficient at none.
21    Q.   What does that mean, a
22  presence in the back office?
23    A.   She was basically performing

Page 59

1  as a bedside clinician where her job
2  function was supposed to be business.
3    Q.   Was this first occasion during
4  the five weeks she was off to have her
5  brain surgery or after?
6    A.   I don't have dates in front of
7  me.  But I can tell you there were
8  concerns with job performance probably
9  that go back prior to her illness as
10  well that involve the overordering of
11  flu vaccines, it involved writing off
12  insurance accounts without the approval
13  of the administration of the hospital.
14  Then toward the end there were concerns
15  that we were not billing and collecting
16  for the patients that were seen.
17    Q.   Read back my last question,
18  please.
19       (Requested portion of record
20        read by the court reporter.)
21    A.   That he and I talked?
22    Q.   Yes, sir.
23    A.   It would have been after.

Page 60

1    Q.   After she came back to work?
2    A.   Yes.
3    Q.   Was she on half days?
4    A.   I don't recall.  I don't know.
5    Q.   But she was back at work?
6    A.   Yes.
7    Q.   When was the second occasion
8  you had a conversation with Dr. Ennis
9  about deleting the position of
10  Ms. Hughes?
11    A.   After the decision was made
12  that we were going to outsource the
13  billing, a discussion was held between
14  Dr. Ennis and Ms. Hughes as he shared
15  with me that he had talked with her
16  about staying on to collect old
17  accounts to which she told him she
18  could not do because she knew those
19  people in Ariton too well and she
20  couldn't call them up and collect money
21  from people that she had grown up
22  knowing.  So at that point Dr. Ennis
23  shared with me if we are going to

Page 61

1  outsource the billing and she refuses
2  to collect old accounts, there is
3  really nothing left for her to do in
4  the office.
5    Q.   Read back my last question.
6       (Requested portion of record
7        read by the court reporter.)
8    A.   That was after her surgery.
9    Q.   Do you know how long the
10  second -- when the second conversation
11  occurred between you and Dr. Ennis from
12  the first conversation?
13    A.   I do not.
14    Q.   Weeks?  Days?
15    A.   I don't know.
16    Q.   Did you have a third
17  conversation with Dr. Ennis?
18    A.   I don't know.  I mean, I see
19  Dr. Ennis weekly.  We talked about many
20  things.  It wasn't always about
21  Ms. Hughes.
22    Q.   But the first time he talked
23  to you about Ms. Hughes and deleting

Page 62

1 her position was after her surgery?
2    A.  That is correct.
3    Q.  Was there a third conversation
4 about deleting her position?
5    A.  I don't know.
6    Q.  Had Dr. Ennis spoken to you on
7 any other occasions prior to the one
8 about deleting Ms. Hughes' position
9 about Ms. Hughes?
10    A.  I am sure we had conversations
11 about asking her health out of a
12 concern level.  Had nothing to do with
13 her job performance.  But we are a
14 small community hospital.  When someone
15 is sick in our organization, we are
16 generally concerned.  Dr. Ennis was
17 concerned for Debbie.
18    Q.  Prior to him approaching you
19 about deleting her position, had you
20 and Dr. Ennis ever met to discuss
21 Ms. Hughes?
22    A.  No.
23    Q.  He had never conveyed any

Page 63

1 dissatisfaction with her job
2 performance prior to the two of you
3 meeting to delete her position?
4    A.  Yes.
5    Q.  That is what I'm asking.
6 When --
7    A.  He was dissatisfied when we
8 ended up with 3,000 flu vaccines at a
9 huge cost to his office.  He was
10 dissatisfied to learn that patient
11 accounts were written off with no one's
12 approval.  He was very dissatisfied
13 with it.  Sometime after that we
14 discovered that she was ill.
15    Q.  Okay.  Did you meet and
16 discuss Ms. Hughes on those occasions?
17    A.  You know, what I clarify
18 meeting -- when you are dealing with
19 physicians, a telephone call to me with
20 a concern is a discussion.  I don't
21 know that we never had a formal
22 sit-around-the-table meeting about
23 Ms. Hughes, no.

Page 64

1    Q.  Did you have a telephone
2 conversation?
3    A.  Absolutely.
4    Q.  When was the first time?
5    A.  When we discovered we had an
6 abundance of flu vaccine for Dale
7 County.
8    Q.  Who initiated that call?
9    A.  Dr. Ennis did.
10    Q.  Did he call you?
11    A.  Absolutely.
12    Q.  What did he say?
13    A.  He was a little upset because
14 his clinic was being charged with
15 thousands of dollars of unnecessary
16 expenses.
17    Q.  What did he tell you?
18    A.  I don't recall.  He wasn't
19 happy.
20    Q.  You don't recall anything
21 about the conversation?
22    A.  No, I do not.  Other than he
23 wasn't happy.  I speak with a lot of

Page 65

1 unhappy physicians from time to time.
2 I don't recall their words, but I know
3 their tone.
4    Q.  Did he blame that immediately
5 on Ms. Hughes?
6    A.  Absolutely.
7    Q.  Did you tell him to fire her?
8    A.  I did not.
9    Q.  Why not?
10    A.  We were disturbed by it as
11 well.  But this was also in a year that
12 there was a major flu vaccine shortage.
13 Had we have not been able to recoup
14 that money, a decision would have been
15 made.  But we did take into
16 consideration the years service that
17 Ms. Hughes had to that community and to
18 that clinic.  And I was able to recover
19 the money and just said, okay, that is
20 a human error, let's be more cautious.
21 So could I have made the decision to
22 fire her at that time?  Yes, I could
23 have.  Did I?  I did not.  We took in

Page 66

1  consideration her years of service.
2    Q.   Okay.  When were you told of
3  the error on the flu vaccine?
4    A.   As soon as the invoice hit the
5  hospital.
6    Q.   What was used as an exhibit
7  yesterday is Defendant's Exhibit 6.
8  Can you tell looking at that invoice,
9  please, sir, when it hit the hospital?
10   A.   Looks like it was received in
11 the hospital September of '02.
12 September 2nd of '04.
13   Q.   Could the shipment have been
14 rejected?
15   A.   No, it could not.
16   Q.   Had to accept it?
17   A.   We had to accept it.
18   Q.   Did the shipment arrive or the
19 invoice arrive first?  Which arrived
20 first is my question.
21   A.   That I don't know.
22   Q.   Do you know when you got the
23 shipment of vaccine?

Page 67

1    A.   I do not.  I would have to --
2  No, I don't.
3    Q.   Do these companies usually ask
4  for payment in advance from the
5  hospital?
6    A.   I think we probably have an
7  account with the providers here.  So
8  no.
9    Q.   So sometime looking at
10 Defendant's Exhibit 6 can you tell when
11 you would have received the shipment of
12 flu vaccine?
13   A.   Not from this document I
14 cannot.  Well, it says here second day
15 UPS Ground.
16   Q.   What is the date?
17   A.   This invoice date is dated
18 August 24.  Then we have got an invoice
19 received September the 2nd.  So I don't
20 know if it was two days from August
21 24th.  I don't know.
22   Q.   Looking at that exhibit,
23 Defendant's Exhibit 6, does it refresh

Page 68

1  your recollection when you would have
2  had the conversation with Dr. Ennis
3  about Ms. Hughes overordering flu
4  vaccine?
5    A.   It does not, but I would
6  assume it was shortly thereafter.
7    Q.   Who brought it to your
8  attention first about the overage of
9  flu vaccine?
10   A.   Ms. Dunn who signed off on
11 this invoice.
12   Q.   Then did you call Dr. Ennis?
13   A.   Did I call him?  No.
14   Q.   Ms. Dunn shows it to you and
15 you don't do anything?
16   A.   I'm sure Ms. Dunn showed it to
17 Dr. Ennis.  I didn't show it to
18 Dr. Ennis.  But Dr. Ennis knew about it
19 when he called me.
20   Q.   Okay.  Had you asked Ms. Dunn
21 to find out from Dr. Ennis why he
22 ordered so much flu vaccine?
23   A.   No, I did not.

Page 69

1    Q.   At the time you got it did you
2  think this is a good thing for the
3  hospital?
4    A.   I sure did not.
5    Q.   When did you decide it was a
6  good thing?
7        MR. VREELAND:  Object to the
8  form.
9    A.   I never did decide it was a
10 good thing.
11   Q.   As you sit here today, that is
12 your testimony, that it was never a
13 good thing for the hospital, the
14 overage of flu?
15   A.   Would I have ordered an
16 overage of flu?  No.  Was I able to
17 unload it?  Yes.
18   Q.   How were you able to unload
19 it?
20   A.   We were -- That whole area was
21 a major shortage that year.  We had
22 newspaper articles written.  The
23 newspapers advertised that we had it

Page 70

1 available. We had people coming from
2 everywhere to utilize the vaccine,
3 thank goodness. And we were able to
4 recoup our money. Did we make a lot of
5 money? Not off of flu vaccines, no, we
6 don't.
7    Q.   How much did you make?
8    A.   I think we probably charged
9 about $10 a shot.
10    Q.   How many shots do you get out
11 of -- How many vials? Is it 300 vials?
12    A.   It is 300 vials. There is 10
13 doses per vial. For an Ariton Clinic
14 that is an excessive amount of flu.
15 Plus we had ordered flu for all of our
16 other physician offices.
17    Q.   Did you have any left?
18    A.   Of this?
19    Q.   Yes, sir.
20    A.   No. We were able to utilize
21 it.
22    Q.   Okay. How much did you order
23 last year?

Page 71

1    A.   I don't know. I would have to
2 pull that.
3    Q.   Who would know that?
4    A.   Our pharmacist.
5    Q.   Who is that?
6    A.   Chris.
7    Q.   Does Chris last name
8 unknown --
9    A.   It slips my mind right now.
10    Q.   -- does he do all flu vaccine
11 orders for all facilities of Dale
12 Medical Center currently?
13    A.   No.
14    Q.   Who else orders?
15    A.   We had a director of pharmacy
16 that we had, Jennifer Hatcher that just
17 left us for another job. Chris is my
18 only pharmacist left. I don't know
19 that he's placed the orders for flu
20 vaccines yet or not.
21    Q.   2006 would he?
22    A.   Would he have placed them?
23 No.

Page 72

1    Q.   Jennifer Hatcher would have?
2    A.   Uh-huh.
3    Q.   Is that a yes?
4    A.   That is a yes.
5    Q.   You told me about magazine
6 articles being run.
7    A.   I didn't say magazine.
8    Q.   I'm sorry. Newspaper
9 articles.
10    A.   Uh-huh.
11    Q.   How many articles?
12    A.   I have no idea. The Dothan
13 Eagle. It was a big news item during
14 that year. Flu vaccines just were not
15 available.
16    Q.   Other than at Dale Medical
17 Center?
18    A.   It was a nationwide problem.
19    Q.   But you had the flu vaccine at
20 Dale Medical Center?
21    A.   We had the flu vaccine at Dale
22 Medical Center.
23    Q.   Did you run out?

Page 73

1    A.   I don't know. Did we have
2 doses left? I don't know.
3        (Plaintiff's Exhibit 1 was
4        marked for identification.
5        A copy is attached.)
6    Q.   Here is one newspaper article.
7 I gave that to you yesterday. I'm
8 sorry. I don't have another copy. Is
9 this one of the articles?
10    A.   This was an article that
11 obviously came out after the article in
12 the Eagle.
13    Q.   Okay. Dated October 20th,
14 2004?
15    A.   That's right.
16    Q.   Is that you being quoted?
17    A.   That is me being quoted.
18    Q.   Where you state, "We were
19 officially out of the flu vaccine as of
20 Friday," is that a true statement as of
21 whenever this paper came out, October
22 20th, 2004?
23    A.   If I was quoted saying that,

Page 74

1  that would be a true statement.
2     Q.   So you got the invoice for the
3  300 vials on September 2nd, 2004?
4     A.   That's what it says, yes.
5     Q.   And less than two months later
6  you were out of it?
7     A.   That's what I said.  What we
8  were able to do also was sell vials to
9  our local physicians on our medical
10  staff for their offices that didn't
11  have it.
12     Q.   What did you sell those vials
13  for?
14     A.   I have no idea.
15     Q.   Do you have paperwork that
16  would follow that up?
17     A.   I am sure we do.
18     Q.   Defendant's Exhibit 6 would
19  have shown up on the books for the
20  Ariton Clinic as an expense, correct,
21  or would that show up on the books for
22  Dale Medical Center?
23     A.   That would obviously be a

Page 75

1  question for the bookkeeper because it
2  could go several ways.  Number one, if
3  this was all expensed out to the Ariton
4  Clinic, then yes, it would.  But then
5  there would have also been credits
6  applied to that clinic that showed
7  where we distributed the vaccine to.
8     Q.   What would I need to look at
9  to show what credits were applied to
10  the Ariton Clinic for the expenditure
11  of the flu vaccine?
12     A.   What I would see would be the
13  department DOR.
14     Q.   What does that mean?
15     A.   Department operating report.
16     Q.   Do you know if you sold the
17  vials for more or less than $85 per
18  vial to these other clinics?
19     A.   It was probably at cost.
20     Q.   You would sell it to the
21  clinics for cost and then the clinics
22  would sell the shot, is that correct,
23  to the patient?

Page 76

1     A.   Well, that would be a fair
2  statement of it other than it would be
3  billed to probably Medicare or whoever
4  their insurance carrier was.  We would
5  collect what is allowable by them.
6     Q.   Did it end up, Mr. Johnson,
7  that the Dale Medical Center received a
8  lot of positive publicity as a result
9  of the flu vaccine overage?
10     A.   If you consider putting the
11  word out that we had an average of
12  vaccine available.  Was that positive?
13  It was to those people hunting the
14  vaccine.  Did we gain market share from
15  this error?  No.
16     Q.   How many different newspapers
17  did you provide comments for based on
18  the flu vaccine?
19     A.   Probably these two, the Dothan
20  Eagle and Southern Star.
21     Q.   Did you ever look at any
22  financial report, sir, that you
23  contributed an increase in the revenues

Page 77

1  of Dale Medical Center to the overage
2  of the flu vaccine?
3     A.   No.
4     Q.   Do you know if any exist?
5     A.   That shows that we made money?
6  No.
7     Q.   Do you know if you lost money?
8     A.   Off of the flu vaccine?
9     Q.   Yes, sir.
10     A.   I don't know.
11     Q.   What is your understanding as
12  the CEO of Dale Medical Center?
13     A.   As the CEO of Dale Medical
14  Center, I think we were able to recover
15  what we had in it.  That was our goal.
16     Q.   Did you save the newspaper
17  articles?
18     A.   I did not.
19     Q.   Did you ever instruct anyone
20  to discipline Ms. Hughes for the
21  ordering of the flu vaccine?
22     A.   I don't recall if I personally
23  instructed anyone to discipline her or

Page 78

1  not.
2      Q.   Is that the first time
3  Dr. Ennis had ever discussed Debbie
4  Hughes with you was when the overage of
5  the flu vaccine occurred?
6      A.   To the best of my
7  recollection.
8      Q.   Did you know Ms. Hughes at
9  that time?
10     A.   Yes.
11     Q.   How is it you knew her?
12     A.   She had been at that clinic up
13 there for a number of years.
14     Q.   Thirty years at that time?
15     A.   That may be so.  I don't know.
16     Q.   Had you ever met her?
17     A.   Yes.
18     Q.   How often would you go to the
19 Ariton Clinic?
20     A.   I didn't get there very often.
21     Q.   Once a year?
22     A.   Probably more than that.
23     Q.   Twice?

Page 79

1      A.   More than that.  I mean,
2  especially when Dr. Ennis was ill.  I
3  went up there and checked on him,
4  checked on the clinic.  Probably the
5  last year that he was there I was
6  probably up there half a dozen times.
7  Most of the time I would see him in my
8  office.
9      Q.   In the six times you were at
10 the clinic --
11     A.   I'm guessing.  I am not saying
12 I was there six times.
13     Q.   Well, you said half a dozen.
14     A.   You are asking me how many,
15 more or less.  I would guess probably
16 that many times.  I can't say I was
17 here on this date, that date, that
18 date.
19     Q.   Did you make any notes of
20 those visits?
21     A.   No.
22     Q.   Complete any reports?
23     A.   I routinely round on

Page 80

1  physicians.  I just stick in and see
2  how things are going.
3      Q.   Did you keep a daytimer in the
4  normal course of business?  A calendar
5  system?
6      A.   I don't know what system I had
7  at that time.  Currently now I have a
8  PDA that I keep everything on.  But I
9  don't know what I had at that time.
10     Q.   Do you know of any calendar
11 notation that you made on what days you
12 would visit what clinics?
13     A.   I would not have made those.
14 Most of mine are impromptu.
15     Q.   Did you e-mail Dr. Ennis?
16     A.   I did not.
17     Q.   Did the Ariton Clinic have
18 e-mail capability in 2004, 2005?
19     A.   Not that I'm aware of, but
20 could very well have.
21     Q.   Did you issue any type of
22 memorandum to Dr. Ennis about the flu
23 vaccine overage?

Page 81

1      A.   I did not.
2      Q.   Did you ever receive any type
3  of memorandum from Dr. Ennis or any
4  writing about Debbie Hughes?
5      A.   Did not.
6      Q.   Did you make any notes of the
7  meetings you had with Dr. Ennis to
8  delete the position of Ms. Hughes?
9      A.   I did not.
10     Q.   Have you ever seen any written
11 discipline about Ms. Hughes in her 31
12 years she worked at the Dale Medical
13 Center?
14         MR. VREELAND:  Object to the
15 form.
16     Q.   Or the Ariton Clinic?
17         MR. VREELAND:  Object to the
18 form.  Well --
19         MS. HAYNES:  Once is enough.
20     A.   Not that I recall.
21     Q.   As you sit here today, do you
22 know of any written discipline in her
23 personnel file?

1    A.   I haven't reviewed her
2  personnel file.
3    Q.   Ever?
4    A.   Have I?
5    Q.   Ever?
6    A.   Not that I recall.
7    Q.   Anyone ever told you she's
8  been disciplined?
9    A.   Probably so.  I'm sure that I
10 have had discussions with Sheila Dunn
11 concerning both the flu vaccine, the
12 patient accounts, incidents.  I'm sure
13 I have.
14   Q.   Did you have any conversations
15 with Dr. Ennis about Ms. Hughes writing
16 off patient accounts?
17   A.   I don't recall.  That could
18 have come through Sheila or it could
19 have come directly from Dr. Ennis.  But
20 I know that there were -- Yes.  We have
21 had discussions.
22   Q.   When?
23   A.   In one of those couple of

1  meetings that we were discussing.
2    Q.   After her surgery?
3    A.   Uh-huh.
4    Q.   Is that a yes?
5    A.   Yes.
6    Q.   Any other times you have
7  talked to Dr. Ennis other than the flu
8  vaccine and then after her surgery
9  about Ms. Hughes?
10   A.   I don't recall.
11   Q.   Do you recall any other
12 complaints Dr. Ennis had about
13 Ms. Hughes other than what you have
14 already told me?
15   A.   I don't recall them.
16   Q.   And you made no notes?
17   A.   No.
18   Q.   Have you ever asked for
19 anything to be placed in her personnel
20 file about the flu vaccine or writing
21 off of accounts?
22   A.   Have I ever asked that it be
23 put in there?  I did not.

1    Q.   What conversations have you
2  had with Ms. Dunn about Ms. Hughes?
3    A.   Well, I can assure you that we
4  did discuss the flu vaccine, we did
5  discuss the patient accounts.  Were
6  there other issues?  Possibly so.
7    Q.   Do you recall?
8    A.   I do not.  I talk to a lot of
9  people about a lot of things.  I do not
10 recall.
11   Q.   Did you make any notes of your
12 conversations with Ms. Dunn about
13 Ms. Hughes?
14   A.   I did not.
15   Q.   When is the first time you
16 talked to Ms. Dunn about the flu
17 vaccine and Ms. Hughes?
18   A.   Based on your exhibit there,
19 the day that Sheila Dunn signed off on
20 that invoice, I am sure she came to my
21 office.
22   Q.   That was September 2nd, 2004?
23   A.   And I would say that would be

1  a safe assumption that I learned about
2  it pretty quick after she signed off on
3  it.
4    Q.   Tell me about that
5  conversation with Ms. Dunn.
6    A.   I don't recall other than we
7  were a little upset that we had $25,000
8  worth of flu vaccine on our hand.
9    Q.   Did you call Dr. Ennis on that
10 day?
11   A.   I don't recall.
12   Q.   Did you instruct --
13   A.   I am sure that that day we
14 were in a scramble trying to see if the
15 company would take it back and how were
16 we going to dispose of $25,000 worth of
17 vaccine.
18   Q.   When did you learn there was
19 going to be a shortage of the flu
20 vaccine?
21   A.   I have no idea when the
22 media -- It was a nationwide media
23 blitz on it.  I have no idea if that

Page 86

1 was before or after this. If my memory
2 serves me, I would say it is probably
3 after we had all this on hand that the
4 media really ran with it. I really
5 don't recall.
6    Q.   You don't recall early 2004
7 that there was going to be a shortage
8 of the flu vaccine?
9    A.   I personally don't, no.
10    Q.   Did you have any other
11 conversations with Ms. Dunn about the
12 flu vaccine and Ms. Hughes other than
13 this one that was on or about September
14 2nd, 2004?
15    A.   I will answer that question by
16 saying this. I am sure that we had
17 multiple conversations about the flu
18 vaccine from the time we received it
19 until the time we disposed of it.
20 Whether it centered around Ms. Hughes
21 or not, I don't know. But we had a lot
22 of vaccine on our hand that we needed
23 to recover because a $25,000 hit to a

Page 87

1 small rural hospital is pretty
2 significant.
3    Q.   I'm asking specifically if you
4 had any other conversations with
5 Ms. Dunn about the flu vaccine and
6 Ms. Hughes other than the one you have
7 told me about.
8    A.   I don't recall.
9    Q.   On or about September 2nd,
10 2004, was Ms. Hughes' name even
11 mentioned?
12    A.   I don't recall.
13    Q.   Tell me about your
14 conversations with Ms. Dunn about
15 Ms. Hughes and writing off of patient
16 accounts.
17    A.   To the extent that I was
18 informed by Ms. Dunn and it was
19 discussed. At that point in time we
20 needed to set in place some checks and
21 balances for our clinic. That I can
22 tell you is highly unusual for midlevel
23 or below to make financial decisions

Page 88

1 for a hospital to write off patient
2 accounts. No one has that authority
3 outside of the administrative office.
4    Q.   When was your first
5 conversation with Ms. Dunn about
6 patient accounts and Ms. Hughes writing
7 those off?
8    A.   I don't recall.
9    Q.   Was it before or after the flu
10 vaccine incident?
11    A.   To be quite honest with you, I
12 don't even know the date or the month
13 or the year that that occurred. I
14 don't recall. I would have to research
15 it.
16    Q.   Okay. You did not make any
17 notes?
18    A.   I did not.
19    Q.   What is your best recollection
20 of that conversation, who said what?
21    A.   Other than the fact that I was
22 informed, at the desk I sit at I am
23 informed by my managers of a lot of

Page 89

1 things and we make decisions based on
2 what I am informed.
3    Q.   You have no independent
4 recollection of what you were informed
5 of?
6    A.   I was informed that we had
7 patient accounts from Blue Cross Blue
8 Shield that had been written off and
9 cleared out of the system.
10    Q.   Ms. Dunn told you that?
11    A.   I don't recall who told me
12 initially. But Ms. Dunn's
13 responsibility was that clinic. So I
14 would expect that came from her.
15    Q.   Dr. Ennis did not tell you?
16    A.   Dr. Ennis -- I don't recall
17 that he did. He was aware of it. Now,
18 you are asking me about the first time
19 I heard of it.
20    Q.   Yes, sir.
21    A.   Okay.
22    Q.   How many different
23 conversations did you have with anyone

Page 90

1 about Ms. Hughes writing off patient
2 accounts?
3     A.  I have -- I don't know.
4     Q.   Was it only the one or could
5 it have been more than one?
6     A.   Something like that.  I am
7 sure there were discussions with my
8 CFO, there were discussions with my
9 controllers.  But I don't recall.
10     Q.   Did you understand what
11 happened to write off those accounts?
12     A.   Tell me what you mean what
13 happened.
14     Q.   Did you ever learn that there
15 was an issue with a physician's
16 provider number being cancelled?
17     A.   No.  But that still should
18 have come to an administrative level.
19 Provider numbers get cancelled, but
20 they can also be reapplied for.
21     Q.   Did you have that knowledge,
22 sir, that that was --
23     A.   Did I?  No.

Page 91

1     Q.   Until I just said that --
2     A.   No.
3     Q.   -- you had no knowledge?
4     A.   No.
5     Q.   Why would a physician provider
6 number be cancelled by Blue Cross Blue
7 Shield?
8     A.   Are you referring to a
9 specific physician?
10     Q.   No, sir.  I am just asking you
11 as CEO of Dale Medical Center, if you
12 know, why would provider numbers be
13 cancelled?
14     A.   There is probably a multitude
15 of reasons.  Blue Cross Blue Shield
16 credentials physicians just like
17 hospitals do.  It could be an issue
18 with documents not being provided to
19 Blue Cross Blue Shield, it could be the
20 physician requested that it be
21 cancelled.  I am sure there is a
22 multitude of reasons.
23     Q.   Did you have a -- I may be

Page 92

1 pronouncing this name wrong --
2 Dr. Zumstein filling in for Dr. Ennis?
3     A.   He did.
4     Q.   Was there ever an issue with
5 his provider number being cancelled by
6 Blue Cross Blue Shield?
7     A.   Not that I recall.
8     Q.   Is the hospital usually
9 notified that a provider number has
10 been cancelled by Blue Cross Blue
11 Shield?
12     A.   I would imagine if the
13 provider number is in the physician's
14 name that the physician would be
15 notified and not the hospital.
16     Q.   If a provider number has been
17 cancelled by Blue Cross Blue Shield for
18 a physician, how does one go about
19 getting it reinstated?
20     A.   There is an application
21 process.
22     Q.   Can you transfer those bills
23 to another provider number?

Page 93

1     A.   If that provider number is
2 assigned to the physician that provided
3 the service, to the best of my
4 knowledge yes, you could.
5     Q.   That would be Dr. Zumstein's
6 provider number was -- Well, strike
7 that.  Could you transfer
8 Dr. Zumstein's provider number to
9 Dr. Ennis or transfer that billing that
10 he provided to Dr. Ennis's number?
11     A.   The provider number is
12 specifically assigned to a specific
13 physician.  Is it transferable?  No.
14 If you can bring in a physician under a
15 locum tenens basis, there is a time
16 period in which you can bill under that
17 primary physician's provider number
18 with a locums.  I would have to get
19 someone that's -- I would rely on my
20 billing department to tell me if that
21 is a two- or four-week period.  But
22 that is how locums operate.
23     Q.   Do you know what happened in

Page 94

1 this situation with the I think it was
2 $970 written off, how that was obtained
3 back?  Do you have any knowledge of
4 that?
5        MR. VREELAND:  Object to the
6 form.
7    A.   (Witness shakes head.)
8    Q.   Do you know who would?
9    A.   I do not.
10   Q.   Is there a written procedure
11 at Dale Medical Center for writing off
12 accounts?
13   A.   There is a procedure -- I do
14 not know if it is in writing -- that is
15 handled through our finance department.
16   Q.   What is your understanding of
17 the procedure of writing off accounts?
18   A.   What kind of accounts are you
19 talking about?
20   Q.   Patient accounts.
21   A.   Are you talking about
22 self-pay?  Are you talking about
23 charity?  Are you talking about bad

Page 95

1 debt?
2    Q.   What is the difference?
3    A.   It is based on ability to pay.
4    Q.   How long do you carry it
5 before you write it off?
6    A.   It is probably -- We carry it
7 a while.
8    Q.   Do you have an outside
9 collection agency?
10   A.   Yes, we do.
11   Q.   Who is that?
12   A.   Alliance is one of them.
13 Holloway is another one.  We have an
14 attorneys group that we use, Flowers --
15 I think it is Flowers and Brackin in
16 Dothan.  Those are just three that I
17 know of.
18   Q.   Is there a certain amount you
19 will turn over to a collection agency
20 or an attorney group on a patient bill?
21   A.   I don't know the answer to
22 that right off the top of my head.
23   Q.   $970 that Ms. Hughes had

Page 96

1 written off, do you know how many
2 different patient accounts those were?
3        MR. VREELAND:  Object to the
4 form.
5    A.   I do not.
6    Q.   You do not know?
7    A.   I do not.
8    Q.   Have you ever seen any
9 records, written records of those
10 accounts?
11   A.   I have not.
12   Q.   Do you know if that amount was
13 rebilled under a different provider
14 number and the money received?
15   A.   I do not know.
16   Q.   Who would know that?
17   A.   Well, if we have the patient's
18 name and accounts, we have the ability
19 of going in and pulling those up.
20   Q.   Did you ever discuss the
21 writing off of these patient accounts
22 with Ms. Hughes?
23   A.   No.

Page 97

1    Q.   Did you ever discuss the flu
2 vaccine overage with Ms. Hughes?
3    A.   Those were discussed with
4 Ms. Hughes the day that she came to see
5 me to appeal her termination.
6    Q.   The writing off of patient
7 accounts and the flu vaccine?
8    A.   Uh-huh.
9    Q.   That is a yes?
10   A.   Yes.
11   Q.   How did you know she was
12 coming to see you that day?
13   A.   I don't know if she called
14 before she came or if she just came to
15 the office.  I don't recall.
16   Q.   You have no knowledge if she
17 made an appointment to see you?
18   A.   I don't recall.
19   Q.   Did you talk with anyone about
20 Ms. Hughes coming in to see you?
21   A.   I did not.
22   Q.   So she just shows up cold --
23        MR. VREELAND:  Object to the

Page 98

1 form.
2    Q.   -- to your knowledge?
3    A.   I don't recall.
4    Q.   Who is Phyllis Sexton?
5    A.   She is my administrative
6 assistant.
7    Q.   Does she schedule your
8 appointments?
9    A.   She does.
10    Q.   Does she print an itinerary
11 for you each day?
12    A.   She does not.
13    Q.   How does she apprise you of
14 meetings and appointments?
15    A.   I have a Blackberry that is
16 updated where her calendar and mine
17 coincide.
18    Q.   Is that Outlook?
19    A.   It is a Blackberry.  Yes.  I
20 guess it would be Outlook on her
21 computer.
22    Q.   Does Ms. Sexton maintain your
23 calendar in Outlook for you?

Page 99

1    A.   She does.
2    Q.   How long has Ms. Sexton been
3 with you?
4    A.   She's been with me the entire
5 time I have been the CEO.
6    Q.   Was she Mr. Bigley's --
7    A.   She was.
8    Q.   -- secretary as well?
9    A.   Yes.
10    Q.   Tell me about your meeting
11 with Ms. Hughes.
12    A.   My recollection of the meeting
13 with Ms. Hughes was that she came in
14 the office.  The main thing that she
15 wanted me to say to her was I had fired
16 her.  I did not say I fired her.  We
17 deleted her position.  Her position was
18 no longer in the office.  So we
19 terminated her because the job duties
20 no longer existed.  She was very
21 insistent that I tell her she was
22 fired.  I never told her she was fired.
23 She was terminated because the position

Page 100

1 had been omitted or deleted.
2        During the course of that
3 conversation I did -- it did come up
4 about the flu vaccine and about the
5 billing issues and about the backlog of
6 the billing in the current practice as
7 to why the decisions were made to
8 terminate her and that position because
9 there was currently no checks and
10 balances from the hospital standpoint
11 in that standalone billing system that
12 was up there.  We had no way of knowing
13 what was being done or what was being
14 credited or anything.  That was unlike
15 any other office we had.  Secondly, the
16 billing had fallen behind.  So to put
17 the checks and balances in place we
18 went with the system we used in every
19 other clinic, one of the outsources.  I
20 don't recall all the meat of our
21 conversation other than I knew when she
22 left that it wasn't going to be over.
23    Q.   Is there an appeal process for

Page 101

1 terminations at Dale Medical Center?
2    A.   The employees -- they can come
3 to me.
4    Q.   Is there a written appeal
5 process?
6    A.   I believe there is in the
7 employee handbook.
8        (Plaintiff's Exhibit 2 was
9        marked for identification.
10        A copy is attached.)
11    Q.   Plaintiff's Exhibit 2, also
12 marked as Defendant's Exhibit 4 from
13 the Plaintiff's deposition, can you
14 tell me in this employee handbook where
15 the appeal process is located?
16    A.   I don't see it outlined in
17 here.
18    Q.   Do you know if there was an
19 appeal process in a prior employee
20 handbook?
21    A.   I do not.
22    Q.   This handbook produced by your
23 attorney has on the second page May

Page 102

1 2004. Do you know if this policy was
2 implemented by the Dale Medical Center
3 on or about May 2004?
4     A. What did you say? Where do
5 you see from my attorney and what?
6     Q. There is a date on the second
7 page, Bates No. D00158. Do you know if
8 this policy was implemented on or about
9 May 2004?
10     A. I do not know if that date
11 means it was implemented or if it was
12 reprinted in May of 2004. I don't know
13 what that date is referring to.
14     Q. Do you know of any prior
15 handbooks other than this one?
16     A. I do not.
17     Q. How is the employee handbook
18 updated or revised?
19     A. That was done through our
20 personnel department.
21     Q. Do you know of any training
22 that's ever taken place on the handbook
23 to employees at Dale Medical Center?

Page 103

1     A. In new employee orientation it
2 is discussed.
3     Q. Who discusses that?
4     A. Someone from personnel.
5     Q. Do you have a trainer?
6     A. For new employee orientation
7 it is going to be several. We have a
8 nurse educator that organizes it, we
9 have someone from safety comes up and
10 goes over that, and someone from
11 personnel. It is done by different
12 department managers.
13     Q. Was Ms. Hughes eligible for
14 rehire?
15     A. I don't recall.
16     Q. Can you tell me why she would
17 not be eligible for rehire if her
18 position was deleted?
19     A. I cannot.
20     Q. Is there a policy and
21 procedure at Dale Medical Center for
22 those employees whose position has been
23 eliminated and their rehire status?

Page 104

1     A. I just read in this manual
2 that says if they were deleted because
3 of downsizing or whatever, that they
4 would be eligible for rehire.
5     Q. Do you know why she has not
6 been rehired?
7     A. I don't know that she has made
8 application.
9     Q. You have no knowledge of that?
10     A. Not that I'm aware of she
11 hasn't applied.
12     Q. I'm sorry?
13     A. Not that I'm aware of she
14 hasn't applied.
15     Q. If she has applied for three
16 positions, do you know why she has not
17 been granted an interview?
18     A. That is up to each individual
19 department manager.
20     Q. Where is it located in
21 Plaintiff's Exhibit 2 the status of an
22 employee who has been downsized or
23 eliminated? What provision?

Page 105

1     A. What I was just referring to?
2     Q. Yes, sir.
3     A. 1.10. Terminated employees
4 may not be considered for re-employment
5 unless the termination was due to a
6 reduction in work force or the
7 abolition -- abolition of a position.
8     Q. Okay. It also addresses
9 unused vacation time as well?
10     A. Uh-huh.
11     Q. In that same section?
12     A. Uh-huh.
13     Q. That's a yes?
14     A. Yes, it is.
15     Q. Do you know if Ms. Hughes was
16 paid for unused vacation time?
17     A. I do not know.
18     Q. Do you know if she was paid a
19 severance?
20     A. I don't believe she was paid a
21 severance.
22     Q. What is the policy of Dale
23 Medical Center in paying a severance?

1    A.   There is not one.
2    Q.   Is it discretionary?
3    A.   Yes.
4    Q.   Have you awarded a severance
5  pay to any terminated employee?
6    A.   Not that I recall.
7    Q.   Have you awarded a severance
8  to any employee whose position has been
9  eliminated or downsized?
10   A.   Not that I recall.
11   Q.   If her position was
12  eliminated, do you know of any reason
13  Dale Medical Center would move to block
14  her unemployment?
15   A.   Yes.
16   Q.   Why?
17   A.   Our dissatisfaction with her
18  work performance.
19   Q.   Do you have an understanding
20  that Dale Medical Center moved to block
21  Ms. Hughes' unemployment?
22   A.   Yes.
23   Q.   Did you make that decision?

1    A.   Yes.
2    Q.   Based on what?
3    A.   Job performance.
4    Q.   When?
5    A.   At the time the decision was
6  made to delete the position.
7    Q.   Did you make that decision
8  before or after she came to see you for
9  the appeal process in your office?
10   A.   That was made before.
11   Q.   Did she put that in writing?
12   A.   There is a separation of
13  employment form.  I don't know what is
14  on that form, no.  Did I put it in
15  writing?  No.
16   Q.   Did you tell her that when she
17  came to see you, that you were firing
18  her because you were dissatisfied with
19  her work performance?
20   A.   That is exactly what I told
21  her because we discussed the flu and
22  the billing situation.  Absolutely.
23  She was clear that we were dissatisfied

1  with her employment.  She was also
2  clear that we had tried to make a place
3  for her and let her collect old
4  accounts.  But she was not comfortable
5  in doing that.
6    Q.   How is it you know she was
7  clear that you were dissatisfied with
8  her work performance?
9    A.   Because I told her.
10   Q.   Does Dale Medical Center have
11  a progressive discipline policy?
12   A.   Yes.
13   Q.   Where is that located in
14  Plaintiff's Exhibit 2?
15   A.   If you will look at Section
16  3.3 in Rules of Conduct in our employee
17  handbook, Section A, Termination, "An
18  employee may be terminated without
19  prior warning for certain offenses.
20  Reasons for immediate termination
21  include, but are not limited to such
22  matters of, one, repetition of any
23  offense for which a written warning was

1  issued or an accumulation of verbal or
2  written warnings for various offenses
3  that warrants discharge under the
4  circumstances; two, misuse" --
5    Q.   That's fine.  It is a long
6  policy.
7    A.   Okay.
8    Q.   Starting on 14 and it goes
9  through 17.  If you were dissatisfied
10  with the job performance of Ms. Hughes,
11  what is the procedure you would follow
12  per 3.3 of the employee handbook?
13   A.   We would have had discussions
14  with her verbally, which did take
15  place.  I don't know if any written
16  documentation was performed on that or
17  not.
18   Q.   Would you --
19   A.   But you also in a physician's
20  office there has got to be a level of
21  trust and ability to work.  And that
22  did not exist between her and
23  Dr. Ennis.

Page 110

1   Q.   At what point did you make
2 that determination?  Before or after
3 her brain surgery?
4   A.   It was after.
5   Q.   Would you agree with me,
6 Mr. Johnson, that Dale Medical Center
7 failed to follow the progressive
8 discipline policy with regards to
9 Ms. Hughes?
10   A.   I would not.
11   Q.   It is your opinion the
12 progressive discipline policy of Dale
13 Medical Center was followed in the
14 termination of Ms. Hughes?
15   A.   I would.
16   Q.   Can you tell me when any
17 written warning occurred for the
18 dissatisfaction of her job performance?
19   A.   I could not tell you that not
20 having her file in front of me, nor do
21 I know that they even exist.  I am
22 aware that there were multiple
23 conversations with Ms. Hughes between

Page 111

1 her and Dr. Ennis and Sheila Dunn.
2   Q.   Can you tell me --
3   A.   Did I personally have those
4 conversations?  No, I did not.
5   Q.   Do you know of any verbal
6 warnings where Ms. Hughes was apprised
7 that if her work performance did not
8 improve, she could be terminated?
9   A.   I do not know.  Could I have a
10 break, please?
11   Q.   Sure.  Any time.
12   (Recess was taken, commencing at
13 10:25 a.m., concluding at 10:36 a.m.)
14   Q.   (MS. HAYNES) During the break
15 did you think of any question that you
16 need to amend or append?
17   A.   (Witness shakes head.)
18   Q.   Is that no?
19   A.   (Witness shakes head.)
20   MR. VREELAND:  You need to
21 answer out loud.
22   A.   No.  I'm sorry.
23   Q.   As part of your duties as the

Page 112

1 CEO of Dale Medical Center have you
2 been charged by the board of directors
3 to follow all the policies and
4 procedures of Dale Medical Center?
5   A.   I have.
6   Q.   Is the employee handbook one
7 of those policies?
8   A.   Yes.
9   Q.   Can you tell me why there was
10 never a written warning issued to
11 Ms. Hughes prior to her termination?
12   A.   I cannot.
13   Q.   Do you know whose
14 responsibility it was to insure that a
15 verbal warning and written warning was
16 issued to her prior to termination?
17   MR. VREELAND:  Object to the
18 form.
19   A.   Do I answer?
20   MR. VREELAND:  Yes.
21   A.   That would be Ms. Dunn.
22   Q.   You told me when Ms. Hughes
23 came to see you that you discussed the

Page 113

1 backlog of accounts?
2   A.   Uh-huh.
3   Q.   Is that correct?
4   A.   (Witness nods head.)
5   Q.   You are shaking your head.
6   A.   I'm sorry.  Yes.  I'm sorry.
7   Q.   You also discussed the flu
8 vaccine?
9   A.   Yes.
10   Q.   You discussed the writing off
11 of patient accounts?
12   A.   Yes.
13   Q.   You discussed there were no
14 check and balances in that facility?
15   A.   I don't know that that was
16 discussed.
17   Q.   Okay.  That was just your
18 opinion, there was no checks and
19 balances?
20   A.   That was my knowledge, yes.
21   Q.   You also discussed that the
22 billing was falling behind?
23   A.   Yes.

Page 114

1    Q.   Anything else you discussed?
2    A.   Not that I recall.
3    Q.   Did Ms. Hughes ask you to be
4 placed in another position?
5    A.   She did not.
6    Q.   Did she ask for a job?
7    A.   She did not.
8    Q.   Did you make the comment to
9 her that you knew she was suing the
10 facility?
11   A.   I did not.
12   Q.   Did she ask you if she had
13 appeal rights?
14   A.   I don't recall.
15   Q.   Did she ask you if she was
16 eligible for rehire?
17   A.   She did not.
18   Q.   Did you discuss that, that she
19 was eligible for rehire?
20   A.   Not that I recall.
21   Q.   Did you discuss that her
22 position was eliminated?
23   A.   Yes.

Page 115

1    Q.   The time that you met with
2 her, what did you understand she had
3 been doing for Ariton Clinic?
4    A.   What --
5    Q.   What was she doing for Ariton
6 before she was eliminated?
7    A.   She was working in the back
8 and supposedly the front.  She was
9 basically all over the office.
10   Q.   You understood she was doing
11 everything?
12   A.   Uh-huh.
13   Q.   Is that yes?
14   A.   Yes.  Yes.
15   Q.   Did you understand in 31 years
16 she had done everything there at the
17 clinic?
18   A.   I did not.
19   Q.   What was your understanding of
20 what she had done in 31 years for the
21 Ariton Clinic?
22   A.   Well, number one, during 31
23 years it was a private -- during that

Page 116

1 time the majority of it was a private
2 practice.  I have no idea what she did
3 for Dr. Zumstein.  I know what her job
4 was for us.  It was to be the office
5 manager and her responsibility was
6 around charts and the billing.
7    Q.   Was charts and billing?
8    A.   Same thing.  The coding.
9    Q.   After she left, who did
10 coding?
11   A.   After she left we went with
12 United ProBill.
13   Q.   Had you gone with United
14 ProBill before she left?
15   A.   I beg your pardon?
16   Q.   Had you already gone with
17 United ProBill before she left?
18   A.   I don't recall the time line.
19 I don't know.
20   Q.   You would have to look at the
21 contract?
22   A.   I would have to look at the
23 contract and look at the date that she

Page 117

1 was terminated and see where they fall.
2    Q.   At the time she was
3 terminated, do you know personally that
4 you had already gone with United
5 ProBill?
6    A.   I just stated I would have to
7 look at the contract and her
8 termination date to tell you that.  I
9 don't know.
10   Q.   Do you know what else she was
11 doing other than charting and billing
12 as office manager of Ariton?
13   A.   As I stated earlier, she was
14 acting as a clinician in the back.  But
15 there was a clinician in the office.
16   Q.   Did that person have more or
17 less seniority than Ms. Hughes?
18   A.   Well, no one in that clinic
19 had 31 years.
20   Q.   So the answer to my question
21 is the person operating in the back
22 would have had less seniority?
23   A.   That is -- That would be

Page 118

1 correct if you consider the 31 years
2 that -- all that was employed with Dale
3 Medical Center. I don't know who the
4 other clinicians were in the office.
5 As I stated earlier, I would have to go
6 pull and see when we hired that
7 individual and at what point Ms. Hughes
8 went on the payroll with Dale Medical
9 Center. And that would be how I would
10 measure seniority. So to answer your
11 question, I do not know.
12    Q.   What other job duties other
13 than acting as clinician did she have
14 for the Ariton Clinic?
15    A.   I would say that as an office
16 manager per se she was responsible for
17 the ordering and the staffing of that
18 department.
19    Q.   Scheduling?
20    A.   That would fall in there, yes.
21    Q.   Who handled the ordering after
22 she was terminated?
23    A.   Whoever the office staff was.

Page 119

1    Q.   Do you know?
2    A.   Well, as it becomes the
3 department of the hospital,
4 requisitions are turned into our
5 purchasing department. That is where
6 our orders are filled, through the
7 hospital -- excuse me -- through the
8 hospital purchasing department.
9    Q.   All orders?
10    A.   Beg your pardon?
11    Q.   All orders?
12    A.   I would say the majority of it
13 unless they call directly to vendors.
14 There may be some that they call
15 directly to vendors. If it is an
16 in-stock item, we have a warehouse that
17 items come from. If they are special
18 order items, they could call directly
19 to the vendor.
20    Q.   Would the flu vaccine have
21 gone through the purchasing department?
22    A.   No. That did not go through
23 the purchasing department.

Page 120

1    Q.   Who handled scheduling and
2 staffing after she left?
3    A.   Are you talking about
4 scheduling of patients?
5    Q.   You told me scheduling and
6 staffing.
7    A.   That is what I am referring to
8 is scheduling of patients would be done
9 by the receptionist, whoever that was
10 at the time. And as far as the
11 staffing, there wasn't a whole lot to
12 scheduling that unless someone was on
13 vacation. If anyone was on vacation,
14 then usually Sheila would put someone
15 in there to cover is the way it is done
16 in other clinics that we have. But
17 when you have a physician office like
18 there at the medical clinic, they have
19 hours of operations that pretty much
20 that is when your staff is there.
21    Q.   When Dr. Quintana was
22 recruited after Dr. Ennis died, did you
23 hire additional staff for the Ariton

Page 121

1 Clinic?
2    A.   Yes, I did. And I don't know
3 that the word additional is
4 appropriate. I would have to go back
5 and look at the staffing for that
6 department. But with Dr. Quintana he
7 brought with him a nurse. And that was
8 in my agreement with him when I
9 recruited him is he wanted to bring his
10 nurse.
11    Q.   Anyone else you put at the
12 Ariton Clinic when Dr. Quintana --
13    A.   I don't recall. If you are
14 talking about did I increase the staff
15 from three to five or six, no, I did
16 not. I don't know if there was a
17 vacancy and we put people in there or
18 not. I don't know.
19    Q.   After Dr. Ennis passed away,
20 did you have other staff members who
21 left prior to the arrival of
22 Dr. Quintana?
23    A.   I don't know. I don't recall.

Page 122

1  I would have to research it.
2     Q.   When Dr. Quintana left, did
3  you have other staff members there at
4  the Ariton Clinic that you moved to
5  other Dale Medical Center facilities?
6     A.   Yes, I did.
7     Q.   Who did you move?
8     A.   In -- I just thought of it in
9  referring back to earlier questions,
10 there was a full-time lab technologist
11 in that clinic at the time Dr. Quintana
12 came.  Actually, I retract that.  I
13 didn't move the technologist until
14 after Dr. Magony took over the
15 practice.
16    Q.   Who did you move?  What is her
17 name?
18    A.   Sheryl Petrey is a MLT,
19 medical lab technologist.  When
20 Dr. Magony took the practice over, he
21 did not wish to maintain a full lab.  I
22 had a position at the hospital for a
23 medical lab technologist, which there

Page 123

1  is a great shortage of.  And I put her
2  in that position.  Sheryl Petrey has
3  been employed with us for many, many
4  years.
5     Q.   More than 31?
6     A.   She's right around there I
7  would imagine.  I don't know.  But she
8  is a long-term employee.
9     Q.   But her position was downsized
10 or eliminated at the Ariton Clinic?
11    A.   We sold the Ariton Clinic.  I
12 retained her as an employee at the
13 hospital.
14    Q.   So that position was
15 eliminated when you sold?
16    A.   The whole clinic was
17 eliminated as far as Dale Medical
18 Center was concerned.  When I sold it,
19 it was no longer ours.
20    Q.   Anyone else you moved from
21 Ariton when you sold the clinic other
22 than Ms. Petrey?
23    A.   Not that I recall.  I don't

Page 124

1  know if we had -- I wish I recalled who
2  the staff was and I could tell you if I
3  have still got them or not.  But I
4  don't recall who they were.
5     Q.   I think there was a Lisa
6  Williams or a Lisa Brooks.
7     A.   I don't know if Ms. Brooks is
8  with us still or not.  To my
9  recollection, no, I did not move
10 anybody else.
11    Q.   Other than Ms. Petrey?
12    A.   I moved her after the
13 ownership of the clinic changed.  It is
14 really just I maintained her
15 employment.
16    Q.   Did that vacancy already exist
17 for Ms. Petrey in the Dale Medical
18 Center or did you create that for her?
19    A.   It existed.
20    Q.   Do you use any outside
21 employment agencies to staff the Dale
22 Medical Center or do you rely on your
23 intranet?

Page 125

1     A.   I don't understand where you
2  are going.  What is the --
3     Q.   How do you recruit employees
4  for Dale Medical Center?
5     A.   We advertise.
6     Q.   Where?
7     A.   We have a positions vacancy
8  that is outside our personnel
9  department.  We do do some help wanted
10 ads in the Dothan Eagle, the Montgomery
11 Advertiser, and area newspapers when we
12 are after hard to recruit positions
13 like licensed physicians and nursing.
14 For the unlicensed positions, pretty
15 much people come by that are looking
16 and are calling to inquire.
17    Q.   Do you have applications there
18 in the lobby or inside the door?
19    A.   I don't recall seeing them.
20 That is possible.  I know there are
21 applications out beside the personnel
22 door.
23    Q.   That is where you have the

Page 126

1 postings?
2    A.   Yes.  We also post it I think
3 in the bulletin board up on first floor
4 across from the time clocks as well.
5    Q.   Do you retain those postings?
6    A.   I don't know if they do or
7 not.
8    Q.   Do you have an Affirmative
9 Action program or policy?
10   A.   By Affirmative Action I guess
11 you are referring to whether or not we
12 hire -- we don't discriminate due to
13 age, sex, and race?  Is that what you
14 are referring to?
15   Q.   Well, we can go with that.  Do
16 you have a policy that you are hiring
17 minorities and you are trying to keep
18 up with that?
19   A.   No.  No.
20   Q.   Do you know what an EEO-1 is?
21   A.   I can't say that I do.
22   Q.   Who is over personnel?
23   A.   Sheila Dunn.

Page 127

1    Q.   Who is over human resources?
2    A.   Sheila Dunn.
3    Q.   What is her title?
4    A.   Assistant administrator of
5 human resources.
6    Q.   Same title you held?
7    A.   No.
8    Q.   Previously?
9    A.   No.
10   Q.   You never held assistant
11 administrator?
12   A.   Yes, I did.  I was assistant
13 administrator over clinical services.
14   Q.   Do you know of any policy at
15 Dale Medical Center to retain job
16 postings?
17   A.   I do not.
18   Q.   Do you keep up with applicant
19 flow?
20   A.   Do I keep up with applicant
21 flow?  No.
22   Q.   Do you know if Ms. Dunn does?
23   A.   I do not.

Page 128

1    Q.   Have you ever seen any reports
2 as to the makeup of your work force
3 there at Dale Medical Center?
4        MR. VREELAND:  Object to the
5 form.
6    Q.   How many employees are
7 minorities, how many are females?
8    A.   No I have not.
9    Q.   Have you ever received any
10 training on human resource policies?
11   A.   I have had classes at the
12 University of Alabama in Birmingham,
13 yes, when I was in graduate school as
14 well as undergraduate at Troy
15 University.
16   Q.   Do you know it is illegal to
17 discriminate on the basis of gender and
18 age?
19   A.   Yes, I do.
20   Q.   When did you first learn that?
21   A.   I have been knowing that for
22 many years, even prior to graduate and
23 undergraduate school.

Page 129

1    Q.   Been trained in the area of
2 sexual harassment?
3    A.   Yes, I have.
4    Q.   Anyone ever made complaints
5 about you?
6    A.   About me?
7    Q.   Yes.
8    A.   No.
9    Q.   Discriminating or harassing
10 them?
11   A.   No.
12   Q.   Ever made the comment at one
13 of these awards functions that all
14 these big boobs around here are making
15 me hot?
16   A.   That I said that?  Absolutely
17 not.
18   Q.   You would deny that?
19   A.   To my grave.
20   Q.   Who trained you on sexual
21 harassment?
22   A.   I have been to in-service
23 education, I have been in graduate and

Page 130

1 undergraduate school. I have been in
2 management and health care for 25 plus
3 years.
4    Q.   Have you ever trained on
5 sexual harassment, that you have
6 trained people?
7    A.   I am sure that I have in some
8 of my leadership development courses,
9 yes.
10    Q.   If someone made that statement
11 in front of you, what action would you
12 take?
13    A.   If someone made that statement
14 in front of me, it would be totally
15 unprofessional and unacceptable. And I
16 would take action.
17    Q.   Have you ever heard it?
18    A.   I have not.
19    Q.   Why did you take the card and
20 write something starting with B?
21    A.   Why?
22    Q.   Yes.
23    A.   Because I just found that

Page 131

1 comment very interesting.
2    Q.   Why?
3    A.   Because anyone that knows me
4 knows that I would not do that.
5    Q.   You don't recall that being
6 made in any awards function?
7    A.   In an awards function? I do
8 not. And by Vernon Johnson, definitely
9 not.
10    Q.   Was there a reason you looked
11 down to Ms. Dunn when I made that
12 comment?
13    A.   Yes, because that is something
14 that I would have never thought could
15 have ever been said about me.
16    Q.   Do you know why someone would
17 say that?
18    A.   I certainly do not. That
19 would be a total fabrication.
20    Q.   Did you ever make a comment
21 about all these women around here are
22 driving me crazy?
23    A.   Absolutely not.

Page 132

1    Q.   How about a comment about PMS
2 in the workplace?
3    A.   (Witness shakes head.)
4    Q.   You are shaking your head
5 negative?
6    A.   Negative. Absolutely.
7    Q.   Do you know as you sit here
8 today any date that you can recall when
9 Ms. Hughes came to see you in your
10 office, without us going through
11 Ms. Sexton to ascertain that date?
12    A.   No, I do not.
13    Q.   You ever had any complaints
14 about Pat Ennis at the Ariton Clinic?
15    A.   The only complaint I had about
16 Pat Ennis from Ariton Clinic would have
17 been from Debbie Hughes.
18    Q.   When did Ms. Hughes complain
19 about Pat Ennis?
20    A.   At the day she came to my
21 office to appeal her termination.
22    Q.   What did she tell you?
23    A.   That Mrs. Ennis had cursed

Page 133

1 her.
2    Q.   Did she tell you what
3 Mrs. Ennis had said?
4    A.   She did, but I cannot remember
5 the words. I would be paraphrasing and
6 guessing. But it was inappropriate if
7 she said it.
8    Q.   It would be inappropriate for
9 Ms. Hughes or inappropriate for
10 Mrs. Ennis?
11    A.   If what Mrs. Ennis said to
12 Debbie Hughes as relayed to me by her,
13 that would have been inappropriate.
14    Q.   Did Ms. Hughes tell you the
15 words that Mrs. Ennis had used?
16    A.   Yes. I believe she did, but I
17 don't recall what they are.
18    Q.   Did Ms. Hughes have any other
19 complaints about Mrs. Ennis other than
20 being cursed?
21    A.   Not that I recall.
22    Q.   Did Ms. Hughes tell you that
23 Mrs. Ennis had referred to her and

Page 134

1 another worker as fucking morons?
2     A.   I don't know if that's the
3 words that she used, but I can tell you
4 that I do recall her using the F word
5 in her relaying the message to me.  But
6 I don't remember the context in which
7 it was used.
8     Q.   Okay.  Did you do anything
9 after she told you that?
10     A.   No, I did not.
11     Q.   Why not?
12     A.   A couple of reasons.  I'm
13 learning of this after the decision had
14 been made to terminate her.  Had I had
15 been approached prior to termination, I
16 would have absolutely dealt with it.
17 Secondly, Mrs. Ennis and Dr. Ennis was
18 on his death bed.  And I did not see at
19 this point where it would serve any
20 constructive to approach a dying man
21 and his wife over a complaint that I
22 received post-termination of an unhappy
23 employee.  These were some very unusual

Page 135

1 circumstances.
2     Q.   Did you talk to Ms. Petrey?
3     A.   About?
4     Q.   The comment.
5     A.   No, I did not.
6     Q.   Did Ms. Hughes relay to you
7 that Ms. Petrey was present when the
8 comment was made?
9     A.   I don't recall.
10     Q.   Did Ms. Hughes convey to you
11 that she had been hit by Mrs. Ennis?
12     A.   I don't recall her telling me
13 that.  I became aware of that after we
14 were served our original papers about
15 this pending litigation.
16     Q.   Did you talk to Mrs. Ennis
17 about it then?
18     A.   I did not.  And I don't know
19 the time line.  I may not have even
20 been in town at that time.
21     Q.   Was Mrs. Ennis working at the
22 Ariton Clinic?
23     A.   No.

Page 136

1     Q.   What did you understand her
2 presence at the Ariton Clinic was the
3 result of?
4     A.   She had a husband that was
5 dying of pancreatic cancer of which she
6 was driving to the office and looking
7 after him.
8     Q.   Was he able to work?
9     A.   Dr. Ennis was able to come in
10 in between his chemo treatments.  He
11 would work a week or two when his
12 health allowed him to.  But there were
13 times where -- It was sporadic and got
14 more so toward the end.
15     Q.   Did you understand Mrs. Ennis
16 was in the office on a day-to-day basis
17 for hours at a time?
18     A.   I knew that Mrs. Ennis was
19 there.  I had no idea how long she was
20 there.  I know she was there, number
21 one, because she was concerned for her
22 husband.
23     Q.   The times that you told me --

Page 137

1 we are not holding you to this, but
2 about the half dozen times, more or
3 less, was she there then when you were
4 there?
5     A.   There were a few times that
6 she was, yes.
7     Q.   Did she have an office?
8     A.   No, she did not.
9     Q.   What was she doing when you
10 were there?
11     A.   She stood in the hallway and
12 talked to me.
13     Q.   Do anything else?
14     A.   Not in my presence.
15     Q.   Did you understand she was
16 talking to patients?
17     A.   No.
18     Q.   Did you ever hear that from
19 anyone?
20     A.   Do you mean talking to
21 patients as in how are you doing today
22 type thing?  I am sure she did.  She
23 was a very outgoing person.  If you are

Page 138

1 talking to patients as far as acting as
2 a clinician or bedside, I am not aware
3 of that.
4    Q.   Were you ever privy to any
5 complaints from any patient about
6 Mrs. Ennis?
7    A.   I was not.
8    Q.   Did Mrs. Ennis ever complain
9 to you about Ms. Hughes?
10    A.   Not that I recall.
11    Q.   Did Ms. Hughes tell you that
12 Mrs. Ennis was requiring her to send
13 medical excuses from her doctor in
14 Birmingham?
15    A.   I don't recall.
16    Q.   Did you understand that
17 Mrs. Ennis was managing employees at
18 the Ariton Clinic?
19    A.   Not to my knowledge.
20    Q.   Did you discuss with
21 Ms. Hughes her taking a leave from work
22 on or about April 11th to April 18th,
23 2005?

Page 139

1    A.   Ask me -- What did you just
2 ask?
3    Q.   Did you and Ms. Hughes discuss
4 her, Ms. Hughes, taking a leave from
5 work on or about April 11th through
6 April 18th, 2005?
7    A.   Based on what you just asked
8 me and the dates, I don't recall.  Is
9 there a reason for the leave?
10    Q.   I'm asking if you --
11    A.   I don't recall.
12    Q.   When Ms. Hughes was in your
13 office appealing her termination, did
14 the two of you discuss her being out of
15 work?
16    A.   Not that I recall.
17    Q.   Did you have any conversations
18 with Ms. Dunn about Ms. Hughes being on
19 medical leave?
20    A.   Not that I recall.
21    Q.   How did you learn she was
22 having brain surgery?
23    A.   I am sure from the concern of

Page 140

1 Dr. Ennis and that staff.  Again, we
2 are in a small community.  If something
3 is wrong with us, we pretty much share.
4    Q.   So you just heard word of
5 mouth?  No one told you?
6    A.   Yes.  Absolutely.
7    Q.   When Ms. Hughes told you about
8 Mrs. Ennis, did you make a comment
9 about her suing you for harassment of a
10 nonemployee?
11    A.   Absolutely not.
12    Q.   Did you say anything to her
13 when she told you about Mrs. Ennis
14 making remarks to her?
15    A.   If I said anything to her, it
16 would have been I may have questioned
17 why haven't you come to me prior to
18 this point would be the extent of my
19 comment I would have made to her.
20    Q.   Do you think you made that
21 comment?
22    A.   I am pretty sure I did.
23    Q.   Okay.  Why was that important

Page 141

1 to you?
2    A.   Because it is important to me
3 that if I have staff that's being
4 abused or something is going on that's
5 not supposed to go on, I want to know.
6 I don't want you to come in the day
7 after you have lost your job and spill
8 a whole basket full of problems that
9 you haven't shared with me prior to
10 that I can take corrective action.
11    Q.   How long did you know that
12 Dr. Ennis was dying?
13    A.   Dr. Ennis came and shared with
14 me -- I don't remember the date -- that
15 he had pancreatic cancer.  But his
16 prognosis was six months.  Dr. Ennis
17 far exceeded his life expectancy.  He
18 was a fighter.  I don't have the dates.
19 Dr. Ennis was very open with me from
20 the very beginning once he was
21 diagnosed with pancreatic cancer.
22    Q.   Did you have any complaints
23 from any employee or patient about

Page 142

1  Dr. Ennis in the year preceding his
2  death?
3      A.  I did not.  That community
4  loved Dr. Ennis and was heartbroken.
5      Q.   Any employee ever convey to
6  you they had problems because he was
7  moody?
8      A.  Never.  No.
9      Q.  Wasn't moody to you?
10     A.  I never witnessed that.
11  Dr. Ennis was a very levelheaded
12  compassionate physician.  He was a fit
13  for a rural clinic.
14     Q.   Did he recommend to you that
15  he wanted to terminate Ms. Hughes?
16     A.  Yes.
17     Q.  While she's off work for a
18  brain tumor?
19     A.  No.
20     Q.  After she came back?
21     A.  After -- Yes.
22     Q.  Did you convey to him that she
23  had been there for some 31 years?

Page 143

1      A.   He had knowledge of her being
2  there.
3      Q.   Did he have knowledge that she
4  was the principal breadwinner and
5  insurance provider for her family?
6      A.  I have no idea.
7          MR. VREELAND:  Object to the
8  form.
9      A.  I have no idea.
10     Q.  Did you know that?
11     A.  That wasn't a -- Her job was
12  terminated because we deleted the
13  position, because we were unsatisfied
14  with her work performance.  That is the
15  only thing I considered.
16     Q.   Well, was her job deleted or
17  were you terminating her because of
18  unsatisfactory work performance?
19     A.  Our dissatisfaction with her
20  work performance led to us outsourcing
21  the billing which led to the
22  termination of her position.
23     Q.   If her position was

Page 144

1  eliminated, why did you not find her
2  another place?
3      A.  I was dissatisfied with her
4  work performance.
5      Q.  Did you ever convey that to
6  her before you terminated her?  I'm
7  asking you.
8      A.  Did I?  No.
9      Q.  You never conveyed it until
10  she appealed her termination; is that
11  correct?
12     A.  It is highly unusual for me to
13  get involved with employee affairs at
14  that level.  I am not involved in every
15  employee disciplinary action that takes
16  place among the 400 plus employees of
17  Dale Medical Center.
18     Q.  Can you answer my question?
19     A.  What was your question?
20     Q.  Did you ever convey to
21  Ms. Hughes that you were unhappy with
22  her job performance until she appealed
23  her termination?

Page 145

1      A.  Personally, no.
2      Q.  Do you know of anyone that
3  ever conveyed to her they were unhappy
4  with her job performance until she
5  appealed her termination?
6      A.  Those discussions were held by
7  Dr. Ennis and I am sure Ms. Dunn.
8      Q.  How do you know that?
9      A.  Because they have communicated
10  with me.
11     Q.  You have never reviewed her
12  personnel file, Ms. Hughes'?
13     A.  Not that I recall.
14     Q.  You testified earlier that
15  when Ms. Hughes came to see you, she
16  was insistent that she be told she was
17  terminated.  Is that correct?
18     A.  Uh-huh.
19     Q.  You are shaking your head?
20     A.  Yes.  That is correct.
21     Q.  Did you tell her she had been
22  terminated?
23     A.  I told her her position had

Page 146

1 been deleted. We got into a discussion
2 the reasons why. I never used the word
3 fired, but I did tell her she was
4 terminated because her position was
5 deleted.
6     Q.   Did you ever tell her she was
7 fired because you were dissatisfied
8 with her job performance?
9     A.   I don't recall the words that
10 were used. But in our discussion, as I
11 stated earlier, we discussed the flu,
12 we discussed the billing issues, and
13 the reason for our decision to
14 outsource that led to the termination
15 of the position was because we were not
16 satisfied with her performance in those
17 areas.
18     Q.   As insistent as she was that
19 she wanted to know if she had been
20 fired, were you also as insistent that
21 her position had been eliminated?
22     A.   For the reasons I stated, yes.
23     Q.   And you never used the word

Page 147

1 terminated to her?
2     A.   Terminated, yes. She was
3 terminated because her position was
4 deleted.
5     Q.   Okay. And you never provided
6 any other reason that her position was
7 deleted?
8     A.   The reasons that I have
9 outlined, the billing issues, the flu
10 vaccine, and the other issues in the
11 office that were going awry. Dr. Ennis
12 did not think she was on task.
13     Q.   Did you contribute any of that
14 to the fact that she had had a brain
15 tumor?
16     A.   No. When she returned to work
17 we had no doubt in our minds that she
18 was going to be fully capable of
19 carrying out her job duties. And I
20 believe she had that ability to carry
21 out her job duties. This had
22 absolutely nothing to do with her
23 illness but it had to do with her

Page 148

1 performance that led to outsourcing and
2 we could not keep her in the office if
3 we were outsourcing her duties.
4     Q.   The errors you contribute to
5 her, the overage of the flu vaccine and
6 the writing off of the patient
7 accounts, occurred prior to her
8 surgery; correct?
9     A.   Honestly, I don't have a grasp
10 of these time lines. I would assume
11 that they were. I think it goes back
12 to 2004. I don't recall when her brain
13 surgery was.
14     Q.   January 2005. January 3.
15     A.   January what?
16     Q.   January 3.
17     A.   3rd of 2005. Okay.
18     Q.   Did anyone ever make the
19 deduction for you, gee, that's why
20 she's made these mistakes, she had a
21 brain tumor?
22     A.   No.
23     Q.   You never made that deduction?

Page 149

1     A.   No.
2     Q.   Did you ever have the
3 knowledge that she had stepped down
4 from her position as office manager
5 back in November 2004?
6     A.   No.
7     Q.   Is that the first time you are
8 hearing it, today me telling you?
9     A.   Yes.
10     Q.   Did Dr. Ennis ever convey to
11 you that he had a hard time operating
12 his office without Ms. Hughes?
13     A.   Never.
14     Q.   Do you know who took over
15 Ms. Hughes' responsibilities when she
16 was out for surgery?
17     A.   I do not.
18     Q.   Do you know if it was Pat
19 Ennis?
20     A.   I do not. And I would have to
21 go back and pull the records, but we
22 may have put her on part-time
23 employment, but I don't recall. I

Page 150

1  don't recall.
2     Q.   If you did that, you would
3  have a personnel file on Pat Ennis,
4  would you not?
5     A.   If she was on our payroll,
6  yes, we would.
7     Q.   Do you know of any paycheck
8  that Pat Ennis ever received?
9     A.   No.
10    Q.   Do you recall any
11 conversations with Dr. Ennis where he
12 asked that she be put on payroll?
13    A.   I don't recall.
14    Q.   You told me about the two
15 newspapers you use to advertise for or
16 recruit employees.  Are there any
17 others other than those two newspapers?
18    A.   Depending on --
19    Q.   Montgomery and Dothan?
20    A.   Those are the primary markets
21 we advertise in.
22    Q.   How about the Ozark?  Is there
23 a newspaper there?

Page 151

1     A.   The Southern Star.  But we
2  don't advertise employment in that one
3  to my knowledge.
4     Q.   You do not use any agency?
5     A.   For?
6     Q.   Midlevel management employees?
7     A.   I have not since I have been
8  in the office.
9     Q.   Is there an intranet --
10 intranet web site for outside
11 individuals to access if there is
12 openings?
13    A.   We do have a page on our web
14 site that does list employment
15 opportunities.  It is updated from time
16 to time.  Mostly what is posted on
17 there are the licensed positions that
18 are difficult to fill.
19    Q.   Is there a different site for
20 internal applicants?
21    A.   No.
22    Q.   Did you ever approach any of
23 Ms. Hughes' physicians to ask what her

Page 152

1  health condition was?
2     A.   I did not.
3     Q.   Do you know of that occurring?
4     A.   Not to my knowledge.
5     Q.   Have you told me about each
6  and every complaint you had or anyone
7  else that had told you relative to the
8  job performance of Ms. Hughes?
9     A.   I have told you the ones that
10 I recall.
11    Q.   Do you know of others?
12    A.   I don't recall any others.
13    Q.   Do you know of any other
14 employee at Dale Medical Center in the
15 last five years whose position has been
16 eliminated?
17    A.   No.  I have been very
18 fortunate not to have to do that.
19    Q.   Is Ms. Hughes the only person
20 in the last five years whose position
21 has been eliminated at Dale Medical
22 Center?
23    A.   To the best of my

Page 153

1  recollection, yes.
2     Q.   With regards to these other
3  facilities that you told me Dale
4  Medical Center once operated and now
5  does not, have you moved any of those
6  employees to other positions within the
7  hospital?  For instance, Dr. Luna's
8  office, the neurology office,
9  Dr. Cromer-Tyler's office, and
10 Dr. Bowers' office.
11    A.   I believe Dr. Luna Sy retained
12 her staff and she employed them.  I
13 don't believe I moved anybody from her
14 office into the hospital.  Dr. Brad
15 Bower left town.  His office was
16 closed.  We have just recently
17 recruited a replacement.  That staff
18 did not stay with the hospital.  They
19 got jobs elsewhere.  Who were the
20 others?
21    Q.   Dr. Cromer-Tyler?
22    A.   Dr. Cromer-Tyler, I assumed
23 her practice from her.  I maintained

Page 154

1  her staff and still have her staff.
2      Q.   Where did you put them?
3      A.   We recruited a new surgeon.
4  They are in the same office with a new
5  surgeon.
6      Q.   Who is that?
7      A.   Dr. Peurifoy.  He is an
8  independent practitioner.  So he has
9  retained those employees.
10     Q.   The new office that you are
11  replacing with Dr. Brad Bower -- after
12  Dr. Brad Bower left.  That was a bad
13  question.  Who is going to take over
14  that office?
15     A.   It took us two years.  But we
16  got a Dr. Juan Fernandez.  But he is
17  not employed by the hospital.  He is an
18  independent practitioner.
19     Q.   Is the hospital going to staff
20  his office?
21     A.   No.
22     Q.   The neurology office that
23  left, what did you do with those

Page 155

1  employees?
2      A.   He assumed their employment.
3      Q.   The Ariton office you told me
4  Ms. Petrey was moved?
5      A.   Ms. Petrey was the only one
6  that we moved to my recollection
7  because there was a vacancy for her
8  specialty as a licensed medical lab
9  technologist.  We were able to put her
10  in the hospital.  The rest of that
11  staff that was there, unless I am
12  mistaken, were taken over by
13  Dr. Magony's business.
14         (Plaintiff's Exhibit 3 was
15          marked for identification.
16          A copy is attached.)
17     Q.   Plaintiff's Exhibit 3, have
18  you seen this document?
19     A.   (Witness looks at document.)
20     Q.   Have you seen that is my
21  question.
22     A.   I have not.
23     Q.   Do you have any of the

Page 156

1  documents referenced in Plaintiff's
2  Exhibit 3, 1 through 11?
3         MR. VREELAND:  For the record,
4  we did serve objections to the document
5  request.  You can answer.
6      A.   Are you asking me if I have
7  them with me today?
8      Q.   Do you have them at your
9  office?  At the hospital?  With you
10  today would be wonderful.
11     A.   I do not have them with me
12  today.
13     Q.   What do you have that is not
14  with you today?  You can refer to
15  numbers.
16     A.   I brought nothing with me
17  today.
18     Q.   And were not asked, I assume,
19  to bring anything with you.
20     A.   (Witness shakes head.)
21     Q.   Okay.  What do you have?
22     A.   Do I need to go line by line
23  with you?  Is that what we are doing?

Page 157

1      Q.   Yes, sir.
2      A.   In reference to No. 1, there
3  was no individual that replaced Deborah
4  Hughes.  We, of course, have employment
5  policies.  I would say in her personnel
6  file would be evaluations and documents
7  on her termination.  No. 2, there is a
8  personnel file on Deborah Hughes in our
9  personnel department, and there would be
10  for Ms. Dunn.  As for No. 3, there are
11  no notes from my office on my
12  conversations regarding Ms. Hughes.
13     Q.   Do you have any knowledge of
14  raises or benefits that she was
15  receiving?
16     A.   I do not.  I retract that.
17  All those go across my desk for my
18  signature.  But do I recall hers
19  specifically?  No, I do not.
20     Q.   No. 4?
21     A.   I do not use electronic mail
22  for conversations about employees or
23  anything.  There would be none of

Page 158

1  those.  No diaries.  It would be highly
2  unlikely that there would be anything
3  dictated on my calendar that would
4  outline meetings with Ms. Dunn or
5  Dr. Ennis concerning these topics.
6  Could possibly be a date that she made
7  an appointment to see me through my
8  secretary.  That might possibly be
9  there.  If that was a manual system, I
10  don't know if she has that or not.  As
11  far as a current resume' on myself,
12  that is available.
13      Q.    When is the last time your
14  resume' was updated?
15      A.    When I got this job.
16      Q.    Four years ago?
17      A.    Uh-huh.
18      Q.    Is that a yes?
19      A.    Yes, ma'am, it is.
20      Q.    We have talked about No. 6 is
21  available.
22      A.    No. 6 should be available.  A
23  list of employees for the last five

Page 159

1  years, I am assuming that is in the
2  archives.  As far as a list of
3  individuals that I've hired, that would
4  take some research.  If you are talking
5  about individuals that the hospital has
6  hired, I don't know if you are wanting
7  me individually who I have personally
8  hired or if you are wanting the whole
9  hospital.
10      Q.    It was --
11      A.    Ultimately I sign off on every
12  employee that's hired.
13      Q.    It was specific to you.
14      A.    Okay.
15      Q.    Your decisions.  Do you have a
16  list?
17      A.    I do not.  Most of what I hire
18  is the physicians and senior
19  management.  I have had no turnover in
20  my senior management in the last four
21  and a half years.  I do hire some
22  midlevel managers of departments that
23  report directly to me.  Most of those

Page 160

1  are promoted within the facility.
2          MR. VREELAND:  The only
3  question is whether you have a list.
4      A.    I do not have a list.  I'm
5  sorry.
6      Q.    No. 8, do you know of any
7  other policies --
8      A.    We do have a harassment and
9  discrimination policy, yes.
10      Q.    Separate and apart from
11  Plaintiff's Exhibit 2?
12      A.    Yes.
13          (Plaintiff's Exhibit 4 was
14          marked for identification.
15          A copy is attached.)
16      Q.    While we are on that subject,
17  do you know what Plaintiff's Exhibit 4
18  is?
19      A.    Yes, I do.
20      Q.    What is it?
21      A.    It is where we converted our
22  vacation and holiday time to straight
23  PTO time.  We changed our sick leave

Page 161

1  benefits as well and converted it to an
2  extended illness benefit.
3      Q.    Why was the change made?
4      A.    There was several reasons
5  there was a change.  Reason number one
6  is we have to remain competitive with
7  every hospital in this area.  And every
8  hospital in this area had converted to
9  such a pay system.
10          Number two, in our old system
11  where we had vacation and I think there
12  was probably eight holidays, we
13  converted all those to PTO so people
14  could take the time off when they
15  wanted it and they weren't mandated
16  they had to take a Christmas day
17  holiday two weeks prior to or four
18  weeks after the holiday because we have
19  some people within our organization
20  that aren't of the Christian belief.
21  We also had people that wanted to take
22  a Good Friday off or they wanted to
23  take Martin Luther Day off or some

Page 162

1 other that was not a recognized
2 holiday. This gives our employees the
3 flexibility to take their paid time off
4 when they want it.
5        Second reason was and both
6 financial reason as well as to curb the
7 abuse of sick time where our goal is to
8 build up and accumulate sick time to
9 where they have a short-term disability
10 program. And every hospital that we
11 compete with for salaries and benefits
12 did not pay people for the first day
13 they called in sick. You had to be out
14 one or two days. We did that to deter
15 people calling in for very minor
16 illnesses. Our policy is very much in
17 line with every hospital that we
18 personally compete with for employees.
19   Q.   Any other policies or
20 procedures regarding discrimination,
21 retaliation other than the harassment?
22   A.   Not that I --
23   Q.   -- policy you told me about?

Page 163

1   A.   Not that I'm aware of.
2   Q.   Okay. No. 9. Do you know of
3 any training materials?
4   A.   I don't know of any.
5   Q.   Do you know of any training
6 that takes place on discrimination,
7 retaliation, and harassment at Dale
8 Medical Center?
9   A.   We have done it, yes. I don't
10 know when the time was.
11   Q.   It has been done in the last
12 five years?
13   A.   I don't know.
14   Q.   Have any recollection of that
15 being done in the last five years?
16   A.   I have recollection of sitting
17 in training seminars. I don't have
18 recollection of the time they were held
19 in which we had -- Our labor attorneys
20 came in and did some training for us.
21 But I don't remember when it was.
22   Q.   Do you know who did the
23 training? The individual or the law

Page 164

1 firm?
2   A.   I can certainly see him. He
3 is white-headed, curly-headed guy, but
4 I can't remember his name.
5   Q.   Richard Lehr?
6   A.   Yes.
7   Q.   Any other training you have
8 had?
9   A.   Not that I recall right now.
10   Q.   Items 10 and 11?
11   A.   There are none to my
12 knowledge.
13   Q.   Do you know when you received
14 the charge of discrimination from the
15 EEOC relative to Ms. Hughes?
16   A.   I do not remember the date,
17 no.
18   Q.   Did you get a copy of it?
19   A.   I did read a copy of it.
20   Q.   Did it come directly to you or
21 did someone else at Dale provide it to
22 you?
23   A.   I don't recall if it was

Page 165

1 delivered straight to my office or if
2 it went through the personnel
3 department. Most of those things
4 usually come straight to me. Then I
5 distribute them.
6   Q.   Do you know of any
7 investigation you asked to be conducted
8 into any of the complaints of
9 Ms. Hughes she raised in her EEOC
10 charge?
11   A.   I turned that over to the
12 personnel department.
13   Q.   Did you provide any written
14 statement or affidavit to anyone
15 relative to Ms. Hughes' complaints to
16 the EEOC?
17   A.   No, I did not.
18   Q.   Did you have any conversations
19 with any EEOC investigator?
20   A.   No, I did not.
21   Q.   Have you ever had another
22 charge of discrimination that mentioned
23 your name other than Ms. Hughes'?

Page 166

1    A.   Not that I recall.
2    Q.   Ever participated or sat
3  through any other depositions on an
4  EEOC matter?
5    A.   I have not.
6    Q.   Is this your first one?
7    A.   This is my first.
8    Q.   How about that.  What
9  documents did you review to prepare for
10 this deposition?
11   A.   None.
12   Q.   Did you review any notes or
13 summaries or anyone read any notes or
14 summaries to you?
15   A.   No, they did not.  No, I did
16 not.
17   Q.   Did you have any conversations
18 with Ms. Dunn wherein she told you what
19 Ms. Hughes testified to yesterday?
20   A.   I did not.
21   Q.   Going back to your meeting
22 with Ms. Hughes, did she convey to you
23 during that meeting that what had been

Page 167

1  told to the unemployment office was not
2  true, that she had taken back her
3  office manager job?
4    A.   Ask me that again.
5    Q.   Did she convey to you during
6  your meeting on the appeal process with
7  Ms. Hughes that what had been told to
8  the unemployment office by Dale Medical
9  Center that she was not an office
10 manager at Ariton was not true?
11   A.   I don't even know that I
12 recall that she even mentioned the
13 Equal Opportunity Employment Office.
14   Q.   I didn't say the EEOC.
15 Unemployment office is what I
16 mentioned.
17   A.   I don't have any recollection
18 of that.
19   Q.   Do you recall her giving you
20 examples of her different duties that
21 she was performing in the office as
22 office manager?
23   A.   I don't have any recollection

Page 168

1  of that.
2    Q.   Did she tell you that she had
3  never said she would not collect old
4  accounts because they were her friends?
5    A.   She did not.
6    Q.   Did you ever make the comment,
7  well, that is what Dr. Ennis said and
8  it would be his word against hers?
9    A.   I certainly did not.
10   Q.   Did you tell her that no one
11 else was going to be hired in her
12 place?
13   A.   That is very possible.
14   Q.   That her job had been
15 eliminated and no one was hired in her
16 place?
17   A.   That is right.
18   Q.   Did she tell you during that
19 conversation that no one had told her
20 that, that she was terminated for not
21 calling in?
22   A.   I don't recall that.
23   Q.   You don't recall that being

Page 169

1  mentioned?
2    A.   No, I do not.
3    Q.   Do you recall her telling you
4  that it was humiliating that she had to
5  go to the unemployment office?
6    A.   I don't recall that.
7    Q.   Do you recall discussing with
8  her that she had left and not told
9  Dr. Ennis she was leaving?
10   A.   I don't recall.
11   Q.   Have no recollection of that?
12   A.   I do not.
13   Q.   You have no recollection of
14 you and Ms. Hughes discussing what
15 Dr. Ennis's hours were at work
16 currently?
17   A.   I do not.
18   Q.   Did you ask her if you gave
19 her job back would she take it?
20   A.   I did not.
21   Q.   Did she tell you anything
22 about having to walk on egg shells
23 around Dr. Ennis?

Page 170

1   A.   Not that I recall.
2   Q.   Do you recall Ms. Hughes
3 asking you that since she had 31 years,
4 why couldn't she be placed in another
5 position?
6   A.   I do not recall that.
7   Q.   Do you recall telling her she
8 did not qualify for another job?
9   A.   I do not.
10   Q.   Is it possible, you just don't
11 recall it today?
12   A.   I don't believe that
13 conversation took place.
14   Q.   Do you recall her discussing
15 that she could do Lisa's job in the
16 office?
17   A.   I did not.
18   Q.   Do you recall Lisa's name
19 being mentioned?
20   A.   I do not.
21   Q.   Do you recall telling her that
22 you would not fire another person and
23 put her in it just based on seniority?

Page 171

1   A.   I do not.
2   Q.   How long did the meeting last
3 between you and Ms. Hughes?
4   A.   It wasn't long, but I don't
5 have the minutes.
6   Q.   Pardon?
7   A.   I don't know how many minutes
8 it was, but it was not a long meeting.
9   Q.   What is the appeals process?
10 Just talking to you?
11   A.   (Witness nods head.)
12      MR. VREELAND:   You need to
13 answer out loud.
14   A.   I'm sorry.   Yes.   They can
15 appeal it to me.   If they don't have a
16 satisfaction there, the board will
17 review the file.   But historically the
18 board has not gotten involved with
19 those decisions.
20   Q.   Did you tell her she had that
21 option, to go to the board?
22   A.   No.   I did not.
23   Q.   Do you know where it is

Page 172

1 printed?
2   A.   It is not.
3   Q.   How does an employee know they
4 have the option of going to the board?
5   A.   The employees have in the past
6 asked to meet with the board.   The
7 board historically will not get
8 involved in those decisions and prefer
9 it to stop with my office.
10   Q.   So you are it?
11   A.   I'm it.
12   (Recess was taken, commencing at
13 11:43 a.m., concluding at 11:50 a.m.)
14   Q.   (MS. HAYNES) Just a couple
15 more.   Do you know an employee named
16 Lisa Brooks that was employed at the
17 Ariton Clinic?
18   A.   I recall the name, but I can't
19 place the face right now.
20   Q.   Do you recall her being moved
21 to the indigent program to work?
22   A.   The indigent program?
23   Q.   Indigent clinic?

Page 173

1   A.   I don't have an indigent
2 clinic.
3   Q.   Do you recall her being moved,
4 Ms. Brooks?
5   A.   To an indigent clinic, no,
6 because I don't have one.
7   Q.   Do you recall her being moved?
8   A.   I don't recall her being
9 moved.   I recognize the name.
10   Q.   You do recognize the name?
11   A.   I have heard the name.
12   Q.   Do you know if she's still an
13 employee with you?
14   A.   I do not know.
15   Q.   Karen Williams, do you
16 recognize that name?
17   A.   No.
18   Q.   Do you have any recollection
19 of Ms. Williams being moved from the
20 Ariton Clinic to a ward clerk at the
21 hospital?
22   A.   I have no recollection of it.
23      MS. HAYNES:   Okay.   That's all

Page 174

1  I have.
2      MR. VREELAND:  I have no
3  questions.
4      MS. HAYNES:  I do want to
5  reserve the right to redepose him when
6  I get these documents that I requested.
7      MR. VREELAND:  I obviously am
8  not agreeing to that.  But I understand
9  you are reserving it for the record.
10      MS. HAYNES:  That's all I
11  have.
12          (The proceedings were
13          concluded at 11:55 a.m.)
14
15
16
17
18
19
20
21
22
23

Page 175

1      C E R T I F I C A T E
2  STATE OF ALABAMA   )
3  JEFFERSON COUNTY   )
4      I hereby certify that the above
5  and foregoing proceeding was taken down
6  by me by stenographic means, and that
7  the questions and answers therein were
8  produced in transcript form by computer
9  aide under my supervision, and that the
10  foregoing represents, to the best of my
11  ability, a true and correct transcript
12  of the proceedings occurring on said
13  date at said time.
14      I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action; nor am I in
17  anywise interested in the result of
18  said cause.
19
20
21      AMY WALLS LENOIR, CSR-530
22          COURT REPORTER
23