1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2            MIDDLE DISTRICT OF ALABAMA

 3               SOUTHERN DIVISION

 4

 5   DEBORAH HUGHES,

 6   Plaintiff,

 7   vs.

 8   DALE COUNTY MEDICAL CENTER,

 9   Defendant.

10

11   Case Number:  1:06-CV-00595-SRW

12

13

14       DEPOSITION:  SHEILA R. DUNN

15

16

17        S T I P U L A T I O N S

18

19          IT IS STIPULATED AND AGREED by

20   and between the parties through their

21   respective counsel that the deposition

22   of SHEILA R. DUNN  may be taken on May

23   3, 2007, before Amy Walls Lenoir,
```

Page 2

1 Commissioner and Notary Public, at the
2 Hampton Inn, 103 Troy Plaza Loop, Troy,
3 Alabama.
4
5     IT IS FURTHER STIPULATED AND
6 AGREED that it shall not be necessary
7 for any objections to be made by
8 counsel to any questions except as to
9 form or leading questions, and that
10 counsel for the parties may make
11 objections and assign grounds at the
12 time of trial or at the time said
13 deposition is offered in evidence or
14 prior thereto.
15
16
17
18
19
20
21
22
23

Page 4

1          I N D E X
2
3 Examination by Ms. Haynes............5
4 Plaintiff's Exhibit 5...............28
   Plaintiff's Exhibit 6...............30
5 Plaintiff's Exhibit 7...............52
   Plaintiff's Exhibit 8...............53
6 Plaintiff's Exhibit 9...............55
   Plaintiff's Exhibit 10.............110
7 Plaintiff's Exhibit 11.............74
   Plaintiff's Exhibit 12.............74
8 Plaintiff's Exhibit 13.............88
   Plaintiff's Exhibit 14.............88
9 Plaintiff's Exhibit 15.............89
   Plaintiff's Exhibit 16.............91
10 Plaintiff's Exhibit 17.............136
   Plaintiff's Exhibit 18.............150
11 Plaintiff's Exhibit 19.............157
   Plaintiff's Exhibit 20.............166
12 Plaintiff's Exhibit 21.............170
   Plaintiff's Exhibit 22.............191
13 Plaintiff's Exhibit 23.............193
   Plaintiff's Exhibit 24.............210
14 Plaintiff's Exhibit 25.............212
   Plaintiff's Exhibit 26.............213
15 Plaintiff's Exhibit 27.............214
   Plaintiff's Exhibit 28.............216
16 Plaintiff's Exhibit 29.............224
   Plaintiff's Exhibit 30.............224
17 Plaintiff's Exhibit 31.............251
18
19
20
21
22
23

Page 3

1          APPEARANCES
2
3 Appearing for the Plaintiff:
4
5     HAYNES & HAYNES, P.C.
6     Alicia K. Haynes
7     1600 Woodmere Drive
8     Birmingham, Alabama 35226
9
10 Appearing for the Defendant:
11
12     LEHR, MIDDLEBROOKS
13       & VREELAND, P.C.
14     Albert Vreeland
15     P.O. Box 11945
16     Birmingham, Alabama 35202-1945
17
18 Court Reporter:  Amy Walls Lenoir
19 Also Present:  Vernon Johnson,
20          Deborah Hughes
21
22
23

Page 5

1     I, Amy Walls Lenoir, a Court
2 Reporter of the State of Alabama,
3 acting as Commissioner, certify that on
4 this date there came before me at the
5 Hampton Inn, Troy, Alabama, on May 3,
6 2007, beginning at or about 1:05 p.m.,
7 SHEILA R. DUNN, witness in the above
8 cause, for oral examination, whereupon,
9 the following proceedings were had:
10
11
12     SHEILA R. DUNN,
13
14 being first duly sworn, was examined
15     and testified as follows:
16
17 EXAMINATION BY MS. HAYNES:
18   Q.  Ms. Dunn, if you would, please
19 state your full name for the record,
20 please.
21   A.  Sheila Roney Dunn.
22   Q.  Is Roney your --
23   A.  Maiden name.

Page 6

1   Q.   What is your current position?
2   A.   Assistant administrator.
3   Q.   How long have you held that
4   title?
5   A.   Approximately eight years.
6   Q.   What was your previous
7   position?
8   A.   HR director.
9   Q.   Also for Dale County Medical
10   Center?
11   A.   Yes.
12   Q.   How long did you hold that
13   position as human resource director?
14   A.   Since December of 1984.
15   Q.   Is that when you first became
16   employed?
17   A.   Yes.
18   Q.   With Dale County?
19   A.   Uh-huh.  Yes.
20   Q.   How long did you hold the
21   position as HR director?
22   A.   Well, as that title, from '84
23   until about eight years ago.  But HR is

Page 7

1   still one of my responsibilities.
2   Q.   No one replaced you in that
3   job duty?
4   A.   No.
5   Q.   Any other job duties or titles
6   you currently perform other than human
7   resource director and assistant
8   administrator?
9   A.   Practice management is one of
10   my -- practice management -- I don't
11   have a title for that.  That is just
12   one of my responsibilities in
13   marketing.
14   Q.   Marketing being a separate
15   position from practice management?
16   A.   Yes.
17   Q.   How long have you been
18   responsible for marketing?
19   A.   Eight years.
20   Q.   Practice management, how long
21   have you been responsible for that
22   area?
23   A.   Approximately six years.

Page 8

1   Q.   Do you have department heads
2   that report to you?
3   A.   No.  Not department heads.
4   Q.   Who do you report to?
5   A.   Vernon Johnson.
6   Q.   Anyone else?
7   A.   No.
8   Q.   How long have you reported to
9   Mr. Johnson?
10   A.   Since he has been CEO.  About
11   four and a half years.
12   Q.   Prior to Mr. Johnson, who did
13   you report to?
14   A.   Bob Bigley.
15   Q.   Prior to Mr. Bigley, who did
16   you report to?
17   A.   Jim Armour.
18   Q.   Do you know how to spell that?
19   A.   A-r-m-o-u-r.
20   Q.   He was also CEO?
21   A.   Yes.
22   Q.   Anyone else prior to
23   Mr. Armour?

Page 9

1   A.   Everett Claypool.
2   Q.   Anyone prior to Mr. Claypool?
3   A.   Mike Norman.
4   Q.   Anyone prior to Mr. Norman?
5   A.   Bob Humphrey.
6   Q.   Anyone else?
7   A.   Ed Taylor.  That's it.
8   Q.   That's all the CEOs you have
9   reported to?
10   A.   How many is that?
11   Q.   Seven.
12   A.   That's it.
13   Q.   That has been in your 23 years
14   of employment with Dale County Medical
15   Center?
16   A.   Correct.
17   Q.   Did you work anywhere prior to
18   human resources?
19   A.   Southeast Alabama Medical
20   Center.
21   Q.   And how long were you at
22   Southeast Medical Center?
23   A.   Two years.

Page 10

1    Q.  I'm sorry.  That's Southeast
2  Alabama Medical Center; right?
3    A.  Right.
4    Q.  You were human resource
5  director?
6    A.  No.  I was human resource
7  supervisor.
8    Q.  Why did you leave there?
9    A.  Because of the opportunity at
10  Dale Medical and I lived in Ozark and
11  it would cut the travel.
12    Q.  Do you have a degree in human
13  resources?
14    A.  No.  It is in business.
15    Q.  Where is it from?
16    A.  University of Maryland.
17    Q.  Are you originally from
18  Maryland?
19    A.  No.  We were overseas and I
20  went to the extension center overseas.
21    Q.  What was your position again
22  with Southeast Alabama?  Not a manager,
23  but --

Page 11

1    A.  Supervisor.
2    Q.  Supervisor.
3    A.  Yes.
4    Q.  Do you still have contacts at
5  Southeast Alabama Medical Center?
6    A.  Yes.
7    Q.  What contacts do you have
8  there?
9    A.  You mean just people that I
10  remained in contact with?
11    Q.  Yes, ma'am.  Or know.
12    A.  I have contact with Addie
13  McKenzie.
14    Q.  Anyone else?
15    A.  The CEO.
16    Q.  Who is that?
17    A.  I just blanked.  Ron Owen.
18    Q.  Is he over the one here in
19  Troy?
20    A.  No.  He's over the Medical
21  Center in Dothan, Southeast.  And Donna
22  Peters.  She's the director of MedNet
23  Services.  Do you want the names of all

Page 12

1  the people I deal with at MedNet?
2    Q.  What is the difference between
3  Southeast Alabama Medical Center and
4  MedNet?
5    A.  MedNet is owned by Southeast
6  Alabama Medical Center.  It is just a
7  department that does billing, physician
8  billing.
9    Q.  No.  That's fine.  Do you know
10  anyone at ProBilling?
11    A.  Yes.
12    Q.  Who are your contacts there?
13    A.  Tammy.  I do not recall
14  Tammy's last name.
15    Q.  Anyone else?
16    A.  Yes.  Just a moment.  Her last
17  name is Spivey.  I can't recall her
18  first name right now.
19    Q.  Who is your contact at
20  Gentiva?
21    A.  I do not deal with Gentiva.
22    Q.  Who does?
23    A.  The director of home health

Page 13

1  and the director of hospice.
2    Q.  Who is your contact at MedNet?
3    A.  It depends on why I am calling
4  them, but generally Donna Peters
5  because she is the director.
6    Q.  Do you know when you first
7  contracted with United ProBilling for
8  the Ariton Clinic?
9    A.  I believe it was April of
10  2005.
11    Q.  What makes you think it's that
12  day?
13    A.  Because it came around about
14  the same time that Ms. Hughes' position
15  was eliminated.
16    Q.  Had you contacted them prior
17  to Ms. Hughes being eliminated?
18    A.  Yes.  Discussions were already
19  underway to talk with them about the
20  billing at Ariton.  And they bill for
21  another one of our practices.
22    Q.  When did United ProBilling
23  start billing for the Ariton Clinic?

Page 14

1    A.  I believe it was April 1st,
2 2005.  But without reviewing the
3 contract, I can't say for sure.
4    Q.  Who handled that contract on
5 behalf of United ProBilling?
6    A.  Shane Kenny.
7    Q.  Was there a period of time
8 that the Ariton -- am I saying it
9 right?
10    A.  Ariton.
11    Q.  The Ariton Clinic was still
12 coding and ProBilling was billing?
13    A.  No.  That was part of the
14 contract that they would also -- you
15 know, sometimes physicians code also.
16 Sometimes a physician will code.  But
17 they did what we call posting the
18 accounts so that you don't have to have
19 someone in the doctor's office doing
20 that.  You just submit the paperwork to
21 them and they do all the computer and
22 data entry.
23    Q.  What paperwork was being

Page 15

1 submitted to United ProBilling?
2    A.  I believe it's called a face
3 sheet or -- Different offices call it
4 different things.  An encounter form.
5 A UB -- I don't know the numbers
6 because I have never actually worked in
7 a doctor's office.  But it is a form
8 that the doctor uses when they are
9 seeing the patients that they mark what
10 they did, what level of visit.  Then
11 there is a code that is attached to
12 that.
13    Q.  How was United ProBilling
14 receiving these forms or face sheets?
15    A.  We had a courier that went up
16 to Ariton every day and would pick the
17 sheets up and bring them back to
18 ProBill in Ozark.
19    Q.  Was Dale County Medical Center
20 the only client of ProBill?
21    A.  No.  I don't think so.
22    Q.  Is it affiliated in any way
23 with the hospital?

Page 16

1    A.  No.
2    Q.  Does it have the same board of
3 directors?
4    A.  No.
5    Q.  Do you have individuals who
6 report to you?
7    A.  Yes.
8    Q.  Has that changed in the last
9 five years?
10    A.  Have the people changed?
11    Q.  Yes, ma'am.
12    A.  Yes.
13    Q.  Have the positions changed
14 that report to you?
15    A.  Yes.  There has been an
16 additional department that reports to
17 me in the last five years.
18    Q.  When was that department added
19 on?
20    A.  When?
21    Q.  Yes, ma'am.
22    A.  Sometime in 2005.  I'm not
23 quite sure when.  The latter part of

Page 17

1 the year.
2    Q.  Tell me the positions, not
3 names of individuals, but positions or
4 departments that report to you
5 currently.
6    A.  Okay.  The StatMed.
7    Q.  That's the urgent care?
8    A.  That's the urgent care.
9 Correct.  Do you want me to name the
10 practices -- And the physician
11 practices that we own.
12    Q.  Who are those?
13    A.  Dr. Lam, Dr. Duerr.
14    Q.  Is that D-o-e-r?
15    A.  D-u-e-r-r.  I can't even think
16 of the name of the doctors.  I'm sorry.
17 I'm sure the others will come to me.  I
18 will write them down as I think of them
19 and tell you.  Then the senior RX
20 program.
21    Q.  Anyone else?  Any other
22 departments?
23    A.  No.

Page 18

1    Q.   Is there an indigent program?
2    A.   That's the senior RX program
3  that I mentioned to you.  It is not an
4  indigent program as such.  It deals
5  strictly with prescription medications
6  for seniors.  Dr. Parwaiz or Dale
7  Pediatric Clinic is another one.
8    Q.   Is Dr. Crawford's office going
9  to report to you?
10   A.   Yes.
11   Q.   How about the surgical center?
12   A.   No.
13   Q.   Home health?
14   A.   No.
15   Q.   Hospice?
16   A.   No.
17   Q.   You heard Mr. Johnson's
18 testimony about the facilities that are
19 no longer owned by Dale Medical
20 Center -- Ariton office, Dr. Luna Sy's
21 office, the neurology office, Dr. Robin
22 Cromer-Tyler's office, and the
23 urologist's office by Dr. Brad Bower.

Page 19

1  Did you have any reporting structure
2  with those offices?
3    A.   With all of them.
4    Q.   What were your job duties with
5  regards to those five offices?
6    A.   I just -- We kept them
7  staffed.  And it was different.  It
8  could be different in each office
9  because each physician had their own
10 level of preference as to how much
11 involvement they wanted in the daily
12 running of their office.  Some of them
13 didn't call me until the place was
14 falling apart and others wanted me to
15 make at least a weekly visit and talk
16 with the staff.  It depended on the
17 physician as to how much involvement I
18 had.
19   Q.   Did you provide training to
20 the employees at those offices?
21   A.   No.  I did not.
22   Q.   In your -- Is it 23 years?
23   A.   Yes.

Page 20

1    Q.   Did you ever provide any
2  training to the employees at Ariton on
3  human resources?
4    A.   You mean policy training or --
5    Q.   Sexual harassment?
6  Discrimination training?  Retaliation?
7    A.   We have what we call new
8  employee orientation.  All the
9  employees went through that.  One
10 segment of that training is on the
11 policies, sexual harassment and that
12 sort of thing.  Then annually they had
13 to come in for what we call annual
14 update.  Again they were trained
15 annually on those policies.  Not
16 necessarily by me, but either me or
17 someone in my office.
18   Q.   Who else trains other than
19 you?
20   A.   Hilda Houston, Donna Reid.
21   Q.   Anyone else?
22   A.   No.
23   Q.   Is Hilda the mother of Jason

Page 21

1  Houston?
2    A.   Yes.
3    Q.   Did Hilda or Jason ever
4  complain to you about Mrs. Ennis?
5    A.   No.
6    Q.   Did you ever train Mrs. Ennis
7  on any personnel policies or
8  procedures?
9    A.   She received the same training
10 that any other employee that starts
11 does.
12   Q.   When did you train Mrs. Ennis?
13   A.   I believe she started in May.
14 So it probably was in May of '05.  Yes.
15 May of '05.
16   Q.   What position was she hired?
17   A.   Just as a clerk.
18   Q.   Where?
19   A.   At Ariton.
20   Q.   How long was she employed?
21   A.   Until August of '05 when
22 Dr. Ennis died.
23   Q.   As a clerk, what was

Page 22

1  Mrs. Ennis' duties?
2     A.   She was just supposed to clean
3  up, help file, do anything that was not
4  getting done.  But I believe from the
5  time that we actually employed her
6  until the time that she was
7  terminated -- her employment was
8  terminated.  That was at the very end
9  for Dr. Ennis.  I don't know that she
10 probably received more than one or two
11 paychecks.
12    Q.   Did you have an opening at
13 Ariton?
14    A.   Let's see.  At that time let
15 me see who we had.  I don't know
16 without going back to look because I
17 can't really recall who all was working
18 in the clinic at that time.
19    Q.   Did you have any recollection
20 who was working in the clinic May 2005?
21    A.   Well, I know that Debbie was
22 because she had been there for so long.
23 And I know that Sheryl Petrey was

Page 23

1  because she had been there for so long.
2  But I don't have total recollection of
3  when Karen and Lisa went to work there.
4     Q.   I'm sorry.  I thought you told
5  me Mrs. Ennis started May 2005.
6     A.   That's right.  Well, I guess
7  Debbie wasn't there.  Well, then I
8  remember that Sheryl was there.  But,
9  you know, since I have already made one
10 error there, I would hate to go and say
11 something else and make another.  She
12 did not do the billing.
13    Q.   Who?
14    A.   Mrs. Ennis.
15    Q.   What was her rate of pay?
16    A.   I don't recall her rate of
17 pay.
18    Q.   Was Lisa -- is it Brown --
19    A.   Brooks.
20    Q.   -- Lisa Brooks still employed?
21    A.   No.
22    Q.   Where was she?
23    A.   Where was she?  Was she still

Page 24

1  employed then?  I don't -- She may have
2  still been at the clinic at that time.
3  But I'm guessing right now as far as
4  dates go.
5     Q.   Karen Williams, was she still
6  employed with the Ariton Clinic in May
7  2005?
8     A.   There again, it would just be
9  a guess.  I believe that she was.  She
10 was a medical assistant.
11    Q.   Do you know who was the
12 receptionist?
13    A.   If Lisa was still there, it
14 would have been Lisa.
15    Q.   Do you know what Karen's
16 duties were?
17    A.   She was the clinical person.
18 She was the one that assisted the
19 physician in the back with patients.
20    Q.   How long had she been employed
21 at the Ariton Clinic?
22    A.   I don't know.  I don't recall
23 dates.

Page 25

1     Q.   Less than a year?
2     A.   Probably.
3     Q.   Ms. Petrey was over the lab?
4     A.   Yes.
5     Q.   Did she have any other job
6  duties?
7     A.   I think she occasionally
8  assisted bringing patients back to the
9  back.
10    Q.   Okay.  So we think we had
11 Ms. Brooks as the receptionist greeting
12 patients; is that correct?
13    A.   Correct.
14    Q.   And we had Ms. Petrey in the
15 lab and bringing patients back.  And we
16 had Ms. Williams as a clinical
17 assistant assisting the doctor?
18    A.   Correct.
19    Q.   So what did Mrs. Ennis do in
20 May of 2005?
21    A.   She was just hired to catch up
22 on the filing, actually filing papers
23 in charts.  Those sorts of duties.

Page 26

1  Just clerk.
2     Q.   Who was doing those duties
3  before?
4     A.   I guess they all pitched in
5  and did that.  Debbie did some of it.
6     Q.   What were Ms. Hughes' duties
7  before her position was eliminated?
8     A.   Primarily coding and billing.
9     Q.   What else?
10    A.   Debbie was capable of doing
11  any of the clerical work.  I don't
12  really know what she did on a daily
13  basis.  She made the bank deposits,
14  scheduled patients.
15    Q.   What else?
16    A.   That's --
17    Q.   Were you her direct
18  supervisor, Ms. Hughes' supervisor?
19    A.   It was one of those situations
20  where the physician and I were both
21  considered people that she could go to.
22    Q.   Have you ever seen an
23  organizational chart at Dale Medical

Page 27

1  Center that Ms. Hughes reported
2  directly to you?
3     A.   The physician practices are
4  listed under me on the organizational
5  chart.
6     Q.   Have you seen an
7  organizational chart that had
8  Ms. Hughes' name on it?
9     A.   No.
10    Q.   Her position?
11    A.   No.
12    Q.   Have you seen an
13  organizational chart that has Dr. Ennis
14  on it?
15    A.   No.
16    Q.   Just has physician practice?
17    A.   Well, yes.  In their case it
18  would have been Ariton Medical Clinic.
19    Q.   Did you ever tell Ms. Hughes
20  you were her direct report?
21    A.   Yes.
22    Q.   When?
23    A.   When we first assumed that

Page 28

1  clinic after Dr. Zumstein retired.
2     Q.   When was that?
3     A.   I don't recall even the year.
4  It may be -- Maybe 1999, 1998.
5     Q.   Did you ever conduct any
6  performance evaluations of Ms. Hughes?
7     A.   Yes, I did.
8     Q.   How many?
9     A.   I do not recall Dr. Blough
10  doing hers.  He was the first physician
11  there.  I can't tell you a number
12  because Dr. Ennis wanted to do the
13  evaluations on his staff.  I don't know
14  how many I did.
15       (Plaintiff's Exhibit 5 was
16        marked for identification.
17        A copy is attached.)
18    Q.   Plaintiff's Exhibit 5, have
19  you ever seen this document?
20    A.   Yes.
21    Q.   It is dated August 6, 1998; is
22  that correct?
23    A.   Yes.

Page 29

1     Q.   Is that your writing under
2  Personnel Use Only?
3     A.   It is.
4     Q.   Do you know why the hire date
5  is 8/1/98 and this application is
6  completed on 8/6/98?
7     A.   I would imagine it was just a
8  matter of the paperwork catching up
9  with what was going on up at the clinic
10  because when Dr. Zumstein retired and
11  he approached administration about us
12  trying to -- well, actually, before he
13  retired he had already approached us to
14  ask us to recruit a physician for that
15  office.  And at that time we were in
16  the process of recruiting a physician,
17  found a physician.  I do not recall how
18  much of a gap there was in between
19  Dr. Zumstein retiring and Dr. Blough
20  assuming that practice.  But we kept
21  all of the staff in place.  I am sure
22  it was just a timing matter that we got
23  her down there to do the paperwork.

Page 30

1    Q.   Was Ms. Hughes already the
2  office manager under Dr. Zumstein?
3    A.   I believe that -- Yes.  She
4  worked for him.  I don't know if he
5  called her.  I guess he did.
6    Q.   Under -- Well, about middle of
7  the page it talks about a job
8  description for the position for which
9  she is applying.  Have you seen a job
10  description for the office manager
11  position?
12    A.   The job descriptions and
13  evaluation form are one in the same.
14    Q.   I'm sorry.  Say that again.
15    A.   The job description and the
16  evaluation form are one in the same
17  form.
18        (Plaintiff's Exhibit 6 was
19          marked for identification.
20          A copy is attached.)
21    Q.   Let me show you Plaintiff's
22  Exhibit 6.  Can you tell me what you
23  are referring to?

Page 31

1    A.   It begins with the second page
2  there.
3    Q.   Of Plaintiff's 6, Bates
4  No. D00084; is that correct?
5    A.   That is correct.  And then --
6    Q.   I'm sorry.  Was this title
7  consistent, office manager, patient
8  account, and insurance clerk
9  Ms. Hughes' title until she was
10  eliminated?
11    A.   I don't recall if we changed
12  the title, but we would have done --
13  Actually, the lead person in all the
14  doctors' offices I call office
15  coordinators.  At some point the job
16  description may have been changed to
17  office coordinator because that is what
18  we call -- there is only one office
19  that has an office manager.
20    Q.   How many offices have
21  coordinators?
22    A.   Every office has a
23  coordinator.

Page 32

1    Q.   Is it one in the same?  An
2  officer manager the same as office
3  coordinator?
4    A.   No.
5    Q.   What is the difference?
6    A.   An office manager has more
7  responsibility.  Generally there are
8  more employees in that area.  Other
9  than Ariton had four at the time, I
10  believe -- I don't know.  I think when
11  we assumed that practice, there was
12  maybe five or six people in that
13  office, which was more than we had in
14  any of our practices.  But we just
15  assumed all of Dr. Zumstein's
16  employees.  Generally in an office
17  practice just starting up there will
18  only be two employees.  At some point
19  you may add a third.  But it is after
20  that third when you get -- well, like
21  StatMed.  They have probably twelve,
22  thirteen employees.  So that's why we
23  have an office manager there.

Page 33

1    Q.   Is that the only facility
2  currently that has an office manager?
3    A.   Yes.
4    Q.   What facilities have an office
5  coordinator?
6    A.   They all have office
7  coordinators.  That is the front office
8  person.  That is the title.
9    Q.   Is that the same as a
10  receptionist?
11    A.   No.
12    Q.   Okay.  What are the job duties
13  of an office coordinator?
14    A.   They are the ones that assist
15  the physician with the coding, they
16  input all the data in the computer
17  systems.  They are trained on the
18  systems.  They maintain the files.
19    Q.   How many office coordinators
20  do you have currently?
21    A.   Maybe five.
22    Q.   What coding responsibilities
23  would these five individuals have as

Page 34

1 office coordinators?
2    A.   Other than what I just told
3 you?
4    Q.    You just told me they were
5 responsible for coding.  I thought
6 that's what ProBilling is doing.
7    A.    ProBilling does do the coding,
8 but on simple things like a simple
9 office visit where if it is a minor
10 office visit and that is all that is
11 checked on that form, then generally
12 the office coordinator will go ahead
13 and code the form before it is sent.
14 But any of the detail coding where
15 there are several things marked on that
16 encounter sheet, then that goes to
17 ProBill.  ProBill enters all of that
18 now for the offices that we have them
19 contracted to do their billing.  I
20 can't say it has always been that way,
21 but that is the way it is now.
22    Q.    Who are the five office
23 coordinators you have?

Page 35

1    A.    Angela Stelly; Sung, S-u-n-g,
2 Duerr; Stephanie Smith.  I don't have
3 one for Dr. Crawford's office yet.
4    Q.    That's available?
5    A.    Pardon me?
6    Q.    That's available?
7    A.    Yes.  And I believe that is
8 the title of Debbie Ray at StatMed.
9    Q.    Is the job description on the
10 second page of Plaintiff's 6, is that
11 the job description for the office
12 coordinators?
13    A.    I do not know if this is the
14 same job description.
15    Q.    Do you know if you have
16 revised a job description for the
17 office coordinators?
18    A.    Have I revised?  Is that what
19 you asked me?
20    Q.    Yes, ma'am.
21    A.    I do not recall revising this
22 job description.
23    Q.    Who is the office manager you

Page 36

1 have currently?
2    A.   Audra Ammons.
3    Q.   Spell that last name, please.
4    A.   A-m-m-o-n-s.
5    Q.   Have any of the office
6 coordinators or office managers changed
7 in the last two years?
8    A.   No.
9    Q.   Ms. Stelly, where is she the
10 office coordinator?
11    A.   Dr. Parwaiz, Dale Pediatric.
12    Q.   How long has she been employed
13 there as office coordinator?
14    A.   This office only opened in
15 February, but she was a hospital
16 employee in the emergency room.
17    Q.   What did she do in the
18 emergency room?
19    A.   She was an admit rep.
20    Q.   Admitting patients?
21    A.   Yes.
22    Q.   She became the office
23 coordinator in February 2007?

Page 37

1    A.    Correct.
2    Q.    How long has she been employed
3 with Dale Medical Center?
4    A.    I don't recall.
5    Q.    Is she under the age of 40?
6    A.    Yes.
7    Q.    Is she under 30?
8    A.    I don't think so.
9    Q.    Ms. Duerr, Sung Duerr?
10    A.    Uh-huh.
11    Q.    Where is she the office
12 coordinator?
13    A.    At Dr. Duerr's office.
14    Q.    Is that his wife?
15    A.    Yes.
16    Q.    How long has she been the
17 office coordinator?
18    A.    I believe they opened their
19 office in February also.
20    Q.    Who was the previous office
21 coordinator of that office?
22    A.    There was not a previous.  We
23 just opened that practice.

Page 38

1    Q.    Is Mrs. Duerr under the age of
2    40?
3    A.    No.
4    Q.    Ms. Smith, where is she the
5    office coordinator?
6    A.    Dr. Lam's office, Ozark Family
7    Medicine.
8    Q.    How long has she been in that
9    position?
10   A.    That is another practice we
11   assumed when a physician left town.
12   She was employed by that physician.  So
13   she had worked for her for a number of
14   years.  And we have had the practice a
15   couple of years, I believe.
16   Q.    When was Ms. Smith promoted to
17   office coordinator?
18        MR. VREELAND:  Object to the
19   form.
20   A.    That was the position --
21   Q.    -- she was already in?
22   A.    Yes.
23   Q.    You told me Dr. Crawford's

Page 39

1    office.  Was there a previous office
2    coordinator?
3    A.    No.  This will be a new
4    practice.
5    Q.    Debbie Ray, where is she?
6    A.    She's at StatMed.
7    Q.    How long has she been the
8    office coordinator?
9    A.    It is a guess.  Approximately
10   five years.
11   Q.    Was she in a previous
12   position?
13   A.    She worked in a previous
14   practice that we owned.  And the
15   physician moved to Enterprise.  And we
16   had an opening at StatMed when that
17   happened.  And she transferred to
18   StatMed.
19   Q.    What was her position prior to
20   transferring?
21   A.    Well, we did not own the
22   practice at the time.  So I really
23   don't know what her title was.  She was

Page 40

1    an up front office person.
2    Q.    She was a new hire for Dale
3    County Medical Center?
4    A.    I believe so.  But I'm not
5    positive.
6    Q.    The previous practice she was
7    in, was her position eliminated?
8    A.    The physician moved to
9    Enterprise, closed the practice down in
10   Ozark.
11   Q.    So at that time she was not
12   working for Dale County Medical Center?
13   A.    No.
14   Q.    Was she immediately placed as
15   the office coordinator of StatMed?
16   A.    I don't recall if that was her
17   first title or not.
18   Q.    Do you know how long she has
19   held the title of office coordinator?
20   A.    No.
21   Q.    Do you think it has been five
22   years?
23   A.    I think it has been.

Page 41

1    Q.    Did Mrs. Ennis hold the title
2    of office coordinator?
3    A.    No.
4    Q.    Did she hold the title of
5    office manager?
6    A.    No.
7    Q.    Do you know what the pay is
8    for an office coordinator?
9    A.    I believe the starting salary
10   is eight dollars an hour.
11   Q.    Is that what Ms. Stelly is
12   making?
13   A.    I'm not sure if it is or not
14   since she transferred.  But I believe
15   it probably is.
16   Q.    Do you know Audra Ammons' rate
17   of pay?
18   A.    No, I don't.
19   Q.    Do you know how long she has
20   been the office manager?
21   A.    Approximately three years.
22   Q.    Who did she replace?
23   A.    Amy Maund.

Page 42

1    Q.   Spell that last name, please.
2    A.   M-a-u-n-d.
3    Q.   Was Ms. Maund terminated?
4    A.   She moved to Florida.
5    Q.   Was Ms. Maund's position
6  available when you eliminated
7  Ms. Hughes?
8    A.   I do not believe so.
9    Q.   When you hired Pat Ennis in
10 May 2005, was she a full-time employee?
11   A.   No.
12   Q.   How many hours a week was she
13 working?
14   A.   Very few.  I don't recall.  We
15 hired her as a PRN employee, which
16 means, you know, work as needed.  And I
17 do not recall her number of hours.
18   Q.   You would have pay records on
19 that, though, wouldn't you?
20   A.   Yes, ma'am.
21   Q.   Did she complete an
22 application?
23   A.   Yes, she did.

Page 43

1    Q.   And has a personnel file?
2    A.   Yes, she does.
3    Q.   How is it you know that?
4    A.   Because everybody that's
5  employed has to complete an application
6  and has a personnel file.
7    Q.   Is that her first time to be
8  employed?
9    A.   With us?
10   Q.   Yes, ma'am.
11   A.   Yes.
12   Q.   Had you ever received
13 complaints from any employee, vendor,
14 or patient about Mrs. Ennis?
15   A.   Not that I recall.
16   Q.   Have you ever had to talk with
17 her about her conduct in the workplace?
18   A.   No.
19   Q.   Did Ms. Hughes ever complain
20 to you about Mrs. Ennis?
21   A.   No, she didn't.
22   Q.   I'm sorry?
23   A.   No, she did not.

Page 44

1    Q.   Did Mrs. Ennis ever complain
2  to you about Ms. Hughes?
3    A.   No.
4    Q.   Have you ever had meetings or
5  phone conversations with Mrs. Ennis
6  about Ms. Hughes?
7    A.   The only meeting I had where
8  Ms. Hughes was discussed that Pat was
9  present was at a dinner that Dr. Ennis
10 and I had to discuss changing the
11 duties in the clinic.
12   Q.   When was that?
13   A.   I believe it took place latter
14 part of March, first of April of 2005.
15   Q.   Who initiated that meeting?
16   A.   Dr. Ennis.
17   Q.   How did he initiate that?
18   A.   He called and wanted us to
19 meet.  That was at the time I believe
20 the decision had already been made to
21 outsource the billing.  He wanted to
22 come up with a job description for
23 Ms. Hughes.

Page 45

1    Q.   Who suggested dinner?
2    A.   I don't recall who.  I don't
3  recall how it became dinner.
4    Q.   Did you have any other
5  meetings with Dr. Ennis about
6  employees?
7    A.   Yes.
8    Q.   Who else have you met with
9  Dr. Ennis about?
10   A.   Dr. Ennis when he would be
11 over at the hospital would stop by my
12 office when he was making rounds when
13 he first went to Ariton.  Although
14 Debbie had already reported it to me,
15 there were some issues with
16 Dr. Blough's wife who was a nurse that
17 we had kept employed there after
18 Dr. Blough left.
19   Q.   My question was what other
20 employees you have discussed with
21 Dr. Ennis.
22   A.   Renee Blough.
23   Q.   Anyone else?

Page 46

1    A.   Karen Williams.
2    Q.   Anyone else?
3    A.   Not that I recall.
4    Q.   Is there a Ms. Suma?
5    A.   Sessoms?
6    Q.   Ms. Sessoms.  Did you ever
7  discuss Ms. Sessoms with --
8    A.   I am not sure she was still
9  there when he came.  I don't recall.  I
10  don't recall ever discussing her with
11  him.
12    Q.   What conversations did you
13  have with Dr. Ennis about Renee Blough?
14    A.   Dr. Ennis felt like that her
15  presence there was not in the best
16  interest of the clinic.  Although her
17  husband voluntarily left that clinic,
18  there was still I believe a little --
19  this was according to Debbie and
20  Dr. Ennis -- a little bit of resentment
21  on her part that he was no longer there
22  and that she was making comments to
23  patients as, like I said, was reported

Page 47

1  to me by Debbie and Dr. Ennis.  He just
2  felt like that it was just not in the
3  clinic's best interest.  Besides that,
4  he did not feel like he needed an RN in
5  that clinic, which is an unusual
6  occurrence.
7    Q.   Did Dr. Zumstein's wife work
8  in the practice as well when he was
9  employed?
10    A.   You mean when he was employed
11  by us to work there?
12    Q.   Yes, ma'am.
13    A.   No.
14    Q.   What was your conversations
15  with Dr. Ennis about Karen Williams?
16    A.   Right after Dr. Ennis made the
17  decision to hire Karen -- she was a new
18  grad medical assistant.  We just had a
19  couple of discussions that she may need.
20  additional training that she may need.
21  He felt like that she didn't move quite
22  as fast as he was accustomed to having
23  someone move.  Just general

Page 48

1  conversations about trying to get her
2  up to speed.
3    Q.   When did you have these
4  conversations with Dr. Ennis about
5  Karen Williams?
6    A.   When?
7    Q.   Yes, ma'am.
8    A.   I don't know.  It was shortly
9  after she was hired.  And I have no
10  idea when she was hired.
11    Q.   Did you provide additional
12  training to her?
13    A.   Not at that point.  I believe
14  he worked with her on blood pressures
15  because that was one of the issues.
16  She would take a blood pressure.  He
17  would go behind her.  There would be a
18  significant difference in the blood
19  pressures.  I believe that he worked
20  with her.  Later on we did get her some
21  training in meds from our education
22  nurse.
23    Q.   What was the issue with meds?

Page 49

1    A.   Just that -- Well, actually,
2  it was not Dr. Ennis.  I think
3  Dr. Quintana was there at that time.
4  He was concerned about some of her --
5  she was so slow mixing the meds.  I
6  don't believe she had ever made a
7  mistake.  But he wanted us to verify
8  that she did know her medication
9  measures and that sort of thing.  So we
10  brought her in and our education nurse
11  worked with her for a couple of days.
12    Q.   Is she an LPN?
13    A.   No.  She is a medical -- a
14  certified medical assistant.
15    Q.   Where does she work now?
16    A.   She works as a unit secretary
17  on our med surg floor.
18    Q.   Why was she moved?
19    A.   When Dr. Magony took over that
20  practice and it was no longer under
21  Dale Medical.
22    Q.   Her position was eliminated?
23    A.   Yes.

Page 50

1    Q.   And she was moved as a unit
2  secretary?
3    A.   Well, I can't say her position
4  was -- We no longer owned the clinic.
5  Dr. Magony did offer her a job.  But we
6  had a unit secretary position.  She
7  interviewed with the nurse manager and
8  he selected her.
9    Q.   What does the unit secretary
10  do?
11    A.   They work the desk on the
12  nursing floors.  They answer the call
13  button, file lab work, x-ray reports on
14  the patient charts, answer the phone.
15    Q.   Did you post that unit
16  secretary job?
17    A.   Yes.
18    Q.   When was it posted?
19    A.   I do not recall.
20    Q.   Did Ms. Williams apply?
21    A.   Yes.
22    Q.   Anyone else apply?
23    A.   I am sure they did.

Page 51

1    Q.   Was Ms. Brooks still working
2  in the clinic when the clinic was being
3  sold?  I guess it was sold to
4  Dr. Magony.
5    A.   I believe she was.
6    Q.   Did you move her to another
7  position?
8    A.   I did.
9    Q.   Where did you move her?
10    A.   To the senior RX program.
11    Q.   You told me that.  What did
12  she do there?
13    A.   She accepted applications from
14  Medicare recipients -- I'm sorry.  Not
15  Medicare.  Elderly people -- Senior
16  citizens who met the criteria for
17  prescription drug assistance.
18    Q.   What is her job title?
19    A.   Senior RX coordinator, I
20  believe.
21    Q.   Was that job posted?
22    A.   Yes, it was.
23    Q.   Do you know when?

Page 52

1    A.   No, I do not.
2    Q.   The evaluation you have in
3  front of you -- I'm sorry.  Do you need
4  a break?
5    A.   No.
6    Q.   Plaintiff's Exhibit 6 under
7  the manager's signature, is that your
8  signature?
9    A.   That is -- If I am not
10  mistaken, that is Dr. Blough's
11  signature, John Blough.
12      MS. HUGHES:  That's
13  Dr. Blough's.
14    Q.   Thank you.  Did you review
15  this evaluation with Ms. Hughes?
16    A.   I did not, no.
17      (Plaintiff's Exhibit 7 was
18      marked for identification.
19      A copy is attached.)
20    Q.   Plaintiff's Exhibit 7 is a
21  2001 evaluation.  Did you participate
22  in this evaluation?
23    A.   No.  Dr. Blough did this

Page 53

1  evaluation also.
2    Q.   Did you review it with
3  Ms. Hughes?
4    A.   No, I did not.
5    Q.   In the 2000 and 2001
6  evaluations were those deemed
7  satisfactory evaluations?
8    A.   Yes.
9      (Plaintiff's Exhibit 8 was
10      marked for identification.
11      A copy is attached.)
12    Q.   Plaintiff's Exhibit 8.  Is
13  this the 2002 evaluation?
14    A.   Dr. Blough did this one also.
15    Q.   Did you review this evaluation
16  with Ms. Hughes or Dr. Blough?
17    A.   No.
18    Q.   Do you recognize the writing
19  on the second page?  Did she have
20  additional duties added to her in 2002?
21      MR. VREELAND:  Object to the
22  form.
23    Q.   Do you know?

Page 54

1    A.   What this tells me is this is
2  the year that we discontinued the
3  billing service with MedNet for Ariton
4  and implemented the Medisys system that
5  Dr. Blough had bought.
6    Q.   So prior to September '01, was
7  the clinic using MedNet?
8    A.   That is correct.
9    Q.   MedNet is like United
10  ProBilling?
11    A.   Yes.  It is an outside billing
12  service.
13    Q.   Do you know what Ms. Hughes
14  was doing as office manager when MedNet
15  was doing the billing for the Ariton
16  Clinic?
17    A.   Initially when MedNet was put
18  at Ariton I do not believe that they
19  were entering any of the data into the
20  computer system.  So basically Debbie
21  would have been doing the same thing.
22  She would have entered the patient
23  demographics, she would have entered

Page 55

1  the patient charges.  She would have
2  posted -- That is my understanding.  I
3  was not that involved with the billing
4  aspect of it at that time.
5    Q.   Was she coding?
6    A.   She probably coded some too.
7    Q.   Okay.  On the page four,
8  D00073 of Plaintiff's 8, can you tell
9  me No. 11 what that reads?
10    A.   It looks like to me maintained
11  BCLS training, which is basic cardiac
12  life support training.
13    Q.   Was she training or had
14  received that training?
15    A.   I do not know.
16       (Plaintiff's Exhibit 9 was
17        marked for identification.
18        A copy is attached.)
19    Q.   Plaintiff's 9, did you
20  complete this evaluation?
21    A.   I did.
22    Q.   That is your handwriting?
23    A.   It is.

Page 56

1    Q.   That is your signature on the
2  last page?
3    A.   Yes, it is.
4    Q.   Why is it you evaluated
5  Ms. Hughes in 2003?
6    A.   I am assuming we might have
7  been in between physicians.  I don't
8  know that.  Because Dr. Blough left.
9  I'm not sure if there was a little gap
10  or if Dr. Ennis had just gotten there
11  and wasn't comfortable with doing the
12  evaluation at that point.  But I would
13  have guessed it would be one of those
14  two or three.
15    Q.   What was the basis of your
16  evaluation on pages three and four
17  under the performance standards?
18    A.   I guess probably with whatever
19  contact that I had with Debbie during
20  that period of time.
21    Q.   Were those your only personal
22  observations or is this self
23  evaluation?

Page 57

1    A.   It is not either.  I can't say
2  it is personal because I didn't spend
3  that much time up in the clinic.  But
4  even though I wasn't there a lot,
5  Debbie and I had conversations about
6  the work.  I am assuming there was
7  nothing standing out one way or the
8  other at the time.
9    Q.   Did you have a physician at
10  the Ariton Clinic?
11    A.   I don't know.  I don't know
12  when Dr. Ennis started.  I don't know
13  if there was one there or not.  But we
14  never closed the clinic.  We always
15  maintained the clinic open so the
16  employees would not lose the jobs.  But
17  I can't say if Dr. Ennis was there or
18  not.
19    Q.   Well, if you were between
20  physicians, what would the office staff
21  do?
22    A.   Not a lot.  You know, catchup
23  work.  They did at sometimes swap

Page 58

1 taking days off.  But we just wanted to
2 maintain a presence in the clinic just
3 to let people know because people could
4 come in and see Debbie or the front
5 office person and they could say, well,
6 the new doctor will be here.  These
7 were our reasons behind it.
8    Q.   Did you ever have a contract
9 doctor there?
10   A.  We did.  But it was during
11 Dr. Ennis's illness, some of the
12 periods of time that he was out that we
13 had a contract.
14   Q.   Did Dr. Zumstein ever come
15 back?
16   A.  He did.  But that was,
17 again -- Let me think a minute.
18 Dr. Zumstein worked there on two
19 different occasions.  One of them could
20 have been when we were between
21 Dr. Blough and Dr. Ennis, but I do not
22 know without looking it up.  Then he
23 did work after Dr. Ennis came and he

Page 59

1 was out for an extended period of time.
2 So it is possible Dr. Zumstein was
3 there at this time.
4    Q.   Do you know why you did not
5 sign on the first page as her manager?
6    A.  No, I do not.
7    Q.   You stated that you and
8 Ms. Hughes talked a lot during this
9 time, 2003 time period?
10   A.  I believe we talked quite a
11 bit during the whole time she was
12 employed up there.  I won't say daily.
13 Certainly it wasn't daily.
14   Q.   2003 did you have any issues
15 with her job performance?
16   A.  No.
17   Q.   Ever have to discipline her or
18 counsel her?
19   A.  During 2003?
20   Q.   Or prior.
21   A.  I did have to talk with her
22 several times when Dr. Zumstein was
23 there, but I can't give you a time

Page 60

1 frame because I don't know when he was
2 there.  That had to do with the amount
3 of overtime.  But I don't know if it
4 was the first time he was there or the
5 second time he was there.
6    Q.   Okay.
7    (Recess was taken, commencing at
8 2:09 p.m., concluding at 2:19 p.m.)
9    Q.   (MS. HAYNES) Looking back at
10 the 2003 evaluation you completed,
11 Ms. Dunn, on Ms. Hughes, looking back
12 at that, on page three and four, which
13 is Bates Nos. D0062 and 63, were those
14 the 22 separate responsibilities that
15 Ms. Hughes was responsible for?
16   A.  Yes.
17   Q.   Which of those duties did she
18 lose when you were going to transfer
19 coding and billing to United
20 ProBilling?
21   A.  The things that changed was
22 when she was actually -- told Dr. Ennis
23 that she no longer wanted to be the

Page 61

1 office manager.  She would not -- I
2 think at that point Dr. Ennis had taken
3 over the responsibility of the other
4 employees, doing their evaluation and
5 monitoring their work.  She would not
6 have had to do the assures that all
7 office staff follows established
8 policies and procedures because that is
9 a supervisory.  She wouldn't have had
10 to do No. 4 on 00062.  She wouldn't
11 have had to do No. 5, No. 9, 10.  Then
12 on the next page.
13   Q.   Just so we are clear on the
14 first page, she would not have been
15 responsible for 4, 5, 9, and 10.  But
16 you are identifying those as when she
17 stepped down as office manager?
18   A.  Yes.
19   Q.   My question was when you
20 turned coding and billing over to
21 United ProBilling, which duties would
22 she have not been responsible for?
23   A.  Well, the ones that I just --

Page 62

1  Well, actually, her whole job
2  description would have changed because
3  it would have not involved hardly any
4  of these. Let's see. Those two things
5  kind of go hand in hand, not being
6  office manager. One or the other. And
7  turning the billing over to ProBill.
8  The discussion that I had with
9  Dr. Ennis, the only thing that she was
10 going to do was collect on the old AR
11 was the only specific duty that we
12 discussed.
13    Q.  All right. Let's divide it
14 up. You sat through her deposition
15 yesterday?
16    A.  Yes, ma'am.
17    Q.  Is that correct?
18    A.  Yes.
19    Q.  And you heard her testify that
20 in November 2004 she asked to step down
21 because of health problems?
22    A.  Right.
23    Q.  Did she tell you that she

Page 63

1  wanted to step down because of health
2  issues or did you learn that from
3  someone else?
4    A.  I believe I learned that from
5  Dr. Ennis. I don't recall Debbie
6  telling me that. I'm not saying she
7  didn't, but I don't recall it.
8    Q.  Did you have any discussions
9  in November or December 2004 with
10 Ms. Hughes where she shared with you
11 that she was having health issues?
12    A.  I did. I had a conversation
13 with her in December when she dropped
14 by my office.
15    Q.  What did she share?
16    A.  She just came by my office.
17 She was there at the hospital for some
18 outpatient testing. She told me that
19 she had some health issues and that she
20 was about to go through some testing.
21 She brought up the flu vaccine issue,
22 she brought up the writing off the
23 accounts issue with me at that time.

Page 64

1  If I'm not mistaken -- It was just a
2  very general conversation. She
3  apologized for the errors that she had
4  made. At that time I talked with
5  Debbie. I told her. I said I just
6  wish that you would have come to me. I
7  believe I even asked her have I ever
8  refused to work with her on anything.
9  I would rather that someone come to me
10 with a mistake that had been made so
11 that we could correct it. She made the
12 comment that she didn't feel like she
13 could ever come to me because she
14 didn't think I liked her. I told her
15 that my personal feelings for anybody
16 had nothing to do with my professional
17 relationship with them in the work
18 environment and that I would work with
19 her on anything that I could. But she
20 had to come to me. She had to tell me
21 what was going on.
22        I wished her well, talked
23 about hoping that it was just a

Page 65

1  medication thing that was making her
2  behaving the way that she did. That
3  was basically the content of the
4  conversation. I told her to keep me
5  informed on her health. That was it.
6    Q.  She didn't mention she had
7  stepped down as office manager?
8    A.  You know, I don't recall that.
9    Q.  Did she relate to you that she
10 thought her errors in writing off the
11 accounts and the overage on the flu
12 vaccine were related to the issues she
13 was sharing with you, the health
14 issues?
15    A.  I don't recall if she
16 mentioned that or not because at that
17 time she didn't even have a diagnosis.
18 It was just health issues. I don't
19 think that she had been tested and
20 discovered that she had the benign
21 brain tumor.
22    Q.  Did she come back later when
23 she was diagnosed with the brain

Page 66

1 tumors?
2    A.  I don't recall how I learned
3 that.  I don't recall her coming back
4 to my office again.
5    Q.   She did tell you when she came
6 to your office that she did not feel
7 comfortable coming to you?
8    A.   Yes.
9    Q.   Do you know why she came that
10 day?
11   A.   No.  I don't.  She was in the
12 hospital.  I don't know what made her
13 come by.  Debbie and I had always
14 gotten along fairly good.  There were
15 some issues, but I never felt like it
16 was anything that we could not discuss.
17 I don't think she had a really warm and
18 fuzzy feeling about me.  It's very
19 difficult for an employee to transition
20 from working for a private physician in
21 a rural setting for a long period of
22 time and then to become a member of a
23 large organization and the rules

Page 67

1 changing.  And I just don't think that
2 she was ever comfortable working with
3 me in that aspect.  She was just used
4 to just going to the doctor and saying,
5 hey, I need to do this, I need to do
6 that.  That changed.
7        And I think -- I think it
8 happens every time we do this.  All of
9 them look at me like I have made the
10 change.  So I'm always the person that
11 they are always afraid to come to if
12 there is something that happens outside
13 our policies or outside the way that we
14 want the office run.
15   Q.   What issues had you and
16 Ms. Hughes had in the past?
17   A.   Well, we had the thing about
18 the vaccine and we had the thing about
19 the writing off the accounts.  And we
20 had several conversations.  I don't
21 recall having that many about the
22 vaccine.  I recall having the one the
23 day that I got the invoice.  We had

Page 68

1 several conversations about the writing
2 off of the accounts.  That basically
3 had to do with so much of that could
4 have been prevented if Debbie had
5 called me rather than trying to go
6 around me and calling MedNet and trying
7 to find out a way to fix it.  I am not
8 saying I could have fixed it.  But we
9 could have worked together on it.
10       I had some issues with her
11 about overtime when Dr. Zumstein was
12 working there.  Their patient load was
13 not very heavy.  And when I noticed
14 that Debbie was coming at four o'clock
15 in the morning to start her workday and
16 working until four or five that
17 afternoon, I called her and talked to
18 her about the overtime and about
19 keeping expenses down.  And she told me
20 that she had to come in early to get
21 ready for her day.  Generally
22 Dr. Zumstein's first appointment was
23 not until eight o'clock.  The more

Page 69

1 times we talked about it and the longer
2 we talked about it, she made the
3 comment that Dr. Zumstein kept calling
4 her to come assist him, which is what I
5 think he did when he owned the
6 practice.  So I went up and I had a
7 conversation with Dr. Zumstein.  I
8 don't remember who was working in the
9 back at that time.  I don't know if it
10 was Sandy Sessoms or -- there was
11 another LPN there at one time.  I don't
12 recall her name.  But I talked to
13 Dr. Zumstein and I told him that I had
14 to get the hours down and that Debbie
15 felt like that she couldn't get her
16 work done because he called her a lot
17 of times.  I just asked him please let
18 whoever the back person was, let them
19 assist you in the rooms and don't call
20 Debbie so she can take care of the
21 billing and the coding and what have
22 you.  And he said he would.
23       I only had one other --

Page 70

1 Overtime got okay. There wasn't any
2 overtime for a long time. Then it
3 started creeping back up again. I
4 called Debbie. You know, it was the
5 same thing. She said she just couldn't
6 get the amount of work done. But there
7 were four employees in that clinic. I
8 don't have four employees in any clinic
9 except that urgent walk-in clinic. And
10 I expressed that to Debbie. I just
11 didn't understand why the work could
12 not be completed in an eight-hour day.
13 Because they didn't even see patients
14 on Friday or maybe Friday morning. So
15 that would leave Friday afternoon for
16 catchup. She said she understood. I
17 told her if it happens again, I will
18 take your key and change the security
19 code so that the only time you get in
20 the building is when I come let you in.
21 After that we had no more problems with
22 overtime or anything.
23     But I worked with Debbie when

Page 71

1 we first took that clinic over. In
2 between Dr. Blough and Dr. Ennis,
3 Debbie and I worked together quite a
4 bit. We were trying to upgrade that
5 office because that's a very, very old
6 building. There were things there that
7 those employees didn't have. We fixed
8 up their break room a little bit.
9 Seems like we got a bigger refrigerator
10 or something. Painted. All that time
11 I tried to establish a rapport with
12 Debbie because that clinic was, like,
13 12 or 13 miles away from the hospital.
14 It is difficult to make a lot of trips
15 up there when you have got everything
16 else going on around you. But that's
17 basically it.
18     Q.   The overtime issue, when was
19 that that you talked with her about it?
20 What year?
21     A.   I don't know. It was when
22 Dr. Zumstein was there. One of the
23 periods of time he was there. I don't

Page 72

1 know the year.
2     Q.   We have looked at the
3 evaluations and we had Dr. Blough and
4 Dr. Ennis. So would it have been
5 before 2000?
6     A.   Uh-uh. No. Because
7 Dr. Zumstein worked there. He may have
8 worked there from the time Dr. Blough
9 left -- which I don't know when that
10 was -- and when Dr. Ennis came -- which
11 I don't know when that was. We may
12 have had him in there that period of
13 time to keep that clinic going. Then
14 he worked one other time after
15 Dr. Ennis got there and was going to be
16 out for an extended period of time.
17 Dr. Zumstein came back and worked
18 again. So it was during one of the
19 periods of time that Dr. Zumstein
20 worked in that clinic.
21     Q.   Do you know who else was
22 working other than Ms. Hughes and
23 Dr. Zumstein in the clinic?

Page 73

1     A.   I know that Sheryl Petrey was
2 working. I know there was a
3 receptionist. I don't know who it was
4 at that time. And I know that there
5 was either an MA or an LPN in the back.
6 But I don't know who that person was at
7 that time.
8     Q.   Do you recall allowing
9 Dr. Zumstein to hire another
10 individual, Ms. Sessoms, Sandy Sessoms?
11     A.   I do.
12     Q.   Did you hire Ms. Sessoms or
13 allow him to hire Ms. Sessoms because
14 the work was there?
15     A.   We did allow him to do it. I
16 do not remember if it was during that
17 period of time that the other LPN left.
18 Debbie had an LPN that worked back
19 there that I don't think she let her go
20 but she had to talk with her on several
21 occasions about her employment. So I
22 don't know if it was when that LPN was
23 gone or not. Sandy worked part-time.

Page 74

1    Q.   Did you put anything in
2  Ms. Hughes' file about talking with her
3  about the overtime?
4    A.   No.  It was all verbal.
5       (Plaintiff's Exhibits 11 and
6        12 were marked for
7        identification.  Copies are
8        attached.)
9    Q.   Let me show you what has been
10  produced by your lawyers as Plaintiff's
11  Exhibit 11 and Plaintiff's Exhibit 12.
12  If you could, tell me what 11 and 12
13  are.
14    A.   These are copies of her time
15  and attendance report.  This one looks
16  like November of '04 through April of
17  '05.
18    Q.   Okay.  And what is the reason
19  you pulled this document or what is the
20  significance?
21    A.   Part of this time is when she
22  was out on leave.  I don't know.
23  Somebody had to have requested it.

Page 75

1    Q.   Can you tell me when it
2  appears she went out on leave?
3    A.   She worked in November.  It
4  appears that she started using her sick
5  leave January the 3rd of '05.  She used
6  it in the next pay period.
7    Q.   How can you tell that is sick
8  leave?  It is on Document No. D0012 of
9  Plaintiff's 11.
10    A.   If you will go down there to
11  January the 3rd.
12    Q.   Yes, ma'am.  That is a Monday.
13    A.   It has got PCD:S.  That S
14  stands for sick leave.  The H right
15  above it is holiday.
16    Q.   Above that on 12/30 can you
17  tell what that is?
18    A.   She clocked in at 7:55 and
19  clocked out at 12:36.  She worked a
20  total of four and a half hours.
21    Q.   Okay.  Are there certain days
22  of the week they work half days in that
23  office?

Page 76

1    A.   Typically it was Friday.  I
2  don't know why she only worked a half
3  day that day.  Maybe it was because it
4  was -- I don't know what day New Year's
5  fell on that year.  So I don't know.
6    Q.   Okay.  The office is not open
7  on Saturdays and Sundays?
8    A.   Correct.
9    Q.   Looking at the next document,
10  No. D0013, continuing with 1/6 through
11  1/19, that's all sick leave?
12    A.   Yes, ma'am.
13    Q.   Do you know why you would
14  leave out the Friday?
15    A.   I don't know why she only took
16  64 hours a pay period.  That's not
17  uncommon with someone that is going to
18  be out for an extended period of time
19  so that their sick leave lasts longer.
20  But generally it is by employee
21  request, it is not ours.
22    Q.   Do you have any leave
23  documentation that you received from

Page 77

1  her?
2    A.   I don't know if I did or not.
3    Q.   Would you agree with me in
4  looking at those two weeks or maybe it
5  is even three weeks she never took a
6  Friday time?
7    A.   Yes, I would.
8    Q.   What are the pay periods?
9  Paid twice a month?
10    A.   Every two weeks.  Biweekly.
11    Q.   On Fridays?
12    A.   No.  Pay period ends on a
13  Wednesday and we are paid the following
14  Thursday.
15    Q.   A week later?
16    A.   Uh-huh.  A week later after
17  the pay period ends.
18    Q.   Okay.  So yesterday was a
19  Wednesday.  That pay period ended if it
20  was the 15th.
21    A.   Yesterday did not end a pay
22  period.  Yesterday ended the first week
23  of the pay period.

Page 78

1    Q.   So employees are being paid
2   today?
3    A.   Yes.
4    Q.   If she had claimed the Friday,
5   would that have put her over into
6   overtime?
7    A.   No.  Sick time doesn't count
8   into overtime anyway.  If she had
9   claimed the Friday, she would have
10  gotten 80 hours a pay period.
11   Q.   All right.  Then moving to
12  D0015.
13   A.   She returned to work working
14  half days.
15   Q.   How can you tell that?
16   A.   Well, she has clock-in and
17  clock-out times on Thursday, February
18  3rd; then Monday, February 7th; and so
19  on down the sheet.  Some days she
20  worked four, some days she worked four
21  and a quarter.  One day she worked
22  three and a half.
23   Q.   In the category at the far

Page 79

1   right can you tell me what non-PROD
2   means?
3    A.   That's when she was using sick
4   leave.  She used 36 hours of sick leave
5   this pay period.
6    Q.   Can you tell me how many hours
7   of sick leave she had accrued?
8    A.   Not from this report.
9    Q.   At the top under her name can
10  you tell me, D0015, what it means
11  00399?  Do you see this?  I am looking
12  right here.  What does that mean?  Is
13  that her employee number?
14   A.   That was her employee number.
15  Uh-huh.
16   Q.   Can you tell me what the next
17  numbers mean where it says 00/40?
18   A.   No.  I cannot.
19   Q.   Do you know what that
20  department code indicates to you?
21   A.   You mean under --
22   Q.   The No. 083 under department.
23   A.   That was the department

Page 80

1   number.  Every department in the
2   hospital is assigned a number.
3    Q.   What does that department
4   indicate to you?
5    A.   Well, it doesn't mean anything
6   to me because I don't actually do the
7   payroll, but it would be the Ariton
8   Medical Clinic.
9    Q.   Looking at the next page,
10  D0016, does this indicate that she came
11  back on Monday, the 21st?
12   A.   The pay period begins on
13  Thursday.  She came back.  This is the
14  beginning of the pay period is 2/17.
15   Q.   Is she still out sick half
16  days?
17   A.   Well, she's got some days that
18  she worked all day.  She came back that
19  Thursday.  She worked a half a day.
20  Friday she worked a half a day.  But
21  Monday, the 21st, with the exception of
22  Friday she worked whole days.
23   Q.   There is no overtime on that

Page 81

1   page?
2    A.   No, there is not.
3    Q.   The next page, does it
4   indicate she worked?
5    A.   On March 3rd?
6    Q.   Starting with March 3rd on
7   Document No. D0017.
8    A.   Yes.  She worked 7.75 hours on
9   Thursday.  She worked 2.75 on Friday.
10  Then Monday she worked 8.75.  Tuesday,
11  Wednesday, and Thursday she worked 9
12  hours.
13   Q.   On that Thursday it has a V.
14  Does that indicate vacation?  You see
15  Thursday, 3/10?
16   A.   Uh-huh.  Oh.  I was looking at
17  the wrong one.  Yes.  That is vacation
18  time.
19   Q.   So she would have worked
20  Tuesday.  Does that mean 9 hours she
21  would have worked on Tuesday?
22   A.   Yes.
23   Q.   Then we have no time for

Page 82

1  Wednesday; correct?
2      A.  8.25.  On the 16th you mean?
3  3/16?
4      Q.  No, ma'am.  I am looking at
5  Tuesday, March the 8th.  I don't see
6  anything for March the 9th.
7      A.  No.  It is not on here.  So
8  that would have been Wednesday.
9      Q.  Do you know if --
10     A.  She didn't work, she didn't
11 take vacation or sick time.  So it
12 doesn't show up.
13     Q.  On Thursday she took vacation;
14 is that correct?
15     A.  That is correct.
16     Q.  And then works Monday,
17 Tuesday, and Wednesday?
18     A.  Uh-huh.  Yes.
19     Q.  On the next page, D0018, any
20 sick leave there?
21     A.  No.  There is 12 hours of
22 vacation.
23     Q.  On this document can you tell

Page 83

1  me how much vacation time she had
2  accrued?
3      A.  No.
4      Q.  Is there another document that
5  you would use to show how much sick
6  time or vacation time an employee has
7  accrued?
8      A.  Yes.
9      Q.  What is that document?
10     A.  A benefits statement.  Well, I
11 don't know what it is called.  There is
12 two -- It is all on one report.  We
13 have a report that shows sick and
14 vacation balances.
15     Q.  You would have those for each
16 employee?
17     A.  Yes.
18     Q.  Do you know how much time she
19 had accrued in sick time and vacation
20 before she would have exhausted that
21 and had to take FMLA?
22     A.  I don't know --
23         MR. VREELAND:  Object to the

Page 84

1  form.
2      A.  -- what her balances were at
3  the time.
4      Q.  What is the policy, the FMLA
5  policy?
6      A.  If you are out due to your own
7  illnesses once you start your FMLA, we
8  use your sick leave until your sick
9  leave is exhausted.  Then we use your
10 vacation time until that is exhausted.
11 Then you go into unpaid leave -- unpaid
12 leave then for your 12 weeks.
13     Q.  Maximum 12 weeks?
14     A.  Correct.
15     Q.  Any other leave an employee
16 can take to extend that FMLA?
17     A.  We have what we call -- I
18 don't know if we still have it.  At one
19 time.  I would have to look at our
20 current handbook.  An extended leave
21 policy where you have exhausted your
22 FMLA but it is not time to come back,
23 but it is not job protected leave.

Page 85

1  Your benefits do not remain in effect.
2      Q.  Do you know at the time
3  Ms. Hughes started taking leave in
4  January 3rd, 2005, if she had more than
5  12 weeks of accrued vacation and sick
6  leave?
7      A.  I do not know that.  I am just
8  trying to think if it were possible for
9  her to have that much time by then.
10 This is in 2005.  We accrue 12 days a
11 year sick and vacation.  So that's 96
12 hours of each.
13     Q.  All right.  But the benefits
14 statement should have that information
15 on it?
16     A.  Right.
17     Q.  Did you ever provide to
18 Ms. Hughes a benefits statement, how
19 much time she had accrued when she
20 needed medical leave?
21     A.  Your benefit hours are on each
22 check stub that you get so that you
23 always know how many hours of sick and

Page 86

1  how many hours of vacation that you
2  have.
3      Q.   Where is it located on the
4  check stub?
5      A.   I believe it is in the lower
6  left-hand corner.
7      Q.   Is it separated vacation and
8  sick leave?
9      A.   Yes.
10     Q.   Did she complete FMLA
11  paperwork?
12     A.   No.
13     Q.   Why not?
14     A.   I don't think she ever came
15  back in the office for us to talk about
16  that.  We put her on an FMLA -- just
17  put her on leave and paid out her
18  benefits.  But I don't recall the
19  paperwork ever being completed.
20     Q.   Do you know why you didn't
21  forward that paperwork to her?
22     A.   No.
23     Q.   You knew she was having

Page 87

1  surgery?
2      A.   Yes.
3      Q.   Did you at any time advise her
4  of her rights under the Family Medical
5  Leave Act?
6      A.   No, I did not.
7      Q.   Did you require her to submit
8  documentation from her doctor to you?
9      A.   Before she returned to work
10  she had to -- we had to have a release
11  from her doctor.
12     Q.   How did you indicate that you
13  needed that?
14     A.   I believe I spoke with her on
15  the phone.
16     Q.   Did she call you and tell you
17  she was coming back to work half days?
18     A.   I don't recall how it came
19  about.  I don't even recall if I
20  actually spoke with her on the phone.
21  She provided the document.
22     Q.   Fax number 334-762-2433, what
23  number is that?

Page 88

1      A.   Can you say that again?
2      Q.   334-762-2433.
3      A.   762 is an Ariton prefix.  I am
4  assuming it must be at the Ariton
5  Medical Clinic.
6          (Plaintiff's Exhibit 13 was
7           marked for identification.
8           A copy is attached.)
9      Q.   Do you recall ever receiving
10  Plaintiff's Exhibit 13, a medical
11  excuse from Norwood Clinic for
12  Ms. Hughes to return to work part-time?
13     A.   I do.
14          (Plaintiff's Exhibit 14 was
15           marked for identification.
16           A copy is attached.)
17     Q.   Did you receive that by way of
18  Plaintiff's Exhibit 14?
19     A.   I did.
20     Q.   Do you know who sent this to
21  you?
22     A.   Yes.
23     Q.   Who?

Page 89

1      A.   (No response.)
2      Q.   Who?
3      A.   I'm sorry.  What did you ask
4  me?
5      Q.   I said do you know who sent it
6  to you?
7      A.   Debbie sent it to me.
8      Q.   How is it you know that?
9      A.   Well, that is her handwriting
10  where she's written my name.  And she
11  was always sending little smiley faces
12  and hi's and hello's.
13          (Plaintiff's Exhibit 15 was
14           marked for identification.
15           A copy is attached.)
16     Q.   Okay.  Plaintiff's 15, did you
17  receive that documentation?
18     A.   Yes.
19     Q.   How do you know you received
20  that one?
21     A.   Well, just that I have seen
22  it.
23     Q.   Okay.  Did you ever make a

Page 90

1 determination when she returned to work
2 full-time how much time she had
3 exhausted?
4    A.  Did I ever -- Are you asking
5 me if I went in and counted to see how
6 many weeks that she was out?
7    Q.  Yes, ma'am.
8    A.  I knew that she was out less
9 than 12.  That was all that was --
10 Actually, I remember thinking that that
11 was not a lot of time that she was out.
12    Q.  At the time you eliminated her
13 position did she still have sick leave
14 time?
15    A.  I don't know.
16    Q.  You would have to look at the
17 benefits statement --
18    A.  I am sure she did because she
19 never went a pay period without being
20 paid hours.  So she was continuously
21 accruing her benefits.  So she would
22 have had time built up again.  I don't
23 know how much, but --

Page 91

1        (Plaintiff's Exhibit 16 was
2          marked for identification.
3          A copy is attached.)
4    Q.  Plaintiff's 16, a
5 return-to-work slip on 4/18/05, did you
6 receive that?
7    A.  Yes, I did.
8    Q.  How do you know you received
9 it?
10    A.  Because I have seen it prior
11 to today.
12    Q.  Okay.  Did you ever have a
13 conversation with Dr. Sy about
14 Ms. Hughes?
15    A.  Just in passing.  Just saying,
16 hey, I am glad she's better.  That type
17 thing.  I never asked Dr. Sy anything
18 about her.
19    Q.  After Ms. Hughes was
20 eliminated from the work force at Dale
21 Medical Center, did you approach Dr. Sy
22 and ask her what was really wrong with
23 Ms. Hughes?

Page 92

1    A.  I did not.
2    Q.  Do you know why Dr. Sy would
3 make that statement?
4    A.  No, I don't.
5    Q.  Did Dr. Sy tell you what was
6 wrong with Ms. Hughes?
7    A.  No.  Like I said, the only
8 conversations we had were in passing in
9 the cafeteria and what have you.  Any
10 inquiries I made were just general, not
11 trying to find out details.
12    Q.  In Plaintiff's 11 that we went
13 over, the time, is there any time that
14 she worked or any week that she worked
15 overtime?
16    A.  No.
17    Q.  Plaintiff's 12, if you would,
18 look at that and tell me if there is
19 any time that she worked overtime in
20 this document.
21    A.  The first page, 00115, she was
22 paid eighty-nine and a half hours.
23    Q.  Nine and a half hours

Page 93

1 overtime?
2    A.  Correct.
3    Q.  That represented two different
4 days she had worked over?
5    A.  Right.  It is on both of the
6 Wednesdays because that's when -- it is
7 just anything over 40 is how we figure
8 it.
9    Q.  Looking at this document,
10 Bates No. D00115, the week or the time
11 period of 4/1/2004 until 4/14/2004, do
12 you know if that is when Dr. Ennis was
13 out?
14    A.  I don't know if he was out
15 then or not.
16    Q.  Do you know who was --
17    A.  Wait a minute.  No, I don't
18 know.
19    Q.  Do you know which employees
20 were working at the Ariton Clinic
21 during that period of time?
22    A.  Other than Sheryl Petrey, I do
23 not.

Page 94

1    Q.   Okay.  Any other pay period
2  she was paid overtime?
3    A.   The next page she -- I'm
4  sorry.
5    Q.   I'm sorry?
6    A.   I'm talking to myself.  I'm
7  sorry.  I will keep my mouth shut.
8    Q.   No.  I am just asking for
9  overtime.
10    A.   The next pay period I am
11  having to look because she had some
12  nonproductive time.
13    Q.   What does that mean?
14    A.   Sick leave.  Sick leave --
15  Sick and vacation time does not count
16  toward overtime.  There is not overtime
17  on this one, but she was paid for
18  ninety-seven hours, which meant she
19  worked more than eight hours a day.
20  The next page, 00115, although she was
21  not paid for overtime she was paid for
22  eighty-eight and a half hours because
23  she -- wait.  She was paid for six and

Page 95

1  a quarter hours of overtime.  Then she
2  had twelve hours of nonproductive.  She
3  was paid a total of eighty-eight and a
4  half hours that pay period.
5    Q.   Nonproductive meaning vacation
6  or sick time?
7    A.   Yes, ma'am.  Let's see.  Eight
8  hours was vacation, four hours was sick
9  time.
10    Q.   That was on vacation, April
11  30th, and then sick was on May 3rd?
12    A.   May 3rd.
13    Q.   There is also a Code 1 on May
14  4th.  Do you know what that indicates?
15    A.   No.  I don't know.
16    Q.   Do you know who would know
17  that?
18    A.   The two payroll people in my
19  office.
20    Q.   The next document, D00118, do
21  you have any recollection why she was
22  taking vacation one hour, one hour and
23  a half, and one hour and a quarter?

Page 96

1    A.   No.  No, I don't, especially
2  when she worked ten hours that day.  I
3  do not know why she would take
4  vacation.
5    Q.   Do you know if this is during
6  the time period that you talked with
7  her about her overtime?
8    A.   I don't know when I talked
9  with her about her overtime, so I can't
10  really say.
11    Q.   You made no notes?
12    A.   No.
13    Q.   Did she ever tell you she was
14  taking vacation time so she could stay
15  and work?
16    A.   No.
17    Q.   No?
18    A.   No.
19    Q.   Any other overtime?
20    A.   Pay period 7/22/04 to 8/4/04.
21  It is not overtime, but she was paid 82
22  and a half hours.  She's got 16 hours
23  of nonproductive time in there is

Page 97

1  probably why it is not overtime.
2    Q.   Did you consider this
3  overtime?  You weren't paying time and
4  a half, were you?
5    A.   No.  I was not paying time and
6  a half.  The next pay period she got a
7  half hour.
8    Q.   What time system were you
9  using at the hospital then?
10    A.   Our computer system is CPSI
11  system.  What they did at the clinic
12  they had just a little bitty punch time
13  clock.  They used little time cards.
14  They punched in at the clinic.  Debbie
15  signed off on the card and sent it down
16  to us.  Then their clock-in and
17  clock-out times were input in the
18  system so that their time would roll
19  out.  We didn't figure -- look at her
20  time and say she clocked in at 7:59 and
21  clocked out at 17:40 and figure 9.75
22  hours.  We let the system do it.
23    Q.   They were not having to clock

Page 98

1 out for lunch for their half hour?  The
2 system just automatically did that?
3    A.  I don't know if they clocked
4 out for lunch or not.  I don't know.
5    Q.  Any other overtime?
6    A.  In the pay period 9/3/04 to
7 10/13/04, 10.3 hours.
8    Q.  That is Document No. 128?
9    A.  Yes, ma'am.  Document 129,
10 three hours.  That appears to be all.
11    Q.  Were any other employees at
12 the Ariton Clinic working overtime
13 other than Ms. Hughes?
14    A.  I believe at times Sheryl
15 Petrey had some on hers.
16    Q.  Did you talk to Ms. Petrey
17 about her overtime?
18    A.  No.  I talked to Debbie about
19 Sheryl's overtime.
20    Q.  Is this when Dr. Ennis was
21 out?
22    A.  I don't know if he was out or
23 not.  I believe he was.

Page 99

1    Q.  Do you know if they were
2 short-handed at the clinic?
3    A.  No.  I don't think they were.
4    Q.  Do you know one way or the
5 other?
6    A.  No.
7    Q.  Look for me, please, ma'am,
8 the last page of Plaintiff's Exhibit
9 12.  What does that indicate to you?
10    A.  She was paid sick leave 4/14,
11 4/15, worked the 18th and 19th, the
12 20th.  This must have been her last pay
13 period.  We paid her out her vacation,
14 which was 51.44 hours and paid her two
15 weeks -- paid her 80 hours in addition
16 to the time she had worked.
17    Q.  Was that severance?
18    A.  Yes.
19    Q.  Did you pay her for any unused
20 sick time she had accrued?
21    A.  We do not pay sick time on
22 termination.
23    Q.  Had you already changed to

Page 100

1 PTO?
2    A.  I don't recall when that
3 policy went in effect.  It was about
4 this time frame, but I'm not quite sure
5 when it went into effect.
6    Q.  It should be over there.
7 Plaintiff's Exhibit 4.
8    A.  There is another page to this.
9    Q.  There is a page missing?
10    A.  There should be a front page.
11    Q.  That is a document that we
12 have produced.  We may not have had the
13 entire document.
14    A.  There is a front page that
15 gives the effective date of the new
16 policy and who wrote the policy and if
17 it is superseding another policy.
18 Someone has written on here, "New
19 policy effective 3/3/05."
20    Q.  You don't know that to be the
21 case?
22    A.  Pardon me?
23    Q.  You don't know that to be the

Page 101

1 case?
2    A.  I don't know that to be the
3 case.
4    Q.  But is the policy called the
5 extended illness benefit policy?
6    A.  Right.  It is.
7    Q.  In looking at this, do you
8 know whether or not PTO -- accrued PTO
9 would be paid?
10    A.  Accrued PTO would be paid.
11 And a new policy actually benefitted
12 the employees under PTO time because
13 they accrued the holidays.
14    Q.  Did you have to be out two
15 days before you would get paid under
16 the new extended illness benefit
17 policy?
18    A.  That is correct.
19    Q.  Okay.
20    A.  Unless you had 500 hours of
21 sick leave in your bank, unless you
22 were hospitalized, or unless you were
23 out on a workers' comp injury.

1    Q.   If you look at Plaintiff's 16.
2 You with me?
3    A.   No, I'm not with you.  Sorry.
4 Okay.
5    Q.   That doctor's excuse has
6 4/11/05 until 4/18/05.  When I look at
7 her time on Document No. 141 of
8 Plaintiff's 12, 4/11 and 4/12 are
9 missing from her time.
10    A.   Correct.
11    Q.   Is that based on the new
12 policy?
13    A.   That is correct.
14    Q.   Under the old policy she would
15 have been paid those two days?
16    A.   Right.  She could have used
17 PTO time if she had chosen if she had
18 it.
19    Q.   Do you know if she was told
20 she could have used PTO time for those
21 two days?
22    A.   It is in the policy.
23    Q.   When did the policy go into

1 effect?
2    A.   This says March 3rd.
3    Q.   Did you provide any training
4 to your employees in --
5    A.   Not except handing the policy
6 out to them.
7    Q.   Can you tell me looking at the
8 Exhibit 4 how an individual employee's
9 time was converted -- if they already
10 had sick leave accrued, how it was
11 converted to PTO?
12    A.   The sick leave wasn't
13 converted to PTO.
14    Q.   What happened to their sick
15 leave?
16    A.   They kept their sick leave
17 balance, whatever it was, when we went
18 to this policy.
19    Q.   So she would still have sick
20 leave as of 3/3/05?
21    A.   If she had not used it all,
22 yes.
23    Q.   So why wouldn't she be paid

1 for her sick leave time?
2    A.   Because the policy states that
3 you can't use sick leave the first two
4 days you are out unless you have been
5 hospitalized, it is due to a workers'
6 comp injury, you have been to the
7 emergency room, or you have 500 hours
8 in your bank.  If any of those four
9 things happen, then you can use sick
10 leave your first two days.
11    Q.   You had to have 500 hours of
12 sick leave time?
13    A.   I believe that's correct.
14    Q.   How many years would you have
15 to work to have 500?
16    A.   Well, we get 96 hours a month.
17 So a little over -- 96 hours a year.
18 I'm sorry.  A little over a year --
19 five years.
20    Q.   You would have to have worked
21 five years without taking sick leave?
22    A.   Right.  And this policy is a
23 lot more generous than the hospitals

1 that surround us.
2    Q.   At the time this went into
3 effect, 3/3/05, if in fact that is the
4 time it went in, did you have any
5 employees who had more than 500 hours
6 of sick leave time banked?
7    A.   Yes.
8    Q.   How many?
9    A.   I don't know how many.  But it
10 wasn't a great number.  That is one of
11 the purposes for these policies is
12 because people indiscriminately use
13 their sick leave.
14    Q.   Did Ms. Hughes have PTO time
15 to convert when she was terminated?
16    A.   According to this last page on
17 your Exhibit No. 12, she had 51.44
18 hours because that's what we paid her.
19    Q.   Was that PTO or vacation?
20    A.   One in the same.  If this --
21 If this policy had gone into effect
22 already, we called it PTO time.  If it
23 had not, it was vacation.  The

Page 106

1  number -- When we got this new policy
2  and it went into effect, your numbers
3  that were whatever you had in your sick
4  and vacation bank just transferred
5  over. Nobody lost anything. But the
6  accrual rate on PTO time increased
7  because we incorporated the vacation
8  days that we gave into the PTO accrual.
9  So accrual went from, like, 3.69 to a
10 higher amount, 6.769. I'm sorry.
11 5.846.
12    Q.  I'm sorry. You have lost me
13 now.
14    A.  Okay. Under the old policy
15 where it was sick and vacation time, an
16 employee with less than ten years would
17 have accrued 3.69 hours per pay period
18 of vacation time.
19    Q.  Every two weeks?
20    A.  Every two weeks. And when we
21 went to the new policy, the PTO time,
22 we incorporated the 7 holidays that we
23 were getting into the vacation accrual.

Page 107

1  So accrual went from 3.69 to 5.846.
2    Q.  Per pay period?
3    A.  Per pay period.
4    Q.  Which works out on a yearly
5  basis how many hours?
6    A.  15 days, I believe, as opposed
7  to 12 under the old policy. Wait. No,
8  it didn't. I'm sorry. It went from 12
9  to 19 days because we were getting 7
10 holidays and we didn't take anything
11 away from the employees. We did the
12 whole 7 days.
13    Q.  Prior to the extended illness
14 benefit, how many vacation days?
15    A.  12.
16    Q.  12 vacation days?
17    A.  A year.
18    Q.  Then how many sick days?
19    A.  12.
20    Q.  Under the old policy?
21    A.  Uh-huh.
22    Q.  And then they had 12 vacation
23 days, 12 sick days, and 7 holidays?

Page 108

1    A.  7 holidays.
2    Q.  So then you converted that to
3  19 days?
4    A.  We converted the vacation and
5  the holidays to 19 days. Your sick
6  leave accrual still stayed separate.
7    Q.  If you had it banked?
8    A.  Right.
9    Q.  But under the new policy you
10 did not accrue sick days anymore?
11    A.  Uh-huh.
12    Q.  You still did?
13    A.  We still do. At the same
14 rate.
15    Q.  Where does it talk about sick
16 days in the new extended illness
17 benefit policy?
18    A.  Talk about what?
19    Q.  How they are accrued.
20    A.  On the first page right under
21 procedure, second paragraph.
22    Q.  Did I understand you correct?
23 Even though you have sick time accrued,

Page 109

1  you will not be paid for it for the
2  first two days?
3    A.  Unless you meet the criteria
4  in the next paragraph.
5    Q.  That is surgery or workers'
6  comp?
7    A.  It is hospitalization, an
8  outpatient surgical, or an emergency
9  room visit, workers' comp, or 500 hours
10 in your bank.
11    Q.  Why would an employee have to
12 use their sick time for workers' comp?
13    A.  Well, because workers' comp
14 doesn't kick in until you have been out
15 three days. A lot of employees opt to
16 use some of their sick leave so that
17 they are paid.
18    Q.  Okay. Under Plaintiff's 12,
19 the Document No. 142 that we were
20 talking about, we talked about the
21 vacation being 51.44 hours and the 80
22 hours as a severance. Continuing down,
23 it states other totals and has an S?

Page 110

1    A.   She was also paid 12 hours
2  sick time that she had taken on the
3  14th and 15th of April.
4    Q.   How can you tell that?
5    A.   Look at those two dates and
6  out to the side, four and eight.
7      (Plaintiff's Exhibit 10 was
8      marked for identification.
9      A copy is attached.)
10    Q.   Let's go back and get No. 10
11  in.  Have you seen this document?
12    A.   I have seen it.
13    Q.   Whose writing is that on the
14  top of the page, "Please return by
15  7/22/04"?
16    A.   Donna Reid in my office.
17    Q.   What is her position?
18    A.   She is a personnel assistant,
19  HR assistant.
20    Q.   Do you recognize the signature
21  as manager whose signature that is?
22    A.   John Ennis.
23    Q.   What is the initials out

Page 111

1  beside it?
2    A.   It is D.O.  He was a doctor of
3  osteopath medicine instead of an M.D.
4    Q.   Did you discuss this
5  evaluation with Ms. Hughes?
6    A.   No, I didn't.
7    Q.   Did you discuss it with
8  Dr. Ennis?
9    A.   No.
10    Q.   In 2004, as of July 2004, do
11  you have any knowledge that on page 55
12  and 56 of this exhibit that Ms. Hughes
13  was completing all of these 22
14  responsibilities?
15    A.   Not specifically.  The areas
16  where he did not mark her -- give her a
17  three, those were general areas that he
18  and I discussed where he would like to
19  see improvement.
20    Q.   When did you discuss this with
21  Dr. Ennis?
22    A.   Prior to him discussing the
23  evaluation with Debbie.

Page 112

1    Q.   What was the purpose in
2  discussing this with Dr. Ennis?
3    A.   I believe this might have been
4  the first evaluation that he had done
5  on her and he just called me to go over
6  the areas that he had not given her the
7  three.
8    Q.   Look for me patient insurance
9  information, No. 2.  What did the two
10  of you discuss under Item 2?
11    A.   I will have to be honest with
12  you.  I don't remember any specifics
13  about any of the areas.
14    Q.   Generally do you recall
15  anything about your conversation with
16  Dr. Ennis?
17    A.   I would be guessing if I said
18  anything.  No.
19    Q.   Did you ever discuss with
20  Dr. Ennis that Ms. Hughes had stepped
21  down from office manager after November
22  2004?
23    A.   You know, I don't recall that

Page 113

1  at all.
2    Q.   Did Dr. (sic) Hughes ever tell
3  you that she had taken the position
4  back when she came back from her brain
5  surgery?
6    A.   No.
7    Q.   Did you have that knowledge?
8    A.   I don't even think I had the
9  knowledge that she voluntarily decided
10  to step down.  I may have, but I don't
11  recall it.
12    Q.   Did you ever tell the
13  Industrial Relations that she was not
14  the office manager when you terminated
15  her?
16    A.   I think what came about,
17  whether it was in the telephonic
18  hearing or the -- of course, I don't
19  fill the paperwork out that goes
20  back -- that the reason that she was
21  terminated is because we had outsourced
22  the billing, eliminated the office
23  manager position, and that she had

Page 114

1 failed to take on the responsibilities
2 that were left, which was collecting
3 old patient accounts is all I recall
4 about that.
5    Q.   All right.  What duties --
6 Outsourcing billing would have been
7 eliminated looking at Plaintiff's
8 Exhibit 10, pages 55 and 56.  Which
9 duties were eliminated by outsourcing
10 the coding and billing?
11    A.   The thing that outsourcing the
12 coding and billing would have
13 eliminated would have been No. 6.
14    Q.   Under direct administrative
15 activities?
16    A.   Yes.  That's all on that page.
17 No. 2 under patient insurance
18 information.  Under other duties,
19 No. 1.  That's all on that one.
20    Q.   Going back to Item No. 2 under
21 patient insurance information, who was
22 taking payments and crediting those to
23 patient accounts?  Was ProBilling doing

Page 115

1 that as well?
2    A.   I believe at this point the
3 receptionist up front was taking money
4 if the patient actually came into the
5 facility.  Now, on a bill or an
6 insurance or what have you that ProBill
7 billed, they mailed the statements out
8 to the patient and the patient -- we
9 had a P.O. box that the payments came
10 back into that ProBill got and then
11 posted it to the patient accounts.
12    Q.   Who was making bank deposits?
13    A.   At this time?
14    Q.   Yes, ma'am.
15    A.   I do not know.  I know that --
16 I don't know.
17    Q.   Was it Ms. Hughes'
18 responsibility to make those bank
19 deposits?
20    A.   At one time it was.  I don't
21 know if that was ever removed from her
22 responsibility or not.
23    Q.   Who was doing bank deposits

Page 116

1 after she left?
2    A.   I believe Lisa Brooks was
3 making deposits.
4    Q.   That is the receptionist?
5    A.   Correct.
6    Q.   Other than Items 6 on Document
7 No. 55 of Plaintiff's Exhibit 10, and
8 Item 2 on page 56, the top portion, and
9 Item 1 under other duties, was
10 Ms. Hughes performing all these other
11 duties at the time you terminated her?
12    A.   I do not know if Dr. Ennis had
13 already taken some of those duties away
14 from her or not because those were
15 definitely -- these other duties would
16 definitely be office manager or office
17 coordinator duties.
18    Q.   Now I'm correct, am I not, at
19 this period of time you don't know that
20 she's resigned or taken the job back as
21 office manager; correct?
22       MR. VREELAND:  When you say
23 this period of time, you are talking

Page 117

1 about --
2    Q.   At the time you terminate her.
3    A.   No, I do not know.
4    Q.   Dr. Ennis never shared with
5 you that she stepped down and he
6 offered her the position back when she
7 came back after her tumor surgery?
8    A.   I do not recall him doing
9 that, no.
10    Q.   Am I correct that you had no
11 knowledge about her ever stepping down
12 or taking the job back?
13    A.   If I had knowledge, it has
14 certainly left me now.  I do not right
15 now think that I ever knew that.
16    Q.   Am I correct that I read
17 something or heard something that you
18 told the Industrial Relations that she
19 was not office manager at the time you
20 terminated her?
21    A.   You may have.
22    Q.   Am I correct that I've heard
23 that?  Did you say that?

Page 118

1    A.  I don't think I have said it
2 to you.  I --
3    Q.  No.  But you said it to
4 Industrial Relations?
5    A.  Back then it was a little
6 fresher on my mind than it is now too.
7 It is not that I am trying to evade
8 your question or anything.  What I
9 recall about the office manager thing
10 is my meeting with Dr. Ennis and him
11 saying that, you know -- I think I do
12 recall him saying she no longer wanted
13 to be the office manager.  At that
14 meeting that we had that night at
15 dinner is when the biggest discussion
16 about her not being the office manager
17 took place and that he was going to, I
18 guess, maybe the next day after we had
19 dinner that night talk to her about the
20 new duties and see if -- although she
21 wasn't going to be the office manager,
22 that she would accept those duties.
23 That's what I recall at this moment.

Page 119

1    Q.  You knew Dr. Ennis was
2 terminal?
3    A.  I did.
4    Q.  How long had you had that
5 information?
6    A.  I think probably -- I can't
7 give you, like, a month or a date.  It
8 was in 2005.  I do believe it was at
9 the time that he went out that last
10 time that he would not be back because
11 that was at the time that we brought in
12 a temporary contract physician.  And,
13 you know, he never told me, Pat Ennis
14 never told me, but it is just something
15 you know.  He was losing weight like
16 mad, not being able to eat, and just
17 looked like a ghost.
18    Q.  In 2005 or 2004?
19    A.  Five.
20    Q.  In 2004 did you have the
21 knowledge he had pancreatic cancer?
22    A.  I did.
23    Q.  You had heard that through the

Page 120

1 work grapevine or he told you?
2    A.  No.  He told me.
3    Q.  Did he tell you that cancer
4 was terminal?
5    A.  He did.  But when he first
6 discovered that he had pancreatic
7 cancer and he came and he spoke to
8 Vernon and I at the same time to inform
9 us of the fact that he had pancreatic
10 cancer, he was the one that shared the
11 statistics with us and told us that
12 there was only a two percent survival
13 rate.  But he was convinced he was
14 going to be in that two percent.
15    Q.  Did he share with you, as
16 Mr. Johnson testified, that he had six
17 months to live?
18    A.  That's the normal life
19 expectancy of someone who has.  But he
20 had several reasons to think that he
21 would last longer than that.  One was
22 that his was discovered at such an
23 early stage, probably because he was a

Page 121

1 physician and just noticed that he was
2 jaundice and immediately began the
3 process of trying to find out what was
4 wrong with him.  And he just had that
5 faith.  I think he was a very unique
6 man.  He handled that illness with such
7 dignity and fought and did everything
8 that any physician -- he went up to
9 M.D. Anderson.  So he felt like -- He
10 really felt like for a long time he was
11 going to be in that two percent.
12    Q.  Did you and Mr. Johnson have
13 conversations after he shared -- After
14 Dr. Ennis shared his news about his
15 health situation, did you and
16 Mr. Johnson have conversations what you
17 were going to do with the clinic?
18    A.  I don't think it was
19 immediately after that because
20 Dr. Ennis worked for some time after
21 that before he -- I think his first
22 time away from the clinic -- I don't
23 recall when it was -- he had to go to

Page 122

1 UAB for a surgical procedure. He was
2 in the hospital for quite some time. I
3 don't believe that we did anything at
4 that point about bringing another
5 physician in.
6    Q.   My question is did you and
7 Mr. Johnson have conversations about
8 what you were going to do with the
9 clinic after -- any time after
10 Dr. Ennis shared his news with you?
11    A.   Yes.
12    Q.   And what were your
13 discussions?
14    A.   Well, about how we were going
15 to hold the clinic together during each
16 period of time that he was out. There
17 again, we didn't want to cut the
18 employees' hours, we didn't want to
19 lose the patient base. So we just
20 decided that when there were periods of
21 time that we were going to be very lengthy
22 that we would try to get or -- that is
23 when Dr. Zumstein's name kind of came

Page 123

1 up again.
2    Q.   Did you and Mr. Johnson ever
3 discuss closing the clinic?
4    A.   There were periods of time,
5 yes, when it looked like financially
6 that would have been the best decision.
7    Q.   When did the two of you
8 discuss closing the clinic?
9    A.   Time frame, I don't know. I
10 think it was after he had been out
11 several times. The clinic was not
12 making money. But I can't tell you
13 when we had those discussions.
14    Q.   Would that have been 2004 or
15 2005?
16    A.   Probably 2005.
17    Q.   He died May 2005; correct?
18 Dr. Ennis?
19    A.   No. He died in August.
20    Q.   August?
21    A.   Uh-huh. My twin grandchildren
22 were born within a day or two of that.
23 That's why I remember it so well.

Page 124

1    Q.   Do you know the last time he
2 worked?
3    A.   No. I do not remember the
4 last time he worked. There was a long
5 period of time there at the end.
6    Q.   That he did not work?
7    A.   That he did not work.
8    Q.   Did you and Mr. Johnson
9 discuss that if you closed the clinic,
10 you would have to absorb the employees
11 into the hospital?
12    A.   Any time in a similar
13 situation in the past we had always
14 tried to do that or either hoped that
15 if -- if we closed the clinic, yes, we
16 would have had to absorb. But if we
17 could get something like we did from
18 Dr. Magony's group to come in and take
19 it over, we would have always hoped
20 that they would absorb the employees
21 that were already in place there.
22    Q.   Why do you make that
23 statement, that if you closed it, you

Page 125

1 would have to absorb them?
2    A.   Because that's what we had
3 generally done in the past.
4    Q.   Prior to terminating
5 Ms. Hughes, had you and Mr. Johnson had
6 conversations about closing the
7 facility, Ariton facility?
8    A.   At some point we did have
9 those conversations. When Dr. Quintana
10 was up there.
11    Q.   Did you talk about it before
12 Dr. Quintana was there, closing the
13 facility?
14    A.   Yes.
15    Q.   Did you talk about it when
16 Dr. Zumstein was there and you were
17 having difficulty staffing?
18    A.   I think we probably had that
19 conversation every time we were given
20 the financials for the month because
21 they were so dismal.
22    Q.   Would that have been in 2004
23 as well that they were dismal, the

Page 126

1 financials?
2    A.  Yes.
3    Q.  Did Dr. Ennis ever tell you he
4 wanted Ms. Hughes terminated?
5    A.  Only after, according to him,
6 she did not want to collect the old
7 accounts.  He felt like there was
8 nothing else in the clinic for her.  At
9 that point, yes, he did.
10    Q.  What did he say?
11    A.  He just said just what I said,
12 that if she wasn't going to collect on
13 the old accounts, then there was not a
14 position in there for her.
15    Q.  When did the two of you have
16 this conversation?
17    A.  It was right after we had that
18 dinner meeting, which was the latter
19 part of March, first of April, and he
20 was going to discuss it with her within
21 the next day or two.  And then it was
22 in the next day or two after that that
23 he called me and said she didn't want

Page 127

1 to collect old accounts or said she
2 could not collect old accounts because
3 it was patients she had known for so
4 long.  Then he called me and said there
5 was nothing else that he had for her to
6 do.
7    Q.  Did he tell you he wanted her
8 terminated?
9    A.  Yes.
10    Q.  Was it Dr. Ennis's decision to
11 terminate?
12    A.  Yes.  He made the
13 recommendation to me.  And I carried it
14 to Vernon.  And Vernon approved it.
15    Q.  Did he put that recommendation
16 in writing?
17    A.  No, he did not.
18    Q.  Did you make any notes of your
19 conversation with Dr. Ennis?
20    A.  No, I did not.
21    Q.  Who came up with the decision
22 to eliminate her position?
23    A.  Dr. Ennis.  I mean, it was a

Page 128

1 discussion between he and I.  But he
2 made the final decision.  At that point
3 he was still hoping to take that clinic
4 over and he was still trying to manage
5 the operations when he was there.
6    Q.  But when he made this
7 decision, you could tell he was not
8 doing well; correct?
9    A.  This was early 2004.  Or 2005
10 we are talking about?
11    Q.  2005.
12    A.  I did not think he was well,
13 no.  He was not spending a lot of time
14 in the clinic.  It was probably around
15 June that he really started really
16 going downhill.
17    Q.  Was Mrs. Ennis present when he
18 told you he wanted to terminate?
19    A.  I was speaking to him on the
20 phone.  So I do not know.
21    Q.  When you had your dinner
22 meeting and Mrs. Ennis was present, did
23 the two of you discuss eliminating or

Page 129

1 terminating Ms. Hughes?
2    A.  No, because at that point he
3 had not offered her the other duties.
4    Q.  Did he tell you that she had
5 refused to do collections?
6    A.  He did on the phone.
7    Q.  Why didn't you terminate her
8 for insubordination?
9    A.  I don't guess I considered it
10 insubordination.  She was given the
11 option of doing her job or not having
12 one.  I guess I just viewed it that --
13 I didn't say you have to do this.  So I
14 didn't consider it insubordination.  It
15 didn't even cross my mind.
16    Q.  Did you tell her she had to do
17 collections or she was going to be
18 terminated?
19    A.  No.  Dr. Ennis had that
20 conversation with her as far as I know.
21 I never told her that.  The next time I
22 spoke to Debbie is when she came down
23 to my office the day that I did.

Page 130

1    Q.   That was on April 20th, 2005?
2    A.   If that was her last day, yes,
3 ma'am.
4    Q.   Okay.  Tell me what you told
5 her on April 20th, 2005.
6    A.   I told her that due to the
7 fact that we had outsourced the billing
8 and that she did not feel like she
9 could collect on the old AR, that the
10 position was being eliminated.  Then we
11 talked about several -- we kind of
12 backtracked a little bit and talked
13 about the account write-offs, the flu
14 vaccine, and the fact that she used an
15 improper procedure when she was out
16 that week.
17    Q.   Did you tell her she was
18 terminated?
19    A.   I told her that her job had
20 been eliminated and she was no longer
21 employed.
22    Q.   Did she ask you if there was
23 another position she could work?

Page 131

1    A.   She did.
2    Q.   What did you tell her?
3    A.   I told her I didn't think so
4 at that time.
5    Q.   Did you tell her she was
6 eligible for rehire?
7    A.   It did not come up.
8    Q.   You don't recall that at all?
9    A.   That subject never came up.  I
10 don't as a rule tell employees when
11 they are terminated whether or not they
12 are or are not eligible for rehire.
13    Q.   So she asked you if there was
14 something else she could do?
15    A.   Right.  She did.
16    Q.   And you told her not at that
17 time; is that correct?
18    A.   That is correct.
19    Q.   What did that mean?
20    A.   It meant that there was
21 nothing she could do.  There were no --
22 There was no place I could put her I
23 think is the way that came out.

Page 132

1    Q.   Is that what you said?
2    A.   I don't know word for word.  I
3 could be paraphrasing.
4    Q.   Did she ask you if something
5 came up, would you call her?
6    A.   I told her that she could
7 apply for any opening that she became
8 aware of, which is what I tell
9 everybody.  We don't have call-back
10 lists.  So I told her that she could
11 apply for anything that she became
12 aware of.
13    Q.   Did you make the comment that
14 she would be the first one you would
15 call?
16    A.   No.
17    Q.   You didn't say that?
18    A.   No.
19    Q.   Are you aware of her applying
20 for positions?
21    A.   I am.
22    Q.   How were you made aware of
23 that?

Page 133

1    A.   The application comes to my
2 front desk person.  By the time I think
3 that we got the first one, she had
4 already filed an EEO complaint.  So my
5 front office -- front desk person just
6 brought the applications back to me.
7    Q.   What did you do with them?
8    A.   I asked her to -- we log them
9 in, make a card on them, and then file
10 them.  I asked her just to log it in
11 and put it in the file.
12    Q.   What file?
13    A.   The file with all the other
14 applications that we had received that
15 month.
16    Q.   Okay.  Were the applications
17 filed per position?
18    A.   No.  We file them by month
19 because they are only active for 30
20 days.
21    Q.   You still have those
22 applications?
23    A.   I do.

Page 134

1    Q.   How many jobs did she apply?
2    A.   I think there are three
3  applications there.
4    Q.   Do you know when the first one
5  she -- the first time she applied for
6  an open position?
7    A.   I believe it was in the latter
8  part of 2006, like November, December
9  2006.
10   Q.   When you told her she could
11 apply for anything, what did you mean?
12   A.   Just that.  We have employees
13 who are not eligible for rehire that
14 apply all the time.
15   Q.   Why would she have not been
16 eligible for rehire?
17   A.   Well, it was my opinion --
18 with the problems that I had had with
19 her and the ones that Dr. Ennis had had
20 with her, that I made the determination
21 right then I would have said no.  That
22 is what I put on her separation of
23 employment form because I had

Page 135

1  supervisory -- I had problems with her
2  periodically during the course of her
3  employment.
4    Q.   If you have problems with an
5  employee, what is the procedure you are
6  to follow per Dale Medical Center's
7  policies and procedures?
8    A.   I discussed each and every one
9  of the problems that I ever had with
10 Debbie.  She was at a level in her
11 career and in her knowledge that -- If
12 I say no more overtime or if I say do
13 this or don't do that, I just expect it
14 to be done.  She was not like a clerk
15 that walks in off the streets that's
16 never been trained for anything.  And
17 the issues -- there weren't that many
18 of them, but I just always felt this
19 distance with her.  And no rehire or
20 not, it is discretionary upon the
21 person who they have worked for, who
22 their supervisor was.
23   Q.   My question was if you have

Page 136

1  issues with an employee, what are you
2  supposed to do as the director of human
3  resources for somewhat 23 years?
4    A.   As a director of human
5  resources, the problems that I had with
6  Debbie, I didn't handle those as the
7  director of human resources.  I handled
8  those as the person who had
9  administrative responsibility over that
10 clinic.  And it is just like I do with
11 the employees in my office that I have
12 direct supervisory responsibility over.
13 If they are doing something in a manner
14 that I don't think they should be doing
15 it, I call them in and I talk to them.
16 Same thing I did with Debbie.
17       (Off-the-record discussion.)
18       (Plaintiff's Exhibit 17 was
19        marked for identification.
20        A copy is attached.)
21   Q.   Plaintiff's 17, do you recall
22 receiving effective supervisor
23 training?

Page 137

1    A.   Yes, I do recall that.
2    Q.   By Mr. Steve Brandon?
3    A.   Yes, I do.
4    Q.   How long was this training?
5    A.   I believe it lasted about all
6  day, eight hours.  It was an eight-hour
7  training session that we put together
8  for our supervisors.
9    Q.   Do you still have the training
10 material?
11   A.   I believe I do.
12       (Off-the-record discussion.)
13   Q.   In this training that you
14 received, was that on December 10,
15 2004, by Mr. Brandon?
16   A.   Yes.
17   Q.   At that time Mr. Brandon was
18 with the law firm of Lehr Middlebrooks?
19   A.   He was.
20   Q.   In those materials that you
21 received in that eight-hour training
22 session, did Mr. Brandon discuss with
23 you how to effectively counsel a

1  problem employee?
2     A.  I'm sure he did.
3     Q.  Did he discuss progressive
4  discipline?
5     A.  I don't know that he discussed
6  progressive discipline.
7     Q.  Did he talk about informal
8  counseling, followed by a verbal
9  counseling placed in an employee file,
10  followed by a written counseling one or
11  more placed in that employee's file,
12  followed by suspension with or without
13  pay, followed by termination?
14     A.  You are quoting our policy
15  pretty much.  Am I the world's worst in
16  documenting?  Yes, I am.
17     Q.  You admit that?
18     A.  I admit that.  I should not be
19  because of my position.  But I am.  But
20  I also hold people like Debbie Hughes
21  and the people in my own office at a
22  higher level than I do an hourly
23  employee.  I feel like if I call -- If

1  I tell somebody else in my office
2  please don't do that that way anymore,
3  it doesn't get done that way anymore.
4  That is why -- That was the problem I
5  had with Debbie.  I never could reach
6  her.  I don't know if it was because of
7  the difference in our personalities or
8  if she felt threatened by me or she
9  plain out didn't like me.  That was
10  just the feeling I had, that we could
11  not connect.  Yes, I am the world's
12  worst documenter.
13     Q.  You also understand as a
14  professional in human resources that
15  you have to rise above personality
16  conflicts and follow the procedures?
17     A.  Absolutely.  I did not
18  follow the procedure because of the
19  personality conflict.  I didn't have a
20  personality conflict.  Yes, I do
21  realize that.  I do realize I am a
22  whole lot better at telling people what
23  to do than doing it myself.  Al told me

1  I was like a lawyer and a doctor.
2     Q.  You knew that that clinic
3  closed, you were going to have to
4  absorb Debbie Hughes into Dale Medical
5  Center; correct?
6     A.  Correct.
7     Q.  And you knew she had health
8  problems; correct?
9     A.  I knew she had been out.  I
10  have had health problems, but I'm back.
11  The health issue never was an issue.
12  Debbie doesn't -- she was certainly not
13  a person that called in a lot.  Yes,
14  she had that issue.
15     Q.  She never had a brain tumor
16  before.
17     A.  No.  She never -- Not until
18  she had the brain tumor.  If I recall
19  correctly, during the whole time that
20  she was employed with us, that was the
21  only -- she may have been out a day
22  here or there possibly.  I don't even
23  know that.  But that was the first time

1  that Debbie had had any kind of illness
2  that caused her to be out for a certain
3  period of time.
4     Q.  If Dr. Ennis died and you had
5  to absorb those employees, she was
6  going to become your problem; correct?
7        MR. VREELAND:  Object to the
8  form.
9     A.  I would not say that she was
10  going to become my problem, no.
11     Q.  But she was an employee with a
12  health problem.  And you knew that.
13     A.  I did know that.  Yes.  I knew
14  that.
15     Q.  At the time you terminated
16  her, that was two days after she came
17  back from a leave.
18     A.  Right.
19     Q.  Is that correct?
20     A.  That's correct.
21     Q.  Is that coincidental?
22     A.  It is coincidental.  The
23  conversations that I had with Debbie

Page 142

1  after she came back, she was fully
2  functional. Everybody that is out -- I
3  understand the seriousness of the
4  problem that she had. But thank
5  goodness it was benign, she had them
6  removed, she was back, she was
7  functional.
8      Q.  Doing her job?
9      A.  Doing her job. Well, two days
10 is probably not a long time to
11 determine whether or not she was going
12 to be effective at that. But yes.
13     Q.  Had any issues at work after
14 she had the brain tumors removed?
15     A.  No.
16     Q.  No one said she wasn't doing
17 her job after she came back from the
18 tumors?
19     A.  No. Because the time frame of
20 the tumor or the no tumor was not an
21 issue, was not relevant in deciding
22 that we were going to go to an outside
23 billing company. The fact that at some

Page 143

1  point she was not doing her job very
2  well is when the decision was made to
3  go to an outside billing company. I
4  believe that Vernon testified earlier
5  this morning we had no checks and
6  balances in that office. It is kind of
7  like a loose cannon. You just don't
8  have -- The only thing that we ever got
9  about patient accounts came from Debbie
10 and that system. She was the only one
11 that could access it. We don't have
12 those kind of situations in our -- That
13 was an exception to our general way of
14 doing business. And we just felt like
15 it was time to change that.
16     Q.  In the other offices what is
17 the checks and balances?
18     A.  They never -- Well, first of
19 all, MedNet or ProBill inputs all the
20 data in the system. They collect all
21 the money that comes in. Or actually
22 the money comes directly to the
23 hospital. They just provide us the

Page 144

1  reports where the money -- They key the
2  remits to the patient in the system.
3  Then they send us the reports. They
4  never touch the money. That is a check
5  and balance. They never touch money.
6      Q.  Who is not touching the money?
7      A.  The people in the offices.
8  Because it doesn't come to them. It
9  comes to us.
10     Q.  Did you think she was taking
11 money?
12     A.  No, I did not.
13     Q.  Have any proof she was taking
14 money?
15     A.  No. Nobody ever even
16 suspected she was taking anything.
17     Q.  If you asked her for reports,
18 would she generate those reports?
19     A.  Generally, yes. There at the
20 end when we were dealing with those
21 patient write-offs we had a little bit
22 of trouble with reports. And those
23 reports -- The monthly reports that

Page 145

1  were generated out of her system went
2  to our CFO. That is just not something
3  that I dealt with a whole lot.
4      Q.  Is there ever a time that you
5  asked her for a report she didn't give
6  you a report?
7      A.  She gave them to me, but it
8  just took her a long time to get them
9  to me. I would call and ask for a
10 report. I would have to call back.
11 That type thing. She never refused to
12 give me a report.
13     Q.  Did the chief financial
14 officer -- I believe that is
15 Mr. Hull -- did he ever say Ms. Hughes
16 was not providing him timely financial
17 reports?
18     A.  I never heard him say that.
19     Q.  He never complained to you
20 about that?
21     A.  No.
22     Q.  Did he --
23     A.  He wouldn't. He would have

Page 146

1  just taken care of it.
2      Q.   Did he ever complain he had
3  issues with Ms. Hughes' job
4  performance?
5      A.   No, he didn't complain to me.
6      Q.   In all the other offices where
7  you have office administrators or
8  office coordinators -- I think they are
9  office coordinators and office
10  managers?
11      A.   Correct.
12      Q.   Do you have third party
13  billing there?
14      A.   Yes.
15      Q.   So why do you need an office
16  coordinator there?
17      A.   Well, someone has to make the
18  appointments, act as the receptionist
19  type thing.  Some of the offices -- I
20  think most of the offices put the new
21  patient demographics in the system.
22  And then at the end of the day they get
23  their charge sheets together and those

Page 147

1  are sent to whichever billing company
2  and they input the charges.  Of course,
3  then when the money comes in, the third
4  party biller also posts that money.
5      Q.   Who was doing that at Ariton?
6      A.   Well, we got -- MedNet did it
7  for the first three years that we had
8  Ariton.  Debbie did it for two or
9  three.  Then we got United ProBill was
10  doing it.
11      Q.   Who was doing the patient
12  demographics?
13      A.   When?  At which time?
14      Q.   Okay.  Bad question.  Who did
15  patient demographics and the collecting
16  of the face sheets to send to United
17  ProBilling?
18      A.   Well, Debbie would have if she
19  had been there.  That would have
20  probably still been one of her duties.
21  The person up front can do it.  I don't
22  think that Debbie got that far in the
23  training with United ProBill.  Debbie

Page 148

1  did it when MedNet was doing our
2  billing.  I think she also put in
3  charges.  I don't think that MedNet was
4  doing that at that time.
5      Q.   After Ms. Hughes was
6  terminated who did that job?
7      A.   Put the patient demographics
8  in?
9      Q.   Yes, ma'am.
10      A.   United ProBill.
11      Q.   What was Lisa Brooks doing?
12      A.   She was the receptionist.  She
13  collected copays, made appointments,
14  pulled charts, answered the phone,
15  greeted the patients as they came in.
16      Q.   The duties that Ms. Hughes had
17  performed that were not related to
18  those being taken by United ProBilling,
19  who assumed those?
20      A.   All of the supervisory duties
21  that are in here, Dr. Ennis assumed
22  them.
23      Q.   Okay.  Was he working about

Page 149

1  part-time then, April 2005?
2      A.   Uh-huh.  About three days a
3  week.
4      Q.   Okay.  So when he wasn't
5  there, who was supervising the staff?
6      A.   Nobody.  They all went in, did
7  their jobs.  There was not an actual
8  supervisor on site.
9      Q.   The other 19 items on that
10  evaluation, who did those duties?
11      A.   I'm sure that -- I'm not sure.
12  I can give you my opinion.  Debbie -- I
13  mean, Lisa Brooks probably ordered the
14  nonmedical supplies, the back office
15  person probably ordered the medical
16  supplies.  Some of the other things
17  they probably just called me about.
18      Q.   Did Ms. Brooks assume the bulk
19  of Ms. Hughes' responsibilities?
20      A.   She had no supervisory duties,
21  no supervisory -- the financial reports
22  had to come from ProBill.  Dr. Ennis
23  did his own coding.  Then ProBill would

Page 150

1  do -- check behind him.  The back
2  office person would have worked up.
3  Sheryl would have drawn blood.  I think
4  they probably divided the duties.  We
5  had housekeeping from the main hospital
6  to go up and do the cleaning duties.
7      Q.   One person or just the
8  department?
9      A.   I think they had one person
10  that was designated to come up there
11  and clean the office once or twice a
12  week.  I don't recall the schedule.
13      MS. HAYNES:  Okay.  You had
14  asked for a break.
15    (Recess was taken, commencing at
16  4:07 p.m., concluding at 4:19 p.m.)
17  (Plaintiff's Exhibit 18 was marked for
18  identification.  A copy is attached.)
19      Q.   (MS. HAYNES) Plaintiff's 18,
20  do you recognize this document?
21      A.   Yes, I do.
22      Q.   Is this your handwriting?
23      A.   Yes, it is.

Page 151

1      Q.   When did you fill this out?
2      A.   4/20 of '05.
3      Q.   Are you sure about that?
4      A.   No, I am not sure.  But that's
5  what it says.
6      Q.   What time of day was it when
7  you terminated Ms. Hughes?
8      A.   It was in the morning before
9  lunch.
10      Q.   On her time records,
11  Plaintiff's 12, did you pay her for the
12  entire day or did she clock out?
13      A.   We must have just paid her for
14  the entire time because her clock-out
15  time is 16:30.
16      Q.   That would be 4:30?
17      A.   4:30.  Yes, ma'am.
18      Q.   She didn't come over to your
19  office at 4:30 in the afternoon?
20      A.   No.  I am pretty certain it
21  was before lunch.
22      Q.   How is it you recall that it
23  was in the morning?

Page 152

1      A.   Because typically when I know
2  I have to do something like that I
3  don't like to have to worry about it
4  all day.
5      Q.   Get it over with?
6      A.   Yes, ma'am.
7      Q.   On Plaintiff's 18 is there any
8  reason you did not get her to sign
9  where it says Employee Signature?
10      A.   More than likely I did not
11  fill it out until after she departed my
12  office.  I'm saying more than likely.
13  I do not feel like I did it before she
14  came in.
15      Q.   In the details relating to
16  separation you did not make mention of
17  the flu vaccine, the backtracking on
18  accounts, or not following or
19  implementing an improper procedure
20  during the week; correct?
21      A.   Correct.
22      Q.   Why did you leave that out?
23      A.   Because the primary reason for

Page 153

1  her no longer being employed with us is
2  that we had outsourced the billing and
3  she didn't want to do what we had left.
4      Q.   At any time during your
5  meeting with her on April 20th, 2005,
6  did you ever tell her she was
7  terminated?
8      A.   I don't think I used the word
9  terminated.  I think I said because we
10  were eliminating her position and she
11  didn't want to collect the aged AR,
12  that we just did not have anything else
13  left to do.  So, therefore, she would
14  not be employed with us any longer.  I
15  believe that's what I said.  It has
16  been over two years.
17      Q.   The employee rating, when did
18  you complete that?
19      A.   At the same time I filled out
20  this form.
21      Q.   Had she ever been told that
22  her job performance, initiative,
23  judgment, and cooperation needed

Page 154

1 improvement prior to you terminating
2 her on April 20th, 2005?
3    A.   Probably not using those very
4 words unless it had been done by
5 Dr. Ennis.  I did not do it.
6    Q.   What is written there under
7 "Cooperation" in the box?
8    A.   (No response.)
9    Q.   Is that "Leave possible"?
10    A.   Yes.
11    Q.   What does that mean?
12    A.   I guess -- Nobody ever fills
13 that out.  I think it is probably just
14 if we are going to pay them out their
15 vacation time.  Like I said, nobody
16 ever fills out any boxes on that row.
17    Q.   If her work was
18 unsatisfactory, why were you paying her
19 two weeks' severance?
20    A.   I just felt it was the right
21 thing to do.  It is discretionary with
22 each termination as to whether or not.
23 We don't have a policy about paying

Page 155

1 severance pay.
2    Q.   Why did you think it was the
3 right thing to do to pay her two weeks'
4 severance?
5    A.   In the situation I just felt
6 like -- I don't have a reason.  I just
7 felt like it was the right thing to do.
8    Q.   Why did you block her
9 unemployment?
10    A.   Pardon me?
11    Q.   Why did you block her
12 unemployment?
13    A.   When Donna first filled out
14 the first form that came, she just put
15 exactly almost verbatim what I had
16 written on here.  And she was denied
17 unemployment.  Then she appealed it.
18 There was something that she said or
19 that was brought up.  I will have to
20 think real hard if I can bring it back
21 that was said during that hearing that
22 was not true about why she was
23 terminated.  It won't come to me right

Page 156

1 now.  But I will write myself -- Maybe
2 it will.  But that was the reason.
3 There was something that was said in
4 that unemployment hearing on the
5 telephone.  I believe it was something
6 that Debbie had said that just was not
7 the reason she was terminated.  Oh.
8 Well, no.  We had both agreed that she
9 didn't voluntarily -- I never knew
10 where that came from in that
11 unemployment paperwork either, that she
12 voluntarily quit her job.  But there
13 was something that was said.  I will
14 think on it.  But there was something
15 that was said that made me decide when
16 we got the determination that she was
17 due her unemployment, to appeal that.
18    Q.   But you don't know what it is?
19    A.   Well, not at the moment I
20 don't.  But I will think about it.
21 Maybe it will come back to me.
22    Q.   But it was your opinion she
23 had stated an untruth about her

Page 157

1 termination?
2    A.   I am not going to say it is an
3 untruth.  I believe at any time that
4 Debbie stated what she honestly
5 believed.  I don't think she
6 intentionally lied.  But there was
7 something said.
8    Q.   Made you mad?
9    A.   No.  It didn't make me mad,
10 but it was not a true statement
11 according to my recollection.  Didn't
12 make me mad.  But, you know, in those
13 hearings or in that whole process with
14 unemployment sometimes you don't get
15 but one shot to correct something.  And
16 I guess I felt like the appeal was my
17 only shot.  But I don't remember what
18 it is.  But I will think about it.
19    Q.   How many hearings did you
20 participate?
21    A.   Just one.
22       (Plaintiff's Exhibit 19 was
23        marked for identification.

1        A copy is attached.)
2    Q.  Plaintiff's 19, do you know
3  what this document is?
4    A.  Okay.
5    Q.  What is this?
6    A.  It is a fax transmission form
7  that Donna Reid sent to -- I think
8  Mr. Archie is with the State
9  Unemployment Office.  Generally when we
10  process an employee, we have them sign
11  that they have been handed a copy of
12  their job description.  I am just
13  assuming from reading this -- Donna
14  acts pretty independently on most of
15  the unemployment stuff -- that that
16  slip was not in Debbie's file.
17    Q.  Going back to Plaintiff's 18,
18  I have got a couple more questions I
19  want to ask you.  You put here or wrote
20  here that she was not eligible for
21  rehire and then listed your reasons;
22  correct?
23    A.  Yes.

1    Q.  Lack of initiative and
2  inability to perform assigned tasks?
3    A.  Yes.
4    Q.  What was her lack of
5  initiative?
6    A.  Well, I guess because I felt
7  like because the billing and everything
8  had gotten behind and the AR was -- the
9  outstanding AR was so high.  She didn't
10  have many other duties at that point
11  that she had to do.  That was just my
12  choice of words, I guess.
13    Q.  What were you relying on that
14  the AR was high?
15    A.  Financial reports and
16  conversations with Brad Hull.
17    Q.  I thought we had already gone
18  over that Mr. Hull never commented
19  about Ms. Hughes.
20    A.  But the reports that Brad got
21  when I would -- sometimes they would
22  come to me and I sent them up to Brad.
23  But that was the basis for knowing the

1  AR.  He may not specifically be talking
2  about Ms. Hughes, but we did discuss
3  the outstanding AR in that office.
4    Q.  The AR would be the patient
5  accounts, money that is owing on
6  patient accounts?
7    A.  Yes.
8    Q.  And it is your opinion or at
9  least what you are testifying to as far
10  as her lack of initiative that the AR
11  was considerably more higher than other
12  facilities?
13    A.  Right.
14    Q.  Do you know what it was?
15    A.  Do I know the figure, the
16  number?  No, I do not.  Not anymore.
17    Q.  Who started doing the accounts
18  receivable after she left?
19    A.  United ProBill.
20    Q.  I'm sorry?
21    A.  United ProBill.
22    Q.  Did you already have that in
23  the works, that they were going to do

1  AR?
2    A.  No.  They were initially just
3  going to do the billing.  But after
4  Debbie left, we brought the old Medisys
5  system down to United ProBill's office
6  for them so they could print reports
7  off and start collecting the old AR.
8    Q.  Who was doing the AR in the
9  other offices?
10    A.  Whoever is doing the billing.
11  You don't have -- Generally you don't
12  have a lot of old AR in a physician
13  practice.  You should not.  Because
14  there is more to just initially billing
15  insurance when a patient comes in.
16  There is all the follow-up.  And either
17  MedNet or ProBill in the other offices
18  does the follow-up so that your AR
19  doesn't get up there.
20    Q.  In the other offices are the
21  office coordinators or office managers
22  working the AR?
23    A.  No.

Page 162

1    Q.   That is left to the third
2  party administrator?
3    A.   Right.  Only offices where
4  they have their own system does the
5  person in the office work the AR.
6    Q.   With regards to Defendant's
7  Exhibit 6, did you have any
8  conversations with Ms. Hughes about the
9  overage of the flu vaccine?
10    A.   Yes.
11    Q.   What were those conversations?
12    A.   I called her the day I
13  received this, which was probably
14  September 2nd because I generally don't
15  keep invoices on my desk.  When I got
16  it, I called because I saw this was 300
17  vials of flu vaccine and $25,000 is a
18  lot of money out of a practice.  So I
19  called her.  The first thing she said
20  when she got on the phone was, oh, you
21  got the invoice.  I just asked her,
22  Debbie, why in the world did you order
23  so much flu vaccine?  Initially she

Page 163

1  told me he told me to, but I am sure we
2  had a few more words.  At that point
3  flu vaccine is not something you can
4  return.  So we just started working on
5  what we were going to do with 300 vials
6  of flu vaccine and it should have been
7  30.  That office was also one of few
8  offices that orders their own flu
9  vaccine.  Generally that is ordered
10  through our pharmacy.  And it would
11  have been caught had she placed the
12  order through the pharmacy.
13    Q.   Do you know what the profit
14  the company ended up making on that?
15    A.   I doubt very seriously we made
16  a profit.  Flu vaccine is not something
17  that our practice generally makes a lot
18  of money on.  The vaccine that we sold
19  in bulk we sold for what we paid.  What
20  I started doing immediately was calling
21  physician practices in Ozark and Dale
22  County to see if everybody had gotten
23  their vaccine.  Now, that didn't -- And

Page 164

1  that information didn't get back to me
2  immediately because this was in
3  September.  Typically offices do not
4  start giving the flu vaccine until
5  October 1 or somewhere around the first
6  of October.  But what I did was I made
7  contact with every physician
8  practice -- family practice in Ozark.
9  There are two nursing homes in Ozark.
10  I called those.  There is a clinic in
11  Midland City that is located in Dale
12  County that I called.  And eventually
13  what vaccine our practices that we
14  owned did not use, then we sold -- we
15  did sell all of it.  There was none
16  that was wasted.  But we sold it at
17  cost.
18    Q.   Was it all gone by October
19  20th, the newspaper clipping?
20    A.   All that we had kept in our
21  possession.  Had we known this was
22  going to happen, that everybody was
23  going to come to StatMed in Ozark to

Page 165

1  get their flu shot from everywhere, we
2  probably would have kept more here than
3  we did.  But, two, we wanted the
4  nursing homes to get it.  I think there
5  are a hundred beds apiece.  So they
6  have a hundred residents apiece.  So
7  that was two hundred shots right there.
8  They both bought the number of shots
9  that they needed actually for their
10  employees and their residents.  We kept
11  enough vaccine for our employees that
12  wanted the flu shot.  And the rest,
13  like I said, we distributed.  We had
14  doctors calling us that, of course,
15  they gave their flu vaccine out very
16  quickly and wanted more.  But when it
17  was gone, it was gone.
18    Q.   Where would the paperwork be
19  where you sold the vaccine?
20    A.   I am assuming it would be in
21  our accounts payable office because --
22  or Brad Hull may have a record of the
23  checks that came in from the

Page 166

1  physicians' offices paying for this
2  vaccine.  And I think I went to Ariton
3  after this happened and Dr. Ennis kept
4  out what he thought he was going to
5  need for his practice.  I took the rest
6  of the vaccine down to our pharmacy
7  because this is a vaccine that has to
8  be refrigerated.  And they kept it in a
9  separate refrigerator.  As we got
10 requests, we would fill them and
11 dispense it out of the pharmacy.  Of
12 course, we sent StatMed what they
13 needed and our other practices that we
14 own what they needed -- or what they
15 requested.
16    (Plaintiff's Exhibit 20 was
17      marked for identification.
18      A copy is attached.)
19    Q.  Plaintiff's 20, this is one of
20 the applications that you testified to
21 earlier.  Do you know who received the
22 emergency room admit rep?
23    A.  No, I don't.

Page 167

1    Q.   Where it says this application
2  is to be active for a period of 30 days
3  only, what does that mean as far as
4  other job openings in the facility?
5    A.  If at the end of 30 days if
6  the applicant has not called in and
7  updated their application, then they
8  are just put in another file.  We keep
9  them for whatever the period of time is
10 that you have to keep applications.
11 But unless an employee calls and says,
12 you know, I know my application is over
13 30 days, but I see you have got an ER
14 admit rep available, will you pull my
15 application and send it, then we will
16 pull it, update it, and send it.
17    Q.   Is there anything wrong with
18 this application, Plaintiff's 20?
19    A.  Well, have you ever been
20 discharged from a job before or asked
21 to resign?  She put no.
22    Q.  Is that wrong?
23    A.  Well, she had been discharged

Page 168

1  from the hospital.
2    Q.  Was she terminated or reduced?
3    A.  Ma'am?
4    Q.  Was her position reduced or
5  was she terminated?
6      MR. VREELAND:  Object to the
7  form.
8    A.  Well, I think that is just --
9  the form here says she was discharged.
10    Q.  Is that what you told her?
11    A.  I don't think I used the word
12 discharged, no.  Terminated,
13 discharged, fired, it all means the
14 same thing.  It means you are no longer
15 employed.  The only other thing -- Of
16 course, this is just something I happen
17 to know.  I guess it is just a
18 technicality just like terminated or
19 discharged.  Ariton Medical Clinic from
20 1974 to 2005.  Although she did state
21 that she was previously.  If I wanted
22 to nitpick it to death, yes, I could
23 find things wrong with it.  She didn't

Page 169

1  come to work for us in 1985.  But we
2  don't nitpick applications.
3    Q.  You heard Mr. Johnson's
4  testimony this morning where he said
5  that Ms. Hughes was asking whether or
6  not she was terminated, fired, and he
7  would not commit to that.  Correct?
8    A.  That's what he said, yes,
9  ma'am.
10    Q.  Do you know of anyone who has
11 ever told her she was fired?
12    A.  Used the word fired?
13    Q.  Uh-huh.
14    A.  Not to my knowledge.
15    Q.  She's either been told by you
16 that her position was eliminated or she
17 was downsized?  Is that correct?
18      MR. VREELAND:  Object to the
19 form.
20    A.  I don't recall using the word
21 downsized.  I do recall using the word
22 that the position had been eliminated.
23 But I don't recall using -- I don't

Page 170

1  recall using the word downsized.
2        (Plaintiff's Exhibit 21 was
3        marked for identification.
4        A copy is attached.)
5    Q.  Plaintiff's 21.  I believe you
6  testified earlier that you had received
7  this and had knowledge of it.  Is that
8  correct?
9    A.  That is correct.
10   Q.  Okay.  When is the first time
11 you had knowledge of the charge of
12 discrimination Ms. Hughes had filed?
13   A.  Whenever we received this at
14 the hospital.  And I'm not quite sure
15 when that was.
16   Q.  Did you read the affidavit
17 that she had attached, three pages?
18   A.  I --
19   Q.  Ma'am?
20   A.  I'm sorry.
21   Q.  Have you read it?
22   A.  Yes, I have read it in the
23 past.

Page 171

1    Q.  When is the last time you read
2  it?
3    A.  Probably a couple of months
4  ago.
5    Q.  Look at Paragraph 3, page 1 of
6  the affidavit.
7    A.  Yes.
8    Q.  She writes, "My job was office
9  manager, but I also acted as insurance
10 and billing coder and a manager of
11 other programs such as the indigent
12 patient program."  Is that correct?
13       MR. VREELAND:  Are you asking
14 that's what it says or is the statement
15 true?
16   Q.  Is the statement true?
17   A.  I think having someone or
18 whether she did it herself complete the
19 applications for indigent patient
20 assistance, I mean, all of that was
21 done.  But was she the manager of it?
22 I just think that's the choice of words
23 that she used.

Page 172

1    Q.  What were her job duties with
2  regards to the indigent patient
3  program?
4    A.  At one time there was another
5  lady up there.  I think her name was
6  Mary Skinner.  Basically this was about
7  all they do because it is in a rural
8  community and there are a lot of
9  indigent patients in that area.  It is
10 an assistance program that they can
11 apply for.  I don't know if it is just
12 for medication.  But that has to be
13 filled out in a physician's office and
14 a physician has to sign off on it.  So
15 someone up there was doing it.
16   Q.  You don't know that Ms. Hughes
17 was doing it?
18   A.  No, I don't know that
19 Ms. Hughes was doing it.
20   Q.  Did you receive any reports
21 from anyone about the indigent patient
22 program?
23   A.  No.  No.

Page 173

1    Q.  Does the hospital receive any
2  federal funding?
3    A.  No.
4        MR. VREELAND:  Do you mean by
5  virtue of the indigent patient program
6  or at all?
7        MS. HAYNES:  The patient
8  program.
9        MR. VREELAND:  Okay.
10   Q.  (MS. HAYNES) Paragraph 6.
11 Were you aware in 2004, 2005 that
12 Mrs. Ennis was in the office during
13 work hours?
14   A.  I was aware that she drove
15 Dr. Ennis to work and that she picked
16 him up every day.  But I did not know
17 how much time she spent in the office,
18 that she stayed all day or part of a
19 day.
20   Q.  When did you first know she
21 was staying all day and acting as a
22 supervisor?
23       MR. VREELAND:  Object to the

Page 174

1 form.
2    A.  I believe I knew that
3 yesterday when Debbie stated that in
4 her deposition.  I don't believe I knew
5 it prior to then.
6    Q.  Why would you hire her in May
7 2005 if she had no experience --
8    A.  One --
9        MR. VREELAND:  Let her finish.
10   A.  One of the things that she did
11 was she did help or was going to help
12 with this indigent patient program.
13 Those are very lengthy forms.  It is
14 very time-consuming to do it.  Not a
15 lot of doctors' offices do it, but that
16 clinic has always done it.  That was
17 one of the reasons that she was put on
18 part-time.
19   Q.  Did you know if she had any
20 experience?
21   A.  No.  She had no experience.
22   Q.  But you put her in charge of
23 an indigent patient program?

Page 175

1        MR. VREELAND:  Object to the
2 form.
3    A.  I can't say as being put -- it
4 is filling out a form.  It is a
5 difficult form.  It is time-consuming.
6 But it doesn't take a mental giant to
7 do it.  It is just very tedious.
8    Q.  Who was doing it before
9 Mrs. Ennis?
10   A.  I do believe that Debbie did
11 it and some of the other -- Lisa
12 probably did some of them.  They just
13 kind of shared them around.  I don't
14 think it was anything that anybody was
15 just crazy about doing all the time.
16   Q.  Did you know prior to
17 yesterday that Mrs. Ennis was foul-
18 mouthed, abusive, and complained about
19 Ms. Hughes?
20   A.  No, I did not.
21   Q.  Had you ever been in her
22 presence where she was cursing?
23   A.  Have I ever heard her use

Page 176

1 profanity?  Yes.  But not in the
2 office.
3    Q.  Where were you?
4    A.  I think we were at her house.
5 She was extremely angry over how things
6 were going with her husband.  Hurt,
7 angry.  That kind of anger.  And she
8 did use some profanity then.
9    Q.  Why were you at her house?
10   A.  I think I had taken something
11 by for Dr. Ennis to sign.  I don't
12 recall.  I remember spending some time
13 with him and then she and I walked
14 outside and talked.
15   Q.  Did Mrs. Ennis ever complain
16 to you that Ms. Hughes was on a
17 part-time basis back after her brain
18 tumor?
19   A.  No.
20   Q.  When is the first time you
21 knew that Mrs. Ennis had intentionally
22 struck Ms. Hughes on the head after her
23 surgery?

Page 177

1        MR. VREELAND:  Object to the
2 form.
3    A.  I learned of that when I got
4 this complaint.  I guess that's also
5 when I learned that she was foul-
6 mouthed, abusive, and complained about
7 Debbie.
8    Q.  Did you ever talk to Sheryl
9 Petrey about that?
10   A.  No.
11   Q.  Have you to this day?
12   A.  No.
13   Q.  Have you ever talked to
14 Ms. Petrey about Ms. Hughes?
15   A.  No.
16   Q.  Have you talked to Mrs. Ennis
17 about Ms. Hughes?
18   A.  Since I received this or ever?
19   Q.  Ever.
20   A.  The only time that I can
21 recall that Debbie was the subject of
22 the conversation was that night that we
23 all went to dinner in March or April.

Page 178

1   Q.   Of 2005?
2   A.   Yes.
3   Q.   That was after her brain
4 surgery?
5   A.   That was after what?
6   Q.   The brain surgery?  Brain
7 tumor surgery?
8   A.   Yes.  That was.
9   Q.   Was she back at work full-time
10 or still half days?
11   A.   I think she was back full-time
12 again.
13   Q.   At the time you got the charge
14 of discrimination, was the Ariton
15 Clinic still in operation?
16   A.   I don't really know when I got
17 this.  I don't recall when we got out
18 of the business with Ariton.  I don't
19 know.
20   Q.   When you got the charge, did
21 you conduct any type of investigation?
22   MR. VREELAND:  When you answer
23 that, I caution you not to reveal any

Page 179

1 communications with your attorneys.
2   MS. HAYNES:  I am just asking
3 what she did personally.
4   MR. VREELAND:  She can answer
5 that.  I am just cautioning her.
6   A.   I believe that I received this
7 after Dr. Ennis had passed away.  I did
8 not contact any of the employees to try
9 to verify this.  Some of this I knew it
10 wasn't true or I felt was not true.
11 Some things you couldn't verify like
12 things she said that Dr. Ennis had
13 said.  I never discussed it with
14 Mrs. Ennis.  And I have not called the
15 employees that were there to see if any
16 of them had witnessed this.
17   Q.   What did you think is untrue
18 when you read it?
19   A.   Well, one thing is when she is
20 stating -- she said when I came back
21 from surgery Sheila Dunn and Pat Ennis
22 we know why we don't like you, your
23 hair and your baggy pants.  I knew I

Page 180

1 didn't say that.  And this does not
2 read the way that she stated it
3 yesterday.  She didn't say that
4 Mrs. Ennis told me that on the phone.
5 The way this reads is that I said that.
6 I knew I didn't say that.  I knew that
7 the revised extended illness benefit
8 policy was not done because of
9 Ms. Hughes.
10   Q.   Where does it say that she is
11 saying that?
12   A.   That she is saying what?  I'm
13 sorry.
14   Q.   That it was revised because of
15 her.
16   A.   Well, she didn't say it was
17 because of her.  I probably read into
18 that.  "Dale Medical Center revised its
19 extended illness benefits policy after
20 I returned to work making it more
21 difficult to get leave."  If you are
22 going to put that in as a charge, then
23 I guess I assumed she was talking about

Page 181

1 we did it intentionally to keep her
2 from having.  I don't guess I have any
3 more to say about that.
4   Q.   My question is what you read
5 and it was your statement that you knew
6 it was untrue.
7   A.   That I didn't say I didn't
8 like her because of her hair and her
9 baggy pants.
10   Q.   Did you hear Mrs. Ennis say
11 that?
12   A.   No, I did not.  Mrs. Ennis
13 never talked bad about Ms. Hughes to
14 me.
15   Q.   Paragraph 13 where she writes,
16 "I was called to Dale Medical Center on
17 April 20th by Sheila Dunn and told I
18 was no longer needed," is that what was
19 conveyed to her?
20   A.   Well, was she told that at
21 some time during that conversation?
22 Yes.
23   Q.   Okay.  Next sentence, "She,"

Page 182

1  meaning you, Ms. Dunn, "initially
2  accused me of not calling in an
3  absence." Is that part of that
4  sentence true?
5      A.  Is that what?
6      Q.  Is that part of that one
7  sentence -- there is a comma there, but
8  I am asking you about that, "Ms. Dunn
9  initially accused me of not calling in
10  an absence," is that true?
11      A.  I did not accuse her of
12  anything.  That was part of the
13  conversation that we had that day that
14  she was -- her position was eliminated.
15  We did talk about the time that she did
16  not use the proper procedure for
17  calling in.
18      Q.  Is that how you started the
19  meeting off?
20      A.  No, it is not.  That came
21  after the job elimination part.
22      Q.  You started the conversation
23  your job has been eliminated?

Page 183

1      A.  I started the conversation
2  with the fact that we had had to
3  outsource the billing to an outside
4  billing service and that they -- since
5  she had refused to collect the aging
6  AR, that her job was eliminated.
7  Subsequently after that I talked about
8  the not calling in -- not using the
9  proper procedure for calling in an
10  absence.
11      Q.  Then did she follow that up
12  that she had notified the office?
13      A.  She may have said that.  But
14  the information that I had from the
15  office was that she had been in that
16  morning, all of a sudden got up and
17  left the office, didn't tell anybody
18  where she was going, when she would be
19  back.  And when I learned that she was
20  not working is when I got the excuse
21  from Dr. Sy's office.  Now, that is the
22  information that I have been given.  I
23  wasn't there at the office.

Page 184

1      Q.  Who gave you that information?
2      A.  I don't recall specifically
3  who gave me the information.
4      Q.  Mrs. Ennis?
5      A.  I don't recall.
6      Q.  Did you make any notes?
7      A.  No.
8      Q.  Did you admit that you had
9  received the doctor's excuse?
10      A.  I did.
11      Q.  Did you tell her you did not
12  agree with it?
13      A.  No, because I don't know what
14  would not have been to agree with it.
15  It was just simple to state that she
16  was out from 4/11 to 4/18.
17      Q.  The part she has in quotes
18  here, I just don't agree with it; for
19  that reason I am going to have to let
20  you go; you have been downsized; it is
21  your word against mine; did you say
22  that?
23      A.  Those are not my words, no.

Page 185

1      Q.  Did you say anything similar
2  to that?
3      A.  We got into a conversation to
4  where it was just a battle of I said,
5  you said, she said, they said, you
6  said.  At that point I did say,
7  "Debbie, there is no point in
8  continuing this conversation in this
9  manner because anywhere you go it is
10  just your word against mine."  I did
11  use those words, but not this whole
12  sentence.  That is just the way I
13  remember it.  You know, Debbie
14  remembers it differently.
15      Q.  Was the conversation about
16  whether or not you had received the
17  doctor's excuse?
18      A.  I don't think so.  I mean, I
19  said, yes, I got the doctor's excuse.
20  But that was the end of that
21  conversation.
22      Q.  Did you tell her you have been
23  downsized and use that word?

Page 186

1    A.   No, I did not.
2    Q.   Never used that word with her?
3    A.   No.
4    Q.   Did the two of you have
5  another conversation the next day where
6  Ms. Hughes called you back?
7    A.   I remember her saying
8  something about that yesterday.  But I
9  don't really recall having another
10 conversation with her.
11   Q.   Do you recall her calling you?
12   A.   Uh-uh.  I don't recall her
13 calling me.  I don't recall anything
14 about it.  I just -- Like I said, I
15 heard her yesterday.
16   Q.   All you recall is this one
17 meeting?
18   A.   I'm sorry.  She did call to
19 see at some point if she could go get
20 her own belongings up at the clinic.
21 She did call me and request that.
22   Q.   In that conversation did she
23 tell you I'm still not clear why I have

Page 187

1  been let go?
2    A.   I don't recall her saying
3  that.  All I recall is the call and
4  that she wanted to pick up her own
5  things.  I don't remember.
6    Q.   Did you tell her in the
7  earlier conversation that she could not
8  go and pick up her own things?
9    A.   I did tell her I preferred her
10 not to got back to the office, that I
11 would personally gather her things up
12 for her.
13   Q.   What did you tell the people
14 back at the clinic?
15   A.   I believe that Dr. Ennis took
16 care of that.
17   Q.   You didn't tell anyone
18 anything?
19   A.   Only I called Dr. Ennis after
20 Debbie left my office.
21   Q.   And told him what?
22   A.   That I had talked to her and
23 told her that her job had been

Page 188

1  eliminated and she wouldn't be back.  I
2  didn't talk to any of the other staff.
3  So I am sure that he did.
4    Q.   Did anyone ever tell you what
5  Dr. Ennis told the staff?
6    A.   No.
7    Q.   In the conversation, either
8  the one in your office or the phone
9  conversation, did you and Ms. Hughes
10 discuss severance?
11   A.   I don't recall if I told her
12 at that point or not.  I think I
13 probably did, but I can't be sure.
14   Q.   Did you ever -- Did she tell
15 you she had gone to the unemployment
16 association?
17   A.   I don't recall that she told
18 me that, no.
19   Q.   Do you recall when you
20 terminated Ms. Hughes that you told her
21 she would collect severance and
22 vacation?
23   A.   I don't recall telling her

Page 189

1  that.  I'm thinking that I probably
2  did, but I could not swear that I did.
3    Q.   At some point in time did she
4  call to tell you there was a problem
5  with her collecting her unemployment?
6    A.   I honestly don't recall
7  talking to Debbie again after that
8  Friday that I met her up at the clinic.
9  So I do not recall such a phone call.
10   Q.   If her position was eliminated
11 and she put that on the paperwork for
12 unemployment, do you know how
13 unemployment would get information that
14 she had quit her job?
15   A.   No, I don't because on the
16 form that is sent -- the initial form
17 that comes from the unemployment office
18 that was sent to us, Donna took that
19 form and she copied almost -- which is
20 what she does every time we receive a
21 form from unemployment -- what is on
22 the separation from employment form.
23 It is almost verbatim.

Page 190

1    Q.   Had you ever eliminated the
2  position of any other employee?
3    A.   Yes.  We eliminated a position
4  in Dr. Cromer-Tyler's office.
5    Q.   Who was that?
6    A.   It was an LPN.  She had two
7  LPNs.
8    Q.   When did you eliminate the
9  position?
10   A.   Gee, I don't remember.
11 Sometime in 2006.
12   Q.   Who was the individual?
13   A.   Jennifer Campbell.  We left
14 the decision as to which position was
15 going to be eliminated to Dr. Robin.
16 And that was the one that she picked.
17 Her name was Jennifer Campbell.
18   Q.   Did you have an opening for an
19 LPN in the hospital?
20   A.   We always have openings for
21 LPNs, yes.
22   Q.   Did you hire that person?
23   A.   She stayed with us.  I don't

Page 191

1  remember what she did.  Oh.  Initially
2  she worked the senior RX program that
3  Lisa Brooks had been doing.  She now
4  works in Dr. Parwaiz' office.
5        (Plaintiff's Exhibit 22 was
6          marked for identification.
7          A copy is attached.)
8    Q.   Plaintiff's Exhibit 22.  Donna
9  Reid, is she your personnel assistant?
10   A.   Yes, she is.
11   Q.   How long has she been with
12 you?
13   A.   15 years.
14   Q.   Do you recognize this as
15 Ms. Reid's handwriting on this
16 document?
17   A.   Yes, I do.
18   Q.   Did you partner with her in
19 completing this document?
20   A.   No.
21   Q.   Is Ms. Reid still with you?
22   A.   Yes, she is.
23   Q.   Did you see under the claimant

Page 192

1  identified the reason for separation to
2  be discharge for absenteeism?
3    A.   I did.
4    Q.   Did you ever tell Ms. Hughes
5  that she was being discharged for being
6  absent the week before?
7    A.   No, I did not.
8    Q.   She testified yesterday to
9  ordering 500 self-addressed stamped
10 envelopes.  Have you ever seen that
11 order?
12   A.   I have not, no.
13   Q.   Who would have that?
14   A.   Our purchasing department
15 probably.
16   Q.   Who would that be?
17   A.   Craig Davis is the director
18 over purchasing.  Lucy -- her last name
19 escapes me.  That is more than likely
20 who would have processed the order.
21 Bruner.  Lucy Bruner.
22        Can I go back a couple of
23 minutes to tell you something?  I think

Page 193

1  it is in this form I do believe now
2  that what struck me was this discharge
3  for absenteeism.  I do believe that was
4  the statement that Debbie made during
5  the hearing as to the reason that she
6  was terminated.  That just was not so.
7  I think that's what compelled me to
8  appeal it.
9        (Plaintiff's Exhibit 23 was
10         marked for identification.
11         A copy is attached.)
12   Q.   Plaintiff's 23, have you seen
13 this document?
14   A.   Have I ever seen this
15 document?
16   Q.   Yes, ma'am.
17   A.   No.
18   Q.   Are you familiar with the
19 call-in procedure of employees?
20   A.   Yes, I am.
21   Q.   Did you ever talk to an
22 investigator or intake clerk with the
23 Department of Industrial Relations?

Page 194

1    A.   I do not recall if I did or
2  not.
3    Q.   Okay.  On page -- Document
4  No. T32, which is the first page of
5  Plaintiff's 22 --
6        MR. VREELAND:  Plaintiff's 23?
7    Q.   Sorry.  I couldn't read my own
8  writing.  Plaintiff's 23.  You disagree
9  that you told her she was being
10  terminated for not calling in?
11    A.   Yes, I do.
12    Q.   Was it discussed in the
13  meeting you had with her on 4/20?
14    A.   Yes, it was.
15    Q.   It was also discussed about
16  the doctor's excuse being faxed?
17    A.   Yes.
18    Q.   All right.  Look for me on
19  Document No. 34.  Do you remember
20  another conversation where you told her
21  the position was being eliminated?  See
22  where she's written?
23    A.   I'm reading it now.  Are you

Page 195

1  talking about in my statement?
2    Q.   No, ma'am.  I'm sorry.  I'm
3  asking in the claimant's statement.
4    A.   The question is that she's
5  answering -- is it on the prior page?
6    Q.   I think it goes back to her
7  previous screen.
8    A.   I don't follow this so well.
9  I'm sorry.
10        MR. VREELAND:  I'm not sure
11  which it attaches to.
12    A.   I don't either.
13    Q.   It could be my missing
14  documents even though they are numbered
15  sequentially.  Let me ask you about
16  your statement or if you made this
17  statement on Document No. 34,
18  Plaintiff's 23.  See where it says
19  Employer's Statement?
20    A.   Yes.
21    Q.   Does that refresh your
22  recollection that you had a
23  conversation with someone?

Page 196

1    A.   Just a minute.  It doesn't
2  refresh my memory about a conversation
3  with anybody, no.
4    Q.   Well, what is written here as
5  the employer's statement, is it true?
6    A.   It looks true.  Yes.  Reads
7  true.
8    Q.   What other duties was
9  Ms. Hughes offered around February 2005
10  that she chose not to do?
11    A.   Collecting on the old
12  accounts.
13    Q.   I thought you told me that
14  happened late March, early April after
15  your dinner.
16    A.   I did.
17    Q.   Is that not true?
18    A.   That is what I told you.  Yes.
19    Q.   So is it true that she was
20  offered the duties in February 2005 or
21  late March, early April 2005 to call on
22  old accounts?
23    A.   I still think it was March or

Page 197

1  April.  I don't know why I said
2  February.  She was --
3    Q.   Did -- I'm sorry.
4    A.   She was out on leave in
5  February.  I don't know where I got
6  this February thing.
7    Q.   Did you tell the
8  investigator -- The interviewer here is
9  Mr. Carmen Archie.  Do you see his name
10  down there?
11    A.   Uh-huh.
12    Q.   Does that help you, that you
13  talked to Mr. Archie?
14    A.   No.
15    Q.   Okay.  Did you tell anyone at
16  the Department of Industrial Relations
17  that Ms. Hughes was the office manager
18  and at some point said she didn't want
19  the position anymore?
20    A.   Well, it is here and I have no
21  reason to believe that I did not say
22  it.  This is supposedly a transcript of
23  the hearing.

Page 198

1      MR. VREELAND:  Just tell her
2  what you remember.
3      Q.  All right.  Then did you say,
4  "We came up with other tasks for her to
5  reconcile old accounts and make payment
6  arrangements"?
7      A.  I did say that.
8      Q.  How is it you came up with
9  those tasks?
10     A.  It said we came up with other
11  tasks.
12     Q.  Did you partner with someone?
13     A.  Dr. Ennis.
14     Q.  You and Dr. Ennis came up for
15  her to -- came up with the task for her
16  to reconcile old accounts?
17     A.  Yes.
18     Q.  Did she tell you she would not
19  do that job because these patients were
20  her friends?
21     A.  No.
22     Q.  She never made that statement
23  to you?

Page 199

1      A.  Not to me.
2      Q.  All right.  Did you say, "I
3  can't say that it wasn't through no
4  fault of her own, because if she had
5  been doing her job to begin with, we
6  wouldn't have had to eliminate the
7  position"?
8      A.  I don't recall saying that,
9  but I'm sure I did.
10     Q.  You had outsourced billing
11  before, had you not?
12     A.  Yes.  We outsource it in all
13  of our clinics.
14     Q.  And it had been outsourced at
15  this clinic prior?
16     A.  Yes.
17     Q.  To MedNet?
18     A.  Yes.
19     Q.  And it had not worked her out
20  of a job, had it, meaning Ms. Hughes?
21     A.  No.
22     Q.  And it has not worked the
23  other office coordinators or office

Page 200

1  managers out of a job to have their
2  billing handled by a third party;
3  correct?
4      A.  There is still one clerical
5  person in each office.  There has to be
6  a clerical person.
7      Q.  All right.  Did you tell the
8  Industrial Relations that Ms. Hughes
9  had been given verbal warnings by you
10  and by the doctor she worked for the
11  last one on December 2004?
12     A.  Yes.
13     Q.  What was the verbal warning
14  that was provided to her in December
15  2004?
16     A.  I can't recall at this point.
17  I am sure I surely had something in
18  front of me when I was talking to this
19  man.
20     Q.  In December 2004 Ms. Hughes
21  did not tell you she was not going to
22  do any duties?
23     A.  No.  And that's what I was

Page 201

1  talking about when I said I talked with
2  her on 12/2004.  That was the day that
3  Debbie stopped by my office.  I did
4  tell her that I had been told that she
5  would not collect from the old
6  accounts.  She did tell me at that
7  point.  She says, "I didn't say that; I
8  said it would be hard."  That was the
9  end of that part of the conversation.
10  No.  I take that back.  I'm sorry.  I
11  am getting all this confused.  I guess
12  I am getting tired.  She told me that
13  on the day that I called her down and
14  told her her job was eliminated that it
15  would be hard.
16     Q.  Okay.  Do you know what the
17  verbal warning was she received on
18  December 2004?
19     A.  No.
20     Q.  You did not give her a verbal
21  warning?
22     A.  I am not saying I didn't give
23  her a verbal warning.  I don't know

Page 202

1  what I was referring to.  And I --
2    Q.  Well, when she came to your
3  office, she was just coming by to talk
4  to you about what was going on with her
5  physically?
6    A.  Uh-huh.
7    Q.  With her health?
8    A.  Uh-huh.
9    Q.  Is that correct?
10   A.  That is correct.
11   Q.  In that meeting did you
12  counsel with her and give her a verbal
13  warning that her job performance was
14  not satisfactory?
15   A.  I do not recall doing that.  I
16  don't know -- I can't say if I meant
17  here that I gave her the verbal warning
18  or Dr. Ennis gave her the verbal
19  warning in December 2004 because this
20  is not clear to me at all.
21   Q.  Okay.  Then it states here,
22  "I," meaning you, Ms. Dunn, "talked
23  with her about the duties that she

Page 203

1  didn't want to do and we couldn't come
2  up with duties she wanted to do."  Is
3  that true?
4    A.  Yes.
5    Q.  You told me that you talked
6  about the old accounts and she said I
7  never said that.
8    A.  I am not sure that this means
9  I did this on December of 2004.  It is
10  not clear to me.  It just says I talked
11  with her.  And I did.  But --
12   Q.  Okay.  At any time did you try
13  to come up with duties she wanted to
14  do?
15   A.  I am just assuming that I was
16  referring to the ones that we did come
17  up with that she didn't want to do.  I
18  do not believe that we came up with
19  anything after she said she did not
20  want to work those aged accounts or
21  after I was told she didn't want to
22  work those aged accounts.
23   Q.  But she told you she didn't

Page 204

1  say that.
2    A.  She did tell me that on April
3  20th.  She did tell me that.
4    Q.  And she told you it will be
5  hard, but I can do it?
6    A.  She did tell me that.
7    Q.  So why not tell her to go back
8  to work and do her job?
9    A.  Because Dr. Ennis had made the
10  decision he didn't want her in that
11  office out there.
12   Q.  Dr. Ennis had also told you
13  that she wasn't going to collect old
14  accounts; correct?
15   A.  He did.
16   Q.  And now you know that's not
17  true; correct?
18     MR. VREELAND:  Object to the
19  form.
20   A.  I now know that she disagrees
21  with what he told me.  I don't know
22  which is true and will never know.
23   Q.  Well, you knew in April 20th,

Page 205

1  2005, when one is in your office and
2  one is 12 miles away that you had two
3  people saying two different things.
4    A.  I did.
5    Q.  So why didn't you pick up the
6  phone and call him and say I have
7  Debbie Hughes here, she is saying she
8  will collect these accounts?
9    A.  I don't have an answer for
10  you.
11   Q.  Is it because he didn't say
12  that?
13   A.  No, it is not because he
14  didn't say that.  I am not sitting here
15  making up things that he would or would
16  not.  That was one of the problems with
17  this hearing.  There was a lot they
18  wouldn't let me say because there was
19  no way to prove it because Dr. Ennis
20  was no longer with us.  But no, I never
21  made up anything.
22   Q.  You had this conversation on
23  April 28th, 2005.  He was still alive,

Page 206

1 was he not?
2     MR. VREELAND:  Object to the
3 form.
4     A.  I don't believe this date is
5 correct.  There is no way they would
6 have made a determination and her
7 appeal it and them have a hearing eight
8 days after she was fired.  There is
9 something wrong with that date there.
10 The State does not work that fast.  As
11 a matter of fact, this form was filled
12 out April 26, 2005.  That is the
13 initial notice of claim.  So there is
14 something wrong here.
15     Q.  Plaintiff's 19, the fax?
16     A.  Ma'am?
17     Q.  Think there could be anything
18 wrong with that, that Ms. Reid is
19 communicating with Mr. Carmen Archie as
20 of April 28th?
21     A.  May I ask you a question?
22     Q.  No, ma'am.
23     A.  Okay.  What is this document?

Page 207

1     MR. VREELAND:  If you don't
2 know what it is, just tell her you have
3 never seen it before and you don't know
4 what it is --
5     THE WITNESS:  I did tell her I
6 have never seen it before.
7     MR. VREELAND:  -- and you
8 don't remember anything in it.
9     Q.  These are certified copies of
10 documents from the Industrial
11 Relations.
12     A.  Of?
13     Q.  And the employer's statement
14 is listed as the person being
15 interviewed, you, by Mr. Carmen Archie
16 on April 28th, 2005, which is the same
17 day that Ms. Reid is faxing copies to
18 Mr. Carmen Archie.  Do you have any
19 reason to believe you were not having a
20 conversation with Mr. Carmen Archie on
21 April 28th?
22     A.  No, I do not believe -- I have
23 no reason to believe that I did not

Page 208

1 have a conversation with Mr. Archie.
2 But to my knowledge the only taped
3 conversation I had where there would be
4 a transcript was at that unemployment
5 hearing.  So I don't know if this stuff
6 is factual or not.
7     Q.  And you have listened to the
8 tape?
9     A.  No, I have not.
10     Q.  Did you record any of your
11 conversations?
12     A.  No, ma'am.
13     Q.  Did you record any of
14 Ms. Hughes' conversations?
15     A.  No.  No, I did not.
16     Q.  And you didn't record the
17 termination session?
18     A.  No.  I have never recorded
19 anything.
20     Q.  And you did not make any other
21 written records other than the document
22 that you completed, Plaintiff's 18?
23     A.  No.

Page 209

1     Q.  Is that correct?
2     A.  That's correct.
3     Q.  Did you have another
4 conversation on May 3rd, 2005, with
5 Mr. Archie?
6     MR. VREELAND:  Object to the
7 form.
8     A.  I don't know.
9     Q.  I am referring to Document
10 No. 36 of Plaintiff's Exhibit 23.
11     A.  I don't recall the
12 conversation, but the content here is
13 all true.
14     Q.  Did you make the statement
15 that Ms. Hughes had worked herself out
16 of a job?  Do you recall making that
17 comment to the Industrial Relations
18 Board?
19     A.  I don't recall making that to
20 the board.
21     Q.  Did you ever make that
22 statement, "You worked yourself out of
23 a job"?

Page 210

1    A.  I did make that statement, but
2  I could not tell you who.  But there is
3  a lot about this document that makes me
4  think I don't believe anything that is
5  on it because it has got claim date
6  4/17/05.  She hadn't even been
7  terminated at that point.  So this
8  document really bothers me.
9    Q.  Did you ever tell Ms. Hughes
10  that United ProSource --
11    A.  ProBill.
12    Q.  -- was going to be doing the
13  coding and billing before you
14  terminated her?
15    A.  I believe that I did.  I don't
16  recall exactly when that took place.
17      (Plaintiff's Exhibit 24 was
18        marked for identification.
19        A copy is attached.)
20    Q.  Plaintiff's 24.  Do you recall
21  this letter?
22    A.  I do.
23    Q.  First page, Document No. 49?

Page 211

1    A.  Yes, ma'am.
2    Q.  That is your signature?
3    A.  Yes, it is.
4    Q.  And Ms. Hughes got her
5  unemployment?
6    A.  Yes.
7    Q.  And you appealed that?
8    A.  I did.
9    Q.  Did you ever have a
10  conversation or recall the conversation
11  when she was terminated that she asked
12  you if she could collect unemployment
13  and you said she could?
14    A.  I asked her -- I remember her
15  asking me that question.  But there is
16  no way I would ever tell anybody they
17  could because that is a determination
18  of the State, not mine.  I told her she
19  could apply for it.
20    Q.  Eliminating her position, you
21  knew she was entitled to it, though;
22  correct?
23      MR. VREELAND:  Object to the

Page 212

1  form.
2    A.  Normally, yes.
3    Q.  That is what you had told her,
4  that her position was eliminated?
5    A.  That's what I had told her
6  when she was terminated, yes, ma'am.
7      (Plaintiff's Exhibit 25 was
8        marked for identification.
9        A copy is attached.)
10    Q.  Plaintiff's 25, is this the
11  policy on extended illness benefits?
12    A.  Yes.
13    Q.  Effective date, March 3rd,
14  2005?
15    A.  Yes, ma'am.
16    Q.  You see where it says Paid
17  Time Off in bold under Procedure?
18    A.  Yes.
19    Q.  "Paid time off must be used
20  for the first two scheduled workdays
21  for any absence, including FMLA and
22  medical leave of absence, except in the
23  following circumstances."  Do you not

Page 213

1  read that to understand that she was
2  entitled to two days paid time off when
3  she is submitting an excuse for medical
4  leave?
5    A.  It could be interpreted that
6  way.  That was not my intent, but yes,
7  I can see how it would be.
8      (Plaintiff's Exhibit 26 was
9        marked for identification.
10        A copy is attached.)
11    Q.  Did you also implement the
12  paid time off policy and procedure on
13  the same date, 3/3/05, Plaintiff's
14  Exhibit 26?
15    A.  Yes.  It was implemented on
16  the same day.
17    Q.  Did you draft this policy?
18    A.  I did.
19    Q.  When did you start the first
20  draft?
21    A.  I probably worked on this for
22  six months prior to actually getting
23  the one that we published.

Page 214

1       (Plaintiff's Exhibit 27 was
2         marked for identification.
3         A copy is attached.)
4    Q.   Plaintiff's Exhibit 27, can
5  you tell me what this is?
6    A.   It is our harassment policy.
7    Q.   Does this supersede the policy
8  that's in Plaintiff's Exhibit 2?
9    A.   I don't have 2. Oh. Sorry.
10   Q.   I'm sorry. Did I not ask a
11 question about it?
12   A.   You did ask a question about
13 it. I don't know if it is just a
14 matter of timing in publishing a new
15 handbook. I am trying to see. They
16 could be identical. So I would have to
17 read both of them to see.
18   Q.   The format lends itself that
19 there are other policies in that same
20 format. Is that true?
21   A.   There are about a dozen
22 policies in this format. But what I
23 have tried to do over the years is

Page 215

1  incorporate all of these policies in
2  the handbook and for them to match up
3  because that way the employees only
4  have one thing to keep up. But as long
5  as you have a policy and procedure
6  manual, you have to keep it up.
7    Q.   With regards to the policies I
8  have shown you, 26, 27, and 25, how are
9  the employees advised of the changes?
10   A.   In regards to the harassment
11 policy, it is treated a little bit
12 differently than any of the other
13 policies. Every employee when they
14 start work at the hospital are given a
15 copy of the current harassment policy
16 and they must sign for it. I don't
17 recall if we did that with these two
18 policies, the sick and the vacation, if
19 we actually gave each employee a copy
20 and had them sign that they had
21 received it. The education of the
22 policies could have been done in a
23 different manner. I'm sorry. I just

Page 216

1  don't recall at this point. But I do
2  know about the harassment policy.
3       (Plaintiff's Exhibit 28 was
4         marked for identification.
5         A copy is attached.)
6    Q.   Plaintiff's 28, do you
7  recognize this document?
8    A.   Yes, I do.
9    Q.   What is it?
10   A.   We have a folder that we keep
11 all the personnel documents in. This
12 is just a snapshot of the position and
13 salary history.
14   Q.   Is there writing on the inside
15 cover of this folder?
16   A.   No. It is a folder like this.
17 On the inside of the folder? No.
18   Q.   It has ends like this manila
19 folder?
20   A.   Yes. Yes.
21   Q.   Is there writing on the back?
22   A.   It is just this portion again.
23   Q.   Is any of the writing on

Page 217

1  Plaintiff's 28 yours?
2    A.   No.
3       (Recess was taken, commencing at
4  5:45 p.m., concluding at 5:55 p.m.)
5    Q.   (MS. HAYNES) All right. This
6  document, Plaintiff's 28, are there any
7  other documents that would depict
8  salary changes other than this
9  document?
10   A.   There is a form inside the
11 file that backs this up.
12   Q.   That is the benefits
13 statement?
14   A.   No. It's what we call an
15 employee transaction form. Any time
16 there is a change made to salary,
17 position, that's the form we use.
18   Q.   At the time she was
19 terminated, was Ms. Hughes making
20 $11.36?
21   A.   Yes.
22   Q.   Do you know what the benefit
23 package at Dale Medical Center is

Page 218

1 valued?
2    A.   When we are trying to put a
3 dollar figure to it, we use 16 percent.
4 That includes FICA, our portion of FICA
5 and what we pay for health.  And it
6 kind of depends because if the person
7 opts to participate in our pension
8 plan, then the hospital matches.  So it
9 kind of differs from employee to
10 employee.  And that does not include
11 pension, that 16 percent.  That's just
12 our portion of health, dental, life,
13 FICA, vacation, sick.
14    Q.   I'm sorry.  Did Ms. Hughes
15 participate in the pension plan?
16    A.   I don't know.
17    Q.   What percentage of the pension
18 plan does the hospital contribute?
19    A.   They will match up to five
20 percent in her case.  We did make a
21 change later on that would not have
22 applied to her.  Five percent.
23    Q.   When was the change made?

Page 219

1    A.   I believe it was in maybe 1999
2 the change was made.  But everybody
3 that was employed was grandfathered in
4 because what they did was reduce the
5 percentage they would match.
6    Q.   Haven't been any other changes
7 in the benefits in the last two years
8 that would have affected Ms. Hughes had
9 she stayed employed?
10    A.   We added vision care.
11    Q.   Anything else you have added?
12    A.   I don't recall anything else.
13    Q.   What is the value of the
14 vision care package?
15    A.   I don't know.
16    Q.   How much does the hospital pay
17 per month?
18    A.   The hospital does not pay
19 anything on the vision.  That's
20 strictly an employee-paid benefit.
21    Q.   Do all employees participate
22 or is it elected?
23    A.   It is elected.  And no, they

Page 220

1 do not.
2    Q.   Do you have any literature on
3 the vision care benefit?
4    A.   Yes, we do.
5    Q.   What is it entitled?
6    A.   You mean what are the benefits
7 of the vision care plan?
8    Q.   Just what is the policy
9 entitled or the --
10       MR. VREELAND:  What is the
11 name of the literature?
12    A.   It is a booklet that is
13 published by the carrier.
14    Q.   Who is the carrier?
15    A.   I don't recall the name.
16    Q.   Have you received any
17 telephone calls or e-mails or
18 correspondence from anyone seeking any
19 reference on Ms. Hughes?
20    A.   No, I have not.
21    Q.   Have you called any employer
22 that she has applied for employment and
23 provided a negative employment

Page 221

1 reference?
2    A.   No.
3    Q.   Do you know why she was
4 terminated from Southern
5 Medical -- Southern Health?
6    A.   Until yesterday I didn't even
7 know she had been employed by Southern
8 Health.
9    Q.   Have you asked relative to any
10 application that she has submitted to
11 Dale Medical Center for a department
12 head to interview her for a job?
13    A.   No.  No.
14    Q.   Have you submitted her
15 application to any department head for
16 consideration?
17    A.   No.
18    Q.   Are you the decision maker?
19    A.   No.  The way our process
20 normally goes is when a department head
21 has a vacancy, we post it in-house and
22 let them take in-house applications
23 first.  And then after that's over, if

Page 222

1  they have not -- if there is no one
2  in-house that has applied or anyone
3  they want, then they will generally
4  contact Donna Reid and tell them that
5  they want to see applications for an ER
6  admit rep or a switchboard operator.
7  And Donna goes through and pulls the
8  applications and logs them out to the
9  department head.  The department head
10 makes their own decisions as to who
11 they interview.
12    Q.   Did Donna Reid make you --
13 Strike that.  Did Donna Reid advise you
14 that Ms. Hughes had submitted
15 applications?
16    A.   She did.  She gave those
17 applications to me.
18    Q.   What did you do with the
19 applications?
20    A.   Because I had received her
21 complaint from the EEOC, I had made a
22 file on Ms. Hughes.  I put them in that
23 file.

Page 223

1     Q.   What is that file?
2     A.   It is just a manila folder.
3     Q.   Okay.  So the applications
4  were never put in any file for anyone
5  to consider for her to be considered
6  for employment?
7     A.   No.
8     Q.   Did you do that because she
9  had filed a charge of discrimination
10 against Dale Medical Center?
11    A.   I did that because I had
12 marked her separation from employment
13 as not being eligible for rehire.
14    Q.   Why did you even mention then
15 that you knew she had filed a charge of
16 discrimination against the facility as
17 removing her applications and placing
18 them in a file?
19    A.   Just to let you know that I
20 had made a file and that is where I put
21 them.  You asked me what I did with
22 them.
23       (Plaintiff's Exhibits 29 and

Page 224

1       30 were marked for
2       identification.  Copies are
3       attached.)
4     Q.   Plaintiff's 30.  I'm sorry.
5  29.  Plaintiff's 29 and Plaintiff's 30.
6  Do you know what these documents
7  represent?
8     A.   They are e-mail messages from
9  Gina May to me.  And from me to Gina
10 May.
11    Q.   Who is Gina May?
12    A.   She works at MedNet, one of
13 the billing companies that we outsource
14 with.
15    Q.   Is she a friend of yours?
16    A.   A friend?  No.  She is a
17 business associate.  I have a long-term
18 working relationship with her.
19    Q.   Look at 29.  Did you start the
20 e-mail trail on June 3rd, 2004, to Gina
21 May?
22    A.   It looks as if I did.  I don't
23 really know what I am talking about

Page 225

1  here, but yes.
2     Q.   Is there another e-mail that
3  preceded this one from Gina May?
4     A.   (No response.)
5     Q.   It doesn't make sense how it
6  starts; correct?
7     A.   That is correct.  I do believe
8  that it started with a telephone call
9  from Gina May to me.
10    Q.   Telling you what?
11    A.   About the call that Debbie
12 made to her about the accounts that had
13 been written off -- that were being
14 rejected and subsequently written off.
15    Q.   Were the accounts written off
16 as of June 3, 2004, or were the
17 accounts being kicked back?
18    A.   I believe they had been
19 written off at this point.
20    Q.   Why is MedNet involved in June
21 2004 with the Ariton?
22    A.   Because Debbie called Gina May
23 trying to find out what went wrong

Page 226

1  rather than calling me.
2      Q.   MedNet was doing the billing
3  in 2004?
4      A.   No.  MedNet was not doing the
5  billing.  Debbie had established a
6  relationship with MedNet.  Gina May was
7  working there at the time MedNet did
8  the billing for Ariton.  Gina is a very
9  knowledgeable person.  And I am
10  assuming that's why Debbie called her.
11  I consider her a subject matter expert
12  when it comes to billing and provider
13  numbers and that sort of thing.
14      Q.   Tell me about the top part of
15  the e-mail.
16      A.   In order to help us figure out
17  what was going -- why those claims were
18  being rejected, Gina May called
19  Medicare.  This is the information, the
20  Challenges 1, 2, and 3 is the
21  information that she got from Medicare.
22  And the solutions -- I don't know if
23  these are solutions that Gina came up

Page 227

1  with by herself or in conjunction with
2  Medicare.  But what we needed to do to
3  resolve the problem with the rejected
4  claims.
5      Q.   All right.  Under the
6  challenges do any of those challenges
7  have to deal with Ms. Hughes writing
8  off accounts?
9      A.   Only No. 3 stating that the
10  claims that she filed were not HIPAA
11  compliant.  And that's why they were
12  being caught on the front end of the
13  Medicare system.  And that's why
14  Medicare wouldn't really have a record.
15      Q.   Was there also an issue with
16  the provider number?
17      A.   Yes.  There was an issue with
18  a provider number.
19      Q.   Okay.  All right.  Under
20  solutions, "We need to insure that
21  Ariton's billing vendor" -- who is
22  that?
23      A.   Medisys Systems.

Page 228

1      Q.   That is a computer system?
2      A.   It is the computer and the
3  software.
4      Q.   It was not HIPAA compliant?
5      A.   It was HIPAA compliant.  I
6  called Medisys.  I spoke with Debbie
7  and she gave me a phone number and a
8  name of someone to call.
9      Q.   Okay.  Did you update the
10  software?
11      A.   No.  We didn't have to.  Their
12  software was HIPAA compliant.  The
13  problem was they had discontinued
14  Dr. Zumstein's provider number in their
15  system.  So, therefore, when those
16  claims hit, they just popped right
17  back.  I guess Debbie got an electronic
18  message that they were not being paid
19  or that they were -- whatever it said.
20      Q.   Tell me about Solution No. 2.
21      A.   An EOB is explanation of
22  benefit.  Normally if you send -- Say
23  you send a claim to Medicare and it's

Page 229

1  got the wrong date of birth on it or
2  something wrong.  Then they -- If they
3  get the claim and start processing it
4  and find an error, then they send a
5  denial EOB.  According to whatever the
6  problem was with this provider number,
7  they were not getting -- these claims
8  were not hitting their processing part
9  of the software.  I don't know how -- I
10  am not -- That is why I have MedNet and
11  United ProBill.  I am not an expert on
12  billing insurance or anything.  I don't
13  recall how Debbie was getting notified
14  that these claims were being rejected.
15  But there are always audits that a
16  person can print off and start working
17  the account to see what's wrong.  I
18  guess that's what didn't happen until
19  Gina May got involved.
20      Q.   Okay.  Did Ms. Hughes call
21  Gina May trying to get help on why
22  these accounts were getting kicked
23  back?

Page 230

1    A.   Yes.  Yes, she did.
2    Q.   Is there anything improper
3  about that?
4    A.   Well, we didn't have a
5  business relationship between Ariton
6  and MedNet.  We pay for their services.
7  So basically she was calling and asking
8  Gina to provide her something gratis.
9    Q.   Anything wrong with that?
10    A.   Well, it is not the way we
11  generally do business.  I mean, why
12  would she -- No.  There is nothing
13  illegal.  But I think it was -- the
14  intent was to keep anybody else from
15  knowing it.
16    Q.   Why do you say that?
17    A.   Well, because she had already
18  written accounts off.  When Gina asked
19  her if she had contacted me, she said,
20  oh, no, like no, I am not calling her.
21    Q.   Gina told you that?
22    A.   Yes.
23    Q.   Did you put that in any of

Page 231

1  your e-mails?
2    A.   Unless it is here.  I don't
3  see it here anywhere.
4    Q.   What document are you relying
5  that she had written accounts off prior
6  to June 2004?
7    A.   I am relying on the fact that
8  Debbie told me she wrote the accounts
9  off.  Once I spoke with Gina May, then
10  I called Debbie to see if we could work
11  this thing out.  At the time I think
12  all of us thought that Medisys was not
13  HIPAA compliant.  So that was the first
14  thing we tried to do was just get that
15  corrected.  I think that, if I remember
16  correctly, the Medisys people were kind
17  of trying to put Debbie off with doing
18  anything with this.  So I finally
19  called them.  By the time that
20  happened, Gina May had figured out what
21  was wrong and Debbie had gone back.
22  They had implemented his provider
23  number again.  Debbie had gone back in

Page 232

1  and refiled the claims.  They were
2  processed then.  She made the
3  adjustments where she had written them
4  off.  She adjusted them so that they
5  would have that balance again.
6    Q.   Did the write-offs show up on
7  any financial statement?
8    A.   There should be a way in that
9  system to print that off because I know
10  there is on all other systems.  We have
11  the computer.  We just can't get in it
12  and print the reports because we don't
13  have a business affiliation with
14  Medisys anymore.  Debbie would be
15  better to answer that question than me.
16    Q.   Do you have any financial
17  reports that depict that Ms. Hughes had
18  written off accounts prior to June
19  2004?
20    A.   I do not have any, no.
21    Q.   Have you seen any?
22    A.   I do believe that Debbie
23  provided us a list of the accounts she

Page 233

1  had written off.
2    Q.   All right.  On the second
3  exhibit, Plaintiff's 30, the second
4  page, is this a continuation of your
5  correspondence of earlier June with
6  Gina May?
7    A.   Yes.  Although she had refiled
8  the claims, we still had not received
9  payment.  That's Gina updating me.
10    Q.   Did Dale Medical have a
11  relationship with MedNet?
12    A.   Yes.  They do our billing for
13  StatMed.
14    Q.   Did they in June 2004?
15    A.   Yes.
16    Q.   Is that why you are asking
17  Gina May to assist you?
18    A.   Yes.
19    Q.   And you refer to her in the
20  e-mail of June 22nd, 2004, as your "my
21  wonderful source of information"?
22    A.   I did.
23    Q.   Do you call upon her for

Page 234

1  assistance from time to time?
2    A.  I do.
3    Q.  Is that on coding and billing
4  issues?
5    A.  I generally work with her on
6  provider number issues.
7    Q.  How many issues come up about
8  provider numbers?
9    A.  Tons.  It is not an easy
10  process.  But she is one of the best
11  with working on provider numbers.
12    Q.  How is it you know that?
13    A.  Well, we have had -- we have
14  ProBill who also processes application
15  for provider numbers, but I think it is
16  just the volume and the different
17  specialties that Gina has done.  And I
18  believe it is also -- They have
19  software now where they can just bring,
20  say, the Medicare or the Blue Cross or
21  the Medicaid or whatever application up
22  and just fill it in.  Used to it was
23  just a long arduous task of filling

Page 235

1  them in by hand.  Gina has just had a
2  lot of experience doing it.  She has
3  got contacts at the places that
4  actually issue the provider numbers
5  that she can call and check on things
6  too.
7    Q.  Did Ms. Hughes know that
8  Ms. May was an expert in provider
9  numbers?
10    MR. VREELAND:  Object to the
11  form.
12    A.  I don't know.
13    Q.  Ms. Hughes tell you that's why
14  she called Gina May is because the
15  claims were getting kicked back because
16  of provider numbers?
17    A.  I don't know that she ever
18  told me that.
19    Q.  All right.  What she's writing
20  here in her e-mail of June 22nd, 2004,
21  to you, "Did we decide whether or not
22  there is another issue with him
23  actually not getting claims paid?" who

Page 236

1  is she talking about him?
2    A.  I think Dr. Zumstein because
3  he was the subject of all of these
4  denied claims.
5    Q.  Okay.  Then she writes, "What
6  happened with the vendor?"  Is that the
7  computer system?
8    A.  Yes.  Medisys.  Uh-huh.
9    Q.  Then she writes, "I remember
10  that the vendor could not believe that
11  there could be a problem."
12    A.  That is because they told me
13  when I called them that yes, they were
14  HIPAA compliant.  That's what we
15  initially thought the problem was.
16    Q.  Okay.  Then she writes, "Do
17  they ever see anything wrong with
18  electronic setup?"  What is that
19  referring to?
20    A.  I have lost my place here.
21  I'm sorry.  I don't recall what she is
22  referring to there.
23    Q.  Okay.  Looking at the first

Page 237

1  page of Plaintiff's 30 dated June 25,
2  2004, that is your e-mail to Gina May,
3  Dr. Zumstein.  You are referring to
4  Debbie is in the process of refiling
5  all of those claims?
6    A.  Uh-huh.
7    Q.  Are you referring to Debbie
8  Hughes?
9    A.  Yes, I am.
10    Q.  Was she doing what she was
11  supposed to be doing?
12    A.  Yes, she was.
13    Q.  Okay.  All right.  Then you
14  write, "It was not without its
15  last-minute tribulations.  When Debbie
16  got word that Dr. Zumstein was cleared
17  for Medicare claims, she was told to
18  refile all of the claims she had."
19    A.  Right.
20    Q.  Did you tell her to refile or
21  was she doing that on her own?
22    A.  When I called her to tell her
23  that she could go ahead and refile,

Page 238

1 that Medicare had cleared it to be
2 refiled, she was already in the process
3 of doing it when I called her to ask
4 her to do that.
5    Q.  Would that be initiative?  She
6 took that on her own initiative to do?
7    A.  Yes.  Yes.
8    Q.  It is also part of her job?
9    A.  It is.
10    Q.  All right.  Then you write,
11 "She refiled a whole page and decided
12 to stop and run her audit trails the
13 next day."  What are you referring to?
14    A.  It is a report that she can
15 run to see that the claims are going
16 through and being accepted by Medicare.
17    Q.  Okay.  Anything improper with
18 what she was doing?
19    A.  No.
20    Q.  So she entered a whole page of
21 claims and you are writing they were
22 rejected the same reason as before?
23    A.  Uh-huh.

Page 239

1    Q.  Is that correct?
2    A.  That's what I wrote.
3    Q.  Is any of that her problem,
4 Ms. Hughes' problem?
5    A.  No.  None of that is her
6 problem.
7    Q.  All right.  And then
8 Ms. Hughes called the vendor?  That's
9 Medisys?
10    A.  Yes.  No.  Wait a minute.
11 Yes.  Uh-huh.
12    Q.  And then finds out that the
13 person at Medicare forgot to flip his
14 switch to make him HIPAA compliant.  Is
15 that referring again to Dr. Zumstein?
16    A.  Correct.
17    Q.  Any of that Ms. Hughes'
18 problem?
19    A.  No.
20    Q.  Okay.  And is she telling
21 you -- keeping you apprised and telling
22 you what's going on?
23    A.  You know, I don't know if she

Page 240

1 called me, I called her.  But
2 apparently so since I have the
3 information.  Somebody is calling
4 somebody.
5    Q.  After that was the situation
6 with these accounts cured after June
7 2004?
8    A.  Yes.
9    Q.  All right.  Then the last page
10 of Plaintiff's 30 is another e-mail
11 dated November 19th, 2004, to Gina May
12 from you.  Does this have to do with
13 the provider number for Dr. Zumstein
14 again?
15        MR. VREELAND:  Object to the
16 form.
17    A.  Please state that again, the
18 whole thing.  In an e-mail from?
19    Q.  The last page of Plaintiff's
20 30.
21    A.  207?
22    Q.  Yes, ma'am.  This is an e-mail
23 from you to Gina May?

Page 241

1    A.  No.
2    Q.  I'm sorry.  It's from Gina May
3 to you?
4    A.  Right.
5    Q.  Okay.  And why is Ms. May
6 involved again in November 2004?
7    A.  Let me read it, please.  And
8 your question is why is Gina May?
9    Q.  Once again involved.
10    A.  I suppose she is just doing
11 follow-up.  I don't recall my having
12 any other conversations with her about
13 it.
14    Q.  Well, was any of the issue
15 with Dr. Zumstein's provider number
16 being cancelled any fault of
17 Ms. Hughes?
18    A.  No, it was not.
19    Q.  Who is Eddie Thornhill?
20    A.  He is in the credentialing
21 department of Blue Cross Blue Shield.
22    Q.  Did Ms. Hughes convey to you
23 at any time that Ms. Brooks had told

Page 242

1 Blue Cross Blue Shield that
2 Dr. Zumstein had left and that's what
3 caused them to cancel his provider
4 number?
5    A.   I don't recall her telling me
6 that, no.
7    Q.   Ms. May is telling you this?
8    A.   Yes.
9    Q.   Did you ever talk to
10 Ms. Brooks about the problems she
11 caused?
12    A.   I did.
13    Q.   And tell me what problem she
14 did cause by making that comment to
15 Blue Cross.
16    A.   Well, because she just said he
17 hadn't been there since April.  I am
18 guessing the person she talked to
19 assumed he wasn't there at all in April
20 and they discontinued his provider
21 number.  So, therefore, when a claim
22 hits their system, it will not process
23 it.

Page 243

1    Q.   Did you discipline Ms. Brooks?
2    A.   I had a verbal conversation
3 with her about what that one comment
4 she made all of the issues that it
5 caused, yes.  Call it discipline.  I
6 don't --
7    Q.   You didn't terminate her?
8    A.   No.
9    Q.   Ms. Brooks is in her 20s or
10 was at this time?
11    A.   I don't think so.  I think she
12 is older than that.
13    Q.   Is she in her early 30s?
14    A.   I don't know.  She has got a
15 grown child, an 18-year --
16    Q.   Is she under 40?
17    A.   I don't know her age.
18    Q.   Have you had any other charges
19 of discrimination while you have been
20 the human resource manager against Dale
21 Medical Center?
22    A.   Yes.
23    Q.   Have you had those in the last

Page 244

1 five years?
2    A.   There has been -- I can recall
3 two.
4    Q.   I think those were listed in
5 your interrogatory responses.  But tell
6 me who those are again.
7    A.   Maureen Beatles and Nancy
8 Hawkins.
9    Q.   Any others?
10    A.   Not to my recollection.
11    Q.   Were they -- Ms. Beatles and
12 Ms. Hawkins, age and gender?
13    A.   What is their age and --
14    Q.   I'm sorry.  The basis of the
15 charge, was it age and gender
16 discrimination?  Do you recall?
17    A.   No.
18    Q.   Ms. Hawkins' is age and
19 disability?
20    A.   Yes.
21    Q.   What was Ms. Hawkins'
22 disability, if you know, that she
23 alleged?

Page 245

1    A.   Eyesight.
2    Q.   Did you give a deposition in
3 that case?
4    A.   I did.
5    Q.   Who was the plaintiff's
6 lawyer?
7    A.   Banks Smith.
8    Q.   You sure about that?
9    A.   Yes, I am.
10    Q.   I did not know he did
11 discrimination work.  Have you given
12 any other depositions?
13    A.   Yes.
14    Q.   How many others?
15    A.   I gave one in the Hawkins, one
16 in a workers' comp claim several years
17 ago, and another workers' comp claim
18 even longer than that.
19    Q.   Did you terminate Ms. Hawkins?
20    A.   No, I did not.
21    Q.   Who terminated her?
22    A.   Jennifer Simmons.  She was the
23 nurse manager of that unit.

Page 246

1   Q.   Did you terminate Ms. Beatles?
2   A.   No.
3   Q.   Who did?
4   A.   She was a nurse manager too.
5 Let me see.  Betty Johnson.
6   Q.   What is the basis of
7 Ms. Beatles' charge of discrimination?
8 Here it is.  Disability.  Is that
9 correct?
10   A.   Yes.
11   Q.   Do you know what her
12 disability is?
13      MR. VREELAND:  Object to the
14 form.
15   Q.   Or what she alleges?
16   A.   No, I don't recall.
17   Q.   Any other charges of
18 discrimination other than those on
19 disability or age discrimination?
20   A.   Not that I recall.
21   Q.   Have you had any other
22 lawsuits against Dale Medical Center
23 alleging violations of the Family

Page 247

1 Medical Leave Act?
2   A.   Yes.
3   Q.   Who else has sued?
4   A.   Donna.  I don't recall her
5 last name.  First name was Donna.  She
6 was an LPN.
7   Q.   Did you give a deposition in
8 that case?
9   A.   I don't recall giving a
10 deposition.
11   Q.   Did she file a charge or a
12 lawsuit?
13   A.   I don't recall.
14   Q.   Do you know what the status of
15 her lawsuit is?
16   A.   It was two parts.  Part of it,
17 for lack of a better word, went away
18 and we settled on the -- I don't recall
19 the details.
20   Q.   Who represented Dale Medical
21 Center?
22   A.   Lehr Middlebrooks.
23   Q.   Who represented Donna, last

Page 248

1 name unknown?
2   A.   I don't recall.  It was an
3 attorney out of Montgomery.
4   Q.   Was it filed in Montgomery,
5 Middle District of Alabama?
6   A.   I don't know.
7   Q.   Do you know how long ago it
8 was?
9   A.   I'd say it was in the last ten
10 years, but I can't be much more
11 specific than that.
12   Q.   Since you terminated or
13 eliminated Ms. Hughes from the
14 workplace at Dale Medical Center, how
15 many individuals have you hired?
16   A.   Have I personally hired?
17   Q.   Or approved the hiring of?
18   A.   I have approved positions to
19 be filled, but I don't actually
20 recall -- I know we staffed
21 Dr. Parwaiz' office, but she
22 interviewed and made her decisions.  I
23 might have approved the two positions

Page 249

1 in her office.  Same thing in
2 Dr. Duerr's office.  I approved the two
3 positions, but he interviewed and
4 selected.  I have approved two
5 positions in Dr. Crawford's office, but
6 they haven't been filled yet.
7   Q.   Gina Johnson, she is the
8 department manager of billing and
9 coding?
10   A.   Tina.
11   Q.   Tina?
12   A.   Yes.
13   Q.   How many individuals work
14 under her?
15   A.   Seven, I think.
16   Q.   That's what Mr. Vernon Johnson
17 testified to.  So that would be a
18 correct number?
19   A.   I think so.  Yes.
20   Q.   Any of those individuals been
21 hired in the last two years?
22   A.   No.
23   Q.   Have you hired any office

Page 250

1 managers -- some of these you have told
2 me about earlier -- other than the ones
3 you have already told me about?
4    A.  No.
5    Q.  Have you hired any insurance
6 and billing coders?
7    A.  No.
8    Q.  Have you hired any managers of
9 programs such as the indigent patient
10 program or the senior prescription
11 program in the last two years?
12    A.  I believe it might have been
13 within the last two years that Jennifer
14 Campbell worked in that office for
15 about six months.
16    Q.  Jennifer Campbell was an
17 outside candidate?
18    A.  No.  She was an employee of
19 the hospital.  She is an LPN.
20    Q.  Where was she prior?
21    A.  Dr. Cromer-Tyler's office.
22    Q.  I had asked you about your
23 hiring decisions you have made.  Since

Page 251

1 Ms. Hughes was terminated, would that
2 be more than 20 or less than 20
3 individuals?
4    A.  Less than 20.
5    Q.  Of those 20 individuals, are
6 any of them disabled?
7    A.  Are you talking about that I
8 personally hire?  That I said I want
9 you to work here?  Or approve somebody
10 with a disability for employment?
11    Q.  Where you were either the
12 direct person making the hiring
13 decision or indirect having approval
14 over that decision.
15    A.  No, I have not hired anyone
16 with a disability.  Not a known
17 disability anyway.
18    Q.  Have you hired anyone over the
19 age of 40 in the last two years?
20    A.  I have not.
21      (Plaintiff's Exhibit 31 was
22       marked for identification.
23       A copy is attached.)

Page 252

1    Q.  Plaintiff's 31 are the
2 Defendant's responses to Plaintiff's
3 interrogatories.  Willfully inadequate,
4 but that is another matter.  Is that
5 your signature on the verification
6 page?
7      MR. VREELAND:  I will go ahead
8 and object to the predicate of the
9 question.
10      MS. HAYNES:  You can.
11    A.  Yes, it is my signature.
12    Q.  Did you answer these, these
13 questions that I propounded?
14    A.  In conjunction with the
15 attorney, yes.
16    Q.  Okay.  In Interrogatory No. 13
17 I asked for all facts supporting your
18 position that the Plaintiff,
19 Ms. Hughes, was not an employee in good
20 standing and had received verbal or
21 written warnings as indicated in
22 Paragraph 14 of the Defendant's answer
23 to Plaintiff's complaint.  In that

Page 253

1 response you answered on page 9 that
2 the Plaintiff had received at least
3 five verbal warnings prior to her
4 surgery on January 3, 2005.  What are
5 those five verbal warnings she
6 received?
7    A.  Verbal warnings?
8    Q.  Yes, ma'am.
9    A.  Mistake in ordering the flu
10 vaccines, writing off the patient
11 accounts without authorization, spoke
12 to her twice about the overtime, and
13 then I guess the other one is
14 contributed to Dr. Ennis.
15    Q.  Where he checked needs
16 improvement I think it was three areas
17 of her performance?
18    A.  Yes.
19    Q.  Is that considered a verbal
20 warning under Dale Medical Center's
21 policy?
22    A.  It would be considered that an
23 area that needs improvement has been

Page 254

1  discussed.
2      Q.   The performance evaluation is
3  an annual performance appraisal, is it
4  not?
5      A.   It is.
6      Q.   Is there a separate form or
7  document that you utilize on verbal
8  warnings to an employee's file?
9      A.   We have a form that you can
10  use when you are doing a verbal warning
11  with an employee.  Typically I don't
12  use it a lot because it makes an
13  employee nervous when they see
14  something written on a piece of paper
15  although you mark it it is verbal.  It
16  tends to.  So I rarely use it unless it
17  is a real severe offense.
18     Q.   Okay.  With regard to May or
19  June 2004, you verbally warning
20  Ms. Hughes about writing off accounts
21  without authorization, we have seen
22  today several e-mails between you and
23  Gina May regarding those accounts.  But

Page 255

1  did you ever put anything in writing or
2  e-mail to Ms. Hughes about writing off
3  those accounts?
4      A.   No, I did not.
5      Q.   And you did not place anything
6  in her personnel file; correct?
7      A.   Correct.
8      Q.   Okay.  In 2003, is that when
9  you warned Ms. Hughes on two separate
10  occasions regarding excessive overtime?
11     A.   I don't recall if it was three
12  or four.
13     Q.   Well, it is written here on
14  page nine that it was in 2003.  Is that
15  correct?
16     A.   I don't see 2003.  Am I
17  overlooking it?  Okay.  I see.  I'm
18  sorry.  It might have been 2003.  I
19  don't know.
20     Q.   Have you gone back and pulled
21  her time records for 2003?  We have
22  looked at the time records for 2004.
23     A.   I don't know if I just made a

Page 256

1  mistake in the year here.  But I would
2  have had something in front of me to
3  say 2003 if it is indeed 2003.
4      Q.   Did you relate the actions of
5  writing off the accounts and not
6  ordering the proper amount of flu
7  vaccine to her brain tumor?
8      A.   No.
9      Q.   Prior to 2004, had she,
10  meaning Ms. Hughes, made errors in
11  writing off accounts?
12     A.   Not to my knowledge.
13     Q.   Prior to 2004, had she
14  improperly ordered any medication?
15     A.   Not to my knowledge.
16     Q.   After you talked with her
17  about excessive overtime, did it stop?
18     A.   It did for a while the first
19  time I talked to her.  But then it
20  started happening again and there was
21  another conversation.
22     Q.   Okay.  After that did it stop?
23     A.   Yes.

Page 257

1      Q.   You write here also that
2  "Regina May with Southeast Medical
3  Center has knowledge regarding
4  Ms. Hughes' conduct in writing off
5  accounts without authorization."  What
6  knowledge does Ms. May have?
7      A.   Just that the accounts were
8  written off without approval.
9      Q.   Anything more than these
10  e-mails?
11     A.   We had telephone
12  conversations.  I don't -- About the
13  account.  During this whole process
14  Gina and I had telephone conversations
15  about this.  So I don't know at what
16  point.
17     Q.   Did you tell Ms. May that
18  Ms. Hughes had written off accounts
19  without authorization?
20     A.   At some point when we were
21  discussing these she asked me what
22  status the accounts were in.  And I
23  told her that they had been written off

Page 258

1  by Ms. Hughes.  I don't know if I said
2  without authorization, but I said that
3  they had been written off.
4      Q.  Why would you share that
5  information with her?
6      A.  Because she asked me in what
7  kind of status -- I guess there are
8  different statuses that old accounts
9  can be put in in the computer system.
10  But she asked me what status the
11  accounts were in when all of this
12  started.
13      Q.  Why would that be important to
14  her?
15      A.  I have no idea.
16      Q.  What was the basis of you
17  sharing it?
18      A.  I guess because she was
19  working with us on trying to straighten
20  it out.  I didn't know if it was
21  relevant to what you do to correct it
22  or not.  I don't know if Debbie didn't
23  tell her.  I don't know.

Page 259

1      Q.  Do you have any other e-mails
2  about Debbie Hughes or her job
3  performance other than the ones we have
4  looked at today with Ms. Gina May?
5      A.  I don't believe so.  I think
6  this is all of them.
7      Q.  Don't have any e-mails between
8  yourself and Dr. Ennis?
9      A.  No.  I never e-mailed
10  Dr. Ennis.
11      Q.  Any e-mails between you and
12  Mr. Johnson about Ms. Hughes?
13      A.  No.
14      Q.  You and Ms. Reid?
15      A.  No.
16      Q.  Same question.  No e-mails?
17      A.  No e-mails.
18      Q.  Any e-mails between you and
19  Mr. Hull relative to Ms. Hughes or her
20  job performance?
21      A.  No.
22      Q.  Have you received complaints
23  from any person other than Dr. Ennis

Page 260

1  about Ms. Hughes?
2      A.  No.
3      Q.  And your complaint from
4  Dr. Ennis was that she would not call
5  AR accounts?
6      A.  Right.  Yes, ma'am.
7      Q.  Any other complaints?
8      A.  Nothing that I can
9  specifically remember.
10      Q.  Dr. Ennis ever share with you
11  that he was upset with Ms. Hughes for
12  taking off so much time?
13      A.  No, he did not.
14      Q.  Prior to her brain tumor, had
15  Ms. Hughes ever taken off work for
16  illness?
17      A.  Not for any extended period of
18  time.  She might have taken a day or
19  two for something.  I don't recall.
20  But nothing that stands out.
21      Q.  Did you ever work with
22  Dr. Blough?
23      A.  I had minimal contact with

Page 261

1  Dr. Blough when he was up there.
2      Q.  Did you ever tell Ms. Hughes
3  she had an attitude like Dr. Blough?
4      A.  I don't recall ever saying
5  that.
6      Q.  What was Dr. Blough's attitude
7  in your opinion?
8      A.  He was -- I don't know.  He
9  didn't have a lot of personality in the
10  dealings.  Like I said, my contact with
11  him was minimal.  But I don't remember
12  anything outstanding one way or another
13  about his personality or demeanor.  If
14  he was upset about something, he was
15  very upset.
16      Q.  In June 2004 did Ms. Hughes
17  talk to you about a comment Dr. Ennis
18  had made about getting rid of the old
19  computer system, she would have no job?
20      A.  We discussed a new billing
21  system.
22      Q.  Who is we?
23      A.  Dr. Ennis and I and

Page 262

1 Mr. Johnson. What was the time frame
2 you asked me about, please?
3    Q.   June 2004.
4    A.   I don't at that point recall
5 him saying anything about Ms. Hughes
6 not having a job because you always
7 have to have someone to input data into
8 a computer.
9    Q.   I'm sorry. My question was
10 did she, Ms. Hughes, talk to you about
11 a comment that Dr. Ennis had made to
12 her, that if they got a new computer
13 system, she was not going to have a
14 job?
15    A.   I don't recall her saying
16 that. It sounds like a logical thing,
17 but I don't recall her saying it.
18    Q.   You have no recollection of
19 her coming and talking to you about
20 that?
21    A.   No, ma'am.
22    Q.   And you making the comment
23 that she would have a job because

Page 263

1 someone would have to code?
2    A.   Like I said, it all sounds
3 logical, but I honestly don't recall
4 the conversation.
5       MS. HAYNES: I think that is
6 all the questions I have. Thank you,
7 ma'am. Sorry we kept you so long.
8          (The proceedings were
9          concluded at 7:00 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 264

1       C E R T I F I C A T E
2 STATE OF ALABAMA   )
3 JEFFERSON COUNTY   )
4       I hereby certify that the above
5 and foregoing proceeding was taken down
6 by me by stenographic means, and that
7 the questions and answers therein were
8 produced in transcript form by computer
9 aide under my supervision, and that the
10 foregoing represents, to the best of my
11 ability, a true and correct transcript
12 of the proceedings occurring on said
13 date at said time.
14       I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action; nor am I in
17 anywise interested in the result of
18 said cause.
19
20
21       AMY WALLS LENOIR, CSR-530
22       COURT REPORTER
23