# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEBORAH HUGHES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO.:** |
| | ) | **1:06-cv-00595-SRW** |
| **v.** | ) | |
| | ) | |
| **DALE COUNTY MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____

Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama   35226
Phone:  (205) 879-0377
Fax:  (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com

COMES NOW the Plaintiff, Debbie Hughes, by and through her attorney, and files her response in opposition to defendant's motion for summary judgment pursuant to FRCP 56, and moves this Honorable Court to deny Defendant's motion for summary judgment. Defendant is not entitled to summary judgment as genuine issues of material fact are in dispute contrary to defendant's assertion. This motion in opposition is based on the pleadings, the evidentiary submission of both parties and Plaintiff's memorandum of law. In support of her motion, Plaintiff states as follows:

## I.    <u>INTRODUCTION</u>

Plaintiff filed her lawsuit against Dale Medical Center alleging age discrimination and harassment based on age, disability, Family and Medical Leave and state law torts of emotional distress; negligent hiring, training and supervision; and assault and battery.

As demonstrated in this brief, affidavits, deposition excerpts and other evidence filed with the Court, Defendant's motion for summary judgment is due to be DENIED. More specifically, Plaintiff has established a prima facie case of age, disability and FMLA discrimination and harassment. Defendant has failed to demonstrate any good faith factor other than the protected rights which would establish a defense to Plaintiff's claims under any statutory scheme.

II.    **PLAINTIFF'S STATEMENT OF FACTS**

    A.    **The Defendant, Dale Medical Center**

    1.     There are 400 employees at Dale Medical Center ("DMC") which is comprised of the hospital and several outlying medical facilities. (Johnson depo., pp. 11:16-12:2).

    2.     The outlying medical offices are comprised of an outpatient surgery center, three physician clinics, hospice, a home health agency, an urgent care walk-in clinic, a family practice clinic, a surgery center and a pediatric clinic. DMC is in the process of opening a pulmonary internal medicine clinic. (Johnson depo., pp. 11:22-23; 12:1-13:19).

    3.     The hospital is growing and has reported profits the last two years. Vernon Johnson is the CEO of Dale Medical Center. (Johnson depo., pp. 6:15-16; 17:21-18:10).

    4.     Sheila Dunn is the assistant administrator of professional offices and director of human resources. (Dunn depo., p. 6:2-8; Johnson depo., p. 22:17-19).

    5.     Dale Medical Center recognizes and awards years of service with the company. (Johnson depo., pp. 47:16-48:16).

    6.     Dale Medical Center uses two different billing and coding services, Mednet and United Probill, throughout the hospital and outlying medical facilities.

(Johnson depo., pp. 23:1-24:9).

7.    Dale Medical Center recognizes and awards years of service with the company.  (Johnson depo., pp. 47:16-48:16).

**B.    Plaintiff's Employment with Dale Medical Center**

1.    Hughes' date of birth is September 8, 1956, and she is 50 years old. (Hughes depo., p. 128:16).  Hughes first started working at Ariton Clinic in 1974 with Dr. Zumstein as a receptionist and then moved into the lab performing urine tests.  (Hughes depo., pp. 11:23-12:19).

2.    Thereafter, Hughes began performing the work up on patients which included taking temperatures, blood pressures and weights.  Hughes next learned to do EKG's, chest x-rays, shots and drawing blood.  (Hughes depo., p. 13:1-3).

3.    Hughes was assigned to learn the computer system and started billing and coding patient charges for the clinic which involves coding for the various medical procedures and diagnosis for insurance companies to pay.  Hughes was also responsible for the clinic's computer system.  (Hughes depo., pp. 13:17-14:16).

4.    By 1980, Hughes' principal responsibilities were running the billing and coding on the clinic's computer system.  Those duties remained the same when the Dale Medical Clinic took over the facility.  (Hughes depo., pp. 15:9-16).

4

5.      When Dale Medical Clinic assumed the Ariton Clinic, Hughes became the office manager of the clinic.  It was Hughes' responsibility to order supplies, direct employees in their responsibilities, perform the billing and coding and generally run the clinic with the exception of actual physician services.  (Hughes depo., pp. 15:19-16:17).

6.      In 2002, Plaintiff had additional duties added to her when the MedMet, the third-party billing and coding system was discontinued at the Ariton Clinic.  (Dunn depo., pp. 53:12-54:5).

7.      Hughes was also the manager of other programs such as the indigent patient program.  (PX21, p. 1, ¶3).

8.      The indigent program was important because Ariton Clinic was located in a very rural community where there were a lot of indigent patients and this was an assistant program that the individuals could apply for financial help with their medication, which was filled out in the physician's office and which required the physician to sign off on the paperwork.  (Dunn depo., p. 172:6-14). The computer system changed after the Dale Medical Center assumed the facility but Hughes continued her duties of billing and coding under the new system. Further, Hughes keyed in all patient payments and made the deposits at the end of the day.  She also ran all financial reports for the clinic.  (Hughes depo., pp. 17:8-

20:9).

9.    After Dr. Zumstein left the clinic, Hughes worked under Dr. Blough and later Dr. Ennis.  (Hughes depo., pp. 16:20-24:11).

10.    In all of Hughes' employment evaluations through 2003 she received the highest category of meets expectations in all 22 areas evaluated.  (PX9, Doc. 6364, PX8, Doc. 73, PX7, Doc. 79-80, PX6, Doc. 85-86).

11.    On August 1, 2004, Plaintiff was evaluated and given all threes again except for one area relating to patient insurance information which was a "need improvement" and followed the activities in June 2004 that she had written off 8 to 10 accounts for a provider number being discontinued for Dr. Zumstein.  (PX10, Doc. 55, 56).

12.    Hughes shared with Dunn in December 2004 that she was having some health issues which she had contributed to the mistakes she had made on the flu vaccine and writing off 10 accounts.  Dunn told Hughes she should have come to her and told her about her health issues and Hughes responded that she uncomfortable coming to Dunn because she did not think Dunn liked her.  Dunn replied that her personal feelings had nothing to do with her professional relationship.  (Dunn depo., pp. 63:18-64:19).

C.    **Plaintiff is diagnosed with two benign brain tumors**

13.    Hughes' job duties as office manager remained the same under all the physicians until she became ill in November 2004 with two benign brain tumors. (Hughes depo., pp. 24:12-25:7).

14.    Hughes asked to step down as office manager as she was unable to continue due to stress.  (Hughes depo., p. 25:1-7).

15.    Immediately prior to being diagnosed with her brain tumors, Dale Medical Center alleged Hughes made mistakes in the workplace.  In August 2004, Hughes had ordered 3,000 more flu vaccines than the clinic needed.  The doctor had told her to order 300, but she ordered 300 vials, not 300 shots which would have meant an order of 30 vials.  (Hughes depo., pp. 27:1-2).

16.    Hughes was verbally reprimanded by Dr. Ennis and Dr. Sheila Dunn, the assistant administrator, at Dale Medical Center.  (Hughes depo., p. 27:5-8).

17.    Ennis would thereafter bring up Hughes' mistake and tell Hughes that she was incompetent, worthless and stupid.  (Hughes depo., p. 30:10-11).

18.    Dunn initially brought up the mistake when Dunn received the invoice, but never addressed the matter again until Hughes was terminated in April 2005.  (Hughes depo., pp. 28:13-30:4).

19.    Hughes had also written off 10 to 12 Blue Cross and Blue Shield

accounts on Dr. Zumstein's provider number which had been discontinued and which totaled $970. (Hughes depo., pp. 31:6-10).

20.    Hughes had submitted the accounts to Medicare for payment but because Zumstein's provider number had been discontinued, the system was rejecting the claims. (Dunn depo., pp. 225:11-227:18).

21.    Hughes called and Dr. Zumstein's provider number was implemented again and Hughes refiled the claim and the adjustments were made that had been written off. (Dunn depo., pp. 229:20-232:5).

22.    Hughes had started trying to repair the provider number issue herself with the help of Gina May who is considered an expert on billing and provider numbers. (Dunn depo., p. 226:9-13).

23.    When Dr. Zumstein was cleared for Medicare claims again, Hughes refiled the claims on her own initiative and the claims were rejected once again because Medicare forgot to switch its computer system to accept Dr. Zumstein's provider number. (Dunn depo., pp. 237:15-238:9).

24.    When the question was asked whether or not the write-offs showed up on any financial statement with Dale Medical Center, Dunn stated she could not answer and deferred that Hughes would be better to answer the question than her. (Dunn depo., p. 232:6-15).

25.    The situation with Dr. Zumstein's provider number and the rejection of the claims was not a problem created by Hughes.  (Dunn depo., pp. 239:3-239:19).

26.    However, Ms. Brooks, the receptionist at Ariton Clinic, had actually caused the problem by notifying Blue Cross and Blue Shield that Dr. Zumstein had left the practice which caused Blue Cross and Blue Shield to cancel his provider number.  (Dunn depo., pp. 241:22-242:23).

27.    Dunn admits she had a verbal conversation with Ms. Brooks about her mistake but did not terminate nor discipline Brooks.  (Dunn depo., pp. 243:2-243:8).  Brooks is a young female in her 20's.  (Hughes Aff., ¶ 3).

28.    However, Dunn held Hughes responsible while admitting it was not Hughes' fault.  Dunn admits in the last two years she's not made any hiring decision to hire anyone over the age of 40 and has made less than 20 hiring decisions.  (Dunn depo., pp. 250:22-251:20).

29.    Dr. Ennis was angry about the accounts and again told Hughes she was incompetent and worthless and if she didn't have her meager little job in that office, she wouldn't have a job.  Hughes was successful in getting Dr. Zumstein's provider number reinstated and the accounts were resubmitted to Blue Cross and Blue Shield for payment and the claims were paid.  (Hughes depo., pp. 31:13-

33:7).

30.     Dr. Ennis often spoke harshly to Hughes telling her to get in her office, to do her job and not to come out unless spoken to. (Hughes depo., p. 35:15-17).

31.     After stepping down in November 2004 as office manager, Hughes was diagnosed with the brain tumor. Her physical problems consisted of falling, coordination problems and memory loss problems that had progressively become worse. (Hughes depo., pp. 40:4-41:13).

32.     After stepping down as office manager, Hughes was constantly harassed by Pat Ennis, Dr. Ennis' wife, who started spending more time in the Ariton Clinic. (Hughes depo., pp. 44:13-45:11).

33.     Ms. Ennis would speak disrespectfully to Hughes. However, after Hughes was diagnosed with the brain tumors, Ms. Ennis apologized and stated that she had been so mean to Hughes and was sorry. (Hughes depo., p. 47:3-5).

34.     After her apology, Ms. Ennis stayed in Hughes' office and began discussing inappropriate topics such as the Plaintiff's sex life and discussing her own personal sex life with Hughes. (Hughes depo., p. 47:13-16).

35.     Hughes told Dr. and Ms. Ennis about her brain tumor diagnosis and the need to have surgery. Dr. Ennis complained that Hughes was trying to be

inconvenient for him.  Dr. Ennis asked that Hughes put her brain tumor surgery off until a more convenient time and after his trip to Mexico he had previously planned.  (Hughes depo., p. 53:8-15).

36.    Hughes also informed Dunn, the assistant administrator, that she needed surgery and would be off work.  (Hughes depo., pp. 54:17-55:1).

37.    No one mentioned taking FMLA leave when Hughes asked for time off work and Hughes instead took her vacation and sick days that had accumulated. (Hughes depo., pp. 122:13; 160:13-16).

38.    Dunn did not advise Hughes of her rights under the Family and Medical Leave Act even though Dunn knew that Plaintiff was having brain surgery, but did require her to submit medical documentation and return to work releases from her doctor.  (Dunn depo., pp. 86:10-87:11).

39.    Hughes was not allowed to take all her sick and vacation days that she needed because she was pressured to come back to work early.  (Hughes depo., p. 122:17-22).

### D.    **Plaintiff's Return After Surgery**

40.    While Hughes was off having surgery and on medical leave, Ms. Ennis called Hughes at least three times a week for five weeks stating that Hughes would have to take the office manager job back or otherwise they would not be

able to pay her for the little job she did in coding and billing. (Hughes depo., p. 56:4-13). Mrs. Ennis was performing Hughes' job and managing the employees.

41.    Hughes felt pressured by Dr. and Mrs. Ennis while she was off work on leave to get back to work as soon as possible that work was getting behind. (Hughes depo., pp. 73:19-74:5).

42.    Hughes called her doctor to see if she could be released to return to work and work half-days at the clinic. Hughes was released to come back to work half days, but could not drive. (Hughes depo., p. 74:8-14).

43.    Hughes returned to work working half days for four weeks on February 7, 2005. (Hughes depo., pp. 59:15-21; 109:20-110:4; see DX7 and DX8).

44.    The day Hughes came back to work after her surgery, Ms. Ennis struck Hughes on the head on her surgical site from the brain surgery with her open hand. Ms. Ennis said, "Oh, I thought it'd be well by now" after Hughes told her that hurt. Ms. Ennis did not apologize for striking Hughes. (Hughes depo., pp. 68:6-69:5).

45.    Hughes worked half days for approximately four weeks doing coding and billing. The first week Hughes was back part-time, Ms. Ennis asked Hughes to take the office manager job again. Hughes responded that she would if Dr. Ennis

wanted her to take the job.  (Hughes depo., pp. 59:15-60:5).

46.    Hughes also informed Dr. Ennis that there were some changes she would like to make with regard to the duties of the staff.  Dr. Ennis told her to "go for it."  (Hughes depo., pp. 60:15-18; 61:16-19).

47.    Hughes explained the changes she wanted to make in detail and met with no opposition from Dr. or Ms. Ennis.  (Hughes depo., pp. 61:20-62:10).

48.    Hughes returned to her previous post-surgical job as office manager while she was still working half days and on medical leave.  (Hughes depo., p. 62:11-16).

49.    While she was still on half days, Dr. Ennis made a derogatory comment about Hughes' hair growing back and that it was just sticking up. Hughes felt his comment was harassing.  (Hughes depo., pp. 62:2263:18, 158:3-4).

50.    After four weeks, Hughes came back to work full time.  Dr. Ennis told Hughes to put the money in as fast as she could and when she had input $20,000 into the computer that had piled up while she was out, Hughes brought the results to Dr. Ennis.  Dr. Ennis said it was not good enough and then replied that the five weeks Hughes was out was the worst five weeks of his life.  Hughes told Dr. Ennis that she had tried to get well as fast as she could and Dr. Ennis remarked, "Well, you didn't do it fast enough."  (Hughes depo., pp. 65:22-66:10).

13

51.    Other employees at the Ariton Clinic complained to Hughes about Pat Ennis being in the workplace and telling them how to do their jobs or what to do with patients.  (Hughes depo., p. 71:22-72:6).

52.    After Hughes was back at work full time, she had to take an additional week leave because she started having panic attacks due to the steroids she was taking and the doctor felt Hughes had come back to work too soon.  (Hughes depo., p. 75:5-15).

53.    Hughes' medication was increased in addition to her doctor taking her off work.  (Hughes depo., p. 75:20).

54.    When Hughes' returned to work after being off the one week for panic attacks, neither Dr. Ennis nor Sheila Dunn said anything to her about her time off of work.  (Hughes depo., pp. 79:8-11).

55.    Prior to her one week leave, Dr. Ennis told Hughes that because she was not doing her job they were outsourcing the billing at the clinic and she would have to do collections.  (Hughes depo., p. 81:11-12).

56.    Hughes stated it would difficult for her to do collections since many of the patients were her friends but "you've got to do what you've got to do." (Hughes depo., p. 81:21-82:6).

57.    Hughes then ordered 500 self-addressed stamped envelopes to begin

14

the process of collecting the old accounts that were in receivables.  (Hughes depo., p. 82:4-6).

### E.    <u>Plaintiff's Termination</u>

58.    Hughes returned on Monday from her one week medical leave for the panic attacks and on Wednesday morning at 10:00 a.m. she was terminated by Dunn.  (Hughes depo., p. 92:8-11).

59.    On Wednesday, Sheila Dunn informed Hughes that they were getting a new billing system to do the job and because Hughes did not call Dr. Ennis when she was out for one week they were downsizing and she would no longer be needed.  (Hughes depo., p. 93:11-17).

60.    Hughes contested that she had not properly reported off.  Dunn told Hughes that she had received the doctor's excuse for Hughes to be out, but she did not agree with the excuse.  (Hughes depo., p. 159:12-14).

61.    Dunn stated that Hughes was a great employee and they would give her a letter of recommendation.  (Hughes depo., p. 94:7-9).

62.    Hughes asked if she could draw her unemployment and Dunn responded that she could and if there were any job openings, Hughes would be the first one Dunn would call.  (Hughes depo., p. 94:9-13).

63.    The next day, Hughes called Dunn again to ask her if she could get

her personal belongings instead of having one of the ladies in the office pack her personal items.  (Hughes depo., pp. 94:18-95:3).

64.    Dunn called back and told Hughes that she could come on a certain date and get her personal belongings.  Hughes went after hours and picked up her belongings with Dunn.  (Hughes depo., p. 96:7-10).

65.    Hughes was paid two weeks vacation and an additional two weeks severance.  (Hughes depo., p. 97:1-5).

66.    Hughes was never disciplined in writing prior to being terminated. (Dunn depo., pp. 254:23-255:7).

67.    In the 30 years Hughes was employed, she had never made a mistake like the six months prior to being diagnosed with the brain tumor.  (Dunn depo., pp. 256:9-15).

68.    After Hughes was terminated, Sheila Dunn contacted Hughes' doctor and asked exactly what was Hughes' condition and what was wrong with Hughes. Dr. Sy stated she could not disclose to Dunn any of that information due to the HIPAA regulations.  This conversation occurred after Dunn had terminated Hughes.  (Hughes depo., pp. 156:9-157:19).

69.    Johnson testified that he approved Hughes to be terminated.  Hughes is the only office manager to be terminated since Johnson has been the CEO.

16

(Johnson depo., pp. 53:11-54:6).

70.    Johnson testified that Hughes was fired because her position was deleted by he, Dr. Ennis and Ms. Dunn as the assistant administrator.  (Johnson depo., pp. 55:22-56:4).

71.    Johnson stated he deleted Hughes' position when there was a concern that the billing had backlogged and it was not getting done.  Johnson made the decision to terminate Hughes after she was diagnosed with a brain tumor. (Johnson depo., pp. 56:5-9; 57:3-12).

72.    Johnson admitted there was no discussion to terminate Hughes until after she had brain surgery.  (Johnson depo., pp. 59:21-60:6).

73.    Johnson stated he could have fired Hughes after her order of the flu vaccine but chose not to in consideration of her years of service and that there was a major flu vaccine shortage and they recouped the money.  The facility received positive publicity as a result of the surplus  (Johnson depo., pp. 65:7-66:1).

74.    In her 31 years of service to the Dale Medical Center, Hughes had never been disciplined to Johnson's knowledge.  (Johnson depo., p. 81:10-20).

75.    Johnson understood that Hughes' job duties at the Ariton Clinic were all over the office, that she was doing everything.  (Johnson depo., p. 115:1-14).

76.    Johnson stated he would have to look at the contract with United

Probill to know if they had gone with that company at the time Hughes was terminated.  (Johnson depo., pp. 116:9-117:1).

77.    Johnson admitted that no one in that office had more seniority than Hughes with her 31 years.  (Johnson depo., p. 117:16-19).

78.    Johnson further admitted that Hughes was responsible for the office as a clinician, charting and billing as the office manager, ordering supplies and keeping the office staffed as well as scheduling.  (Johnson depo., pp. 117:10-14; 118:12-20).

79.    When Dr. Quintana was hired to replace Dr. Ennis, Johnson hired additional staff to work at the Ariton Clinic.  (Johnson depo., pp. 120:21-121:2).

80.    When Dr. Quintana left that clinic, Johnson moved the staff members of the Ariton Clinic to other Dale Medical Center facilities.  (Johnson depo., pp. 122:2-123:13; 155:5-10).

81.    These individuals had their positions eliminated at the Ariton Clinic but were absorbed into the other facilities unlike the decision relating to Hughes. (Johnson depo., pp. 122:2-124:15; Dunn depo., pp. 50:1-51:23).

82.    When she terminated Hughes on April 20, 2005, Dunn did not use the word "terminated" but stated she was eliminating Hughes' position.  (Dunn depo., p. 153:8-14).

18

83.    At the time she was terminated, Hughes asked Dunn if there were any other positions she could go into and Dunn told her not at that time.  (Dunn depo., pp. 130:22-131:4).

84.    Dunn had no knowledge what job responsibilities had been removed from Hughes at the time she terminated her.  (Dunn depo., pp. 115:12-22).

85.    Of the 22 job duties that Plaintiff was charged with performing, only three involved insurance billing.  (Dunn depo., pp. 114:5-116:17).

86.    After Hughes left her office, Dunn completed Plaintiff's Exhibit 18 which was the separation from employment listing that Hughes' position had been eliminated.  Dunn did not make any mention of the flu vaccine or writing off accounts as reason for eliminating Hughes.  (PX18, Dunn depo., pp. 150:19-154:21).

87.    Dunn paid two weeks severance pay because it seemed like the right thing to do but then turned around and blocked her own unemployment because Dunn said there was something that Hughes said to the unemployment office that she did not think was true about why she was terminated.  (Dunn depo., p. 155:17-22).

88.    When she received Hughes' unemployment decision, Dunn decided to appeal the decision for something Hughes had written about her termination but

19

Dunn could not recall what made her appeal.  Dunn also completed the paperwork
that Hughes was not eligible for rehire because she lacked initiative and inability to
perform assigned tasks.  (PX18, Doc. D00023).

89.    Defendant in its answer admits that it informed the Department of
Industrial Relations that Plaintiff's position had been eliminated.  (Def.'s Answer,
p. 34).

90.    In the entire time that Hughes had been employed with Dale, she had
never been out sick other than a day here or there and the January-April leave was
the first time Hughes had had any type of illness that kept her out for a certain
period of time.  (Dunn depo., pp. 140:18-141:3).

91.    Dunn states it's coincidental that Hughes was terminated two days
after she returned from leave.  (Dunn depo., p. 141:15-22).

92.    Dunn admits two days was probably not a long enough time to
determine whether or not Hughes was going to be effective at doing her job.
(Dunn depo., p. 142:6-12).

93.    142:8    Q.  [was she] Doing her job?
        142:9    A.  Doing her job.  Well, two days
        142:10  is probably not a long time to
        142:11  determine whether or not she was going
        142:12  to be effective at that.  But yes.

94.    Dunn testified there is not a lot of old accounts receivable in a

physician's office because you initially bill the insurance company when a patient comes in. The third party administrator is doing what little AR there is. (Dunn depo., pp. 161:11-162:5). However, Dunn told the Industrial Relations Board that Ms. Hughes had worked herself out of a job by refusing to work old accounts that she let get old. (PX23, Bates 0036).

95.     Dunn told the investigator with the Industrial Relations Department that in February 2005, Hughes was offered other duties and chose not to do them. (Dunn depo., p. 196:4-7).

96.     Dunn also told the Industrial Relations officer that Hughes had been verbally warned by herself and the doctor she worked for in December 2004. However, during her deposition, Dunn could not recall what Hughes had been disciplined for, but admitted making the statement. (Dunn depo., p. 200:7-19).

97.     Hughes admitted that in December 2004 when Hughes had stopped by her office that she had asked Hughes if she said she would not collect from the old accounts and Hughes told her at that point, "I didn't say that; I said it would hard." Dunn then changed her testimony and said she was confused that it did not happen in December but on the day Hughes' job was eliminated. (Dunn depo., pp. 200:23-201:15).

98.     Dunn states she does not know why she did not pick up the phone

21

when Hughes was in her office stating that she would call on old accounts and tell

Dr. Ennis that that was not what Hughes said that she would and did not need to be

fired.  (Dunn depo., pp. 205:4-10).

99.    Dunn admits on April 20, 2005, that she made no effort to ascertain

the truth as a human resource director about what the supervisor was telling her

was incorrect about an employee that was to be terminated.  (Dunn depo., pp.

204:2-205:21).

100.   203:23    Q.  But she told you she didn't
       204:1  say that.
       204:2    A.   She did tell me that on April
       204:3  20th.  She did tell me that.
       204:4    Q.   And she told you it will be
       204:5  hard, but I can do it?
       204:6    A.   She did tell me that.
       204:7    Q.   So why not tell her to go back
       204:8  to work and do her job?
       204:9    A.   Because Dr. Ennis had made the
       204:10  decision he didn't want her in that
       204:11  office out there.

(Dunn depo., pp. 203:23-204:11).

## F.    Hughes' job Duties and Other Available Positions After Her Termination

101.   Pat Ennis started working at Ariton Clinic in May 2005 as a clerk for

Dale Medical Center and was trained on the personnel policies and procedures of

Dale.  (Dunn depo., p. 21:6-19).

102.    Pat Ennis' jobs were to clean up, help file, do anything that's not getting done. She filed papers in charts and were the previous duties that Hughes performed prior to her termination. (Dunn depo., pp. 25:19-26:14).

103.    Hughes was capable of doing any of the clerical work in the office on a daily basis and did the bank deposits and scheduled patients. (Dunn depo., p. 26:10-14).

104.    There is a lead person in all of the medical clinics with the title "office coordinator" though the job description depicts the job title as "Office Manager, Patient Account and Insurance Clerk." (See PX6, Bates No. 84; Dunn depo., pp. 31:6-32:1). This was the same job description held by Plaintiff. (PX6-10).

105.    An office manager generally has more responsibility than the office coordinator. (Dunn depo., p. 32:6-7).

106.    There are currently five office coordinators at Dale Medical Center. This was considered the front office person who assist the physician with coding, inputting data in the computer system. They are trained on the computer system and maintain all patient files. (Dunn depo., pp. 34:22-35:8).

107.    Even though ProBilling does the coding, the office coordinator will go ahead and code the actual medical form before it is sent to ProBilling. (Dunn depo., p. 34:7-13).

23

108.   At the time of Ms. Dunn's deposition, an office coordinator job was available.  (Dunn depo., p. 35:2-7).

109.   An office coordinator was hired in February 2007, specifically Ms. Angela Stelly, under the age of 40.  (Dunn depo., pp. 36:9-37:6).

110.   In previous years at the Ariton Clinic, the clinic operated with a third party billing service handling the coding and billing and Hughes still had a job entering data into the computer system, entering patient demographics and posting charges and coding.  (Dunn depo., pp. 54:13-55:6).

111.   Any time a hospital has closed a clinic in the past and eliminated positions, they have absorbed the employees within the Dale Medical Center. (Dunn depo., pp. 124:8-125:3).

112.   Dunn admitted had Hughes still been at work she would have been the one entering the patient demographics and putting in charges and the other duties were given to Lisa Brooks.  (Dunn depo., p. 148:11-21).

113.   Ms. Ennis was hired after Hughes was terminated to help out and complete this indigent patient program which included very lengthy forms which was very time consuming.  Ms. Ennis had no experience with these forms.  (Dunn depo., p. 174:10-21).

114.   Dunn stated in 2006 there was another position eliminated in Dr.

Cromer Tyler's office and that individual was put in a senior RX program that Lisa

Brooks, the receptionist from Ariton Clinic was moved to this position after the

Ariton Clinic was closed.  (Dunn depo., pp. 190:3-191:4).

115.   Dunn admitted that billing and coding is outsourced in all of the other

five clinics and there is an office manager in each one of those offices handling the

work associated with that physician.  (Dunn depo., pp. 199:12-200:6).

116.   In fact, Ariton Clinic had outsourced billing previously and Ms.

Hughes remained employed.  (Dunn depo., p. 199).

### G.   The Dale Medical Center Human Resource Policy Was Not Utilized in the Termination of Hughes and Dale Failed to Follow Their Own Policies in Terminating Hughes

117.   Dale has a progressive discipline policy that provides that employees

be counseled through a series of discussions, verbal and written, prior to

termination.  The second part is substantiated by documentation and given the

employee the time and opportunity to improve their performance.  (PX2, 3.3, pp. 4-

17).

118.   Johnson admits that if they were unhappy with the performance of

Ms. Hughes, the policy would dictate to have discussions with her verbally

followed by written documentation and while Johnson will not admit that Dale

Medical Center failed to follow its own progressive discipline policy, he did admit

there are no written warnings in Hughes' personnel file.  ((Johnson depo., pp. 109:9-17; 110:16-21).

119.   Johnson, as part of his duties as CEO, has been charged by the Board of Directors to follow the policies and procedures of Dale Medical Center and specifically the employee handbook, but could not articulate any answer why Dale Medical Center and he failed to issue any written warning to Ms. Hughes prior to her termination.  (Johnson depo., pp. 111:23-112:12).

120.   Johnson stated there was not a level of trust and ability to work between Dr. Ennis and Ms. Hughes and he (Vernon Johnson) determined this after her brain surgery.  (Johnson depo., pp. 109:19-110:4).

121.   Johnson testified it would have been Ms. Dunn's responsibility to make sure a verbal and written warning was issued to Ms. Hughes prior to her termination for job performance issues.  (Johnson depo., p. 112:13-21).

122.   In the last five years, Hughes is the only office who has had her position eliminated at Dale Medical Center.   (Johnson depo., pp. 152:13-153:1).

123.   Dunn admitted as Director of Human Resources she did not follow the progressive discipline of Dale Medical Center and is the worst at documenting.  (Dunn depo., pp. 138:7-139:12).

**H.**    **The DMC Appeal Process**

124.    Hughes had been employed for thirty years with the clinic and Johnson knew Hughes because of her number of years of service.  (Johnson depo., p. 78:12).

125.    Johnson states the appeal process for terminations is for the affected employee to come talk to him but believes there could be a written appeal process in the employee handbook.  (Johnson depo., pp. 100:23-101:7; PX2).

126.    Hughes contacted Vernon Johnson stated she wanted to appeal her termination.  She met with Johnson and he complained about her ordering the flu shots and writing off the 10 accounts.  Johnson told Hughes that she could have hurt the hospital very badly with the flu shot invoice.  Hughes reminded Johnson that the overage of the flu shot had worked out very well for he and the hospital since they had received positive publicity for having a surplus of the flu vaccine.  (Hughes depo., p. 98:17-99:17).

127.    Johnson told Hughes she was just picking at straws.  Johnson asked if Hughes wanted her job back.  Hughes said she would take it if she could change the way she was treated in the workplace by Dr. Ennis or his wife, Pat.  (Hughes depo., pp. 99:12-100:3).

128.    Hughes elaborated that she did not like that Pat used the "f" word all the time and that she was having to walk on eggshells around Dr. Ennis.  Hughes

also asked Johnson why she could not given another job in the office and Johnson told her she was not qualified for any other job in the office. Hughes replied that she was qualified to do other jobs in the office and Johnson replied he was not going to fire somebody just to give her a job because of seniority. (Hughes depo., pp. 99:23-100:14).

129.   Johnson also questioned Hughes if she was trying to get a harassment case against him. (Hughes depo., p. 101:6-9).

130.   Johnson testified he was critical of Hughes ordering the flu vaccine and ordering 300 vials instead of 300 shots of flu vaccine. The hospital was invoiced on September 2, 2004, and Johnson reluctantly admitted that by October 20, 2004, Dale Medical Center had sold all of the flu vaccine as of that date due to the extreme nationwide shortage. (Johnson depo., pp. 73:10-74:11).

131.   Johnson discussed the flu vaccine overage with Hughes in April 2005 when she came to his office to appeal her termination. (Johnson depo., p. 97:1-5).

132.   However, Johnson was adamant that Hughes was not fired, her position was deleted and Hughes was terminated because the job duties no longer existed. Johnson refused to use the word "fired." (Johnson depo., p. 99:12-20).

133.   However, Johnson states the flu vaccine issue did come up during the course of the conversation and billing issues and that Hughes' position did not

allow a check and balance from the hospital standpoint on the billing system. (Johnson depo., p. 100:2-15).

134.   Johnson admits that Hughes complained about Pat Ennis harassing her in the workplace when she came to appeal her termination.  Hughes' appeal was not accepted.  (Johnson depo., pp. 132:15-133:7; 149:14-150:7).

135.   After hearing of Hughes' complaints about Ms. Ennis, Johnson did not investigate nor talk to any of the other employees that were still working with Ms. Ennis in the workplace.  (Johnson depo., pp. 134:8-10).

136.   Johnson admitted no one ever informed Hughes that they were unhappy with her job performance until she appealed her termination.  (Johnson depo., pp. 144:5-145:1).

137.   Johnson hedged several times during his deposition about why Hughes was terminated but admitted that he told Hughes she was terminated because her position was deleted and he never used the word "fired."   (Johnson depo., pp. 145:21-146:5).

### I.    Retaliation by DMC

138.   Hughes applied for other jobs and positions at the Dale Medical Center and has not been hired nor has she been contacted for even an interview. (Hughes depo., pp. 153:17-155:13).

139.    Johnson could not testify if Hughes would be eligible for rehire and also could not testify why she would not be eligible for rehire if her position was deleted.  (Johnson depo., p. 103:13-19).

140.    Johnson admits the personnel handbook states that if an employee is downsized, they are eligible for rehire and does not know why Hughes has not been rehired.  (Johnson depo., p. 104:1-4, PX2 - 1.10).

141.    Johnson did not believe Hughes was paid a severance and would not award a severance to a terminated employee nor an employee who had been eliminated or downsized.  (Johnson depo., p. 105:18-106:10).

142.    When asked why Dale Medical Center would move to block Hughes' application for unemployment benefits, Johnson testified that it was based on the dissatisfaction with Hughes' work performance and that he made the decision to block her unemployment based on job performance and he made that decision at the time he deleted the position.  (Johnson depo., pp. 106:11-107:5).

143.    Johnson then changed his testimony and stated he told Hughes that he was firing her because of the flu vaccine and writing off of the accounts and that Hughes was clear the hospital was dissatisfied with her employment.  (Johnson depo., pp. 107:16-108:9).

144.    Dunn admitted Hughes applied for open positions at the medical

30

center but Dunn also knew that Hughes had filed an EEOC charge.  Hughes'

application had not been submitted to any department head to interview her for a

job, but rather all of Hughes' applications had been placed in a file with her EEOC

complaint.  (Dunn depo., pp. 221:14-222:23).

145.   The applications were never given to anyone for her to be considered

for employment.

> 222:18    Q.  What did you do with the
> 222:19  applications?
> 222:20    A.  Because I had received her
> 222:21  complaint from the EEOC, I had made a
> 222:22  file on Ms. Hughes.  I put them in that
> 222:23  file.

(Dunn depo., p. 222:18-23).


## III.   **MEMORANDUM OF LAW AND ARGUMENT**

### A.   **Summary Judgment Standard**

The moving party has the burden of demonstrating that there is no genuine

issue as to any material fact, and a summary judgment is to be entered if the

evidence is such that a reasonable jury could find only for the moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986) (Emphasis added).

In assessing a summary judgment motion, the court must examine any

31

pleadings, depositions, answers to interrogatories, admissions, and affidavits in a

light that is most favorable to the non-moving party. Fed.R.Civ.P. 56(c);  see

*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176

(1962). Thus, the court must "avoid weighing conflicting evidence or making

credibility determinations." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913,

919 (11th Cir.1994).  It is not the role of the court to weigh the facts. *Id.*  Rather,

the determination is of "whether ... there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

### B.  Plaintiff Can Prove Her Prima Facie Case of Age Discrimination and Show She Was Terminated From Dale Medical Center Because of Her Age

Under the Age Discrimination in Employment Act "ADEA," it is unlawful

for employers "to discharge any individual or otherwise discriminate against any

individual with respect to [her] compensation, terms, conditions, or privileges of

employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  The

sufficiency of an ADEA claim in the absence of direct evidence is based on

circumstantial evidence under the three-step framework established in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and

*Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d

207 (1981). *See Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).

**C.     Plaintiff did meet the statutory prerequisites for bringing her age discrimination claim.**

The defendant has articulated as its first point of argument that plaintiff has failed to satisfy the statutory prerequisites of bringing her termination claim on the basis of her age because she failed to plead in her EEOC charge any facts to support her belief that age was a factor in her termination, but did check the age box on her claim form.  (Def.'s Brief, pp. 13-15).  The defendant cites New York, Pennsylvania and Illinois case law in support of its argument.

For nearly forty years, the Eleventh Circuit Court of Appeals and other courts have addressed questions about what content must be included in EEOC charges in order to preserve a plaintiff's right to later litigate specific claims.[1]

_____

[1]  Neither the employment discrimination statutes, nor the implementing regulations provide much specific guidance on the issue of what content is required to be included in a charge of discrimination, but what guidance there is focuses on the factual content of the charge. In addition to requiring a charge of discrimination to identify the name and address of the charging party and the person against whom the charge is made, the applicable regulation simply states that each charge should contain "[a] clear concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(1)-(3).  Not surprisingly then, the EEOC form used for charges of discrimination, EEOC Form 5, is a rather simple form.

*Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970). [2] *Houston v. Army Fleet Services, L.L.C.* 2007 WL 1747142, 6 (M.D.Ala.,2007).

The filing of a charge of discrimination with the EEOC initiates "an integrated, multi-step enforcement procedure" that enables the EEOC to detect and remedy various discriminatory employment practices. *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 62, 104 S.Ct. 1621, 1627, 80 L.Ed.2d 41 (1984). This process includes the following steps: (1) prompt notice from the EEOC to the employer that a charge has been filed; and (2) investigation of the charge by the EEOC. *Id.* at 63.

The EEOC assumes the burden of "promptly notify[ing] the respondent that a charge has been filed." 29 C.F.R. § 1626.11.  Prior to filing a Title VII action, however, a plaintiff first must file a charge of discrimination with the EEOC. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460 (5th Cir.1970). The purpose of this exhaustion requirement "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation

---

[2]  In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. Nov. 3, 1981) (*en banc* ), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

efforts." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983); see also *Wu v. Thomas*, 863 F.2d 1543, 1548 (11th Cir.1989) ("The purpose of the filing requirement is to insure that the settlement of grievances be first attempted through the office of the EEOC.") (internal quotation and citation omitted).   This circuit has noted that judicial claims are allowed if they "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate. *Wu,* 863 F.2d at 1547. (citation omitted).

The Court stated that in light of the purpose of the EEOC exhaustion requirement, this circuit has held that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir.2000) (internal quotation and citation omitted); *Sanchez*, 431 F.2d at 466 (noting that the allegations in a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination like or related to the allegations contained in the charge). Courts are nonetheless "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *Sanchez*, 431 F.2d at 460-61.  As such, this Court has noted that " 'the scope of an EEOC complaint should not be strictly interpreted' " *Id.* at 465 (citation omitted).

35

The proper inquiry here therefore is whether Hughes' complaint was like or related to, or grew out of, the allegations contained in her EEOC charge.  In *Gregory v. Georgia Dept. of Human Resources*,  355 F.3d 1277 (11th Cir. 2004), the court addressed the issue of whether Dr. Gregory could bring a claim of retaliation when she <u>had not checked </u>the box on her EEOC charge.  Gregory had instead checked the box for race and gender, but brought her claim for race and retaliation.

The Eleventh Circuit found that the ultimate act that Dr. Gregory complained  was that she was terminated. At the point at which she filed the charge, she "believe[d]" that she was terminated because of her race and sex. She set forth the relevant dates of discrimination in the charge, as well as the reasons why she believed she was terminated. Although not clear in the record, the EEOC presumably investigated, at least in some fashion, the possible reasons why Dr. Gregory was terminated, growing from her initial "belief" that it was because of her race and sex.

The court further stated that "Indeed, there could be various permutations of non-legitimate reasons why an employee is ultimately terminated. In Dr. Gregory's situation, for example, it could be that race and sex were the only reasons, as she initially believed, why she was terminated. It could also be, however, that Dr.

Gregory was terminated in retaliation for having complained about Dr. Fuller's disparate treatment of her, inter alia, during physician scheduling and patient assignments. It could further be that she was terminated for actual legitimate reasons, which is not likely the case here because there is a $10,000 jury verdict in favor of Dr. Gregory suggesting otherwise." *Id.* at 1280.

In reaching it's result in *Gregory*, the Eleventh Circuit reasoned that the "ultimate act that she complained about [in the EEOC charge] was that she was terminated" and that consequently the EEOC's investigation of the charge would presumably include an investigation of the possible reasons for the termination which could include retaliation for the plaintiff's having complained about race and sex discrimination. *Id.* at 1280.

Likewise Hughes checked the boxes of age, FMLA, and disability on her EEOC charge. She did not check the box for retaliation and the defendant has not alleged Hughes is deficient in that regard with her EEOC charge.[3] Hughes indicated in her charge her date of birth, that she had been employed for 31 years,

_____

[3] When a retaliation claim is based on adverse actions taken against the employee *after* the initial EEOC charge is filed, it can be said that the retaliation claim grows out of a properly filed employment discrimination charge, and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation. *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169 (11th Cir.1988).

was an employee in good standing, was terminated after brain surgery and provided  conflicting reasons for her termination.  (PX21, pp. 1-4).  Hughes' judicial complaint was like or related to, or grew out of, the allegations contained in her EEOC charge.  The EEOC's investigation of the charge would presumably include an investigation of the possible reasons for the termination of which alleged conflicting reason which could include discrimination based on age.

The court should deny Defendant's motion to dismiss for failure to satisfy administrative prerequisites.  Summary judgment is due to be denied.

### D.    Plaintiff Can Establish the Third Prong of her Prima Facie Case of Age Discrimination

To prove a *prima facie* case of age discrimination in a case involving a layoff, Hughes must show (1) that she was a member of the protected age group and was adversely affected by an employment decision; (2) that she was qualified for her current position or to assume another position at the time of discharge; and (3) that there exists "evidence by which a factfinder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching that decision." *Benson v. Tocco, Inc.,* 113 F.3d 1203, 1208 (11th Cir. 1997).

Defendant has alleged that Plaintiff cannot prove the third prong of her

prima facie case and thus cannot survive summary judgment.[4]  (Def.'s Brief, p. 16).

However, Hughes can offer sufficient evidence that could convince a reasonable jury that DMC intentionally discriminated against her on the basis of her age. See *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1329 (11th Cir.1998) ("At issue is whether [the plaintiff] can point to sufficient evidence to allow a reasonable juror to find discriminatory intent."). "**[P]rovided that the proffered reason is one that might motivate a reasonable employer**, an employee cannot succeed on summary judgment by simply quarreling with the wisdom of that reason." *Lewis v. Chattahoochee Valley Community College*, 136 F.Supp.2d 1232, 1242 (M.D.Ala.2001) (citing *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*)). (Emphasis added).

The defendant has proffered that plaintiff must produce evidence that could lead a factfinder to conclude that "(1) [the] defendant consciously refused to consider retaining Plaintiff because of her age, **or** (2)[the] defendant regarded age as a negative factor in such consideration."  *Williams v. General Motors Corp.,* 656 F.2d 120, 139-30 (5th Dir. Unit B 1981).  Defendants' brief p. 16.

 Plaintiff can prove intent by showing that defendant, specifically the

---

[4]  Defendant does not contest that Plaintiff can prove all other prongs of her prima facie case and as such, no argument is made to prove these.  (Def.'s Brief, pp. 15-16).

decisionmaker, Sheila Dunn, refused to consider retaining Hughes in any capacity. It is undisputed that Dunn considered no one but Hughes in the elimination of positions and without reviewing the job duties of any employee. (Dunn depo., pp. 115:12-22). Dunn made the elimination decision knowing that Hughes not only the most senior employee with regard to longevity with the company, but the senior individual in the office who handled everything for that office. In other words Hughes had done it all and for years. (Johnson depo., p. 115:1-14).

The defendant has not alleged that budgetary cutbacks were the issue, only that it was eliminating Hughes' position because the job duty of coding and billing was being outsourced to a third party billing service known as ProBilling. However, Dunn testified that in previous years when Mednet, a third party billing service was used at the Ariton Clinic, Hughes had maintained her position. (Dunn depo., pp. 54:13-55:6).

Perhaps the most damning of evidence to Defendant's elimination farce is Dunn's testimony that each medical office or facility within DMC had an office coordinator or an office manager *even though* all of these offices utilized an outside billing service. (Dunn depo., pp. 199:12-200:6). All of the other five facilities had a front office person who assisted the physician with coding and inputting data in the computer system. (Dunn depo., pp. 31:22-23). Even though

Probilling performed the coding to the insurance company, the office coordinator still has to code the form to send to Probilling. (Dunn depo., pp. 33:14-18).

Dunn even admitted that if Hughes had remained she would have been the one entering the patient demographics and putting in patient charges – duties given to Lisa Brooks, the young receptionist who had been previously disciplined. (Dunn depo., p. 148:11-21; Hughes Aff., ¶ 3).

The Eleventh Circuit has held that, "[w]here a particular job position is entirely eliminated for nondiscriminatory reasons, for Plaintiff to prevail against her employer she must show that she was qualified for another available job with that employer; qualification for [her] current position is not enough." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082-83 (11th Cir. 1990) (citations omitted). DMC cannot show that it eliminated Hughes' position for a nondiscriminatory reason. It did not eliminate the other office managers in the other five facilities even though Probilling was performing the coding in those offices. Dunn even hired other office managers in those facilities after eliminating Hughes. (Dunn depo., p. 36:9-37:6).

Dunn hired a new office coordinator in February 2007 under the age of 40 and had an available coordinator position at the time of her deposition in May 2007. (Dunn depo., pp. 35, 37, 39:5-39:6). Hughes had submitted an application

41

on October 19, 2006, for a position in the business office and as an emergency room admit representative.  (PX20).  Further, Dunn had three applications that Plaintiff submitted for open positions and never considered her for employment. (Dunn depo., p. 222:18-23).

Hughes had asked Dunn at the time of her termination for job elimination if there was another open position she could move into after 31 years and Dunn replied not at this time, but you will be the first person I call.  (Hughes Aff., ¶ 10).

Dunn volunteered that within one month of terminating Hughes she hired Pat Ennis.  (Dunn depo., p. 21:13-15).  Mrs. Ennis specifically was assigned the indigent program, an important program at the Ariton Clinic and which Hughes had headed.  (Dunn depo., p. 172; PX21, p. 2, ¶ 3).  Plaintiff had also performed the same duties as Brooks and Williams, both under the age of forty (40) with less than one year of employment.  (Hughes Aff., ¶¶ 3, 4).

The Eleventh Circuit held in *Jones v. BE&K Engineering Co.*, 146 Fed. Appx. 356 (11th Cir. 2005) that the district court erred in its analysis of the <u>second requirement</u> of Plaintiff's prima facie case where the Plaintiff and the comparator were doing the same jobs at the time of the RIF.  The Plaintiff could prove that she was qualified to assume another position even though the comparators' education could arguably give her more flexibility for the future in the company, at the time

42

of the RIF.

In *Jones*, the comparator had taken over the same tasks for which the Plaintiff had been responsible and the Court held that, on this evidence, the Plaintiff had proven she was qualified for the young comparator's position and established her prima facie case. *Id.* at 359 (affirming summary judgment on other grounds). Such is the case *sub judice*. Plaintiff was qualified for every job at the clinic, but she was the one eliminated, not the young receptionist or young assistant that Hughes had hired and trained. (Hughes Aff., ¶¶ 3, 4 ).

The ADEA does not mandate that employers establish an interdepartmental transfer program during the course of a layoff nor impose any added burden on employers to transfer or rehire laid-off workers in the protected age group as a matter of course. Rather, the ADEA simply provides that a discharged employee who applies for a job for which she is qualified and which is available at the time of her termination must be considered for that job along with all other candidates, and cannot be denied the position based upon her age. *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344-45 (11th Cir. 2003) (citations omitted).

Hughes asked Dunn when she is being terminated if there was not another job that she could work. Dunn told Hughes that there wasn't at the time. (Hughes Aff., ¶ 10). However, within one month Dunn had hired Pat Ennis to work the

43

same duties as the plaintiff and had assigned plaintiff's duties to younger workers. (Dunn depo., p. 21:13-15). Defendant admitted that it is always hiring and has made numerous hiring decisions since eliminating plaintiff, an employee with 31 years of service. (Dunn depo., p. 250:22-251:4).

Even though Hughes did not openly apply for the position at the Ariton clinic, the Eleventh Circuit has stated that an employee who has not applied for a job opening can still establish a prima facie case of discrimination in two circumstances. First, "nonapplicants may be entitled to relief where the employer's clear policy of exclusion would make an application a useless exercise," which requires a two-part showing: (1) "[the nonapplicant] would have applied but for discrimination;" and (2) "[the nonapplicant] would have been discriminatorily rejected had he applied." *Barron v. Federal Reserve Bank of Atlanta*, 2005 WL 901906, *2 (11th Cir. Ala.), citing *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1560 (11th Cir. 1986). Second, when no policy of exclusion or formal notice of a job exists, an employer "has a duty to consider all those who might reasonably be interested," so a prima facie case will be established when the employee shows that "the company had some reason or duty to consider him for the post." *Id.* Dunn failed to consider Hughes one month later when Pat Ennis was hired and assigned part of Hughes' previous duties.

44

Plaintiff has shown that Plaintiff, the oldest worker at the Ariton Clinic, and who had 31 years of seniority was provided false reasons for her termination and was qualified to assume the duties of younger employees and was not considered. Further, one month later another employee was hired and assumed Plaintiff's duties.

Under the law, Plaintiff is either required to proffer evidence that could lead a factfinder to conclude either the defendant consciously refused to consider retaining the Plaintiff because of her age, or that the Defendant regarded age as a negative factor in such consideration. *Jones*, 146 Fed. Appx. 359. Plaintiff, while not required, has shown both. Summary judgment is due to be denied.

**E.**    **Plaintiff Can Prove She was Terminated and Not Rehired Because she Took an FMLA-covered Leave of Absence**

The FMLA contains two distinct types of provisions. First, it creates a series of substantive rights that eligible employees "shall be entitled" to up to twelve weeks of unpaid leave per year for any one of the following purposes: when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position," 29 U.S.C. § 2612(a)(1)(D); to care for a close family member with such a condition, 29 U.S.C. § 2612(a)(1)(C); or because of the birth, adoption, or placement in foster care of a child, 29 U.S.C. §

45

2612(a)(1)(A) & (B). See also 29 U.S.C. § 2611(11); 29 C.F.R. §§ 825.100(a),

825.114 (1997) (defining a "serious health condition").

Following a qualified absence, the employee is entitled to return to the same

position or an alternate position with equivalent pay, benefits, and working

conditions, and without loss of accrued seniority. 29 U.S.C. § 2614(a)(1); 29

C.F.R. §§ 825.100(c) (1997). The FMLA also provides for "intermittent" leave,

which allows an employee to take such leave intermittently "when medically

necessary," such as to attend appointments with a health care provider for

necessary treatment of a serious health condition. 29 U.S.C. § 2612(b); 29 C.F.R. §

825.117 (1997) (defining requirements for intermittent leave). *Hodgens v. General

Dynamics Corp.,* 144 F.3d 151, 159 (C.A.1 (R.I.) 1998).

Plaintiff was entitled to take FMLA leave for her own health condition.

Plaintiff required surgery to remove two benign brain tumors and timely notified

the defendant.  However, Dunn failed to apprise Plaintiff of her rights under the

FMLA and Hughes was pressured to return to her employment early.  Prior to

Plaintiff returning to work full-time and while working a reduced schedule,

Plaintiff's position was eliminated and she was terminated within two days of

returning from leave.  Open positions were available that Plaintiff qualified for

and, contrary to its own employment policies, Defendant refused to transfer

Plaintiff to these positions while she was laid off.  Defendant has violated the

FMLA because it did not allow the Plaintiff to return to her previous position or an

alternate position.

To make out a prima facie case of retaliation under the FMLA, Hughes must

show that (1) she availed herself of a protected right under the FMLA; (2) she was

adversely affected by an employment decision; (3) there is a causal connection

between the employee's protected activity and the employer's adverse employment

action. *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir.1997).

Dale Medical Center does not contend that Plaintiff can meet her *prima facie*

elements, rather its mere two sentence "argument" is grounded on the assertion that

Plaintiff received all the leave she requested.[5]  (Def's Brief, p. 23).

Dunn testified she did not provide nor advise Hughes that she was entitled to

FMLA leave.  (Dunn depo., p. 87:3-5).  While Hughes was off on medical leave,

Dunn began discussions to eliminate Hughes job duties and her position.  (Dunn

_____

[5]Defendant attempts to address FMLA retaliation in another section of its
brief under sub-heading 4.  Id at 23-24.  Again, defendant's argument is relegated
to a generic statment, providing only that plaintiff cannot satisfy the third prong -
the causal relation between Plaintiff's leave and her subsequent termination.  Id. At
24.  Defendant states that "DMC has clearly articulated that Plaintiff was
terminated because her position was eliminated." Id. (Internal cite omitted).   There
is no further argument by the defendant addressing plaintiff's claim of FMLA
retaliation.

depo., p. 118:13-23).  After Hughes was eliminated, a new worker was hired one

month later.  (Dunn 21:13-15).  When the facility closed permanently a year later,

the employees were all absorbed into other facilities of the medical center.  The

medical center continues to hire employees and Hughes has applied for three

positions and never been granted an interview.  (Dunn depo. , p. 222:18-23).

Further, within a month of Plaintiff's job elimination, Pat Ennis was hired at the

same clinic that Hughes was allegedly downsized from.  No effort was made to

notify Hughes that position was available, or to transfer her into the position.

(Hughes Aff., ¶ 11).

Defendant violated its own policies in terminating Hughes and hiring Pat

Ennis.  A reasonable jury could find that defendant's reasons for terminating and

eliminating her position was a pretext for discrimination in light of the evidence

that plaintiff was terminated after 31 years of employment with the defendant on

the second day she returns from medical leave.  Hughes' job duties were assigned

to other employees and a new employee hired within a month to take over Hughes

job duties with the indigent patient program.  Plaintiff has met her burden on

summary judgment refuting Defendant's two sentence argument.  Defendant failed

to carry its burden on summary judgment.  Plaintiff was terminated in violation of

the FMLA and was not returned to the same position or an alternate position with

equivalent pay, benefits, and working conditions, and without loss of accrued

seniority upon her return from leave.

Summary judgment is due to be denied.

**F.    A Reasonable Jury Could Conclude That Defendant Perceived Mr. Hughes as Being Substantially Limited in the Major Life Activity of Working.**

The sole issue raised by defendant's motion is whether defendant perceived

Mrs. Hughes as substantially limited in the major life activity of working.  It is

well established in this circuit that working is a major life activity.  *Cash v. Smith*,

231 F.3d 1301, 1306 n.7 (11th Cir. 2000); *Mullins v. Crowell*, 228 F.3d 1305, 1313

(11th Cir. 2000).[6]  In determining whether a physical or mental impairment

substantially limits a major life activity, "the regulations instruct [courts] to

consider (1) the nature and severity of the impairment;  (2) the duration or expected

duration of the impairment; and (3) the permanent or long term impact, or the

expected permanent or long term impact of or resulting from the impairment."

*Sutton v. Lader*, 185 F.3d 1203, 1208-09 (11th Cir. 1999) (citing 20 C.F.R. §

1630.2(j)(2)).

---

[6]    This brief cites cases under both the ADA and the Rehabilitation Act, though this case is brought solely under the Rehabilitation Act.  The standards are the same.  *Holbrook v. City of Alpharetta, Georgia*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).  Thus, "cases decided under the Rehabilitation Act are precedent for cases under the ADA, and *vice versa*."  *Cash*, 231 F.3d at 1305 n.2.

49

In order for a plaintiff to establish that an employer regarded him or her as substantially limited in the major life activity of working, he or she must prove that the employer considered him or her as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(I); see also *Cash*, 231 F.3d at 1306; *Standard v. A.B.E.L. Services., Inc.*, 161 F.3d 1318, 1327 (11th Cir.1998). "A 'class of jobs' is the job from which a claimant was disqualified, as well as all other jobs utilizing similar training, knowledge, and skills within 'the geographical area to which the [claimant] has reasonable access.' 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B). A 'broad range of jobs in various classes,' in contrast, is the job from which a claimant was disqualified, as well as all other jobs not utilizing similar training, knowledge, and skills within 'the geographical area to which the [claimant] has reasonable access.' 29 C.F.R. § 1630.2(j)(3)(ii)(A),(c)." *EEOC v. Rockwell Int'l Co.*, 243 F.3d 1012, 1017 (7th Cir. 2001).

"As with real impairments, courts have held that a perceived impairment must be substantially limiting and significant. In this context a significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of tasks." *Gordon v. E.L. Hamm*

& *Assoc.*, 100 F.3d 907, 913 (11th Cir. 1996).

Thus, for example, when an employer perceives an employee as being generally foreclosed from the field of maintenance supervisory work, the employer perceives the employee as being precluded from a class of jobs and substantially limited in the major life activity of working.  *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 303 (4th Cir. 1998); see also *EEOC v. Automatic Systems Co.*, 169 F. Supp. 2d 1001, 1007 (D. Minn. 2001) (defendant who "believed [the plaintiff's] heart condition rendered him unable to work in any job with supervisory or managerial duties" perceived plaintiff as being disabled from the supervisory class of jobs); *Zakaras v. United Airlines, Inc.*, 121 F. Supp. 2d 1196, 1216-17 (N.D. Ill. 2000) (defendant employer who demoted employee from supervisory position because of belief that plaintiff's alcoholism prevented him from being able to supervise employees perceived plaintiff as disabled from a broad class of supervisory jobs).

Hughes was a  supervisor and the highest position in the Ariton Clinic, absent the physician.  Hughes had brain surgery to remove two benign tumors. Plaintiff returned to work working half days for four weeks and when she returned to work full time for one week, Plaintiff began having panic attacks based on her medication.  Her physician took plaintiff off work for another week and returned

plaintiff to work a week later.  When plaintiff returned to work she was met with

hostility.  Dr. Ennis would not speak with her and within two days she was fired

and told her job after thirty one years had been eliminated.  (Hughes Aff., ¶ 8).

However, Plaintiff's office coordinator job was the only one of the five facilities

that was eliminated.  After her termination for job elimination a new employee was

hired within a month to handle Plaintiff's job duties.  Plaintiff has applied for other

positions and been denied.

When asked if Hughes was doing her job when she returned from medical

leave, Dunn responded that two days was probably not long enough to determine if

Hughes was going to be able to be effective at that.  (Dunn depo, p. 142:8- 142:12).

Dunn did not answer that Hughes could or could not do her job but questioned

whether Hughes could be effective. When Dunn completed the termination

documentation she indicated that Hughes was not eligible for rehire because she

lacked the ability to complete assigned task.  (PX 18, Doc. D00023) (Emphasis

added).  Even after terminating Hughes, Dunn approached Hughes' physician with

the query,  "what is really wrong with Hughes?"  (Hughes depo., p. 156:9-157:19).

If the real reason was job elimination, why would Dunn inquire about Hughes'

medical condition other than Hughes was perceived to be disabled by Dunn.

Summary judgment is due to be denied.  Conflicting factual evidence

precludes the grant of summary judgment.  Hughes was terminated within two days of returning from medical leave as a result of panic attacks associated with her brain surgery.  A reasonable jury could conclude that she was dismissed from her employment in violation of the ADA because the defendant perceived plaintiff as substantially limited in the major life activity of working.

### G.    Hughes Can Establish Her Claims of Retaliation

To establish a prima facie case of retaliation under Title VII, Hughes must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. See *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Statutorily protected expression includes internal complaints of sexual harassment as well as complaints lodged with the EEOC, and thus Hughes can establish a retaliation claim if she can prove the requisite causal nexus between either of these activities and an adverse employment decision. See *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989) and *Pipkins v. City of Temple Terrace, Florida*, 2000 WL 1149057 (11th Cir. 2001).

In the recent United States Supreme Court case *Burlington N. & Santa Fe Ry. Co. v. White*, --- U.S. ----, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) the

53

Court issued a resounding opinion that retaliation is not to be taken lightly and

expanded the scope past the workplace and to acts that do not represent adverse

employment acts.

In its opinion, the Supreme Court stated:

"In our view, a plaintiff must show that a reasonable employee would
have found the challenged action materially adverse, which in this
context means it well might have dissuaded a reasonable worker from
making or supporting a charge of discrimination. We speak of
material adversity because we believe it is important to separate
significant from trivial harms. Title VII, we have said, does not set
forth a general civility code for the American workplace. An
employee's decision to report discriminatory behavior cannot
immunize that employee from those petty slights or minor annoyances
that often take place at work and that all employees experience." *Id.*
(citations and quotations omitted).

In the *Burlington* case, White, the only woman in her department, operated

the forklift at the Tennessee Yard of Burlington Northern & Santa Fe Railway Co.

(Burlington).  After White complained of sexual harassment, her immediate

supervisor was disciplined. White was removed from forklift duty to standard track

laborer tasks. White filed her complaint with the Equal Employment Opportunity

Commission (EEOC), claiming that the reassignment to a less desirable job was

unlawful gender discrimination and retaliation for her complaint. Subsequently,

White was suspended indefinitely and without pay for insubordination. Burlington

later found that White had not been insubordinate, reinstated her, and awarded her

54

back pay for the 37 days she was suspended. White filed her lawsuit against Burlington claiming that changing her job responsibilities and suspending her for 37 days amounted to unlawful retaliation under Title VII. A jury awarded her compensatory damages.

On appeal, the Sixth Circuit held that a retaliation plaintiff must show an "adverse employment action," which it defined as a "materially adverse change in the terms and conditions" of employment. The United States Supreme Court granted the writ of certiorari on the basis that the Circuits have come to different conclusions about whether the challenged retaliatory action has to be employment or workplace related and about how harmful that action must be to constitute retaliation.

The Court found that the application of Title VII retaliation provision was further defined as not limiting an employer's retaliatory actions only to those events that affect terms, conditions or status of employment, or those that occur only at the workplace. The Court provided that the scope of the retaliation provision is broader than that of Title VII's substantive discrimination provision. A "plaintiff must show that a reasonable employee would have found the challenged action materially adverse" and would have been dissuaded from coming forward and complaining of discrimination.

The Supreme Court noted that it phrased the retaliation standard in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.* at 2415-2416.

In this instance, Dunn downsized Hughes and told Hughes she was eligible for rehire with the company would be the first she called, and that Hughes could draw here unemployment. (Hughes depo., p. 94). Hughes thereafter appealed her termination to Vernon Johnson, the CEO of DMC. Plaintiff complained in this meeting that she had been treated adversely and discriminated against. Johnson even remarked and questioned if Hughes was going to bring a harassment suit against him. (Johnson depo., p. 101, PX21 - EEOC charge).

Thereafter, Defendant appealed the award of Plaintiff's unemployment based on the elimination of her position. Johnson stated it was his decision to

block her unemployment and he made the decision based on performance problems that were never documented by DMC.  (Johnson depo., pp. 106-107).

Dunn admittedly fabricated the truth to the Industrial Relations stating that in December 2004, Hughes had been reprimanded, and that she had refused other duties offered to her.  (Dunn depo., pp. 155; 196; 200).

Hughes was provided conflicting reasons for her termination from the Industrial Relations when the company appealed the finding of her entitlement to unemployment compensation.[7]   Armed with this conflicting evidence that she was not terminated because her position was eliminated, Plaintiff filed her charge of discrimination with the EEOC alleging discrimination as the reason for her adverse treatment and termination by defendant.  The defendant posted open positions for which the Plaintiff qualified and she applied.  Plaintiff sought employment thereafter with the same company she had worked for 31 years and in open and available positions that she was qualified to work.

However, Dunn testified that none of Hughes' applications were even considered.  Instead, Dunn knowing of Hughes' charge of discrimination placed

_____

[7]The company's position in appealing Hughes' entitlement to unemployment is interesting in light of its position in this litigation that, "DMC has clearly articulated that Plaintiff was terminated because her position was eliminated."  Def. Brief p. 24, ¶ 2.

Hughes' job applications in the same manilla folder as her actual charge of discrimination.  Dunn explained she placed the applications in the same special folder she had created for Hughes' EEOC charge.  Dunn purposely never forwarded the applications to any of the department heads at DMC that were hiring for the posted positions.  Hughes was not considered further for employment.

These separate but repeated acts of retaliation are the type of conduct the Supreme Court had in mind in it's *Burlington* decision. It is this type of conduct which would dissuade an employee from coming forward to complain of illegal discrimination particularly in the circumstance of a downsized employee.  If the downsized  employee knows that her employer has the ability to purposely prevent her from receiving unemployment compensation by fabricating evidence and discipline and being interviewed and considered for employment in another open and available position after telling the employee their previous position was eliminated they would certainly be dissuaded from making an internal complaint with the company or with the EEOC.

Dunn's actions are retaliatory and summary judgment is due to be denied. Defendant has further failed to carry its burden at the summary judgment phase.

**H.    Plaintiff Hostile Work Environment Claim**

Hostile environment claims are analyzed under the Title VII standards for

age-based hostile environment claims.  Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

A hostile environment prima facie case on the basis of age or disability requires that a plaintiff present evidence that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic such as age or disability; (4) the harassment "was sufficiently severe or pervasive [as] to alter the terms or conditions of employment and create a discriminatorily abusive working environment;" and (5) the employer is either directly or vicariously responsible for such environment. *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir.2002); *Keith v. MGA, Inc*. 2006 WL 3228073, *3 (11th Cir. 2006).

As Plaintiff has articulated above, she has shown that her direct supervisor, Dr. Ennis, demeaned her by calling her worthless and stupid.  He spoke harshly to her, telling her to et in her little office and not come out unless spoken to.  Hughes was called repeatedly at home during her recovery from brain surgery and told if she did not come back soon, she would not have a job.  When she comes back to

work, she is purposely whacked on top of her head with no apology.  Further, the

Defendant has created fabricated disciplinary issues that other employees were not

subjected to while recovering from a serious illness.  Plaintiff has proven her

hostile environment claim.  Summary judgment is due to be denied.

## I.    Defendant's Reasons for Terminating the Plaintiffs are Pretextual

Defendant's articulated reasons for terminating the Plaintiff, elimination of

her position, is pretextual. To show pretext, the plaintiffs must "demonstrate that

the proffered reason was not the true reason for the employment decision···· [The

plaintiff] may succeed in this either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence." *Jackson v.

Ala. State Tenure Comm.*, 405 F.3d 1276, 1289 (11th Cir.2005) (citation omitted).

A plaintiff's prima facie case, combined with sufficient evidence to find that

the employer's asserted justification is false, may permit the trier of fact to

conclude that the employer unlawfully discriminated.  *Reeves v. Sanderson

Plumbing Products, Inc.*, 133, 120 S.Ct. 2097, 147 L.Ed. 105 (2000).  In *Hicks*, the

Supreme Court specifically stated, that the factfinder's disbelief of the reasons put

forward by the defendant (particularly if disbelief is accompanied by a suspicion of

mendacity) may, together with the elements of the prima facie case, suffice to show

intentional discrimination.  Thus, rejection of the defendant's proffered reasons will

permit the trier of fact to infer the ultimate fact of intentional discrimination.  *St.*

*Mary's Honor Center v. Hicks*, 509 U.S. at 502, 511, 113 S.Ct. 2742, 2750, 125

L.Ed.2d 407 (1993).

In the recent case *Mock v. Bell Helicopter Textron, Inc.*, 2006 WL 2422835

(11th Cir. August 23, 2006) the Court held that where the employer withholds until

later, telling its employee why this employment has come to an end, a trier of fact

reasonably could find that the subsequent reason constitutes pretext for

discrimination.  A reasonable jury could conclude that DMC's current reason that

Plaintiff had performance problems is pretext for intentional discrimination since

DMC did not tell Hughes that at the time it terminated her nor presented her with

any warnings in violation of Defendant's own policies and procedures.  Hughes

was told that she was being downsized.  (Hughes Aff., ¶ 9l; PX 21).  It was only

after Hughes filed her claim seeking unemployment benefits and filed her EEOC

charge did DMC come forward and say that Hughes was performing

unsatisfactorily and, therefore, the reason she was no longer needed in the

workplace.

DMC finds itself in an indefensible position to its job elimination reason for

Hughes' termination.  Either she was downsized and subject to recall or Hughes

had performance problems and it failed to follow its own policies again to apprise her of those problems.  DMC, therefore, changed it articulated reason for terminating Hughes.  No longer was Hughes being terminated for job elimination for which it states it has "clearly articulated",[8] but the reason changed to reflect performance problems when challenged by Hughes.  If it doesn't fit, it is discrimination.

A reasonable jury could certainly conclude based on this evidence that the Defendant has fabricated its reasons for terminating the Plaintiff thereby creating the causal relationship that its true reason for terminating the Plaintiff was discrimination.

Hughes has shown that DMC's  reasons for her termination are pretextual. The Plaintiff's prima facie case, combined with sufficient evidence to find that DMC's asserted justification is false, inconsistent and contradicted, may permit the trier of fact to ascertain that DMC unlawfully discriminated.  Where the evidence reveals " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action then a reasonable factfinder could find them unworthy of credence.' " *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, (11th Cir. 2005).

---

[8]Defendant's Brief p. 24.

Summary judgment is due to be denied.

## J.    Negligent Hiring, Training, Supervision and Retention

In *Lane v. Central Bank of Alabama, N.A.,* 425 So.2d 1098, 1100

(Ala.1983), (quoting *Thompson v. Havard,* 285 Ala. 718, 723, 235 So.2d 853

(1970), the Alabama Supreme Court first set out the standard for negligent

supervision. This section codifies the employer's duty to investigate the

backgrounds of potential employees before hiring and also the employer's duty to

train and supervise employees, specifically those employees in a managerial

capacity.

In *Big B, Inc. v. Cottingham*, 634 So.2d 999 (Ala. 1993), the defendant was

held liable for negligently supervising its store manager where there was sufficient

evidence from which the jury could find that had the employer sufficiently

investigated the complaints, the manager's attitude towards women and his fitness

for employment would have been more seriously re-evaluated and he would not

have been allowed to remain where he could mistreat female customers or

employees.  Once the company has reason to suspect an employee's unfitness, it is

under a duty to thoroughly investigate and take such precautions so that the

conduct will not occur again.  *Id.*

Dunn  admits as the Director of Human Resources that she failed to carry out

63

the employment policies and procedures of DMC with regards to disciplining and counseling Hughes on her alleged performance problems. Dunn further is charged with implementing these policies and failed. Dunn admits as a human resource director that she has failed to document as she knows she should. Dunn further admitted, "I did not follow the procedure because of the personality conflict." (Dunn depo., p. 139:17-139:19). Dunn likens herself to more like a doctor or lawyer - better at telling people what to do than doing it herself. (Dunn depo., p. 113-140). Dunn is the reporting person that employees report to if they have been subjected to discrimination or harassment and therefore she knew it was illegal to discriminate and retaliate in violation of the law and DMC's policy. (PX 2, Bates Nos. 163, 164). Dunn admitted, however, that after she received Hughes charge of discrimination, she created a special file and placed all of Hughes' future job applications in the same special file and did not forward these to the hiring managers for consideration. By DMC's own policy, if Hughes' position had been eliminated she should have been considered for other employment. "Terminated employees may not be considered for reemployment unless the termination was due to a reduction in force or the abolition of a position. Accrued, unused vacation hours will NOT be paid unless the termination was due to a reduction in force or the abolition of a position." (PX 2, Bates No. 167 (1.10 Resignations and

64

Terminations, ¶ 4)).  Plaintiff was paid for her unused vacation time and two weeks severance.

Within one month of eliminating Hughes' position at the Ariton Clinic, Dunn had hired a new employee at the Clinic who absorbed some of Hughes' duties and when the clinic closed, Dunn reassigned all of the employees of the Ariton Clinic in other positions within DMC.

Defendant has continued to advertise for open positions,  since Hughes' position was eliminated,  but has not recalled Hughes back to work, even though Hughes was told she was eligible for rehire and would be the first person Dunn called when she had an opening.  (Hughes Aff., ¶ 10).

Summary judgment is due to be denied.

## K.    **Intentional Infliction of Emotional Distress**

Plaintiff voluntarily dismisses this claim.

## L.    <u>**Assault and Battery**</u>

Defendant did not address plaintiff's claims of assault and battery other than in a footnote.  (See Def.'s Brief, p. 31, fn 3).  Since defendant has not carried its burden on summary judgment by articulating any reason why summary judgment should be granted, plaintiff has no obligation under FRCP 56 to articulate an argument.  However, if the court interprets that the plaintiff does have an

65

obligation, plaintiff would seek leave of the court to further address her claims of assault and battery.  Summary judgment is due to be denied.

## IV.    <u>CONCLUSION</u>

For all the reasons cited above, Defendant's motion for summary judgment is due to be denied and this matter proceed to a jury.


Respectfully submitted,


/s/ Alicia K. Haynes
Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama   35226
Phone:  (205) 879-0377
Fax:  (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of July, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jennifer L. Howard, Esq.
Albert L. Vreeland, II, Esq.
Lehr Middlebrooks & Vreeland
P.O. Box 11945
Birmingham, Alabama 35202-1945


 s/ Alicia K. Haynes
**OF COUNSEL**