IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBORAH HUGHES,                        )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )     CIVIL ACTION NO. 1:06CV595-SRW
                                       )                  (WO)
DALE COUNTY MEDICAL CENTER,            )
                                       )
          Defendant.                   )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Deborah Hughes is now fifty-one years of age.  She previously worked for

defendant Dale Medical Center as the office manager at its Ariton Clinic. She was diagnosed

with two benign brain tumors in December 2004, and had surgery to remove the tumors in

January 2005.  She took five weeks of leave to have and recuperate from the surgery and, in

April 2005, took an additional week of leave due to panic attacks.  Defendant terminated

plaintiff's employment on April 20, 2005, two days after plaintiff returned from sick leave.

Plaintiff testifies that in the months prior to her discharge, she was subjected to mistreatment

by her supervisor, Dr. John Ennis, and his wife, Pat Ennis.  She further asserts that, although

defendant claims to have terminated her because it eliminated her position when it

outsourced her billing responsibilities to a third party, defendant's Human Resources

Manager, Sheila Dunn, has refused to consider her applications for re-employment in other

available positions.  Plaintiff now brings four counts asserting federal claims against

defendant Dale County Medical Center, contending that defendant violated her rights under

the Family and Medical Leave Act (FMLA), that it discriminated against her in violation of

the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA), and that it retaliated against her for exercising her rights under the ADA, ADEA and FMLA. Plaintiff also asserts four state law claims: intentional infliction of emotional distress; negligent hiring, training, supervision and retention; assault; and battery. This action is presently before the court on the motion for summary judgment filed by defendant. Upon consideration of the motion, the court concludes that it is due to be granted in part and denied in part.

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

2

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## DISCUSSION

### ADEA Termination Claim[1]

The Age Discrimination in Employment Act ("ADEA") makes it "unlawful for an employer to . . . discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Plaintiff claims that defendant discriminated against her by terminating her employment on the basis of her age. The McDonnell Douglas/Burdine framework[2] was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination where, as here, there is no direct evidence of discrimination. See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). This burden-shifting framework applies to claims of discrimination under the ADEA. Cofield v. Goldkist, Inc., 267 F.3d 1264, 1267 n. 6 (11th Cir. 2001); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000).

The plaintiff must first make out a *prima facie* case of discrimination. Burdine, 450 U.S. at 252-53; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir.1998); Combs, 106 F.3d

---

[1] The court rejects defendant's argument that plaintiff's age discrimination claim should be dismissed for failure to satisfy administrative prerequisites. Plaintiff marked the box on the charge form to indicate her contention that the acts about which she complained were based on her age, and the form indicates her date of birth. Although the narrative section of her charge does not include facts which establish her age claim, the charge was sufficient to notify the EEOC that plaintiff claimed age discrimination. See Eastland v. Tennessee Valley Authority, 714 F.2d 1066, 1067 (11th Cir. 1983)("'[T]he allegations in a judicial complaint filed pursuant to Title VII "may encompass any kind of discrimination *like or related* to the allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission."'" )(quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970))(emphasis in Eastland).

[2] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

at 1527-28.   A plaintiff may establish a *prima facie* case of age discrimination by showing that she: "(1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." Chapman, *supra*, 229 F.3d at 1024.   In the context of a reduction in force, a plaintiff may establish a *prima facie* case by producing evidence: (1) that she is within the protected age group; (2) that she was adversely affected; (3) that she was qualified to assume another position at the time of discharge; and (4) from which a factfinder could reasonably conclude that the employer intended to discriminate on the basis of age. Dyer v. Paxson Communications Corp., 2008 WL 596790, ** 1-2 (11th Cir. Mar. 6, 2008)(citing Rowell v. BellSouth Corp, 433 F.3d 794 (11th Cir. 2005)).   To satisfy the fourth element under this iteration of the *prima facie* case, a plaintiff must produce evidence which would permit a factfinder to conclude that the employer "'(1) consciously refused to consider retaining or relocating a plaintiff because of [her] age, or (2) regarded age as a negative factor in such consideration.'" Rowell, 433 F.3d at 798 (citing Williams v. General Motors Corp., 656 F.2d 120 (5th Cir. Unit B Sept. 14, 1981)).

"Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.   If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Id. (quoting Burdine, 450 U.S. at 254); Walker, *supra*.   If the plaintiff establishes a *prima facie* case, the employer has the burden of producing "legitimate, non-discriminatory reasons for

the challenged employment action." <u>Combs</u>, 106 F.3d at 1528 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." <u>Combs</u>, 106 F.3d at 1528 (quoting <u>Burdine</u>, 450 U.S. at 257). If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the *prima facie* case is destroyed. <u>Walker</u>, 158 F.3d at 1184. The plaintiff must then produce evidence "including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." <u>Combs</u>, 106 F.3d at 1528. Defendant challenges the last element of the *prima facie* case under both formulations, arguing that plaintiff cannot demonstrate that she was replaced by a younger individual and cannot produce any evidence that age was a factor in her discharge.

In her deposition, plaintiff testified that no one at Dale Medical Center ever made a comment about her age. (Hughes depo., p. 87). Plaintiff further testified as follows:

Q. Do you believe that you were terminated because of your age?

A. Yes.

Q. What leads you to believe that?

A. Excuse me?

Q. What leads you to believe you were terminated because of your age?

A. Due to my health conditions and my age, I felt like it was fixing to start

6

costing them a lot of costly health problems and making their insurance go up.

Q.  What leads you to believe that?  Or what led you to believe that?

A.  Just health premiums go up when a lot of – you have to use insurance a lot.

Q.  Did anybody at Dale Medical Center say or do anything to cause you to believe that?

A.  No, no.

Q.  That was an assumption on your part?

A.  On my part.

Q.  Okay.  Is there anything else that led you to believe that you were terminated because of your age?

A.  No, sir.

(Hughes depo., pp. 116-17).

　　　　In an affidavit filed in opposition to the motion for summary judgment, plaintiff testifies that Lisa Brooks, a receptionist, was in her late twenties when plaintiff hired her less than a year before plaintiff's termination.  Plaintiff states that she trained Brooks to perform the job.  Plaintiff further testifies that Karen Williams, a medical assistant, was also in her twenties and had been employed less time than Brooks; plaintiff states that she was performing Williams' job prior to Williams' hire, and that she performed Williams' duties when Williams was absent from work.  Plaintiff also states that each of the Dale Medical Center facilities had office managers or office coordinators, that she is familiar with the managers of the other offices, and that it is her "impression and belief" that she is "one of the older office managers and office coordinators of the other five medical facilities."  (Hughes

7

aff., ¶¶ 4-5).  Plaintiff also points to Dunn's testimony that, in February 2007, defendant

hired Angela Stelly – who is younger than forty – as an office coordinator.  Stelly was

employed in the hospital emergency room and was transferred to the office coordinator

position at the Dale Pediatric clinic when it opened in February 2007.  (Dunn depo., pp. 35-

57).

     Plaintiff alleges that she "was terminated and significantly younger individuals were

awarded her position and duties."  (Complaint, ¶ 41).  Defendant argues that no one was

hired to replace plaintiff.  In her responsive brief, plaintiff addresses defendant's argument

only with regard to the reduction-in-force formulation of the *prima facie* case.  (See

Plaintiff's brief, pp. 38-45).  Thus, she apparently does not contend that she can establish that

she was replaced by a younger worker.[3]

     As noted above, to establish the final element of her *prima facie* case under the RIF

formulation, plaintiff must produce evidence which would permit a factfinder to conclude

---

[3] Angela Stelly was hired nearly two years after plaintiff's termination, into a new position
at a clinic other than the one at which the plaintiff worked.  (See Plaintiff's Exhibit 18 (plaintiff
discharged on April 20, 2005 from Ariton Medical Clinic)).  Stelly did not "replace" the plaintiff
or assume plaintiff's duties.  Plaintiff has identified no evidence of record demonstrating that the
particular position she held was filled by a younger worker.  Dunn testified that plaintiff's duties
with regard to patient billing were outsourced to United ProBill, that plaintiff's supervisory duties
were assumed by Dr. Ennis, and that she believed that plaintiff's other duties were divided between
the remaining office employees.  She further testified that Pat Ennis was employed as a clerk from
May until August 2005 (when Dr. Ennis died) on an "as needed" basis to "clean up, help file, do
anything that was not getting done," and that the filing was previously done by plaintiff. (Dunn
depo., pp. 13-14, 21-26, 42, 147-53).  Thus,  there is evidence that plaintiff's duties were divided
between United ProBill, existing employees (two of whom – Brooks and Williams – were younger
than plaintiff) and Pat Ennis.  Even assuming that plaintiff could establish that Pat Ennis "replaced"
her, plaintiff has not directed the court to evidence that Pat Ennis is younger than plaintiff.

that the employer "'(1) consciously refused to consider retaining or relocating a plaintiff because of [her] age, or (2) regarded age as a negative factor in such consideration.'" Rowell, supra, 433 F.3d at 798 (citation omitted). Plaintiff argues that she can establish this element because she has evidence that: (1) Dunn considered no one but plaintiff and did not review the job duties of any employee in deciding to eliminate the position;[4] (2) Dunn was aware that plaintiff was the most senior employee in the office in terms of seniority and in terms of handling "everything" for that office;[5] (3) although plaintiff's job was allegedly eliminated because the job duty of coding and billing was being outsourced, plaintiff had maintained her position in previous years when defendant had used a different third-party billing service;[6] (4) that even though billing is outsourced at all of defendant's clinics, the other offices still have office managers or office coordinators;[7] (5) Dunn admitted that, if plaintiff had remained employed, plaintiff "would have been the one entering the patient demographics

---

[4] The evidence cited by plaintiff is Dunn's testimony that it was, at one time, plaintiff's responsibility to make the bank deposits for the Ariton clinic and that Dunn did not know whether plaintiff or someone else had the responsibility after the billing was outsourced. (Dunn depo., p. 115, l. 12-22).

[5] For this proposition, plaintiff cites Johnson's (not Dunn's) testimony that Johnson's understanding was that plaintiff, at the time of her termination, was "working in the back and supposedly the front" and was "basically all over the office," "doing everything." (Johnson depo., p. 115).

[6] Dunn testified that the Ariton clinic used MedNet, an outside billing service, prior to September 2001. She further testified that she did not believe that MedNet was entering any of the data into the computer system, such as patient demographics and patient charges and, also, that plaintiff "probably coded some too." (See Dunn depo., pp. 54-55).

[7] Dunn testified that one clinic, because of its size, has an office manager, and that the others all have office "coordinators," who are responsible for assisting the physician with coding, inputting data into the computer systems, and maintaining files. (Dunn depo., pp. 31-34).

and putting in patient charges – duties given to Lisa Brooks, the young receptionist who had previously been disciplined";[8] (6) Dunn hired a new office coordinator who was under the age of forty in February 2007;[9] (7) Dunn had a coordinator position available at the time of her deposition in May 2007;[10] (8) in October 2006 (sixteen months after plaintiff's termination), she applied for and did not receive a position in the business office as an emergency room admit representative;[11] (9) Dunn told plaintiff at the time of her termination that if there were an open position, plaintiff would be the first one she would call;[12] (10) that Dunn had three applications from plaintiff for open positions and never considered her for employment;[13] and (11) Dunn hired Pat Ennis within one month of plaintiff's termination, and Ennis was assigned responsibility for the indigent program, one of plaintiff's previous responsibilities.  (Plaintiff's brief, pp. 40-44).

In an ADEA case, the plaintiff bears the burden of introducing "evidence that supports

---

[8]  See Plaintiff's brief at p. 41.  Plaintiff cites her own affidavit testimony that Brooks was younger than plaintiff, and that plaintiff had once given Brooks a written discipline for giving out confidential patient information.  (Hughes aff., ¶ 3).  She further cites Dunn's deposition at p. 148, l. 11-21.  Contrary to plaintiff's argument, Dunn does not state that Brooks was given the duties of entering patient demographics and putting in patient charges.  (Dunn depo., pp. 147-150).

[9]  As noted above, Dunn testified that Angela Stelly was under the age of forty and was hired as the office coordinator at a newly opened office, Dale Pediatric, in February 2007.  (Dunn depo., pp. 36-37).

[10]  Dunn testified that she did not yet have an office coordinator for Dr. Crawford's office, which "will be a new practice."  (Dunn depo., pp. 35, 38-39).

[11]  See Plaintiff's Exhibit 20 to Dunn depo.

[12]  Plaintiff's aff., ¶ 10.  Dunn also testified that she "did not have anything right then[.]" Id.

[13]  See Dunn depo., p. 134, 222.

a reasonable inference of intentional age discrimination." Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 609-10 (11th Cir. 1987). The evidence cited by plaintiff would not permit a reasonable inference that defendant either consciously refused to consider retaining or relocating plaintiff because of her age, or that the defendant regarded plaintiff's age as a negative factor in deciding whether to retain her or assign her to a different position. Plaintiff admitted in her deposition that no one at Dale Medical Center did or said anything to cause her to believe that she was terminated because of her age. Even assuming that the evidence cited by plaintiff would permit an inference that she was terminated for some reason other than a business decision to eliminate her position, she has pointed to no evidence that would permit an inference that plaintiff's position was eliminated or that plaintiff was terminated because of her age.

As noted above, plaintiff cites evidence that some – but not all – of her duties were assumed by younger existing employees. She also argues that she was qualified to perform the duties of these younger employees. Her apparent contention is that, if Dale Medical Center had to eliminate a position, it should have kept plaintiff and terminated one of the younger, newer employees. The ADEA does not require, however, that younger employees be terminated in favor of older employees. See Barnes, *supra*, 814 F.2d at 610 ("Plaintiffs also argue that the new employees [most of whom were less than 40 years old] were on probationary status and that Southwest therefore should have replaced them with the plaintiffs once the plaintiffs were terminated. Although such an action was certainly within Southwest's power, nothing in the ADEA requires that younger employees be fired so that

11

employees in the protected age group can be hired."); <u>Stubblefield v. Trinity Industries, Inc.</u>, 961 F. Supp. 1553 (M.D. Ala. 1997)("The ADEA imposes no requirement on an employer to take a younger, less experienced employee out of a job in order to make room for an older employee who is being subject to layoff.").

Plaintiff also apparently asserts that she should have been retained because defendant hired Pat Ennis a month after plaintiff's termination. However, as noted above, plaintiff has directed the court to no evidence that Pat Ennis is younger than the plaintiff, and plaintiff has not controverted defendant's evidence that it hired Ennis on an "as needed" basis and that she worked very few hours. Accordingly, the evidence of Pat Ennis' hire does not support plaintiff's contention that she was terminated because of her age. Additionally, evidence that defendant hired a younger person, Stelly, as an office coordinator in February 2007 does not permit an inference of age discrimination in plaintiff's termination. See <u>Earley v. Champion International Corp.</u>, 907 F.2d 1077, 1083 (11th Cir. 1990)(in a RIF context, a plaintiff cannot establish *prima facie* case of age discrimination by pointing to job openings at an earlier or later time than plaintiff's termination; subsequent job openings should not "be considered as satisfactory proof of an open position at time of termination").

Plaintiff has produced no evidence that she was replaced by a younger worker and no other evidence which would permit a reasonable inference that her position was eliminated or that she was terminated because of her age. Accordingly, plaintiff has not established a *prima facie* case of age discrimination with regard to her termination, and defendant is entitled to summary judgment on this claim.

**ADA Termination Claim**

The Americans with Disabilities Act ("ADA") provides that an employer may not discriminate against an individual with a disability because of that disability with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "'[T]he burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims. . . . To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) [she] is disabled; (2) [she] is a qualified individual; and (3) [she] was subjected to unlawful discrimination because of her disability.'" Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1255-56 (11th Cir. 2007)(quoting Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000)).

Defendant argues that plaintiff cannot establish a prima facie case of termination in violation of the ADA because: (1) she cannot establish that she is disabled; and (2) she cannot establish that she was terminated because of a disability. A plaintiff is "disabled" under the ADA if she has "(A) a physical or mental impairment that substantially limits one or more of the major life activities . . .; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(2). Defendant argues that plaintiff's brain tumor was not substantially limiting because the impairment was neither permanent nor long-term.

Plaintiff testified that she "became sick" in November 2004 and that she then "stepped down as office manager" because something was wrong with her and she could not take the

13

pressure.  (Hughes depo., pp. 24-25).  Plaintiff began to have memory problems in about June 2004 and had to start looking up codes she had used for twenty years.  Additionally, in August 2004, plaintiff ordered 300 vials of flu vaccine rather than thirty vials (300 doses), because when her supervisor told her to "order three hundred," she could not comprehend what he meant.  Plaintiff's memory problems did not affect her job in any other way and, although she had suffered problems with coordination and falling for about two years, these problems did not affect her job or prevent her from doing any of her daily activities. Plaintiff was diagnosed with two benign brain tumors in December 2004, and surgery to remove the tumors was scheduled for January 3, 2005.  Plaintiff told Dr. Ennis and Pat Ennis about her diagnosis and indicated that she was going to have to be out of work for surgery. Dr. Ennis asked plaintiff if she could delay her surgery until his trip to Mexico, when two other employees were having surgery (an elective hysterectomy and a gastric bypass). Plaintiff responded that she could not wait.  Plaintiff was out of work for five weeks because of the surgery.  She returned to work, working half days, on February 7, 2005 and returned to work on a full-time basis on February 21, 2005.  She was able to perform her job when she returned.  In April 2005, plaintiff took an additional week of leave because she "started having panic attacks."  She had not previously had any such attacks.  Her doctor adjusted her prescription of Lexapro, and the doctor's office faxed an excuse to Dr. Ennis and to Sheila Dunn.  Plaintiff spoke with Lisa Brooks about the attacks; she told Brooks that Dr. Sy had given her a shot and told her to go home and asked that Dr. Ennis call her.  He did not call her, and plaintiff did not speak to Dr. Ennis or Dunn about her leave.  Two days after her

return from leave, plaintiff's employment was terminated.  (Hughes depo., pp. 26-29, 40-44, 49-55, 74-80, 108-111 and Defendant's Exhibits 6, 7, 8, and 9 to Hughes depo.; Hughes aff., ¶¶ 6, 8).

As noted above, plaintiff testified that her brain tumors began to affect her memory in June 2004, causing her to forget codes she had used for twenty years, possibly causing her to place the incorrect vaccine order in August 2004, and causing her to step down as office manager in November 2004.  She had surgery to remove the tumors on January 3, 2005 and returned to work full-time on February 21, 2005, then took an additional week of leave for panic attacks in April 2005.  Plaintiff's evidence falls far short of demonstrating the existence of a genuine issue of material fact regarding whether she was actually substantially limited in a major life activity so as to establish disability under the first prong of the ADA definition.  Plaintiff produced evidence of substantial limitations for – at most – the three-month period between November 2004, when she stepped down from her office manager position;  February 21, 2005, when she returned to full-time work after her surgery; and the one-week period between April 11 and 18, 2005.  This limitation is of insufficient duration to demonstrate disability.  See Garrett v. University of Alabama at Birmingham, 507 F.3d 1306, 1312-15 (11th Cir. 2007)(finding no disability as to plaintiff who was absent from work after diagnosis of breast cancer for two surgeries, a course of radiation therapy, a course of chemotherapy, and a hospital admission for leukopenia, and who suffered multiple side effects; stating, "Most notably, the most severe periods of limitation that Garrett suffered during her cancer treatment were short-term, temporary, and contemporaneous with her

treatment.  A severe limitation that is short term and temporary is not evidence of a disability.")(citation omitted).  To the extent that plaintiff claims her panic attacks as her disability, the plaintiff has not pointed to evidence of record demonstrating that her panic attacks caused limitations which substantially limited a major life activity.  "[T]he ADA requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681, 691-92, 151 L.Ed.2d 615 (2002) (quotations omitted).[14]  Thus, the evidence does not establish that plaintiff is disabled by reason of any impairment which substantially limits a major life activity.

In her responsive brief, plaintiff does not contend that she is disabled as defined under the first prong of the ADA's definition.  Instead, she argues only that defendant perceived her as being substantially limited in the major life activity of working.  (See Plaintiff's brief, pp. 49-53).[15]  An individual is "regarded as" disabled if he "(1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability recognized by the ADA." Hoard v. CHU2A, Inc., 228 Fed.Appx. 955,

_____

[14]  Additionally, plaintiff testified unequivocally in her deposition that she had no disability other than her brain tumor.   (Hughes depo., p. 85).

[15]  Plaintiff argues, incorrectly, that whether she meets this prong of the definition of disability under the Act is the "sole issue raised by defendant's motion."  (Plaintiff's brief, p. 49).

959, 2007 WL 1828269, 2 (11th Cir. Jun. 27, 2007)(citing 29 C.F.R. § 1630.2(*l*)). To meet the "regarded as" definition of disabled, plaintiff must prove that defendant considered her to be "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.'" Id. (quoting 29 C.F.R. § 1630.2(j)(3)(i)). "'The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. Thus, an impairment must . . . be perceived to preclude [] an individual from more than one type of job, even if the job foreclosed in the individual's job of choice.'" Collado v. United Parcel Service Co., 419 F.3d 1143, 1157 (11th Cir.2005)(quoting Rossbach v. City of Miami, 371 F.3d 1354, 1359 (11th Cir. 2004)).

Defendant points to evidence that Dunn, who made the termination decision, and Vernon Johnson, who upheld it on appeal, understood that plaintiff had made a full recovery from her brain surgery. (Dunn depo., pp. 141-42; Johnson depo., pp. 146-48). However, plaintiff contends that defendant perceived her as being disabled from the broad class of supervisory jobs because of "panic attacks associated with her brain surgery." (Plaintiff's brief, p. 53). The court has carefully reviewed the evidence cited by plaintiff in support of her contention that defendant regarded her as disabled. (See Plaintiff's brief, pp. 51-52). Plaintiff cites evidence that when she returned from her one-week leave in April, Dr. Ennis would not speak to her and that she was fired two days later. She also argues that Dunn, in her deposition, "did not answer that Hughes could or could not do her job but questioned

whether Hughes could be effective."[16]  Plaintiff further argues that Dunn indicated that

plaintiff was not eligible for rehire because "she lacked the ability to complete assigned

task."  (Plaintiff's brief, p. 52)(citing Plaintiff's Exhibit 18 to Dunn depo.).  In the cited

document, Dunn did, indeed, note that the reason plaintiff was ineligible for rehire was a

"lack of initiative and inability to perform assigned tasks."  (Plaintiff's Exhibit 18 to Dunn

---

[16]  In the cited testimony, Dunn testified as follows:

Q.  But she was an employee with a health problem.  And you knew that.

A.  I did know that.  Yes.  I knew that.

Q.  At the time you terminated her, that was two days after she came back from a leave.

A.  Right.

Q.  Is that correct?

A.  That's correct.

Q.  Is that coincidental?

A.  It is coincidental.  The conversations that I had with Debbie after she came back, she was fully functional.  Everybody that is out – I understand the seriousness of the problem that she had.  But thank goodness it was benign, she had them removed, she was back, she was functional.

Q.  Doing her job?

A.  Doing her job.  Well, two days is probably not a long time to determine whether or not she was going to be effective at that.  But yes.

Q.  Had any issues at work after she had the brain tumors removed? [sic]

A.  No.

(Dunn depo., pp. 141-42).

depo.).  However, in an adjoining block which states, "Give details relating to separation,"
Dunn wrote, "Position eliminated.  Emp stated she no longer wanted to be ofc mgr.  When
asked to work on aging accts and make financial arrangements with pts she stated she could
not do that because these pts were her friends.  Therefore, we brought in contract company
to bill ins. do follow-up and collect aged AR – " Id.  Read in context, Dunn's use of the
phrase "inability to perform assigned tasks" does not reasonably give rise to an inference that
Dunn believed plaintiff to be unable to perform her assigned tasks because of her medical
condition.  Plaintiff further cites evidence that, after her termination, Dunn asked Hughes'
physician what was "really wrong" with plaintiff.  (Hughes depo., pp. 156-57).  Plaintiff
argues, "If the real reason was job elimination, why would Dunn inquire about Hughes'
medical condition other than Hughes was perceived to be disabled by Dunn."  (Plaintiff's
brief, p. 52).[17]  Although plaintiff argues that defendant perceived her as disabled because
of her panic attacks, plaintiff has cited no evidence of record that she ever informed Dr.
Ennis, Dunn or Johnson about the reason for her one-week leave after her first panic attack
in April 2005.  The medical excuse faxed by Dr. Sy's office does not include any information
other than the dates for which plaintiff required medical leave.  Plaintiff testified that she did
not speak with Dr. Ennis on the day on which she had the panic attack in April while she was
on the one-week leave, or after her return, and that she did not have any conversations with

---

[17] The evidence that Dunn asked this question is inadmissible hearsay.  Plaintiff testified that
Dr. Sy told her that Dunn asked Dr. Sy what was wrong with plaintiff.  (See Hughes depo., pp. 156-
57).

Dunn about her one-week leave.   (Hughes depo., pp. 75-79; Hughes aff., ¶ 8).

The court concludes that plaintiff has not demonstrated the existence of a genuine issue of material fact regarding whether defendant "regarded" plaintiff as disabled. Accordingly, defendant is entitled to summary judgment on plaintiff's ADA termination claim.

### ADA and ADEA Terms and Conditions Claims

In her complaint, plaintiff makes several factual allegations regarding harassment. (Complaint, ¶¶ 20-24, 27).  In Count One, plaintiff's ADEA claim, she alleges that "[a]s a proximate result of Defendant's unlawful intentional discrimination, Plaintiff suffered different terms and conditions of employment than younger workers." (Id.., ¶ 42).  In Count Two, plaintiff's ADA claim, she likewise alleges that she suffered "different terms and conditions of employment" as a result of the defendant's unlawful conduct.  (Id., ¶ 47).  In the portion of its brief setting forth its statement of facts, defendant includes a section styled "Plaintiff's claims of harassment."  (Defendant's brief, pp. 10-12).  However, other than its argument that plaintiff failed to exhaust her age claim – which the court has rejected – defendant made no argument in its initial brief on summary judgment demonstrating why it is entitled to summary judgment on the age-based "terms and conditions" claim.  Instead, defendant's argument on plaintiff's ADEA claim was directed solely to plaintiff's allegation that she was terminated because of her age.  (See Defendant's brief, pp. 15-18).  In her responsive brief, plaintiff refers to her "hostile environment claim." (Plaintiff's brief, pp. 58-60).  In its reply brief, defendant characterizes this as a "Newly Added Harassment Claim,"

argues that plaintiff's age claim "focuses exclusively on her termination," and argues that plaintiff's allegations do not "have anything to do with her age" and "are not sufficiently severe or pervasive to rise to the level of a hostile environment." (Defendant's reply brief, p. 8).

As noted above, plaintiff alleged in Count One that defendant discriminated against her on the basis of her age and that she "suffered different terms and conditions of employment than younger workers." (Complaint, ¶ 42). Although defendant recognized that plaintiff had "harassment claims" (defendant's brief, pp. 10-12), defendant ignored the "terms and conditions" allegation in its initial brief in support of its motion for summary judgment. The court declines to consider the arguments it raises belatedly in its reply brief, as plaintiff has had no opportunity to respond to those arguments. Thus, defendant is not entitled to summary judgment on plaintiff's age-based "terms and conditions" claim.[18]

With regard to plaintiff's ADA claim, however, defendant argued that plaintiff could not establish a *prima facie* case of disability discrimination because she could not establish that she had an actual disability within the meaning of the ADA, or that defendant perceived her as having such a disability. As discussed above, plaintiff failed to produce evidence demonstrating the existence of a genuine issue of material fact regarding whether she was "disabled" within the meaning of the ADA. Defendant is, accordingly, entitled to summary

---

[18] Plaintiff could have made this claim more prominent by labeling it as a "hostile environment" claim. However, the court concludes that plaintiff's "terms and conditions" allegation, in view of her factual allegations of harassment, is sufficient to put defendant on notice of her claim.

judgment on the "terms and conditions" claim included in Count Two.

## Denial of FMLA Leave Claim

Plaintiff alleges that defendant "violated Plaintiff's rights by . . . not allowing her use of her 12 weeks of unpaid leave pursuant to the Family and Medical Leave Act." (Complaint, ¶ 59). Defendant argues that it is entitled to summary judgment on this claim because plaintiff "admittedly received all the leave which she requested and was on leave for less than 12 weeks." (Defendant's brief, p. 23; <u>see</u> Dunn depo., p. 90 (plaintiff was out less than twelve weeks); Hughes depo., p. 74 (plaintiff did not tell anybody that she wanted to take more time off than she actually took)).

In her responsive brief, plaintiff does not make any contention that defendant denied her leave; she argues, instead, that defendant retaliated against her for taking leave by terminating her and not re-hiring her. (<u>See</u> Plaintiff's brief, pp. 45-49)(argument under heading, "Plaintiff Can Prove She was Terminated and Not Rehired Because she Took an FMLA-covered Leave of Absence"). Plaintiff does not direct the court to any evidence of record that she requested and was denied FMLA leave. Accordingly, defendant is entitled to summary judgment on plaintiff's claim that defendant violated her rights by not allowing her use of her FMLA leave.

## Retaliation Claims

### ADEA and ADA Retaliation Claims

To establish a *prima facie* case of discrimination under the ADEA, plaintiff must show that: "(1) [she] engaged in statutorily protected activity; (2) [she] suffered an action

from [her] employer that a reasonable employee would have found to be materially adverse; and (3) there was some causal relationship between the two events." <u>Vennett v. General Electric Company</u>, 2008 WL 834456, (11th Cir. Mar. 31, 2008)(unpublished opinion)(citation omitted). The same elements are required to establish a retaliation claim under the ADA. <u>See</u> <u>Satchel v. School Board of Hillsborough County</u>, 251 Fed. Appx. 626, 629, 2007 WL 3023948, * 2 (11th Cir. Oct. 16, 2007)(unpublished opinion)(citation omitted).

With regard to plaintiff's claim that defendant retaliated against her for asserting her rights under the ADA and ADEA, defendant argues that plaintiff cannot establish a *prima facie* case of retaliation because she never made any complaint of discrimination prior to her termination. Defendant cites plaintiff's testimony that she never complained to anyone at Dale Medical Center that she believed that she was being discriminated against either because of her brain tumor or because of her age. (Hughes depo., pp. 85-87).

In her response in opposition to the motion for summary judgment, plaintiff identifies only two complaints of discrimination. (<u>See</u> Plaintiff's brief, pp. 53-58). She identifies her EEOC charge as protected activity, but acknowledges that this charge was not filed with the EEOC until after her termination. (Plaintiff's brief, p. 57; <u>see also</u> Hughes depo., p. 120 and Defendant's Exhibit 10 to Hughes depo. (EEOC charge filed on October 17, 2005 alleging termination on April 20, 2005)). While the EEOC charge clearly constitutes protected activity, it was filed nearly six months after plaintiff's termination and, therefore, cannot have caused the termination. It also cannot have caused material alterations in plaintiff's

23

work environment or conditions of employment as alleged by the plaintiff.

The only other complaint of discrimination identified in plaintiff's brief is a complaint she made to Vernon Johnson when she appealed her termination. Plaintiff argues that "internal complaints of sexual harassment" can establish a retaliation claim. (Plaintiff's brief, p. 53). She further argues that after "Dunn downsized Hughes," plaintiff "thereafter appealed her termination to Vernon Johnson, the CEO of DMC. Plaintiff complained in this meeting that she had been treated adversely and discriminated against. Johnson even remarked and questioned if Hughes was going to bring a harassment suit against him." (Plaintiff's brief, p. 56). In support of this argument, plaintiff cites her EEOC charge and Johnson's deposition testimony at page 101. It is apparent that plaintiff's counsel intended to cite plaintiff's deposition testimony instead of Johnson's.[19] Plaintiff testified as follows:

Q. What happened when you met with Mr. Johnson?

A. He just complained about the flu shots, writing off of accounts. He told me that I could have hurt the hospital very bad with that flu shot invoice, the amount. And I told him, I said: Well, by the grace of God, it really went very well for you, didn't it? And he said: Well, you're just picking at straws. And he asked me, he said: If I gave you your job back today, would you take it? And I said: No. Not unless you could change things with Sheila – excuse me, with Pat and Dr. Ennis.

Q. Was Sheila in that?

A. No, I didn't mean to say her name, I'm sorry.

---

[19] At the cited page in his deposition, Johnson testifies that there is a written appeal process, that he believes it is in the employee handbook, that he did not see it in the handbook marked as Plaintiff's Exhibit 2 to his deposition, and that he did not know whether it was included in any previous version of the handbook. (Johnson depo., p. 101).

Q.  So, you said you'd take it back if he could change things?

A.  Change things with Dr. Ennis and Pat.  With her saying the F word all the time, and having to walk on egg shells around him.

Q.  What else was said in this meeting with Vernon Johnson?

A.  I asked why couldn't he have given me another job in the office.  He said I wasn't qualified for any other job in the office.  I told him I was.  I could – Lisa's job.  And he said: I'm not going to fire somebody, one person, to give you another job just because of seniority.  I don't do things like that.  That's all that was said.

Q.  You told Vernon Johnson that Pat Ennis was using the F word in the office?

A.  Yes, I did.

Q.  All right.  Did you tell him anything else she was doing in the office?

A.  No, sir.

Q.  Did you explain to him what you meant about having to walk on egg shells around Dr. Ennis?

A.  No, sir.

Q.  What did you mean by that, that you had to walk on egg shells around Dr. Ennis?

A.  His moods.  There was one other thing said.  He asked me, he said: What do you want to do, get a harassment case against me?  I replied nothing.

Q.  You didn't reply at all?

A.  No, sir.

*  *  *  *  *

Q.  After your meeting, appeal's meeting with Vernon Johnson, did you speak with him again?

A. No, sir.

Q. How did that meeting end?

A. I just said it was going nowhere, and I told him good-bye.

(Hughes depo., pp. 99-101).  In an affidavit attached to her EEOC charge, plaintiff states, "I appealed my termination to Vernon Johnson, hospital administrator.  He said he would not move me into another job, and made a snide remark about me suing him because of the harassment of a non-employee at the practice."  (Plaintiff's affidavit attached to EEOC charge, Exhibit 10 to Hughes depo., at ¶ 16).

Plaintiff's evidence regarding her conversation with Johnson cannot form the basis for her retaliatory termination claim or her retaliatory work environment claim for several reasons.  First, plaintiff made no statement to Johnson which even remotely suggests that she believed that she was being discriminated against or harassed on the basis of her age, disability, sick leave, or sex.[20]

> It is well-established that an employee's express complaints to supervisors about perceived discriminatory practices constitutes protected activity. . . . At the other end of the spectrum, however, the "wide range" of protected activity clearly does not include those situations where the opposition relates not to unlawful employment practices but to a personal grievance. . . . Employees often do not speak with the clarity or precision of lawyers. At the same time, however, employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination.  But the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and the Court discerns no

---

[20]  Although plaintiff argues that her retaliation claim can be supported by an internal complaint of sexual harassment, the court does not read her complaint to allege a Title VII retaliation claim.  See Complaint, Count Four (alleging retaliation under the ADEA, ADA and FMLA).

26

> evidence that Congress intended to protect only the impudent or articulate. The relevant question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.

Garcia-Paz v. Swift Textiles, Inc., 873 F. Supp. 547, 559-60 (D. Kan. 1995)(citations and parentheticals omitted).  The court concludes that plaintiff's complaint to Johnson was not a statutorily protected expression sufficient to support her retaliation claim.  See Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989)(employee's allegation in letter that charges against him were a result of "ethnocism" and that supervisor may be a racist is a "vague charge of discrimination" insufficient to constitute "opposition" under state statute patterned after Title VII);   Aldridge v. Tougaloo College, 847 F. Supp. 480, 484-85 (S.D. Miss. 1994)("Nowhere in the above grievance does plaintiff protest any form of sex discrimination.  Her grievance does not even mention that a male was hired for this position.  Instead, her grievance complains that the job vacancy was not properly noticed and that Mrs. Lee had treated her unfairly in certain respects.  Plaintiff, then, has not met the first element – statutorily protected expression – of her prima facie case.  Her grievance had nothing to do with alleged sex discrimination by Tougaloo College."); see also Primes v. Reno, 999 F. Supp. 1007, 1016 (N.D. Ohio 1998), affirmed, 190 F.3d 765 (6th Cir. 1999)("[P]laintiff here offered vague suggestions of racism as one possible explanation of what he perceived as a poor evaluation, but this is not sufficient to constitute 'opposition' under Title VII and cannot form the basis for a retaliation claim.").

Additionally – even if the complaint to Johnson constituted protected activity – the

27

decision to terminate plaintiff occurred before plaintiff met with Johnson and, therefore, plaintiff cannot establish the requisite causal connection between the complaint and her termination. See Vinnett, *supra*, 2008 WL 834456 at *5 ("There is also a lack of a causal connection when an employer makes a decision before the protected activity occurs and then proceeds with that decision.")(citing Clark County School District v. Breeden, 532 U.S. 268, 272 (2001)). Likewise, plaintiff's complaint to Johnson occurred after her termination and cannot, therefore, have caused material alterations in her work environment or conditions of employment.

Accordingly, defendant is entitled to summary judgment on plaintiff's ADA and ADEA claims of retaliatory termination and of retaliatory material alterations in her work environment and terms and conditions of employment.

FMLA Retaliatory Termination Claim

The elements of the *prima facie* case for plaintiff's FMLA retaliation claim are the same as for her ADA and ADEA claims. Smith v. BellSouth Telecommunications, Inc., 273 F.3d 1303, 1314 (11th Cir. 2001). Defendant argues that plaintiff cannot establish the element of causation and, further, that plaintiff cannot demonstrate that its articulated reason for her termination – *i.e.*, that it terminated her because her position was eliminated – is pretextual.

Plaintiff testified by affidavit that, when she returned from her week of sick leave in April 2005, her supervisor, Dr. Ennis, would not speak with her. (Plaintiff's affidavit, ¶ 8). In her deposition, plaintiff testified that, after she returned from the five weeks of sick leave

she took for her brain surgery, Dr. Ennis told her that the five weeks she was on leave were

"the worst five weeks of [his] life."  When plaintiff responded that she tried to get well as

quickly as she could, Dr. Ennis stated, "Well, you didn't do it fast enough."  (Hughes depo.,

pp. 65-66).  Plaintiff also cites evidence that she was terminated only two days after she

returned from her sick leave.  (Plaintiff's affidavit, ¶ 8; see also Hughes depo., pp. 92-93).

Plaintiff further testified that, when she questioned Dunn during the termination meeting

regarding how her job could have been "downsized," Dunn responded that plaintiff had not

called in an absence.  When plaintiff told Dunn that she had used the proper procedure by

calling in and having her doctor fax an excuse, Dunn told plaintiff that she did receive the

excuse from the doctor but that she did not like it, that plaintiff "was still going to be

downsized" and that "it was [Dunn's] word against [plaintiff's]."  (Hughes aff., ¶ 9; see also

Hughes affidavit attached to EEOC charge, ¶ 13 ("I was called to Dale Medical Center on

April 20 by Sheila Dunn and told I was no longer needed.  She initially accused me of not

calling in an absence, but I had notified the office, which is what the handbook requires.  She

admitted she had received my doctor's excuse, but said, 'I just don't agree with it.  *For that*

*reason* I'm just going to have to let you go.  You've been down-sized – It's your word

against mine.'")(emphasis added)).

        If this evidence does not constitute direct evidence of intent to discriminate on the

basis of plaintiff's exercise of her right to FMLA leave, it comes very close.  Even if this is

not direct evidence, it is sufficient to establish the existence of a genuine issue of material

fact regarding both causation and pretext.  See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th

Cir. 2004)("A 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. We have held that a period as much as one month between the protected expression and the adverse action is not too protracted.")(citations omitted); Smith, *supra*, 273 F.3d at 1314 (defendant argued that plaintiff had not produced evidence that its articulated reason for not rehiring him – "poor attendance unrelated to FMLA leave" – was pretextual; court stated, "In her notes on her conversation with Smith's supervisor about why Smith's file was marked 'Not eligible for rehire,' Knockett included 'took a lot of FMLA leave' along with other reasons. A reasonable jury could conclude that BellSouth impermissibly counted Smith's past use of FMLA against him in its decision not to rehire him. A genuine issue of material fact remains: whether BellSouth refused to rehire Smith based on his past use of FMLA leave, or whether it based its decision on non-FMLA attendance problems and other factors. Hence, summary judgment is inappropriate."). Accordingly, defendant's motion for summary judgment is due to be denied as to plaintiff's FMLA retaliatory termination claim.

FMLA Retaliation by Material Alterations in Work Environment and Conditions and ADA, ADEA and FMLA Retaliation by Failure to Consider Plaintiff for Re-employment

In Count Four of the Complaint, plaintiff alleges that defendant retaliated against her in violation of the ADEA, ADA and FMLA by terminating her employment, by materially altering her work environment and conditions, and by refusing to consider her applications for re-employment. (Complaint, ¶¶ 64-65). In its initial brief in support of its motion for

30

summary judgment, defendant advances no argument regarding plaintiff's allegations in her retaliation claim that she applied and was qualified for several job openings after her termination, but that she was denied an interview for the positions. Additionally, with regard to plaintiff's FMLA retaliation claim, defendant's argument cannot be construed to reach plaintiff's allegation that her "work environment and conditions were materially altered and changed" for pursuing her rights under the FMLA, to the extent that plaintiff pursued her rights by taking FMLA leave. Instead, defendant's argument as to the FMLA retaliation claim addresses only plaintiff's allegation that her termination was retaliatory. (See Defendant's brief, pp. 23-28).

Thus, defendant is not entitled to summary judgment on the ADEA, ADA and FMLA retaliation claim, to the extent plaintiff alleges that defendant retaliated against her by denying her interviews for available positions after her termination, or on plaintiff's FMLA claim that defendant retaliated against her by materially altering her work environment and conditions.[21]

### Intentional Infliction of Emotional Distress

Defendant argues that it is entitled to summary judgment on plaintiff's state law claim of intentional infliction of emotional distress because plaintiff has not alleged outrageous

---

[21] The court acknowledges that plaintiff, when questioned in her deposition about the manner in which defendant had retaliated against her, did not mention its failure to consider her for re-employment or material changes in her work environment or conditions of employment. (Plaintiff's depo., p. 118). However, defendant did not argue in the present motion that plaintiff had abandoned these allegations, or that it was entitled to summary judgment on these portions of the retaliation claim because of plaintiff's testimony.

conduct, but only "plain vanilla claims of employment discrimination and retaliation," and because plaintiff cannot demonstrate that defendant was aware of the allegedly tortious conduct by Dr. Ennis and Pat Ennis. (Defendant's brief, pp. 28-31). Plaintiff responds, "Plaintiff voluntarily dismisses this claim." (Plaintiff's brief, p. 65). The time has passed for unilateral voluntary dismissal pursuant to Fed. R. Civ. P. 41, and plaintiff has not produced evidence sufficient to support her intentional infliction of emotional distress claim. Accordingly, defendant is entitled to summary judgment on this claim.

### Negligent Hiring, Training, Supervision and Retention

In Count Six, plaintiff asserts that defendant is liable for its negligent hiring, training, supervision and retention of Dr. John Ennis, Pat Ennis, Sheila Dunn and Vernon Johnson. She alleges that defendant negligently failed to discipline or terminate these employees, who actively harassed and conspired against the plaintiff, and that defendant failed to protect her from further harassment. She further contends that defendant failed to administer its own policies against harassment and discrimination and failed to communicate these policies to its agents and employees regularly and clearly. (Complaint, ¶¶ 74-78).

Defendant argues that plaintiff cannot maintain this claim because she cannot establish "that the allegedly incompetent employee committed a common-law, Alabama tort" as distinguished from duties imposed only by federal anti-discrimination laws. (Defendant's brief, p. 32). Defendant further argues that, even if plaintiff can establish a duty, she cannot establish a breach of that duty, as Dale Medical Center had no prior notice of any harassing conduct, and plaintiff never complained of any alleged harassment. (Id., p. 33). Defendant

concludes that it is entitled to summary judgment because plaintiff cannot establish the

existence of a duty owed to her under Alabama law, nor can she establish breach of any such

duty.  The court does not address defendant's argument regarding the nature of the alleged

underlying misconduct because it is apparent that defendant is entitled to prevail on its

argument that plaintiff has not established a breach of duty on the part of defendant Dale

Medical Center.

> The Supreme Court of Alabama has stated, in the context of a claim for
> negligent supervision, training and retention, that
>
>> [i]n the master and servant relationship, the master is held
>> responsible for his servant's incompetency when notice or
>> knowledge, either actual or presumed, of such unfitness has
>> been brought to him. Liability depends upon its being
>> established by affirmative proof that such incompetency was
>> actually known by the master or that, had he exercised due and
>> proper diligence, he would have learned that which would
>> charge him in the law with such knowledge.
>
> Armstrong Bus. Servs. v. AmSouth Bank, 817 So.2d 665, 667 & 682
> (Ala.2001) (citations and internal quotation marks omitted); see also Zielke v.
> AmSouth Bank, N.A., 703 So.2d 354, 358 n. 1 (Ala.Civ.App.1996) (noting
> that there is no discernible distinction between claims of negligent training and
> claims of negligent supervision).

Jackson v. Cintas Corp., 391 F.Supp.2d 1075, 1100 (M.D.Ala. 2005).

Defendant cites plaintiff's deposition testimony that plaintiff did not report to anyone

at Dale Medical Center that Dr. Ennis told plaintiff she was incompetent, worthless and

stupid, that he instructed her to put money data into the computer as fast as she could, or that

he asked her when her hair was going to grow back and remarked that it was "just sticking

up there."  Defendant further cites plaintiff's deposition testimony that she never reported to

anyone at Dale Medical Center that Pat Ennis stood in her office and told her what to do, talked about "stupid things," told sexual jokes, asked plaintiff about her sex life, referred to plaintiff as a "fucking moron," told plaintiff that she and Dunn did not like plaintiff because of her hair and baggy pants, or struck plaintiff in the head.  Defendant also points to plaintiff's testimony that she does not know whether any other clinic employees ever complained to Dale Medical Center about Dr. Ennis or Pat Ennis.  (Defendant's brief, pp. 10-12; see also Hughes depo., pp. 30, 35, 49-52, 62-64, 67, 70-71).  Plaintiff does not respond directly to defendant's argument that Dale Medical Center had no prior notice of any harassing conduct, and that plaintiff never complained of any alleged harassment.   Thus, plaintiff has not met her burden on summary judgment of producing evidence that Dale Medical Center had or should have had notice of the allegedly harassing conduct of Dr. Ennis or Pat Ennis.[22]

In opposing defendant's motion for summary judgment on this claim, plaintiff instead relies on evidence that Dunn, as the Director of Human Resources, "failed to carry out the employment policies and procedures of DMC with regards to disciplining and counseling Hughes on her alleged performance problems.[23]   She further cites evidence that Dunn violated Dale Medical Center's policy that employees terminated because of elimination of

---

[22]  Plaintiff's complaint to Vernon Johnson that Pat Ennis was "saying the F-word all the time" and that she had to "walk on eggshells" around Dr. Ennis because of his moods did not occur until after plaintiff's termination.  (Hughes depo., pp. 98-101).

[23]  Plaintiff misquotes Dunn's testimony regarding a personality conflict and takes it out of context, eliminating the double negative in Dunn's response, and omitting Dunn's statement that she "didn't have a personality conflict."  (See Plaintiff's brief, at p. 64; Dunn depo. at p. 139).

a position could be considered for other employment, that she has refused to re-hire the plaintiff and has placed plaintiff's applications in a "special file" with her discrimination charge, and that she hired Pat Ennis at the clinic within one month of plaintiff's termination. Plaintiff argues that "Dunn is the reporting person that employees report to if they have been subjected to discrimination or harassment and therefore she knew it was illegal to discriminate and retaliate in violation of the law and DMC's policy." (Plaintiff's brief, pp. 63-65). Notably absent from plaintiff's response is any suggestion that anyone above Dunn in Dale Medical Center's hierarchy had any actual or constructive notice of the alleged incompetency on Dunn's part. Thus, plaintiff has not demonstrated the existence of a genuine issue of material fact regarding whether "such incompetency was actually known by the master or that, had [it] exercised due and proper diligence, [it] would have learned that which would charge [it] in the law with such knowledge." Armstrong, *supra*.

Accordingly, defendant is entitled to summary judgment on Count Six.

### Assault and Battery Claims

In Count Seven, plaintiff alleges that "Pat Ennis, as agent of Defendant, did commit assault upon the plaintiff by showing her intent to place harm upon plaintiff by hitting the Plaintiff on her head after brain surgery, harassing the plaintiff and causing the plaintiff to fear Pat Ennis." (Complaint, ¶ 82). In Count Eight, plaintiff alleges that "Pat Ennis did commit battery of the plaintiff by hitting the Plaintiff on her head after brain surgery and further by touching the plaintiff in a rude and hostile manner that was unwelcomed and uninvited by the Plaintiff." (Complaint, ¶ 86). However, plaintiff expressly alleges in Count

Seven that "[t]his is a claim *against Pat Ennis* arising under the laws of the State of Alabama prohibiting assault." (Complaint, ¶ 81)(emphasis added). Likewise, in Count Eight, plaintiff alleges, "[t]his is a claim *against Pat Ennis* arising under the laws of the State of Alabama prohibiting battery." (Complaint, ¶ 85)(emphasis added).

Defendant argues that plaintiff's claims of assault and battery are made solely against Pat Ennis and not against Dale Medical Center. (Defendant's brief, p. 31 n. 3). Plaintiff does not directly respond to defendant's contention that the claims are brought only against Ennis. Instead, she argues:

> Defendant did not address plaintiff's claims of assault and battery other than in a footnote. (See Def.'s Brief, p. 31, fn 3). Since defendant has not carried its burden on summary judgment by articulating any reason why summary judgment should be granted, plaintiff has no obligation under FRCP 56 to articulate an argument. However, if the court interprets that the plaintiff does have an obligation, plaintiff would seek leave of the court to further address her claims of assault and battery. Summary judgment is due to be denied.

(Plaintiff's brief, pp. 65-66).

Despite plaintiff's allegation that Pat Ennis acted as an agent of the defendant, defendant was entitled to rely on plaintiff's explicit allegations in Counts Seven and Eight that the claims were "against Pat Ennis." Plaintiff is represented by counsel, who presumably understands the import of the allegation that these are "claim[s] against Pat Ennis." Plaintiff could have included or added Pat Ennis as a defendant with regard to these claims, or omitted the allegations limiting the claims to Pat Ennis, or added language expressly including defendant Dale Medical Center, along with Ennis, in Counts Seven and Eight. She did none of these things. Since plaintiff brought the claims only against Pat

Ennis, defendant Dale Medical Center has no obligation to defend against these claims. Additionally, since the time to amend the pleadings to add Ennis as a defendant or to add Dale Medical Center as a defendant as to these claims has passed, the court will dismiss Counts Seven and Eight.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion for summary judgment is DENIED as to: (1) plaintiff's claims pursuant to the ADA and ADEA that defendant retaliated against her by refusing to consider her applications for re-employment; (2) plaintiff's FMLA claim that defendant retaliated against her by materially altering her work environment and conditions, by terminating her employment, and by refusing to consider her applications for re-employment; and (3) plaintiff's ADEA claim that she was subjected to different terms and conditions than younger workers; the motion is GRANTED as to all other claims against the defendant.

It is further ORDERED that Counts Seven and Eight, plaintiff's assault and battery claims against Pat Ennis, are DISMISSED without prejudice.

It is further ORDERED that the parties are DIRECTED to provide to the court, on or before April 23, 2008, a new proposed pretrial order consistent with the court's ruling on the present motion.

DONE, this 16th day of April, 2008.

37

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE